## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**KRISTINA RAPUANO**
c/o DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH  03301

and

**VASSIKI CHAUHAN**
c/o DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH  03301

and

**SASHA BRIETZKE**
c/o DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH  03301

and

**ANNEMARIE BROWN**
c/o DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH  03301

and

**ANDREA COURTNEY**
c/o DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH  03301

and

**MARISSA EVANS**
c/o DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH  03301

and

**JANE DOE**

CASE NO. _____

1

c/o DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH  03301

　　　*Plaintiffs, on behalf of themselves and*
　　　*all others similarly situated,*

v.

**TRUSTEES OF DARTMOUTH COLLEGE**
63 South Main Street, Suite 301
Hanover, NH  03755

　　　*Defendants.*

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

　　　Plaintiffs Kristina Rapuano, Vassiki Chauhan, Sasha Brietzke, Annemarie Brown, Andrea Courtney, Marissa Evans, and Jane Doe,[1] by and through their undersigned counsel, hereby sue Defendant Trustees of Dartmouth College ("Dartmouth" or the "College"), on behalf of themselves and the class defined below, under Title IX[2] and common law claims pursuant to New Hampshire law to remedy the gender discrimination, sexual assaults, and harassment they suffered. These harms directly resulted from Dartmouth's breach of its duty to protect its students from unwanted sexual harassment and sexual assault and to provide an education and/or workplace free from sexual harassment and other forms of gender-based discrimination. Plaintiffs allege upon knowledge concerning her own acts and upon information and belief as to all other matters.

---

[1] Along with this Complaint, Jane Doe has filed a motion to proceed under a pseudonym that sets forth the legal and factual authority for protecting her identity due to the sensitive nature of the acts perpetrated upon her and to mitigate against additional extreme emotional distress that would result in publicly identifying her.

[2] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX").

## I.      **INTRODUCTION**

1.       Dartmouth College has knowingly permitted three of its prominent (and well-funded) professors to turn a human behavior research department into a 21st Century Animal House. For well over a decade, female students in Dartmouth's Department of Psychology and Brain Sciences (the "Department") have been treated as sex objects by tenured professors Todd Heatherton, William Kelley, and Paul Whalen. These professors leered at, groped, sexted, intoxicated, and even raped female students.

2.       These professors ensured the young women in the Department were vulnerable to this sexual harassment by conditioning faculty mentorship and support on students' participation in the alcohol-saturated "party culture" they perpetuated. Among other things, these professors conducted professional lab meetings at bars, invited students to late-night "hot tub parties" in their personal homes, and invited undergraduate students to use real cocaine during classes related to addiction as part of a "demonstration."

3.       Dartmouth has known about bad behavior by these professors for more than sixteen years. Dartmouth's supervisory faculty, administrators, officers, and employees (such agents, unless referred to by name or position, hereinafter referred to as "Dartmouth") have received complaints of pervasive sexual harassment and gender-based discrimination perpetuated by Professors Heatherton, Kelley, and Whalen since at least 2002. But Dartmouth did nothing and ignored these complaints, thereby ratifying the violent and criminal acts of its professors.

4.       In early April 2017, a group of female graduate students, determined to end the intolerable conditions in which they and others were forced to work and study, contacted Dartmouth's Title IX office and detailed instances of sexual assault and sexual harassment by these three professors.

5.    Dartmouth did nothing. As a result, Professor Whalen sexually assaulted Plaintiff Chauhan twenty days later. At Dartmouth's suggestion, Plaintiffs and the other women in the Department continued working with or among the accused professors for nearly four months. The sexual harassment continued unabated.

6.    Over several months, at least 27 complainants came forward to participate in the Title IX investigation. In October 2017, Dartmouth was forced to publicly disclose the existence of the investigation for the very first time after the news was leaked to the media. Days later, on October 31, 2017, the New Hampshire Attorney General opened a criminal investigation into the allegations against the three professors.

7.    Dartmouth eventually hired an outside attorney to conduct an "independent investigation" in which Plaintiffs were told they would have a voice. Instead, Dartmouth unilaterally stopped the investigation and allowed the three professors to retire and/or resign in July 2018, more than fifteen months after Plaintiffs filed their initial complaints.

8.    The seven Plaintiffs, each an exemplary female scientist at the start of her career, came to Dartmouth to contribute to a crucial and burgeoning field of academic study. Plaintiffs were instead sexually harassed and sexually assaulted by the Department's tenured professors and expected to tolerate increasing levels of sexual predation.

9.    Plaintiffs now turn to this Court for appropriate relief to remedy Dartmouth's past wrongs and to force Dartmouth College to enact meaningful reforms that will permit women to engage in rigorous scientific study without fear of being sexually harassed and sexually assaulted.

## II.    PARTIES, JURISDICTION, AND VENUE

10.    **PLAINTIFF KRISTINA RAPUANO** is a natural person who, at all relevant times, was domiciled in Vermont.

11.     **PLAINTIFF VASSIKI CHAUHAN** is a natural person who, at all relevant times, was domiciled in New Hampshire.

12.     **PLAINTIFF SASHA BRIETZKE** is a natural person who, at all relevant times, was domiciled in Vermont.

13.     **PLAINTIFF ANNEMARIE BROWN** is a natural person who, at all relevant times, was domiciled in New Hampshire or Vermont.

14.     **PLAINTIFF ANDREA COURTNEY** is a natural person who, at all relevant times, was domiciled in New Hampshire or Vermont.

15.     **PLAINTIFF MARISSA EVANS** is a natural person who, at all relevant times, was domiciled in New Hampshire.

16.     **PLAINTIFF JANE DOE** is a natural person who, at all relevant times, was domiciled in New Hampshire.

17.     **DEFENDANT DARTMOUTH COLLEGE** is a non-profit corporation organized and existing under the laws of New Hampshire that maintains its principal place of business at 63 South Main Street, Suite 301 Hanover, NH 03755, in this District.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claims under Title IX present a federal question over which this Court has jurisdiction. Plaintiffs also assert state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant is domiciled in and conducts business within this Judicial District.

20.     This Court is the proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 2000e-5(f) because Dartmouth is headquartered in this District and many of the unlawful practices

complained of herein occurred in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## III.   COMMON FACTUAL ALLEGATIONS

**A.   The Department's Predators' Club**

21.   Dartmouth College is an elite Ivy League private research university located in the town of Hanover, New Hampshire. Dartmouth has an enrollment of 6,400 students and is one of the nation's most competitive colleges, with an undergraduate acceptance rate of 8.7%.

22.   The conduct at issue involved three celebrated Dartmouth professors in the Department, which is considered a "powerhouse" for research and innovation at Dartmouth. The Department is housed in a state-of-the-art $27 million building and Dartmouth was the first liberal arts school in the country to have its own fMRI scanner to conduct brain scans.

23.   The most senior member and arguably the founder of the three-member "predatory club" that harassed female students was Todd Heatherton. Heatherton was a prolific researcher who received Dartmouth's prestigious Champion International Professorship endowed chair and served as the Department Chair from 2004 through 2005. Heatherton was instrumental in making the Department a major power center on campus by, among other things, helping to attract what was as of 2005 the largest grant in Dartmouth's history—$21.8 million to establish a center for cognitive and educational neuroscience.

24.   The predatory club was filled out by two younger brain science scholars who joined in Heatherton's pattern of harassment of female students in the Department. William Kelley joined the Department in 2000 and Paul Whalen joined in 2005. Both Whalen and Kelley received tenure through the Department, even as three promising female professors did not. All three female

professors went on to receive tenure, prestigious awards and great success—but at other institutions.

25.    Upon information and belief, Heatherton was instrumental in helping both Kelley and Whalen obtain tenure and, once that happened, the three men frequently socialized and regularly gathered with each other's female graduate students at bars in Hanover.

**B.    Dartmouth Ignores Decades of Complaints**

26.    The pervasive sexual harassment and gender-based discrimination in the Department perpetuated by Heatherton, Kelley, and Whalen was well-known to Dartmouth's supervisory faculty and administrators since at least 2002.

27.    At least two sexual harassment complaints were made against Heatherton in a 12-month span in 2002. In lieu of responding appropriately to either complaint, Dartmouth rewarded Professor Heatherton, first naming him Champion International Professor (after the initial complaint) and subsequently promoting him to Chair of the Department (after the second complaint).

28.    The first complaint arose from an incident that occurred during a public recruiting event for the Department in February 2002. Heatherton grabbed a female graduate student's breasts and told her that she was "not doing very well" in her work in the lab. The incident was reported to Dartmouth's administration, including then-Associate Dean Richard Wright.[3] Not long after the report, Dartmouth appointed Heatherton as Champion International Professor.

29.    The second complaint stemmed from an incident that occurred in late 2002 or early 2003, when Heatherton groped the buttocks of two graduate students, one male and one female,

---

[3] *See* Britta Greene, *Former Professor: Dartmouth Aware of Misconduct Allegations For Years*, SLATE (Nov. 16, 2017), *available at* http://www.nhpr.org/post/former-professor-dartmouth-aware-misconduct-allegations-years#stream/0.

whom he approached from behind at a bar. The female graduate student reported this incident to then-Department Chair Howard Hughes ("former Chair Hughes"). In response, former Chair Hughes encouraged the female graduate student not to "make a fuss" by pursuing the matter further. Dartmouth then promoted Heatherton to Chair of the Department.

30.     Upon information and belief, a complaint relating to sexual harassment and sex discrimination was filed against Kelley and Heatherton in 2005. Upon information and belief, Dartmouth failed to take disciplinary action against either professor.

31.     Upon information and belief, Professor and Director of Graduate Studies Thalia Wheatley ("Director Wheatley"), Department Chair Dave Bucci ("Chair Bucci"), and administrators with supervisory authority knew about discriminatory hiring practices within the Department. Heatherton, Kelley, and Whalen demonstrated an obvious bias toward hiring young, attractive female students to work in their labs. Kelley and Whalen treated this endeavor as a competition and openly debated who had "the hottest lab." Female students in the Department were pressured to appease the professors by flirting with them. Women ultimately felt that their looks were significant in their being hired rather than their academic achievements.

32.     Heatherton, Kelley, and Whalen tied female students' academic success to the students' willingness to tolerate unwanted sexual attention. All three professors favored students who accompanied the men on their frequent drinking binges and engaged in sexual banter or submitted to unwanted touching and sexual contact.

33.     Heatherton, Kelley, and Whalen compelled female students to be objectified and to objectify their female classmates. All three men made inappropriate comments about the students' physical attractiveness, including explicit references to their breasts. Kelley went so far as to publicly "rank" women on  a "Papi" scale by which a "0" rating meant he "would never bang"

under any circumstances, a "1" rating meant "hot enough that you would bang her if her personality was excellent," and a "2" rating meant "so hot you would bang her no matter what she was like."

34. Upon information and belief, Director Wheatley, Chair Bucci, and administrators with supervisory authority knew that Heatherton, Kelley, and Whalen routinely injected themselves into the sexual lives of their female students, such as taking "bets" on how long female students could make their relationships last and advising their female students to "just screw" other members of the lab.

35. Heatherton, Kelley, and Whalen mostly ignored personal and professional boundaries. Kelley regularly accessed students' cell phones without permission and sent inappropriate messages from the students' phones to others. Whalen demanded that his highly educated students act as his personal masseuses and "walk on his back," an activity which he claimed his previous students did for him regularly. Whalen also went "shopping" with his female students, offering to purchase them dresses and shoes he selected for them.

36. Kelley and Whalen openly conducted sexual relationships with their female students. Upon information and belief, Dartmouth administrators with supervisory authority knew Kelley and Whalen were involved in these inappropriate relationships.

37. The Department's faculty have described Dartmouth as "the capital of sexism" and likened the Department to a fraternity house of which Kelley, Whalen, and Heatherton were self-appointed co-presidents.

38. Numerous Dartmouth administrators, including Associate Dean Jay Hull ("Dean Hull"), Chair Bucci, and current and former students described Whalen as being "touchy," "a flirt," "a hugger," and "handsy." Chair Bucci further acknowledged that he observed Whalen blurring professional boundaries, or to be "completely lacking" in them. Indeed, over the last decade,

former faculty members informed Dartmouth's administration that they were concerned about misconduct by Kelley, Heatherton, and Whalen.

**C.**     **Dartmouth Fails to Stop the Predators' Club from Pressuring Female Students into "Black Out" Binge Drinking and Unwanted Physical and Sexual Contact**

39.     On top of the sexual harassment women in the Department endured, they were also forced to reckon with the fact that Heatherton, Kelley, and Whalen conditioned faculty mentorship and support on student participation in the alcohol-saturated "party culture" they created. This practice was both well-known and blatantly ignored by Dartmouth administrators.

40.     Examples of the Department's "party culture" abound. Kelley bragged to his students that he snorted real cocaine in class during demonstrations related to addiction. Kelley, Whalen, and Heatherton openly took shots of alcohol with underage prospective students. When hiring undergraduates to work in his lab, Kelley sometimes scheduled the interviews to take place at bars and purchased drinks for the underage interviewees. Associate Dean Hull was specifically aware of Kelley and Whalen's "tradition" of taking prospective female students out drinking, purportedly to observe how the students "handled themselves" while drunk, but did nothing to investigate or stop it.

41.     The three predatory professors pressured their young female graduate students to accompany them to local bars and other places to engage in binge drinking. All three professors purchased drinks for their female students and encouraged them to drink late into the night. The professors then regaled their lab members with tales of their alcohol-fueled exploits with other students, describing how those students got drunk, became ill, and made fools of themselves.

42.     Kelley regularly hosted "hot tub parties" and other parties at his house, which has a fully outfitted bar in the basement. These parties, for which Kelley coined the term "tubby time," often took place late at night after drinking at bars. Not to be outdone, Whalen hosted numerous

parties at his residence centered around drinking excessively. Both Kelley and Whalen encouraged their female students to spend the night at their homes after long nights of drinking.

43.     The lab environment was no less free from pressure to consume alcohol. Lab meetings and one-on-one advising meetings often took place at bars. On the occasions when meetings did take place in the labs, the professors often expected that alcohol be served. Students were flown to conferences across the country and then urged to skip conference events to drink with the professors in bars. Whalen rescheduled important qualifying exams and meetings because he needed to "recover" from binge drinking over the weekend or "get laid."

44.     Female students who were willing to partake in these activities were rewarded with academic attention, while those who refrained were ignored and neglected academically. Kelley publicly labeled one female student "a bitch" for refusing to participate in drinking events.

45.     Associate Dean Hull and Director Wheatley confirmed that they both received numerous complaints from graduate students who felt pressured to drink alcohol and socialize with Kelley and Whalen, and feared retaliation if they refrained from these activities.

46.     Instead of acting on their knowledge, Dartmouth administrators emboldened the predators' club to continue their harassment and abusive conduct toward female students without fear of punishment. This attitude was on full display when, during the 2010-2011 academic year, Whalen announced to his students that a woman in the Department had previously complained about sexual harassment and that it had "backfired," causing the complainant to "lose resources" and to "lose steam in her career." According to Whalen, the complainant "got what was coming to her, of course; you don't bite the hand that feeds you."

47.     In the three years preceding April 2017, sexual harassment and abuse of female students became intolerable and students' complaints became louder. Within that timeframe,

graduate students repeatedly spoke out about inappropriate student/advisor relationships during annual meetings attended by high-level administrators, including but not limited to Dean Hull, Director Wheatley, and Chair Bucci. Upon information and belief, these administrators were informed that multiple students were attending therapy because of their advisors. One graduate student explicitly told these administrators that this was a "life or death situation," and someone would commit suicide if Dartmouth refused to act.

**D.**     **As Harassment Grows Intolerable, Female Students Band Together to End the Harassment and Abuse**

48.     On January 13, 2017, Ms. Rapuano contacted Provost Carolyn Dever ("Provost Dever") to report that she was experiencing sexual harassment at Dartmouth and had realized this was a pervasive issue. Upon information and belief, Provost Dever failed to launch any investigation of her own and took no steps to protect Ms. Rapuano or other students from sexual harassment.

49.     In or about late March 2017, several female graduate students came together to discuss the harassment and abuse they were experiencing in the Department. With no assistance from Dartmouth, the students researched their legal options, sought support and guidance from advocates and determined that filing a Title IX complaint against the three professors was the best first step.

50.     On April 4, 2017, Ms. Rapuano, Ms. Courtney, and several other graduate students met with Chair Bucci and Director Wheatley to report sexual harassment and sexual assault within the Department. On April 7, 2017, the same group met with Dartmouth's Title IX coordinator. The students outlined instances of sexual assault and sexual harassment so extreme as to constitute a sexually hostile educational environment and work place, inappropriate conduct, and retaliation by Kelley, Whalen, and Heatherton.

51.     Dartmouth took no immediate action to protect the students who complained. Whalen sexually assaulted Ms. Chauhan twenty days *after* the Title IX complaint was filed, and Kelley continued to sexually harass Ms. Rapuano through June 2017.

52.     Even after these serious complaints were lodged, Dartmouth actually encouraged the victims to continue working with or among Heatherton, Kelley, and Whalen. Dartmouth warned the victims that the accused professors would likely retaliate against students who discontinued working with them by disparaging them and revoking their academic support, actions which could result in the victims being expelled or placed on academic probation. Thus, at Dartmouth's suggestion, the victims continued working with their harassers for nearly four months.

53.     Dartmouth waited nearly four months before notifying Kelley, Whalen, and Heatherton of Plaintiffs' complaints (on July 20, 2017) and placing them on administrative leave (on July 28, 2017).

54.     Dartmouth released no information about the three professors' status even after they were placed on leave. Concerned about the situation and the College's lack of candor, undergraduate students posted flyers around campus on October 24, 2017, asking "Where is Prof. Paul Whalen?" and "Where is Prof. Bill Kelley?" The College newspaper, *The Dartmouth*, reported on the flyers, and a College spokesperson said only that the three professors were on paid leave and under "ongoing investigations into allegations of serious misconduct[.]"

55.     On October 31, 2017, the New Hampshire Attorney General opened a criminal investigation into the allegations against the three professors.

56.     In response to the Title IX Complaint, Dartmouth launched an "independent investigation" led by Jennifer Davis, Esquire ("Investigator Davis"), an attorney and self-described

13

"independent investigator." Investigator Davis is on the "approved" list of Dartmouth's insurer, United Educators Insurance, whose focus appears to be helping institutions manage risk and minimize liability stemming from wrongdoing by employees.[4] Indeed, Investigator Davis seemingly made no effort to address Dartmouth's prior knowledge of the professors' conduct or to examine Dartmouth's role in fostering the continuing harassment Plaintiffs experienced.

57.     Investigator Davis demanded extensive confidential information from Plaintiffs, including privileged mental health records, emails, texts, pictures, and other such information. In several instances, however, Investigator Davis showed these confidential records to Heatherton, Whalen, and Kelley, and their attorneys without Plaintiffs' knowledge or consent.

58.     Investigator Davis also conducted numerous lengthy interviews with Plaintiffs and others without advising them of their rights or encouraging them to seek legal counsel. Without Plaintiffs' knowledge or consent, she then shared portions of these interviews with the perpetrators and their attorneys.

59.     Investigator Davis and Dartmouth's Title IX office failed to protect Plaintiffs' privacy by erroneously including one reporting party's confidential exhibits in a different reporting party's folder. On several occasions, email communications from the Title IX office were addressed to the wrong person, revealing the complainant's identity and confidential information to others.

60.     Dartmouth included Ms. Brown as a "Reporting Party" to the complaints into Whalen's conduct without Ms. Brown's knowledge or permission. Ms. Brown learned that she was a Reporting Party for the first time when she unexpectedly received a copy of the investigation report along with and, most concerning, a copy of Whalen's rebuttal to her specific allegations.

---

[4] *See* JENN DAVIS LLC, https://www.jenndavisllc.com/ (last visited on Nov. 13, 2018).

Ms. Brown was never informed that Whalen would be permitted to review or dispute her allegations.

61.     Investigator Davis provided Dartmouth with several reports concerning her "findings" in March 2018, eleven months after the April 2017 Title IX complaint was filed. Plaintiffs were provided with heavily redacted versions of the sections of the reports that pertained to them and given a limited opportunity to correct inaccuracies in the reports. Based on the limited information Plaintiffs received, Investigator Davis purported to "find" numerous violations of Dartmouth's policies and procedures by Heatherton, Kelley and Whalen.

62.     Disciplinary hearings regarding the "findings" were scheduled for July 2018, and Plaintiffs were promised an opportunity to be heard and confront their harassers. Dartmouth then unilaterally suspended the disciplinary process, permitting Heatherton to retire and accepting resignations from Kelley and Whalen. Plaintiffs were not consulted prior to Dartmouth's termination of the Title IX process.

63.     Dartmouth declined to provide Plaintiffs with accommodations, support or guidance, both immediately following their initial complaints to the Title IX office and throughout the investigation. There were three separate Title IX Coordinators while Plaintiffs' complaint was pending. The first of these, Heather Lindkvist, implicitly discouraged Plaintiffs from coming forward.

64.     Since it unilaterally terminated the Title IX process, Dartmouth has taken no action that would demonstrate any intent to investigate how the abuse perpetrated upon Plaintiffs could have happened and/or to make any changes that would prevent it from happening again.

65.     Instead, Dartmouth has taken steps to silence the victims and discourage them from pursuing legal action or demanding change within Dartmouth. On October 12, 2018, Plaintiffs'

counsel sent Dartmouth a letter detailing Plaintiffs' claims and the basis for Dartmouth's liability under Title IX and other statutes. Days later, Chair Bucci and Director Wheatley convened a meeting with all graduate students in the Department. When the students arrived, they saw that the Title IX Coordinator, Kristi Clemens, was also present, and Chair Bucci and Director Wheatley had called this meeting to, in their words, "dispel rumors" about the Title IX investigation.

66.     It became quickly apparent that the meeting was a public platform to disparage the victims and discourage them from pursuing legal action. Chair Bucci accused the victims of "pulling the Department backwards rather than forward" by continuing to demand change at Dartmouth. Chair Bucci and Director Wheatley criticized the victims for questioning their involvement in the facts giving rise to the Title IX complaints and said that it was "very unfair" of the students to discuss the prior complaints about Heatherton and implied that these complaints were irrelevant. Finally, they took pains to dispute and justify several aspects of the investigation that Plaintiffs' attorneys explicitly criticized in their October 12, 2018 letter.

67.     After the departure of Heatherton, Kelley, and Whalen, Dartmouth convened a search committee to hire their replacements. Upon information and belief, 158 applications were submitted for the three positions; from these, Dartmouth's selection committee shortlisted 11 candidates. Only two of the shortlisted candidates are women.

## IV.   FACTUAL ALLEGATIONS

### A.   Kristina Rapuano's Factual Allegations

68.     Ms. Rapuano graduated in the top two percent of her undergraduate class with a Bachelor of Science in Psychology in 2010. She enrolled in graduate studies at Dartmouth College in 2012, where she worked as a Ph.D. student and teaching assistant. While at Dartmouth, Ms. Rapuano won numerous awards, recognitions, and scholarships for her performance as a graduate

student and as a teaching assistant. She has a strong publication record and has routinely given talks and poster presentations at academic conferences across the country.

69.    On approximately March 14, 2014, Ms. Rapuano met Whalen in his office to assist him in grading final exams. She returned to her office after they finished grading the exams. Soon after, she received a text message from Whalen summoning her back to his office.

70.    When Ms. Rapuano entered Whalen's office, he closed the door, turned the lights off, sat down next to her on the couch, and proceeded to try and touch her over her clothes.

71.    When Ms. Rapuano stood and tried to leave, Whalen followed her and pinned her against the wall. He then repeatedly tried to put his hands into her pants over her objections and demands that he stop touching her.

72.    Whalen persisted until Ms. Rapuano forcefully removed his hands from her pants.

73.    Not long after this incident, Whalen told Ms. Rapuano that he had altered the curve for one of his courses (for which Ms. Rapuano was the teaching assistant) so that a young woman in his class would receive an "A-" in the course, despite the negative impact on the other students.

74.    Kelley largely ignored Ms. Rapuano when she first began working in his lab and abstained from socializing or drinking with him. Leading up to and during the 2014-2015 school year, Ms. Rapuano finally succumbed to Kelley's pressure to act as his "drinking buddy."  She noticed an increase in Kelley's interest in working with her professionally and providing her with academic support.

75.    In March 2015, both Ms. Rapuano and Kelley attended the annual conference of the Cognitive Neuroscience Society ("CNS") in San Francisco, California. Ms. Rapuano booked a flight to the CNS Conference leaving on Saturday, March 28, 2015 and reserved her own hotel room. When Kelley learned of Ms. Rapuano's travel plans, he changed her flight so that she would

arrive in San Francisco a day earlier, claiming that it would be better if he and Ms. Rapuano had more time together at the conference. Kelley then suggested that Ms. Rapuano stay in his hotel room for the night, despite knowing—and failing to inform Ms. Rapuano—that his hotel room had just one bed in it.

76.     Kelley instructed Ms. Rapuano to meet him at the hotel bar, even though she would not arrive at the hotel until nearly 12:00 a.m. After drinking at the hotel bar, Kelley urged Ms. Rapuano to accompany him to another bar, encouraging her to continue drinking until she became intoxicated.

77.     Earlier in the night, Ms. Rapuano sent Kelley a text message explicitly stating that she wanted to have fun but "nothing else." Once she became inebriated, however, Kelley chose to ignore her message that sexual contact was unwelcome.

78.     Kelley sexually assaulted Ms. Rapuano in the early hours of March 28, 2015 by having vaginal intercourse and other sexual contact with her when he knew she was too incapacitated to consent.

79.     In the morning, Kelley told Ms. Rapuano that they had "had sex" two times, and that Ms. Rapuano had "freaked out" at some point during the sexual interaction.

80.     Ms. Rapuano has no memory of engaging in sexual intercourse, nor does she recall leaving the bar or how they returned to the hotel. Based on her physical state the following day, she has wondered whether Kelley drugged her.

81.     For his part, Kelley acknowledged on different occasions that he was well aware of Ms. Rapuano's level of intoxication and knew that she had no recollection of that night.

82.     After sexually assaulting Ms. Rapuano in March 2015, Kelley began to pursue an inappropriate sexual relationship with her, using his position of power to exert control over her

personal and professional life and threatening retribution when she rejected or did not sufficiently respond to his advances.

83.     On numerous occasions, Kelley summoned Ms. Rapuano to his office under the guise of academic advising and then aggressively initiated sexual activity with her.

84.     Between March 2015 and July 2017, Kelley regularly sent Ms. Rapuano sexually graphic text messages. For example, Kelley sent her photographs of penises—including his own—and asked Ms. Rapuano to "compare them." Kelley also sent Ms. Rapuano pictures of sex toys, asked her what she was wearing, demanded that she send him sexually graphic photographs of herself, and urged her to talk about his sexual fantasies.

85.     During the 2015-2016 school year, Ms. Rapuano expressed her discomfort with Kelley's sexual advances and attempted to reestablish a professional working relationship with him. Kelley ignored each such attempt and continued to pressure her into sexual contact.

86.     For example, Ms. Rapuano attempted to end their sexual relationship after learning that Heatherton had heard "rumors" that Ms. Rapuano and Kelley were sexually involved. In response, Kelley told Ms. Rapuano he was "going to keep putting [his] tongue in [her] whenever [he] want[s]."

87.     Ms. Rapuano observed a direct correlation between Kelley's willingness to support her as his graduate student and the degree to which she complied with his sexual demands. She pointed this out to Kelley on numerous occasions, telling him that he was crippling her academic advancement by pursuing a sexual relationship with her and was not providing her with the academic support she needed as his graduate student. Kelley reacted to each such attempt with anger and hostility, cementing Ms. Rapuano's fears of retaliation.

88.     When Ms. Rapuano rejected Kelley's sexual advances or was not sufficiently responsive to his lewd and suggestive text messages, he would deprive her of academic guidance and refuse to schedule meetings to discuss her research.

89.     In November 2015, Kelley attempted to undermine Ms. Rapuano's academic career by offering a data set she had been working on to other members of the lab.

90.     To escape Kelley's harassment—at least for a short time—Ms. Rapuano applied to and was ultimately awarded a prestigious fellowship that allowed her to work abroad for part of the 2016-2017 academic year beginning in July 2016.

91.     When Kelley learned of Ms. Rapuano's fellowship, his retaliation and attempts to sabotage her career escalated as punishment for her decision to leave Dartmouth.

92.     In April 2016, a paper Ms. Rapuano co-authored with the professor with whom she would be working with abroad was published in a well-respected journal. Rather than commending the accomplishment, Kelley reacted violently, berating Ms. Rapuano for failing to inform him she was working on a paper with a different professor and accusing her of acting "unprofessionally." Kelley then threatened not to sign her annual progress report for her graduate fellowship.

93.     On May 2, 2016, Ms. Rapuano objected to Kelley's reaction, which she interpreted as stemming from feelings of jealousy and possessiveness. Ms. Rapuano told Kelley "allowing profession[al] and personal lines to blur together" was negatively impacting her career, writing:

> *"I feel that you have been incredibly disrespectful and abrasive these past few days and as much as **I try to distance myself from that, and re-establish professionalism, you seem to push back even harder in unprofessional ways. As my advisor, I hope you can understand how toxic that hostile environment can be** and how unproductive it is for getting work done . . . **I cannot handle the amount of emotional manipulation that you've incited, and would feel forced to seek out possible solutions elsewhere if this continues to be a problem.**"*

94.     In the months before Ms. Rapuano's departure, Kelley became increasingly hostile towards her. He texted Ms. Rapuano almost daily with unfounded criticisms and placed pressures on her that were obviously motivated by his personal feelings.

95.     On different occasions, Kelley told Ms. Rapuano that he was "letting her go" but he was "not happy" about it.

96.     Prior to her departure, Ms. Rapuano proposed a collaboration on a project with Kelley and a post-doctoral fellow working in Heatherton and Kelley's joint lab. Kelley initially agreed to and supported the collaboration. However, when Ms. Rapuano attempted to execute the collaboration in July 2016, Kelley flatly refused and told Ms. Rapuano: "I will not be working with you on this project or any other project going forward."

97.     Kelley then demanded that Ms. Rapuano destroy the data she had brought abroad with her to work on during her fellowship.

98.     In July 2016, Kelley explicitly asked Ms. Rapuano if she was interested in a sexual relationship with him. She answered that she was not. Nonetheless, on July 21, 2016, Kelley confirmed that he was unwilling to separate his personal feelings for her from his professional obligations as her advisor. In an email to Ms. Rapuano, Kelley wrote:

> "Professionally. I'm sad. And jealous. Maybe because of how I feel personally. Probably so. . . . I feel like I'm #1 personally, but #10 professionally, somewhere behind other European names I can't pronounce that have amazing tools my lab should use. **I need to feel #1 professionally to be a good advisor. . . . I need to be first in your eyes as an academic so that I can feel comfortable about sharing you** . . . Maybe that's not a fair ask, but I need it. . . . **I don't know how to separate the personal from the professional. I don't know that it makes sense to do so.**"

99.     In response, Ms. Rapuano told Kelley that she was "terrified" that her academic success had become contingent on personal relations with him.

100.    Kelley's inappropriate and retaliatory behavior grew so extreme that Ms. Rapuano contacted Heatherton to voice her concerns. Ms. Rapuano told Heatherton that Kelley's behavior had put her in "a very difficult situation" that left her feeling "stuck," and she feared Kelley would refuse to allow her back into the lab upon completion of her fellowship.

101.    Heatherton later told Ms. Rapuano that he spoke with Kelley and acknowledged the obvious tension in the lab. Upon information and belief, Heatherton failed to take meaningful steps to remedy Kelley's behavior, despite expressly acknowledging that a problem existed.

102.    In August 2016, Ms. Rapuano briefly returned to the United States for a conference. While at Dartmouth, she encountered Kelley and his girlfriend at a departmental barbecue. Ms. Rapuano tried to keep her distance and avoided interacting with him. This visibly enraged Kelley.

103.    Kelley abruptly cancelled several professional advisor meetings he had scheduled with Ms. Rapuano in retaliation for her failure to personally engage with him at the barbecue.

104.    Kelley also sent Ms. Rapuano several threatening and offensive emails that he characterized as "professional advice." His "professional advice" included verbally berating Ms. Rapuano for not engaging with him at the barbeque and accusing her of being "unprofessional," "childish," and "playing dumb." When Ms. Rapuano attempted to speak with Kelley about his outburst, he refused to meet with her.

105.    After this encounter, Ms. Rapuano again attempted to establish a professional relationship with Kelley and highlight his inappropriate behavior, writing to him:

> "The very fact that you are upset about a personal interaction is by definition unprofessional. The fact that you are willing to sacrifice professional meetings because of your personal feelings is unprofessional. The fact that I am terrified of you right now and do not know how to interact with you in front of people, let alone your girlfriend and daughter, is unprofessional."

106.    Later that day, Ms. Rapuano met with Kelley and implored him to separate his personal feelings from the professional aspects of their relationship. Kelley refused to engage in a conversation on this topic or respond to Ms. Rapuano's concerns in any meaningful way.

107.    In January 2017, Ms. Rapuano returned to Dartmouth and began to more forcefully reject Kelley's advances and express her discomfort with his conduct.

108.    During her first meeting with Kelley, Ms. Rapuano was driven to tears by his demanding, cold, and angry demeanor. When Kelley observed Ms. Rapuano crying, he told her that she "just had to be nice to him." Ms. Rapuano interpreted his statement as indicating that her professional success was once again contingent on her willingness to fulfill Kelley's sexual demands.

109.    On January 13, 2017, Ms. Rapuano contacted Provost Dever to report that she was experiencing sexual harassment at Dartmouth and had realized this was a pervasive issue. Upon information and belief, Provost Dever failed to launch any investigation of her own and took no steps to protect Ms. Rapuano from sexual harassment, which continued unabated.

110.    Between February 2017 and March 2017, Kelley continued to send Ms. Rapuano demeaning and sexually explicit text messages. On many occasions, Ms. Rapuano told Kelley to stop sending her sexual messages and told him that she did not feel right responding to his sexual questions. But Kelley persisted.

111.    When Ms. Rapuano rejected his advances, Kelley became increasingly hostile and difficult to work with. He cancelled meetings and refused to review Ms. Rapuano's work or provide her with academic support.

112.    On one occasion, Kelley learned that the graduate students had planned a happy hour outing without consulting him. He accused the graduate students of being disloyal and rude and texted Ms. Rapuano, "fuck you all . . . It's amazing how ignorant you can all be sometimes."

113.    In March 2017, Kelley and a group of graduate students, including Ms. Rapuano, attended the Social & Affective Neuroscience Society ("SANS") Conference in Los Angeles, California. Kelley witnessed Ms. Rapuano speaking with her ex-boyfriend and flew into a jealous rage. He accused Ms. Rapuano of exhibiting "complete disrespect" for him at the SANS Conference and told her that he was losing interest in seeing or communicating with her.

114.    Soon after, Ms. Rapuano again explicitly told Kelley that she had no interest in a sexual relationship with him. She further informed him that he had taken advantage of her at the March 2015 CNS Conference by initiating sexual intercourse with her when she was too intoxicated to consent and after she had specifically told him she was not interested. She explained that she felt her professional success depended on her reaction to his sexual advances, writing: "*I felt like if I stopped . . . the professional attention would stop. I felt like I had opened a door that could not be closed[.]*"

115.    In response, Kelley told Ms. Rapuano that her explanation was "incredibly offensive." Kelley then attempted to revoke his agreement that Ms. Rapuano complete her Ph.D. in a sixth year at Dartmouth and attempted to coerce her into leaving early, suggesting that she abandon her plans and adhere to a shorter timeline so that she could get her degree as soon as possible and leave the school.

116.    Kelley told Ms. Rapuano that his professional advice would be to "change her situation." He made clear that his opinion was directly related to her disinterest in a sexual relationship with him, writing: "*You just wrote an essay about how I completely fucked you over*

*and you don't want to be here and do science . . . You're not getting anything done here and are really bitter. Let's try to move you to a better place."*

117.    Kelley continued to pressure Ms. Rapuano to leave Dartmouth and told her that he would be happier when she was gone.

118.    Kelley's sexual involvement with students was well-known to administrators, faculty, and students at Dartmouth, especially within the Department. When Ms. Rapuano confronted Kelley about these past relationships with students, he acknowledged, "I guess I have a reputation."

119.    In late March or early April of 2017, Ms. Rapuano learned that other female students in the Department had experienced unwelcome sexual conduct from several professors. After hearing these stories—which were like her own—Ms. Rapuano realized there was a pattern of sexual misconduct within the Department.

120.    Ms. Rapuano was one of the students who reported sexual misconduct by the three professors to Chair Bucci, Director Wheatley, and the Title IX office on April 4 and April 7, 2017.

121.    Because Dartmouth failed to act for months after that report, Ms. Rapuano was subjected to continued sexual harassment as she continued to work in Kelley's lab.

122.    Between April 2017 and July 2017, Kelley continued to send Ms. Rapuano sexually suggestive text messages. When Ms. Rapuano ignored his advances, Kelley targeted her for ridicule and criticism and became increasingly unavailable for meetings or academic-related discussions.

123.    On April 26, 2017, Kelley refused to meet with Ms. Rapuano regarding her dissertation proposal, telling her that there was "no need" to meet because he was just going to tell the Department that she "didn't do it yet"—which would have resulted in Ms. Rapuano being

placed on academic probation. Kelley then began to avoid Ms. Rapuano and refused to schedule meetings with her.

124.    After weeks of denying Ms. Rapuano academic guidance and subjecting her to unwarranted criticism and ridicule, Kelley contacted her on May 8, 2017, to ask that she come to happy hour because he wanted to see her "smiling face." When Ms. Rapuano refused to meet him, Kelley returned to ignoring her academically.

125.    During a retreat on June 12, 2017, Kelley refused to provide necessary feedback on Ms. Rapuano's academic presentation. After the retreat, however, Kelley summoned her to his office. Ms. Rapuano, fearing retaliation and faced with Dartmouth's inaction to date, reluctantly went. When she arrived, Kelley initiated unwelcome sexual activity with her.

126.    On May 31, 2017, Ms. Rapuano initiated plans to switch to a different professor's lab. Dartmouth did not transfer her to a new lab until July 28, 2017. Prior to Ms. Rapuano's self-initiated request, Dartmouth offered her *no* academic accommodations and instead left her under the supervision of the man who assaulted and harassed her.

127.    After Ms. Rapuano reported sexual misconduct to Dartmouth in April 2017, she sought mental health treatment at the College's student health clinic. When she explained that she wanted to discuss the trauma and emotional distress resulting from Kelley's conduct and the Title IX investigation, she was turned away. Dartmouth advised her to seek mental health treatment elsewhere, even though Dartmouth's health insurance would not cover these expenses.

128.    Ms. Rapuano turned down multiple offers from other graduate programs to attend Dartmouth, which she viewed as the dominant player in the social neuroscience field to which she hoped to contribute as a leader and scholar. Her ambitions were quickly crushed. Kelley initially ignored her and made her feel incompetent. Only when she gave in to his pressure to join Kelley's

drinking club did this begin to change.  As Kelley's personal interest in her increased, he rewarded her academically, causing her to doubt whether the increased opportunities were solely related to his sexual interest in her. Indeed, Ms. Rapuano expressed concerns about the poster Kelley slated her to present at the California conference where he sexually assaulted her.

129.    As Kelley's harassment escalated, Ms. Rapuano's mental health deteriorated, and she experienced extreme depression—requiring her to take psychotropic medication for the first time in her adult life—in addition to having Post Traumatic Stress Disorder, suicidal thoughts, a suicide attempt, and physical symptoms such as nausea, insomnia, weight loss, nightmares, and lack of focus and motivational issues. Combined, these effects have dramatically impacted Ms. Rapuano's life and career in nearly every way possible.

B.    **Vassiki Chauhan's Factual Allegations**

130.    Ms. Chauhan is a fourth-year graduate student in the Department who worked as Whalen's teaching assistant. She enrolled in Dartmouth's graduate program in 2015 after completing her master's degree on a prestigious merit-based scholarship. Ms. Chauhan has a strong academic and research record throughout her graduate studies, including poster presentations at conferences and authoring a peer reviewed paper.

131.    On April 4, 2017 and April 7, 2017, several Plaintiffs and other graduate students reported Heatherton, Kelley, and Whalen for sexual misconduct.

132.    Dartmouth took no action for months. Whalen sexually assaulted Ms. Chauhan on April 24-25, 2017, weeks after the initial complaints were made.

133.    On April 24, 2017, Whalen pressured Ms. Chauhan into drinking with him, repeatedly ordering and paying for her drinks. Whalen then suggested that she accompany him back to his home for another drink.

134.    When Whalen attempted to initiate sexual contact, Ms. Chauhan forcefully rejected his advances and told him not to touch her. Ms. Chauhan tried to leave his house several times by going downstairs. Each time, Whalen followed her downstairs and prevented her from leaving.

135.    Whalen then forced her to engage in nonconsensual intercourse with him.

136.    When Ms. Chauhan told him to at least use protection, Whalen laughed and told her, "that is one thing I am *not* going to do."

137.    The next day, Whalen pressured Ms. Chauhan into meeting him and asked her whether she thought their encounter was consensual, demanding that she keep it private and tell no one.

138.    Following her sexual assault, Ms. Chauhan was in physical pain. As a result, she visited Dartmouth's medical facility and sought medical attention. After examining Ms. Chauhan, the medical practitioner asked if the sexual encounter had been forced. Whalen suggested that Ms. Chauhan was merely being "paranoid" for seeking medical treatment.

139.    In the weeks following the assault, Whalen continued to persistently text Ms. Chauhan late at night to ask her to meet him at a bar, on one occasion suggesting that they should meet for a drink to "celebrate" when her medical test results came back.

140.    Ms. Chauhan suffered sexual harassment and a hostile environment at the hands of Kelley and Whalen from the beginning of her time at Dartmouth.

141.    Ms. Chauhan first became acquainted with Kelley when she was run over by his car while she was walking on a street near campus. Kelley's car hit her with enough force to knock her down and send her belongings flying across the street. Ms. Chauhan later learned that Kelley and his girlfriend, who was allegedly driving at the time, had been drinking earlier that day. Ms.

Chauhan met Kelley for the very first time that day, when he stopped to apologize for hitting her with his car.

142.    A few months later, Kelley overheard Ms. Chauhan discussing potential Halloween costumes and suggested that she dress as "roadkill." He continued to call Ms. Chauhan by the nickname "roadkill" for the next two years.

143.    Whalen initiated inappropriate sexual conversations with Ms. Chauhan, such as inquiring about her sexual history and the status of her relationship.

144.    Ms. Chauhan was also present for multiple conversations in which Kelley openly discussed his plans to break up Ms. Rapuano and her boyfriend and advised other female graduate students to break up with their boyfriends.

145.    Kelley regularly accessed students' cell phones without permission to send out inappropriate messages to others. For example, Kelley once accessed Ms. Chauhan's Facebook page and changed her status to: "I am going to streak across the green on my birthday at midnight; be there or be square." This message was transmitted to Ms. Chauhan's friends and family. Kelley did this without Ms. Chauhan's knowledge or permission.

146.    Like the other Plaintiffs, Ms. Chauhan felt pressured to drink, socialize, and endure inappropriate behavior by the Department's faculty members because this was the sole route to building and maintaining necessary relationships with her faculty advisors. Ms. Chauhan observed that Kelley and Whalen always seemed to be trying to get their graduate students drunk.

147.    The first time Whalen witnessed Ms. Chauhan purchasing a drink at a bar, he came up to her and exclaimed, "I can't believe you're this much fun! I thought you were just a shy person."

148.   Ms. Chauhan contacted two Title IX Coordinators multiple times and requested to deliver a victim impact statement during Whalen's disciplinary hearing. Dartmouth scheduled Whalen's hearing to take place on a day when it knew Ms. Chauhan was unavailable to attend and then unilaterally terminated the process, thus depriving Ms. Chauhan of the opportunity to confront Whalen.

149.   Ms. Chauhan attended the October 2018 meeting between Chair Bucci, Director Wheatley, the Title IX Coordinator, and the Department's graduate students. When Ms. Chauhan criticized Chair Bucci for his statements, he responded by telling her that her anger at Dartmouth was misplaced and she should, instead, be angry at the professors who hurt her. This all but confirmed Ms. Chauhan as a victim in front of the Department's entire graduate student population.

150.   Ms. Chauhan came to Dartmouth as an international student from a culture that valued modesty and religion. Having studied at excellent institutions throughout the world, Ms. Chauhan chose Dartmouth because she thought it would provide her with a solid foundation as a researcher and scientist. After she was sexually assaulted on April 25, 2017, Ms. Chauhan sought professional counseling services at Dartmouth's health center. During that session, Ms. Chauhan detailed her most private thoughts and feelings about the assault. Shortly thereafter, Investigator Davis demanded that Ms. Chauhan provide her counseling records to her and assured her that they would be treated as "confidential." Ms. Chauhan was appalled to learn, in the Title IX report, that Investigator Davis showed her private counseling records to the perpetrator and his attorneys to seek their "response."

151.   Ms. Chauhan feels so betrayed by that action that she cannot trust therapists enough to seek the treatment she knows she needs. Combined, the assault, harassment and betrayal of her

most private confidences have left Ms. Chauhan severely depressed, anxious and with difficulty focusing and motivating herself to complete her work. Her academic achievements and productivity have suffered greatly due to her experiences at Dartmouth and her participation in the Title IX investigation. These experiences have had lasting effects on Ms. Chauhan's mental health and emotional state.  She is plagued with doubts about her future prospects in academia and has lost her optimism for her well-being in personal relationships.

**C.**     **Sasha Brietzke's Factual Allegations**

152.    Ms. Brietzke is a current graduate student who began working in Kelley's lab in the fall of 2016. She is a promising researcher who has received positive evaluations from her advisor and presented at professional academic conferences.

153.    Heatherton sexually harassed and inappropriately touched Ms. Brietzke on two separate occasions in March 2017 while attending the SANS Conference with a group of the Department's students and professors.

154.    Heatherton joined Ms. Brietzke and several other conference attendees at the Abbey Nightclub, where he stood extremely close to Ms. Brietzke and placed his hand on her lower back in a way that made her uncomfortable.

155.    The next night, Ms. Brietzke attended a karaoke event after the conference. Heatherton spotted Ms. Brietzke and continuously called for her to join him.

156.    Heatherton grabbed Ms. Brietzke and groped her buttocks. He then grabbed her waist and pulled her into his lap and asked her what she was "going to be doing later that night." Shocked and terrified, Ms. Brietzke jumped from his lap and left the venue.

157.   Kelley and Whalen created a highly sexualized and hostile environment that prevented Ms. Brietzke from availing herself of the benefits of her educational and professional pursuits at Dartmouth.

158.   Kelley, Whalen, and Heatherton all prided themselves on having young and attractive females in their labs. During a lab meeting, Heatherton announced that he found it socially rewarding when women smiled at him. Kelley frequently discussed how Ms. Brietzke and the other female students in his lab were "hot," often bragging that he had "the hottest lab."  On one occasion, Kelley commented that his lab assistants were "hotter" than Whalen's.

159.   Ms. Brietzke felt objectified and treated as a "doll" by Kelley. Kelley often made inappropriate and objectifying comments about Ms. Brietzke's physical appearance, such as regularly commenting on the size of her breasts, complimenting her make-up, and inquiring about her relationship status. Kelley also urged Ms. Brietzke to date his male friends, whom he instructed to flirt with Ms. Brietzke and give her hugs even after she expressed disinterest. When Ms. Brietzke did not respond with enthusiasm to his comments, Kelley became inattentive towards her and her work.

160.   While playing a game called "Heads Up!" (a variation of Charades in which the players act out words and phrases for adult content) with Ms. Rapuano, Ms. Brietzke, and Ms. Chauhan, Kelley referred to a push-up bra by yelling, "[Ms. Rapuano] would wear this but [Ms. Brietzke] wouldn't."  Kelley also referred to chaps by stating, "Assless! You wear these, assless ones."

161.   Kelley also made sexual and demeaning comments about other women in Ms. Brietzke's presence. For example, Kelley described another woman in the Department as "a bitch" and regularly told Ms. Brietzke that he found Ms. Courtney physically attractive. Ms. Brietzke was

present for conversations in which Kelley asked Ms. Courtney about her sex life and the size of her partner's penis. On one occasion, Kelley urged Ms. Brietzke to participate in an "intervention" he staged to encourage another female graduate student to break up with her boyfriend.

162.    Ms. Brietzke, like other women in the Department, felt that she had to drink and socialize with Kelley and Whalen to receive academic attention. Indeed, Kelley once told Ms. Brietzke that another female graduate student was "a bitch" because she had not come drinking with him that night.

163.    Kelley pressured Ms. Brietzke, Ms. Rapuano, and Ms. Courtney to meet him at bars during non-working hours on a moment's notice, often texting them nonstop until they agreed to meet with him socially. Whalen regularly bought Ms. Brietzke drinks at bars without asking her and without regard for Ms. Brietzke's discomfort with accepting alcoholic beverages purchased for her by a faculty member. He also purchased extravagant meals costing hundreds of dollars for Ms. Brietzke and other female students.

164.    On April 4, 2017, and April 7, 2017, Ms. Rapuano, Ms. Courtney, and several other graduate students complained of sexual harassment, sexual assault, inappropriate conduct, and retaliation by Kelley, Whalen, and Heatherton to Chair Bucci, Director Wheatley, and Dartmouth's Title IX office.

165.    Dartmouth took no action for months. As a result, the sexual harassment and hostile environment perpetuated by Kelley, Whalen, and Heatherton continued unabated.

166.    After the April 2017 Title IX complaints, Whalen remarked that Ms. Brietzke "didn't like him" and invited her to watch a movie in his home. When Ms. Brietzke declined, Whalen asked what he had to do to make her like him.

167.    Another female student involved in the Title IX reporting sought another advisor and did not attend a lab meeting with Kelley. When he asked where this student was, Ms. Brietzke feigned ignorance and stated that she might be out of town or out of the country. Later that day, Kelley saw Ms. Brietzke and the other female student walking in town. Kelley removed Ms. Brietzke from a large project she was working on and refused to attend meetings with her. In an email to everyone working in his lab, Kelley wrote that the other female graduate student was considering other lab options and noted that "crafting cover-up stories to suggest that she is out of the country is unnecessary … indeed … it's kind of dumb given the size of Hanover and how often we all see each other in town."

168.    Ms. Brietzke attended the meeting between Chair Bucci, Director Wheatley, the Title IX Coordinator, and all graduate students in the Department that was called days after Dartmouth received the October 12, 2018 letter from Plaintiffs' counsel detailing Plaintiffs' claims and the basis for Dartmouth's liability under Title IX and other statutes. After this attempt to disparage the victims and discourage them from pursuing legal action, Ms. Brietzke felt as though she was no longer safe nor welcome at Dartmouth.

169.    Ms. Brietzke came to Dartmouth to gain experience and learn new research methods in the Department, which was known for its prestigious and rigorous graduate program. Instead, she was discouraged from contacting professors to learn new research methods and found that the Department's professors had no interest in teaching her. The sexually hostile atmosphere and pressure to engage with the professors socially was apparent from Ms. Brietzke's very first day in the Department, and over the course of her first year at Dartmouth, she came to feel that women in the Department, including herself, were objectified and expected to compromise

themselves to succeed. These behaviors escalated when Heatherton sexually harassed and groped Ms. Brietzke at a conference.

170.    Combined, the toxic sexual environment, harassment, and abuse she experienced took a toll on Ms. Brietzke. Ms. Brietzke became depressed, socially withdrawn, and anxious. Ms. Brietzke felt unsafe working in the lab with Heatherton, whom she was forced to see on a regular basis. As a result, her academic work suffered. Ms. Brietzke began to withdraw from friends and isolate herself. She began regularly seeing a therapist for the first time because of her experiences. The harassment she experienced impacted every facet of her life—from her personal relationships to her academic success.

**D.    Annemarie Brown's Factual Allegations**

171.    Ms. Brown worked as a graduate student in Whalen's lab from 2010 to 2015, and successfully defended her Ph.D. in January 2016. She was hired by Dartmouth as an adjunct professor in September 2017.

172.    During her first year working as Whalen's graduate student, Whalen trumpeted the claim that Dartmouth protects its male professors by discrediting women who dare to bring sexual harassment claims against them. Whalen announced to his students that a woman in the Department had previously complained about sexual harassment and that it had "backfired," causing the complainant to "lose resources" and lose steam in her career. Whalen warned his female graduate students that the complainant "got what was coming to her, of course; you don't bite the hand that feeds you."

173.    Ms. Brown observed that Whalen, Heatherton, and Kelley all rewarded young, attractive women who went to social gatherings and drank heavily with their advisors with additional academic attention and advancement opportunities. This "socializing" was often

prioritized over students' academic pursuits. For example, Whalen's students, including Ms. Brown, traveled to London to attend an International Society for Affective Disorders conference. Unbeknownst to the student participants, Whalen arranged a "drinking tour" with himself and his students that lasted the duration of the conference. Indeed, Ms. Brown and her female classmates visited the conference only briefly to pick up their name tags.

174.    Whalen openly rewarded graduate students who drank and socialized with him over those who declined to do so. He pressured Ms. Brown and his other students to attend what he called "mandatory fun" events, such as pajama parties and "boozy lunches" in the middle of the workday. When Ms. Brown refused to attend these events, Whalen called her a "goody two shoes" and a "7-year-old girl." He then began ignoring Ms. Brown academically and subjecting her to undue criticism.

175.    Whalen and Kelley cultivated a hostile environment in which professional boundaries were virtually nonexistent. For example, after learning that Ms. Brown had just interviewed for a position at Harvard, Whalen and Kelley pressured her to take a picture with their arms around her and texted it to her potential Harvard supervisor with the caption "wish you were here." Days later, Harvard rejected Ms. Brown.

176.    Whalen once instructed his graduate students to design a series of experiments related to alcohol consumption. Women were required to take pregnancy tests prior to participating in these experiments. Whalen walked down the hall singing, "Who wants a pregnancy test!?"

177.    Whalen sexually harassed and inappropriately touched Ms. Brown on numerous occasions throughout her tenure in his lab.

178.    Shortly after Ms. Brown joined the lab, Whalen laid down on the floor and demanded that she "walk on his back," an activity he said his previous female graduate students did for him "all the time."

179.    When Ms. Brown was leaving a Super Bowl party at Whalen's house, he squeezed her buttocks and winked at her while hugging her goodbye. His wife was standing right beside them.

180.    When Ms. Brown failed to respond to Whalen's sexual advances, he retaliated by subjecting her to unwarranted criticism and cancelling academic meetings.

181.    As a result, Ms. Brown became fearful that she would be expelled from the program. She eventually voiced these concerns to Whalen. Whalen reminded her of his near total control of her, telling her, "I'll never let you go."

182.    Whalen then delayed Ms. Brown's academic progress by rescheduling her first qualifying exam. The weekend before her exam was scheduled, Whalen organized a trip to his Vermont property. After drinking the entire weekend, Whalen ignored Ms. Brown's attempts to contact him for the first two days of the week-long exam schedule before finally telling her that he needed to delay her exam because he was recovering from the weekend.

183.    Whalen also escalated his inappropriate sexual comments to Ms. Brown. For example, he regularly commented on Ms. Brown's physical appearance, telling her that she was an "8.5 out of 10" and warning her to "act accordingly" and "watch out" because she "should know she is pretty." At another time, Whalen, while openly staring at Ms. Brown's chest, advised her that it was important that she put a lot of sunscreen on her chest area.

184.    Ms. Brown felt that her success at Dartmouth required Whalen's "protection," which he would only provide if she succumbed to his flirtations and sexual advances.

185.     While in a taxi at a professional conference, Whalen publicly shouted to Ms. Brown that she should "just screw" the lab mate he assumed she had feelings for. Whalen made this comment in the presence of many of Ms. Brown's fellow graduate students as well as professional colleagues in the same academic field with the potential to help Ms. Brown secure future employment.

186.     Another time, Whalen instructed Ms. Brown to retrieve something from his desk in the lab on Dartmouth premises in a drawer he knew contained Playboy magazines.

187.     Ms. Brown was also present for several instances in which Whalen behaved in a sexually suggestive and inappropriate manner toward other women. For example, while at a lunch, Whalen remarked that he could see a waitress's panty lines and told Ms. Brown that it was "never good to see panty lines." Whalen also regularly gave Ms. Brown and other female graduate students "bear hugs" while inebriated.

188.     Kelley contributed to this hostile environment by spreading false rumors that Ms. Brown and Whalen were in a sexual relationship.

189.     While with Ms. Brown and other female graduate students, Kelley frequently discussed the "Papi scale," rating women according to whether he would want to "bang" them.

190.     Whalen then rescheduled Ms. Brown's second qualifying exam for nearly a full year. This extreme delay forced Ms. Brown to go on academic probation, which Whalen told her was a "character building exercise." When Ms. Brown was finally scheduled to take this exam nearly a year later, Whalen again rescheduled it, further delaying her academic progress.

191.     Ms. Brown immediately contacted now-Chair David Bucci to request a secondary advisor after learning her qualifying exam had been further rescheduled. Chair Bucci told Ms. Brown that a secondary advisor was not an option. Even though Ms. Brown explicitly asked Bucci

to keep her request confidential and refrain from telling Whalen, Bucci informed Whalen that Ms. Brown had requested a secondary advisor.

192.     Thereafter, Whalen retaliated against Ms. Brown for rejecting his sexual advances and seeking a secondary advisor. He promptly removed Ms. Brown from Dartmouth's centralized funding and placed her on his individual grant, which allowed him to exercise complete control over her work. Over time, Whalen increasingly denied Ms. Brown access to resources vital to her work and academic success at Dartmouth. During this time, Whalen also abruptly cancelled meetings with Ms. Brown. After one such cancelled meeting, Whalen told her, "I'm sorry, but I had to get laid. You understand, don't you?" Finally, Whalen then rescheduled Ms. Brown's dissertation defense on two separate occasions, delaying her academic progress by months more.

193.     Ms. Brown was hired as an adjunct professor in September 2017. When she was hired, Bucci told her that Dartmouth would continue to employ her as an adjunct if everything went well.

194.     In approximately October 2017, Ms. Brown contacted the Title IX investigator to provide information regarding Whalen's sexual misconduct against her and other students.

195.     In April 2018, Dartmouth released the teaching schedule for the following year. Despite receiving outstanding student evaluations, Ms. Brown was scheduled to teach no courses. On April 9, 2018, Ms. Brown contacted Chair Bucci and requested a meeting to discuss her teaching schedule for the following semester. Chair Bucci told Ms. Brown that he had nothing to say and refused to meet with her, claiming that they could not discuss her employment until the investigation had concluded.

196.     Chair Bucci did, however, give teaching assignments to a male adjunct with similar credentials to Ms. Brown's. Both Ms. Brown and this individual were graduate students working

in the Department and were subsequently hired as adjunct professors during approximately the same period. The only difference between Ms. Brown and the male teacher, aside from gender, is that the male did not participate in the Title IX investigation.

197.    Dartmouth also denied Ms. Brown access to free counseling resources provided to her as an employee benefit. In December 2017, Ms. Brown contacted Dartmouth's employee assistance program and scheduled an introductory session (during which she was to provide an overview of the issues she wished to discuss) and a follow-up appointment for the following week. During Ms. Brown's introductory session, she explained that she wanted to discuss the Title IX investigation and its impact on her. The Dartmouth counselor cancelled Ms. Brown's follow-up appointment just days in advance and did not respond to Ms. Brown's efforts to reschedule.

198.    When Ms. Brown received a copy of the final investigative report from Dartmouth, she was shocked to learn, for the very first time, that she was listed as a "Reporting Party" to the complaint against Whalen. Neither Dartmouth nor Investigator Davis asked Ms. Brown for permission to list her as a Reporting Party or informed her that they intended to do so.  Ms. Brown was unaware that Whalen would have the opportunity to review and dispute her specific report. Ms. Brown suffered from a panic attack when she unexpectedly received the report listing her as a Reporting Party along with Whalen's rebuttal to her story.

199.    After a promising undergraduate career, Ms. Brown was pursued by prestigious schools such as Harvard. She ultimately chose Dartmouth because of its reputation and well-respected professors in her desired field of science. Ms. Brown came to Dartmouth full of potential, work ethic, and energy, but left Dartmouth demoralized with a shattered academic record and diagnosed with anxiety, Post Traumatic Stress Disorder, and stress-induced onset of autoimmune disease. Ms. Brown matriculated at Dartmouth with the expectation that her work would be

examined and scrutinized by a team of well-known researchers whom she looked forward to engaging with at each step. Instead, she was thrust into an environment in which these esteemed researchers were prone to flagrant sexual misconduct and cared little about her research or helping her improve her work. This environment quickly took its toll on Ms. Brown, who came from a sheltered background and was just 21 years old when she came to Dartmouth. Ms. Brown became and remains socially withdrawn, hopeless about her future, and severely disadvantaged in a competitive field.

## E.   Andrea Courtney's Factual Allegations

200.    Ms. Courtney enrolled at Dartmouth in 2012 and worked in Kelley's lab as a doctoral student. While at Dartmouth, Ms. Courtney won multiple awards and travel grants. She authored and published numerous papers and gave poster presentations and talks at academic conferences.

201.    Kelley regularly initiated inappropriate and sexual conversations with Ms. Courtney concerning the sex lives and physical appearances of Ms. Courtney and other female graduate students in the Department.

202.    For example, Kelley questioned Ms. Courtney about her sex life with her partner, asking whether the sex "was good" and inquiring about the size of her partner's penis. Kelley also openly discussed the number of Ms. Courtney's sexual partners and demanded to know whether Ms. Courtney would have sex with male graduate students. When she started at Dartmouth, Kelley took bets on how long Ms. Courtney's and Ms. Rapuano's long distance relationships with their boyfriends would last.

203.    On one occasion, Kelley demanded that Ms. Courtney refrain from talking to men in bars because they "didn't know that [Ms. Courtney was] the prettiest girl in here and [they don't] have a shot."

204.    Kelley regularly discussed the physical attributes of female graduate students and women. For example, Kelley openly remarked on various female graduate students' breast sizes and commented that Ms. Courtney "wouldn't need a boob job." Kelley noted his preference for "boobs that have a natural, ski jump shape."

205.    Ms. Courtney and Ms. Rapuano worked together in Kelley's lab. Ms. Courtney observed that Kelley had a manipulative and controlling relationship with Ms. Rapuano, who often seemed distressed and upset in the lab.

206.    Ms. Courtney, by contrast, was utterly neglected academically and often completely ignored by Kelley in the lab. Kelley rarely expressed interest in Ms. Courtney's work and often refused to answer her emails, took long periods of time to review her manuscripts, and denied her academic opportunities.

207.    Whalen sexually harassed Ms. Courtney and repeatedly made unwelcome sexual advances towards her.

208.    Whalen once pulled Ms. Courtney away from a male lab mate, held her hand, and hugged her while saying, "you can't do this to me. It makes me jealous when you touch other guys like that."

209.    On another occasion, Whalen grabbed Ms. Courtney's face and told her, "you are the prettiest girl in the room; you are the prettiest girl in any room you are in." Another time, he followed her out of a bar, stating "in another life…" before taking her hand and walking with her for a block. Whalen also told Ms. Courtney and other female graduate students that he loved them

on multiple occasions. Whalen also inquired about Ms. Courtney's relationship and asked her if she was happy with her partner.

210.    Ms. Courtney observed that Whalen liked to surround himself with young and attractive women and selected his teaching assistants based on their physical appearance. Whalen directed extra attention to the female students in his lab whom he deemed the most physically attractive.

211.    Ms. Courtney found the Department to be a toxic environment from the moment she enrolled. Kelley and Whalen especially inhibited Ms. Courtney's progress by prioritizing drinking over acting as academic advisors, forcing her to dedicate most of her free time to socializing with these professors to receive academic advising.

212.    Kelley and Whalen regularly spoke about their alcohol-fueled exploits with other students, describing how those students got drunk, threw up, and made fools of themselves.

213.    On one occasion, Ms. Courtney became extremely ill after Kelley and Whalen led a drinking marathon that commenced at 3:00 p.m. on a week day. Whalen continuously bought Ms. Courtney and the other graduate students pitchers of sangria, refilling Ms. Courtney's glass without being asked. Ms. Courtney announced at one point that she needed to stop drinking. Ms. Courtney later learned that Whalen continued to refill her glass even after she expressed that she needed to stop. Ms. Courtney was brought back to the lab and fell asleep in one of the rooms.

214.    Ms. Courtney was later told that Whalen attempted to enter the room to "take care of her," but was thwarted by a male lab mate watching over her who angrily forced Whalen to leave.

215.    At a conference in San Diego, Whalen accompanied Ms. Courtney and two other female graduate students to a mall and attempted to help Ms. Courtney find a dress to wear at dinner, bringing various dresses to the dressing room for her to try on.

216.    Whalen, Kelley, and Heatherton regularly made demeaning and sexualized comments about Ms. Courtney or other women in her presence. For example, Kelley once remarked that all the graduate students were thin now and said that they "didn't have anyone who was fat." After interviewing graduate students to work in the lab, Heatherton remarked that one interviewee "was a jap (Jewish American Princess) and needed to eat a hamburger."

217.    Kelley repeatedly told the story of a "joke" he'd played on Whalen in the past in which Kelley told a young female student working in Whalen's lab that Whalen had a "botched penis circumcision" that left him with a "halfie cap." Kelley bragged that he told Whalen about this joke immediately, remarking that it was "brilliant" because Whalen was left with the option of either allowing his student to believe he had a "botched" circumcision or correcting her himself—which he did.

218.    Kelley also initiated sexualized conversations about male students in the Department in the presence of Ms. Courtney and other women. He publicly humiliated a religious male graduate student for being a virgin and asked Ms. Courtney and other graduate students to bet on "how long [the male graduate student] would last" on his wedding night. Kelley also remarked that another male working in his lab had "a big penis."

219.    On April 4, 2017, and April 7, 2017, Ms. Courtney joined Ms. Rapuano and several other graduate students in complaining of sexual harassment, sexual assault, inappropriate conduct, and retaliation by Kelley, Whalen, and Heatherton to Chair Bucci, Director Wheatley, and Dartmouth's Title IX office.

220.    Following these complaints, Dartmouth encouraged the victims to continue working with or among their harassers for several months. Dartmouth warned the victims that, if they did not continue working with their harassers, there was a strong possibility that Heatherton, Kelley, and Whalen would revoke their support and disparage the victims to the Department, which could result in the victims being placed on probation or asked to leave the program. Ms. Courtney thus continued to work in Kelley's lab, forced to tolerate his abusive and manipulative behavior, for nearly four months.

221.    Ms. Courtney chose to attend Dartmouth with the expectation that she would be trained by experts in the field to publish papers and conduct cutting-edge science using resources promised to graduate students. However, she soon learned that these professors prioritized a highly sexualized drinking culture over academic advising. Ms. Courtney was dissuaded from using the very resources that brought her to Dartmouth in the first place and struggled to receive advising and feedback on her work. Because Heatherton, Kelley, and Whalen controlled most of Ms. Courtney's resources, she felt forced to participate in their predatory "boys club" as a means to succeed in the Department. The power these professors wielded over Ms. Courtney eventually made her believe that her own worth as a scientist was directly dependent on their support. Faced with unrelenting sexual harassment and academic neglect, Ms. Courtney's academic advancement and productivity suffered greatly and limited her career prospects. She began to lose passion for pursuing a career in the field, which she came to believe nurtured this predatory "boys club" culture. Because of Ms. Courtney's experiences at Dartmouth, she began to question her religious faith and developed anxiety and depression.

**F.**     **Marissa Evans's Factual Allegations**

222.     Ms. Evans was an undergraduate student at Dartmouth from 2014 until 2018.  She majored in Neuroscience and worked in Kelley's lab from Fall 2015 to Spring 2017. Ms. Evans began a post-baccalaureate premedical program at the University of Southern California in the Fall of 2018.

223.     In the fall of 2015, when Ms. Evans was a sophomore, a male student broke into her dorm room and raped her.  Ms. Evans reported the assault to Dartmouth College Health Service counselor Dr. Bryant Ford on November 10, 2015. When Ms. Evans relayed the assault, Dr. Ford replied, "Was it a dream?" Then, at Ms. Evans's direction, Dr. Ford reported the sexual assault to Dartmouth's Title IX coordinator and campus safety on her behalf on approximately November 19, 2015.

224.     Dartmouth's response to Ms. Evans's sexual assault report violates Title IX and numerous other state and federal laws. First, Dartmouth failed to inform Ms. Evans of her right to obtain a no-cost Jane Doe forensic examination at the nearest qualified facility, to which law enforcement is legally required to transport her. Moreover, Dartmouth falsely informed Ms. Evans that she would not be permitted to proceed anonymously to pursue a Title IX complaint. In addition, Dartmouth engaged in *no* investigation concerning the reported rape, refusing even to check the entry logs to see which students had entered her dorm during the relevant hours on the night of her assault. Although Ms. Evans provided the approximate height, hair length and color, and build of the person who raped her, she is unaware of any steps that were taken to investigate her assault or identify the rapist. Thus, Dartmouth violated Title IX at least by: failing to prevent the sexual assault; failing to have a workable process for reporting sexual assault; impeding a criminal investigation by failing to take necessary steps to preserve evidence; failing to conduct

any investigation of the rape; failing to offer the victim any accommodations; and failing to take any measures to prevent against retaliation.

225.    Kelley sexually harassed Ms. Evans throughout her tenure in his lab. From the outset, Kelley eschewed professional and personal boundaries. During the summer of 2015, Ms. Evans interviewed for a position in Kelley's lab. Although she was just 19 years old, Kelley insisted that her formal job interview take place at a bar. There, Kelley plied her with several glasses of wine before taking her bar-hopping and buying her whiskey, commenting several times that Ms. Evans was underage and could not legally drink.

226.    Kelley's conduct escalated in the summer of 2016. For example, Kelley began sending Ms. Evans Snapchats of himself drinking and commented on his level of intoxication. Over the 2016-2017 academic year, these messages escalated to inappropriate compliments, such as telling Ms. Evans that "a guy like me could never be with a girl like you" and calling her "beautiful" and "sexy." In December 2016, Kelley arrived, uninvited, at one of Ms. Evans's track meets while intoxicated.

227.    Ms. Evans did not submit to Kelley's sexual advances or convey any romantic or sexual interest in him, often responding to his comments by saying, "no, you don't mean that." Ms. Evans became anxious over Kelley's level of interest in her and feared that rejecting him would hurt her academically. Kelley warned Ms. Evans that his letter of recommendation would be "crucial" for her future and once told her that, as a "favor," he was giving her a better grade in his course than she deserved.

228.    Kelley repeatedly threatened to harm Ms. Evans academically after she refused to engage in his sexual banter. Each time, Kelley responded by telling Ms. Evans, "Someone's honors

thesis just got harder." Ms. Evans responded by telling Kelley not to bring her honors thesis into the conversation.

229.     In December 2016, Ms. Evans returned home due to a close childhood friend's death. Kelley sought to exploit Ms. Evans's vulnerable state—of which he was well-aware—by dramatically escalating his unwelcome sexual advances towards her.

230.     Kelley began to send Ms. Evans sexually explicit images that were both unwelcome and unsolicited. These images displayed, among other things:

- Kelley's fully naked body, including his erect penis;
- Kelley's genitalia with sex toys, including a penis "cage" and a penis "hat"; and
- Kelley engaged in sexual encounters with two unidentified persons.

231.     Kelley barraged Ms. Evans with unwelcome and offensive text messages of a sexual nature, including:

- Describing his personal use of sex toys, his past sexual encounters, and his sexual preferences in terms of dominant/submissive roles;
- Asking Ms. Evans to describe her sexual practices and fantasies;
- Instructing Ms. Evans on how to perform oral sex on a woman;
- Seeking to assert sexual dominance by commanding Ms. Evans to masturbate and—likening her to a pet—calling her "good girl"; and
- Expressing his intention to have sexual intercourse with her when she returned to Dartmouth in January 2017.

232.     After receiving more than 10 explicit sexual photographs, Ms. Evans blocked Kelley's number so that he could not contact her.

233.     Ms. Evans returned to Dartmouth in January 2017, after the holidays.  Because Kelley had told her he intended to have sexual intercourse with her upon her return, Ms. Evans was terrified that he was going to force her to have sex with him.

234.    As a result, Ms. Evans attempted to limit her interaction with Kelley and tried to work directly with his senior graduate student, Ms. Rapuano, rather than working with Kelley directly.

235.    Kelley eventually emailed Ms. Evans and demanded to know why she was not responding to his text messages. Afraid to tell Kelley that she had blocked him, she instead said that her phone was broken. In response, Kelley took it upon himself to make Ms. Evans an appointment at the Verizon store. Fearing retaliation if Kelley learned the truth, Ms. Evans went to the Verizon store and paid for a phone upgrade that she did not need.

236.    To escape Kelley's sexual harassment, Ms. Evans transferred to a different lab in the spring of 2017.

237.    After switching labs, Ms. Evans was at a local restaurant with a group of Dartmouth students when Kelley arrived to join the group. Ms. Evans switched to a different table so that she would not be seated near him. Kelley continued to stare at her throughout the night and said her name loudly as if to draw her attention to him.

238.    Kelley's conduct robbed Ms. Evans of her undergraduate educational experience and caused her to suffer severe emotional distress and disruptions to every area of her life.

239.    Dartmouth retaliated against Ms. Evans for participating in the Title IX investigation.

240.    On May 23, 2018, Ms. Evans easily passed the oral defense of her honors thesis. Professors Bob Maue and Alan Green, the faculty judges, unanimously recommended that she pass with honors.

241.   However, Professor Maue then, without explanation, refused to provide Ms. Evans with his signature as required for Ms. Evans to turn in her honors thesis. Ms. Evans sent Professor Maue numerous emails requesting his signature.  He did not respond.

242.   These circumstances delayed Ms. Evans's submission of her honors thesis, forcing her to file it one day past its due date. Purportedly because of this "lateness," Ms. Evans received a failing grade on her thesis.

243.   Ms. Evans met with Chair Bucci, Assistant Dean of Undergraduate Students Anne Hudak, and Professors Jeffrey Taube and Dave Kramer to explain the circumstances and request that Dartmouth reverse its decision to fail her. They refused and, instead, presented Ms. Evans with an untenable ultimatum: either accept an A- in an independent study without an honors thesis or receive her honors thesis but with a C grade for two semesters (which would drop her GPA below the threshold for medical school, the next professional step in her career).

244.   Ms. Evans appealed this decision to President Hanlon. In her appeal, she voiced concern about possible retaliation for her involvement in the Title IX investigation against Kelley, writing: "I personally feel as though this decision is rooted in retaliation, as I am the only undergraduate student who was directly involved in the investigation of the three neuroscience professors this past year." A petition was started on Ms. Evans's behalf requesting that Dartmouth reverse its decision, accumulating approximately 200 signatures.

245.   Still Dartmouth refused to reverse its decision. Ms. Evans was ultimately permitted to accept grades of B+ and A- for two semesters.

246.   Ms. Evans is the only undergraduate student who participated in the Title IX investigation. She is also the only undergraduate student whose honors thesis Dartmouth failed.

247.    Ms. Evans was a top-ranked high school graduate when she was recruited by Dartmouth to join its track and field team. Kelley took an immediate interest in her when she enrolled in several of his undergraduate courses. Ms. Evans, who was just 18 years old at the time, construed Kelley's interest as recognition of academic potential in her, and subsequently applied to work in his lab with the expectation that he would assist in building her career and shaping her honors thesis. Kelley's harassment of Ms. Evans caused her to question her own intellect and academic capabilities, doubts which permeated every aspect of her academic and social relationships. She became terrified that Kelley would force her to have sexual intercourse with him (after he stated his intention to do so) and was driven to severe depressive episodes and a suicide attempt. Ms. Evans's experiences at Dartmouth have had a lasting effect on her professional career and mental health. Ms. Evans will only work in research labs run by women because of her deep distrust of male employers. She was forced to withdraw from her first semester in a post-baccalaureate premedical program due to mental health reasons resulting from her time at Dartmouth.

## G.    Jane Doe's Factual Allegations

248.    Jane Doe received a master's degree in experimental psychology and obtained a Bachelor of Liberal Arts degree from a top college. Prior to matriculating at Dartmouth as a doctoral student, she worked in a prestigious neuroimaging lab.

249.    While at Dartmouth, Jane Doe received numerous external funding and conference awards, co-authored multiple papers, and gave talks and poster presentations at academic conferences across the country.

250.    Jane Doe worked in Whalen's lab during the 2016-2017 academic year. Whalen sexually harassed Jane Doe and subjected her to a hostile environment during her entire tenure in his lab.

251.    Jane Doe and other female graduate students in Whalen's lab felt pressured to submit to his constant and inappropriate flirtation and dress in a manner he felt was "sexy" to get any of Whalen's academic attention or support. Emblematically, Whalen once told Jane Doe that he had been described as a "benevolent sexist," which he told her he took as a compliment.

252.    Whalen made numerous unwelcome sexual advances toward Jane Doe, such as putting his arm around Jane Doe's waist and invading her personal space by, despite her obvious discomfort, putting his face just inches away from her face to speak to her. Additionally, Whalen once observed his ex-girlfriend at a bar, sat down next to Jane Doe, and instructed her that they were going to "make [his ex-girlfriend] jealous by making her think we are on a date."

253.    Whalen also made inappropriate comments about Jane Doe's physical appearance. For example, before attending a dinner at an academic conference, Whalen expressed disappointment in Jane Doe's physical appearance and implied that he did not find her attractive in the outfit she was wearing by remarking that he had hoped she would "dress up."

254.    While with Jane Doe and her female colleagues, Whalen and Kelley regularly rated the "hotness" of female students in the Department, remarking on their physical attractiveness and their clothing choices.

255.    Within months of starting at Dartmouth, Jane Doe noticed that students were expected to drink and socialize with the Department's professors to build key relationships and receive academic attention. Meetings often took place at bars and often involved heavy drinking.

On the occasions when Jane Doe declined to attend these "meetings," Whalen would disappear and ignore Jane Doe's emails, leaving her with no advisory support.

256.    Jane Doe realized that participating in this drinking culture was a prerequisite to getting the advising, guidance, and academic support she needed from Whalen to complete her studies at Dartmouth.

257.    Whalen prioritized female students who indulged his flirtations and sexual advances and neglected those who did not. Most tellingly, Whalen lavished advising, academic attention and opportunities upon a female student in his lab with whom he was widely known to be having a sexual relationship. By contrast, Whalen completely ignored and "froze out" Jane Doe, who refused his sexual advances.

258.    This dynamic impeded Jane Doe's academic progress at Dartmouth. While attempting to complete her work in the lab, Jane Doe felt pressured to leave Whalen and the graduate student with whom he was having a sexual relationship alone. When they were in the lab together, Whalen often spoke only to the female graduate student with whom he was in a relationship, ignoring Jane Doe.

259.    After Jane Doe participated in the Title IX process and investigation, Dartmouth retaliated against her by denying her reasonable accommodations, unilaterally transferring her into a new lab that was inconsistent with her background and academic field of science, and ultimately expelling her from the program after the school had set her up to fail.

260.    After subjecting Jane Doe to a highly sexualized and hostile lab environment perpetuated by its tenured professors for years, Dartmouth forced Jane Doe to a different lab that was incompatible with her background and field of science. Dartmouth's actions made it impossible for Jane Doe to realize the benefits of her education as a student at Dartmouth.

261. In mid-July 2017, Jane Doe was abruptly informed that Whalen had been placed on administrative leave and, effective immediately, she would be reassigned to a different professor's lab that was inconsistent with her background and field of science. Dartmouth did not give Jane Doe the opportunity to object to her placement or seek a more suitable lab.

262. The next day, Jane Doe told Dartmouth that the new lab to which she had been assigned was incompatible with her academic background and interests.

263. Immediately thereafter, Jane Doe became involved in the Title IX investigation.

264. Jane Doe continued to raise concerns with Dartmouth that her new lab was a poor fit. She discussed this with the new professor to whom she was assigned, who agreed that she would be better suited in a different lab.

265. Thereafter, Jane Doe met with a different professor whose lab was more aligned with her background and field of science. This professor offered to take Jane Doe into his lab, promising to communicate his offer to Dartmouth and advocate for the transfer during the annual faculty meeting. With this professor's support, Jane Doe initiated plans to transfer into his lab.

266. Director Wheatley and Chair Bucci initially seemed agreeable, but ultimately refused to let Jane Doe switch labs.

267. In June 2018, Dartmouth expelled Jane Doe from the program, without notice or a probationary period.

268. Within 48 hours, Jane Doe met with both Chair Bucci and Director Wheatley separately to discuss her expulsion.

269. Chair Bucci advised Jane Doe not to appeal her evaluations, warning her that "this is a small field and you don't want bad blood." In this same meeting, Jane Doe told Chair Bucci that the culture and harassment perpetuated by the Department's professors and the poor fit with

54

the lab she had been assigned had left her without a safe scientific home to complete her work. Chair Bucci trivialized Jane Doe's experiences of harassment and displacement by comparing them with a time when he was inundated with administrative work, stating "I had a hellish year, too, but was able to do my work."

270.    Director Wheatley claimed that she "had no choice" but to expel Jane Doe. Referencing an upcoming required presentation, Director Wheatley demanded to know: "What would you even present on if you were to stay?" This presentation was not scheduled to take place for nearly one year, and Jane Doe already had projects underway that she intended to present. Nonetheless, Dartmouth stood by its decision to expel her.

271.    Jane Doe chose to attend Dartmouth specifically to work with Whalen, whose research she had followed for many years. She came to Dartmouth with the expectation that Whalen, whose work heavily informed her interests and goals, would provide her with the background and knowledge necessary to launch a career in the field of social neuroscience. Instead, Jane Doe found herself in a place in which a highly sexualized environment was normalized and women, including herself, were systematically gaslighted. The pressure to drink and stay out late to receive mentorship served as a devastating trigger to Jane Doe, who had previously suffered from depression and had experienced trauma earlier in her life. Because of her experiences at Dartmouth, she lost her motivation, excitement, and passion for her work and became extremely withdrawn, cutting off communication with her family and closest friends.

## V.    CLASS ACTION ALLEGATIONS

272.    Plaintiffs and Class Representatives re-allege and incorporate by reference each and every allegation in the Complaint as though fully set forth herein.

273.     Plaintiffs and Class Representatives sue on behalf of themselves individually and on behalf of three classes of similarly-situated individuals pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3).

274.     Dartmouth tolerates and cultivates a gender discriminatory and sexually hostile environment for female students in the Department. Dartmouth has failed to respond adequately or appropriately to evidence and complaints of gender discrimination, sexual harassment, and hostile environment in the Department. The College has failed to create adequate procedures to ensure its employees comply with anti-discrimination laws and has failed to adequately discipline its employees when they violate anti-discrimination laws. Dartmouth knew or should have known that, because of its actions and inactions, female students have been subjected to a sexually hostile environment that has been sufficiently severe, pervasive, and objectively offensive to interfere with their educational opportunities, undermining and detracting from their school experience. Dartmouth's policies, practices, and procedures for investigating and responding to student complaints of gender discrimination, sexual harassment and hostile environment have an ongoing disparate impact on female students.

## A.     Rule 23 Class Definition

275.     Plaintiffs and Class Representatives seek to bring this action under Rule 23 on behalf of every current and former female graduate and undergraduate student who has matriculated or will matriculate at Dartmouth in the Department of Psychological and Brain Sciences between March 31, 2015 and the date of judgment.

276.     Plaintiffs reserve the right to modify this Class definition and Class period.

**B.**     **Efficiency of Class Prosecution of Class Claims**

277.    Certification of the proposed class is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the Class.

278.    Plaintiffs' individual claims, as Class Representatives, require resolution of the common questions concerning whether Dartmouth has subjected its female students in the Department to a sexually hostile environment that is sufficiently severe, pervasive, and objectively offensive to interfere with their educational opportunities, undermining and detracting from their school experience. The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives and working conditions, and the working conditions of the class members, and to prevent Dartmouth's continued gender discrimination.

279.    The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female students in the Department generally. Dartmouth caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures and failure to remedy or correct such discrimination. These injuries are redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in this action. Plaintiffs have a personal interest in the policies, practices, and procedures implemented at Dartmouth.

280.    To obtain relief for themselves and the class members, the Class Representatives will first establish the existence of systemic gender discrimination and hostile work environment as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

281.   Certification of the proposed class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives and the class members.

## C.   Numerosity and Impracticability of Joinder

282.   The Class that the Class Representatives seek to represent is too numerous to make joinder practicable.

283.   Upon information and belief, the proposed class consists of more than 40 current and former female students during the liability period. The exact size of the Class and the identities of the individual members are ascertainable through records maintained by Dartmouth.

## D.   Common Questions of Law and Fact

284.   Prosecuting Class Representatives' claims will require the adjudication of numerous questions of law and fact common to their claims and those of the Class they seek to represent.

285.   Common questions of law and fact predominate, and include, but are not limited to, the following: (i) whether Dartmouth has engaged in unlawful, systemic sex discrimination and facilitated a hostile educational environment that violates Title IX; (ii) whether Dartmouth has violated the Title IX and other legal rights of its female students by failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of discrimination in the educational environment; (iii) whether Dartmouth is liable for continuing systemic violations of Title IX; (iv) whether the harassment permitted and facilitated by Dartmouth interfered with the work or educational opportunities normally available to students; (v) whether an "appropriate person" had knowledge of the sexual harassment and hostile environment, including such knowledge of facts that would reasonably indicate substantial risk to any female

students, and failed to adequately respond; (vi) whether Dartmouth acted with deliberate indifferent to the notice of harassment; (vii) whether Dartmouth owed Plaintiffs and the proposed class members a fiduciary duty; (viii) whether Dartmouth breached its fiduciary duty by tolerating, condoning, ratifying, and/or engaging in the hostile environment, sexual harassment, gender discrimination, and/or retaliation, and failing to take remedial action; (ix) whether Dartmouth knew or should have known that its breach of fiduciary duty resulted in the sexual harassment and hostile environment to which Plaintiffs and members of the proposed class were subjected.

## E.    Typicality of Claims and Relief Sought

286.    Each Class Representative is a member of the Class she seeks to represent. The Class Representatives' claims are typical of the claims of the proposed class. The Class Representatives possess and assert each of the claims they assert on behalf of the proposed class. They pursue the same factual and legal theories and seek similar relief.

287.    Like members of the proposed class, the Class Representatives are current and former female graduate or undergraduate students who matriculated in the Department at Dartmouth during the liability period.

288.    The acts and omissions to which Defendants subjected the Class Representatives and the Class applied universally within the Class and were not unique to any Class Representative or Class Member.

289.    Dartmouth has failed to respond adequately or appropriately to evidence and complaints of sexual harassment and hostile environment in the Department. Dartmouth has failed to create adequate procedures to ensure its employees comply with anti-discrimination laws and has failed to adequately discipline its employees when they violate anti-discrimination laws. The Class Representatives and proposed class members have been affected in the same or similar ways

by Dartmouth's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination and sexually hostile environment.

290.    The relief necessary to remedy the claims of the Class Representatives is the same as that necessary to remedy the claims of the proposed class members. The Class Representatives seek the following relief for their individual claims and on behalf of the members of the proposed class: (i) a declaratory judgment that Dartmouth's policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and class members under, inter alia, Title IX and the applicable New Hampshire state laws; (ii) a permanent injunction against Dartmouth and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein; (iii) an Order requiring Defendants to initiate and implement programs and policies that (a) remedy the gender discrimination, sexual harassment, and hostile environment at Dartmouth; (b) ensure prompt remedial action regarding all claims of gender discrimination, sexual harassment and hostile environment; and (c) eliminate the continuing effects of the discriminatory and retaliatory practices described herein; (iv) an award of damages to Plaintiffs and the Class under Title IX of the Education Amendments of 1972 and common law, including compensatory damages and enhanced compensatory damages and/or punitive damages to deter Dartmouth from engaging in similar discriminatory practices in the future; and (v) an award of litigation costs and expenses, including reasonable attorneys' fees.

## F.    **Adequacy of Representation**

291.    The Class Representatives are adequate representatives of the proposed class.

292.    The Class Representatives' interests are coextensive with those of the members of the proposed class that they seek to represent in this case. The Class Representatives seek to remedy Dartmouth's hostile environment so female students will not suffer differential treatment, depriving them of educational opportunities and resources.

293.    The Class Representatives are willing and able to represent the proposed class fairly and vigorously as they pursue their similar individual claims in this action.

294.    The Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity. The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Rule 23(a)(4).

**G.    Requirements of Rule 23(b)(2)**

295.    Dartmouth has acted or refused to act on grounds generally applicable to the Class Representatives and the proposed class by facilitating a hostile environment and failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of hostile environment, sexual harassment, and retaliation by faculty and administrators. Dartmouth's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief for the Class as a whole.

296.    Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of the College's systemic sex discrimination. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by

the Class Representatives and class members of monetary and non-monetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of compensatory and punitive damages.

**H.**   **Requirements of Rule 23(b)(3)**

297.   The common issues of fact and law affecting the claims of the Class Representatives and proposed class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims. The common issues include whether Dartmouth has engaged in sex discrimination against female students by facilitating a hostile environment and failing to appropriately handle evidence and complaints of harassment.

298.   A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representatives and members of the proposed class. The cost of proving Dartmouth's hostile academic environment for female students also makes it impracticable for the Class Representatives and class members to pursue their claims individually.

299.   The hostile academic environment at Dartmouth makes the Class Representatives and class members eligible for monetary remedies for losses caused by this systemic discrimination, including back pay, front pay, compensatory damages, and other relief.

300.   Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all class members.

## VI.   COUNTS

### COUNT ONE

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,
AS AMENDED —**

## SEXUAL HARASSMENT – HOSTILE EDUCATIONAL ENVIRONMENT
### *(On Behalf of All Plaintiffs, Class Representatives and Class Members)*

301.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

302.   This Count is brought on behalf of the Plaintiffs and Class Representatives and all members of the proposed class.

303.   Upon information and belief, at all times relevant to this action, Dartmouth has received, and continues to receive, federal financial assistance.

304.   Dartmouth has subjected Plaintiffs, Class Representatives and the members of the proposed class to a sexually hostile educational environment in violation of Title IX.

305.   Dartmouth has discriminated against Plaintiffs, Class Representatives and all members of the proposed class by subjecting them to a sexually hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with the Plaintiffs' and the proposed class members' educational opportunities, undermining and detracting from their school experience. Because of Dartmouth's failure to implement adequate procedures to detect, monitor, and correct this discrimination and hostile environment, Dartmouth has denied Plaintiffs and members of the proposed class their personal right to work and learn in an environment free of sexual harassment.

306.   Dartmouth was on actual notice of the sexual harassment committed by the Department's professors and the hostile academic environment that the Plaintiffs and class members endured at Dartmouth during the relevant timeframe. Dartmouth has demonstrated deliberate indifference by tolerating, condoning, ratifying, and/or engaging in the hostile work and educational environment and failing to take remedial action.

307.    Because of Dartmouth's unlawful conduct, Plaintiffs and the proposed class members have suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

308.    By reason of the continuous nature of Dartmouth's unlawful conduct, Plaintiffs and the proposed class members are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

309.    Plaintiffs and the proposed class members are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT TWO

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS AMENDED —**
**GENDER DISCRIMINATION IN TERMS AND CONDITIONS OF EDUCATION U.S.C. § 1681 *et seq.***
*(On Behalf of Plaintiffs, Class Representatives and Class Members)*

310.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

311.    This Count is brought on behalf of the Plaintiffs and Class Representatives and all members of the proposed class.

312.    Upon information and belief, at all times relevant to this action, Dartmouth has received, and continues to receive, federal financial assistance.

313.    Dartmouth has discriminated against Plaintiffs, Class Representatives and all members of the proposed class by subjecting them to different treatment on the basis of their

gender. Plaintiffs and members of the proposed class were treated differently and less favorably than similar-situated male students. Dartmouth subjected Plaintiffs and members of the proposed class to disparate terms and conditions of education in violation of Title IX.

314.    Dartmouth's differential treatment of Plaintiffs and members of the proposed class is a direct and proximate result of gender discrimination.

315.    Dartmouth has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination.

316.    Dartmouth had actual notice of this discrimination and failed to adequately respond, both before and after the discrimination against Plaintiffs and members of the proposed class occurred, amounting to deliberate indifference.

317.    Because of the continuous nature of Dartmouth's unlawful conduct, Plaintiffs and members of the proposed class have suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

318.    Because of the continuous nature of Dartmouth's unlawful conduct, Plaintiffs and members of the proposed class are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

319.    Plaintiffs and the proposed class are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs, and other appropriate relief.

## <u>COUNT THREE</u>

### BREACH OF FIDUCIARY DUTY UNDER NEW HAMPSHIRE LAW
*(On Behalf of All Plaintiffs, Class Representatives and Class Members)*

320.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

321.    This Count is brought on behalf of the Plaintiffs and Class Representatives and all members of the proposed class.

322.    Plaintiffs, Class Representative and the proposed class members are or were enrolled at Dartmouth as undergraduate and/or graduate students in the Department during the liability period.

323.    Dartmouth, a New Hampshire post-secondary educational institution, has a fiduciary relationship with the Plaintiffs and the members of the proposed class. Plaintiffs and the proposed class were or are dependent on Dartmouth for their education, and Dartmouth owed them a duty to act in good faith and with due regard for their interests. Dartmouth thus owed Plaintiffs and the proposed class a fiduciary duty to create an environment in which they could pursue their education free from sexual harassment by faculty members.

324.    Dartmouth breached the fiduciary duty it owed to Plaintiffs, Class Representatives and the proposed class by tolerating, condoning, ratifying, and/or engaging in the hostile environment, sexual harassment, gender discrimination, and/or retaliation, and failing to take remedial action. Dartmouth failed to adopt and enforce practices and grievance procedures to effectively respond to faculty misconduct that would minimize the danger Plaintiffs and the proposed class would be exposed to sexual harassment by faculty members. Dartmouth failed to act in good faith and with due regard for the interests of Plaintiffs and members of the proposed class, who entrusted Dartmouth with their confidence.

325.    Dartmouth knew or should have known that it fostered a hostile academic environment that enabled Heatherton, Kelley, and Whalen to sexually harass Plaintiffs and

members of the proposed class. Dartmouth knew that Heatherton, Kelley, and Whalen had a propensity for sexually harassing female students.

326.     The faculty and members of administration responsible for the sexual harassment and hostile environment in the Department were or are employed by Dartmouth and had supervisory authority over the Plaintiffs and proposed class members.

327.     Dartmouth's conduct was wanton, malicious, outrageous, and conducted with full knowledge of the law. Dartmouth exhibited reckless indifference to the foreseeable risks of harm.

328.     Because of Dartmouth's breach of its fiduciary duty owed to Plaintiffs and members of the proposed class, Plaintiffs and members of the proposed class have suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

329.     Plaintiffs and members of the proposed class have suffered and continue to suffer damages and injuries for which Dartmouth is liable under state law.

## COUNT FOUR

## NEGLIGENT SUPERVISION AND RETENTION UNDER NEW HAMPSHIRE LAW
### *(On Behalf of Plaintiffs, Class Representatives and Class Members)*

330.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

331.     Dartmouth owed Plaintiffs, Class Representatives and members of the proposed class a duty of care to protect them from sexual harassment, which was unwarranted, unwanted and improper.

332.    Dartmouth breached its duty in its training, supervision and retention of Kelley, Whalen, and Heatherton, employees that Dartmouth knew, or in the exercise of reasonable care should have known, were unfit to work with and supervise young, female students.

333.    As a direct and proximate result of Dartmouth's breach of its duty, Plaintiffs and members of the proposed class were subjected to sexual harassment by Kelley, Whalen, and Heatherton.

334.    Plaintiffs, Class Representatives and members of the proposed class suffered damages and injuries for which Dartmouth is liable under state law.

## COUNT FIVE

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,
AS AMENDED —
*QUID PRO QUO* SEXUAL HARASSMENT
20 U.S.C. § 1681 *et seq.*
(*On Behalf of All Plaintiffs*)**

335.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

336.    This Count is brought on behalf of all Plaintiffs.

337.    Upon information and belief, at all times relevant to this action, Dartmouth has received, and continues to receive, federal financial assistance.

338.    Dartmouth has discriminated against Plaintiffs by creating and maintaining a hostile educational environment in violation of Title IX. The hostile environment endured by the Plaintiffs was sufficiently severe, pervasive, and objectively offensive to interfere with the Plaintiffs' educational opportunities, undermining and detracting from their school experience.

339.    Plaintiffs were subjected to unwelcome *quid pro quo* sexual harassment based on their sex. They were subjected to unwelcome sexual conduct, including sexual comments, unwanted sexual advances, and unwanted touching. Plaintiffs were expected to submit to this

unwelcome sexual conduct in exchange for favorable academic treatment, including mentoring time, research assistance, grades, and other academic opportunities.

340.   Dartmouth had actual notice of this conduct by Heatherton, Kelley, and Whalen, and was deliberately indifferent to this harassment, both before and after the harassment of Plaintiffs occurred. Such deliberate indifference places Plaintiffs and other students at risk of sexual harassment.

341.   By reason of the continuous nature of Dartmouth's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

342.   By reason of the continuous nature of Dartmouth's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

343.   Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs, and other appropriate relief.

## COUNT SIX

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS AMENDED —**
**RETALIATION**
**20 U.S.C. § 1681 *et seq.***
***(On Behalf of Plaintiffs Chauhan, Brietzke, Brown, Evans, and Doe)***

344.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

345.   This Count is brought on behalf of Plaintiffs Chauhan, Brietzke, Brown, Evans, and Doe.

346.    Upon information and belief, at all times relevant to this action, Dartmouth has received, and continues to receive, federal financial assistance.

347.    Plaintiffs Chauhan, Brietzke, Brown, Evans, and Doe engaged in protected activity by participating in the Title IX complaint and investigation. Dartmouth knew that these Plaintiffs engaged in this protected activity and subsequently undertook actions disadvantageous to them, including denying reasonable accommodations, expulsion, unwarranted grades of "fail," and convening a meeting of all students in the Department to publicly denounce the victims of the investigation. A retaliatory animus substantially motivated Dartmouth to take these adverse actions.

348.    Dartmouth's differential treatment of these Plaintiffs is a direct and proximate result of the protected activity they undertook.

349.    Because of the continuous nature of Dartmouth's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

350.    Because of the continuous nature of Dartmouth's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

351.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs, and other appropriate relief.

## **PRAYER FOR RELIEF ON CLAIMS**

**WHEREFORE**, Plaintiffs and Class Representatives, on their own behalf and on behalf of the proposed class, pray that this Court grant the following relief:

A.      Certification of this case as a class action under Federal Rule of Civil Procedure 23 on behalf of the proposed Plaintiff Class, designation of the proposed class Representatives as representatives of this Class, and designation of Plaintiffs' counsel of record as Class Counsel;

B.      A declaratory judgment that Dartmouth's policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and class members under, *inter alia*, Title IX and the applicable New Hampshire state laws;

C.      A permanent injunction against Dartmouth and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein;

D.      An Order requiring Defendants to initiate and implement programs and policies that (i) remedy the gender discrimination, sexual harassment, and hostile environment at Dartmouth; (ii) ensure prompt remedial action regarding all claims of gender discrimination, sexual harassment and hostile environment; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described herein;

E.      An award of damages to Plaintiffs and the Class under Title IX of the Education Amendments of 1972 and common law, including compensatory damages and punitive damages, in an amount not less than $70,000,000.

F.      An award of litigation costs and expenses, including reasonable attorneys' fees to the Plaintiffs;

G.      An award of pre-judgment interest and post-judgment interest available under law; and

H.      Such additional and further relief as this Court may deem just and proper.

# VII.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable of right by jury.


Dated:  November 15, 2018                    Respectfully submitted,

                                             */s/ Charles G. Douglas, III*
                                             Charles G. Douglas, III (NH Bar #669)
                                             **DOUGLAS, LEONARD & GARVEY, P.C.**
                                             14 South Street, Suite 5
                                             Concord, NH 03301
                                             Telephone: (603) 224-1988
                                             Fax: (603) 229-1988
                                             chuck@nhlawoffice.com

                                             *-- and --*

                                             David Sanford (*pro hac vice* forthcoming)
                                             Nicole Wiitala (*pro hac vice* forthcoming)
                                             **SANFORD HEISLER SHARP, LLP**
                                             1350 Avenue of the Americas, 31st Floor
                                             New York, New York 10019
                                             Telephone: (646) 402-5650
                                             Facsimile: (646) 402-5651
                                             dsanford@sanfordheisler.com
                                             nwiitala@sanfordheisler.com


                                             Deborah K. Marcuse (*pro hac vice* forthcoming)
                                             Steven J. Kelley (*pro hac vice* forthcoming)
                                             **SANFORD HEISLER SHARP, LLP**
                                             400 Pratt Street, 8th Floor
                                             Baltimore, MD 21202
                                             Telephone: (410) 834-7415
                                             Facsimile: (410) 834-7425
                                             dmarcuse@sanfordheisler.com
                                             skelly@sanfordheisler.com

                                             *Attorneys for Plaintiffs and the Proposed Class*