**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KRISTINA RAPUANO, VASSIKI CHAUHAN, SASHA BRIETZKE, ANNEMARIE BROWN, ANDREA COURTNEY, MARISSA EVANS, AND JANE DOE,<br><br>            Plaintiffs,<br><br>     v.<br><br>TRUSTEES OF DARTMOUTH COLLEGE,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:18-cv-01070-LM |

**ANSWER AND AFFIRMATIVE DEFENSES OF
TRUSTEES OF DARTMOUTH COLLEGE**

Defendant Trustees of Dartmouth College ("Dartmouth" or the "College") answer the

Plaintiffs' "Class Action Complaint and Demand for Jury Trial" (the "Complaint") as set forth

below.  Numbered paragraphs below refer to the corresponding paragraphs in the Complaint.

RESPONSE TO UNNUMBERED INTRODUCTORY PARAGRAPH:

First and foremost, Dartmouth applauds the courage displayed by members of the

Department of Psychological and Brain Sciences ("Department") who brought the misconduct of

three tenured faculty members to the College's attention in April 2017.  To address that

misconduct, forestall its recurrence, and ensure an equitable environment for students throughout

their time at Dartmouth, Dartmouth launched independent investigations of each faculty member

(together, the "Title IX Investigation") to be carried out in response to the allegations.  Through

that process, and through the investigative efforts undertaken to respond to this lawsuit,

Dartmouth's decision-makers now understand that an unacceptable environment involving

excess alcohol consumption, an inappropriate level of fraternization, and inappropriate personal

comments and contact between former Professors Heatherton, Whalen, and Kelley (collectively, the "Former Professors," and each a "Former Professor") and some Department students, existed in or after 2014.  In response to that environment, Dartmouth took unprecedented but necessary steps to terminate the employment and revoke tenure of the Former Professors.  Notwithstanding the Complaint's reference to isolated and remote incidents of alleged misconduct in the early 2000s – which is well outside the limitations period in any event – any such incident that was reported to Dartmouth was likewise promptly addressed at the time.

After receiving information from Department students in April 2017 about recent events, Dartmouth moved expeditiously to investigate and begin the process of removing the Former Professors.  The passage of time of which Plaintiffs complain initially resulted from their own requests for anonymity pending a critical academic program review date in June 2017.  Later "delays" were a product of independent and thorough investigations of all three Former Professors encompassing interviews of over fifty witnesses, the review of thousands of pages of documents, and multiple invitations to Plaintiffs and all other reporting parties to provide relevant evidence and to comment on preliminary drafts of investigative reports, all in compliance with Title IX requirements.  The final period of "delays" reflected Dartmouth's adherence to all required procedural safeguards in seeking to terminate the tenured employment of the Former Professors.   Dartmouth continues to work to identify and correct any remaining unacceptable environmental factors following the departure of the Former Professors and has recently announced a special and expansive initiative related to those efforts.

Dartmouth does not speak for, and has no intention of speaking in defense of, the Former Professors.  If they acted as alleged, they did so completely outside the scope of their employment and in violation of Dartmouth's policies and core values.  Because Dartmouth was

in the process of stripping them of tenure and terminating their employment at the time that they resigned or retired, Dartmouth does not have current access to them for information-gathering purposes and has not aligned in any way with them. Many of Dartmouth's responses to Plaintiffs' allegations must therefore be of insufficient knowledge to admit or deny. Of particular note, Dartmouth in this Answer is obligated to cite credible evidence countering the most serious allegations of nonconsensual sexual contact, i.e., rape and sexual assault. Dartmouth acknowledges that the investigator who conducted the Title IX Investigation (the "Title IX Investigator"), and the faculty hearing panel that adopted the Title IX Investigator's findings in Former Professor Whalen's case, credited Plaintiff Chauhan's allegations regarding Former Professor Whalen's sexual conduct, and Dartmouth acted swiftly to remove him in part on that basis. This legal action presents a wholly different context. Here, Dartmouth, being aware of evidence of disputed facts, including evidence beyond that tendered by the Former Professors, does not believe that the Title IX Investigator, or the faculty hearing panel to the extent applicable, can or should usurp the jury's role as factfinder in the context of this lawsuit.

## I.   INTRODUCTION

1.      Dartmouth denies the first and second sentences of Paragraph 1, and, further answering, says that the allegations do not appear to have been asserted to inform. With respect to the third sentence of Paragraph 1, Dartmouth admits that the Former Professors engaged in improper conduct that resulted in their prompt departure once the College and its decision-makers were made aware of that conduct. Dartmouth further admits that the information available to it strongly suggests that the Former Professors inappropriately touched and texted some students on certain occasions, which conduct contributed to the Former Professors' removal from the College campus and prompt departure from the College's employ. Dartmouth

lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the third sentence of Paragraph 1, but Dartmouth denies the allegations to the extent they purport to allege that such actions occurred with respect to all female students in the Department.  Answering further, Dartmouth acknowledges that the Title IX Investigator, and the faculty hearing panel that adopted the Title IX Investigator's conclusions in Former Professor Whalen's case, credited Plaintiff Chauhan's allegations regarding Former Professor Whalen's sexual conduct.   However, Dartmouth, being aware of evidence of disputed facts, including evidence beyond that tendered by the Former Professors, does not believe that it can or should usurp the jury's role as factfinder.  Dartmouth has since 2008 prohibited relationships between faculty members and undergraduates, as well as faculty members and graduate students under their academic supervision.   Dartmouth's new sexual misconduct policy, once adopted, will incorporate that prohibition.  Dartmouth further notes that, in several instances, the Plaintiff-specific allegations vary markedly from those voluntarily provided during the Title IX Investigation.

Answering further, Dartmouth states that, far from knowingly permitting the actions of the Former Professors outside the scope of their employment and in violation of Dartmouth's policies and core values, Dartmouth took the unprecedented step of seeking to terminate the tenured employment of all three.  In addition, Dartmouth – and many concerned faculty, staff, and administrators in the Department and elsewhere – are actively pursuing significant steps to ensure that such actions will not recur, to ensure that students have a safe environment in which to learn, research, and grow, and to facilitate a prompt and effective response to any report of inappropriate conduct in the future.  For example, earlier this month, Dartmouth launched the Campus Climate and Culture Initiative ("C3I"), a comprehensive program to create a learning

environment free from sexual harassment and the abuse of power.  It is the third pillar in a set of initiatives, building on Moving Dartmouth Forward ("MDF"), which was launched in 2015, and Inclusive Excellence ("IE"), which was launched in 2016.

2.      Dartmouth denies the first sentence of Paragraph 2.  With respect to the second sentence of Paragraph 2, Dartmouth states that during the first year that Professor Jay Hull ("Associate Dean Hull")[1] was Department Chair (July 2009-June 2010), one of Former Professor Whalen's graduate students informed Associate Dean Hull that Former Professor Whalen was holding lab meetings in a bar.  She stated that she felt uncomfortable with this practice, that she felt there was implicit pressure to drink at these meetings, and yet she felt she had to attend such meetings in order to have access to her advisor.  Associate Dean Hull immediately confronted Former Professor Whalen about this practice and told him that it was unprofessional and had to stop.  In that conversation, Associate Dean Hull made it clear that no student should have to go to an environment where he or she feels uncomfortable in order to have access to an advisor, nor should others who are comfortable in that environment have de facto greater access to their advisors.  Associate Dean Hull reasonably believed that the practice stopped after that, as there was no further report regarding such meetings.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second sentence of Paragraph 2, but Dartmouth denies the allegations to the extent they purport to allege that such actions occurred with respect to all female students in the Department, or that the College had knowledge of such conduct.

---

[1] Dartmouth is adopting the shorthand "Associate Dean Hull" based on Plaintiffs' shorthand used in the Complaint; however, at the time discussed in this response to Paragraph 2, and specifically between 2009 and 2015, Associate Dean Hull was a Department Chair, not an Associate Dean at the College.  At no time has Associate Dean Hull been a Dean of the College.

3.    Dartmouth is without knowledge or information sufficient to respond as to whether any relevant personnel were aware of unspecified "bad behavior by these professors" going back sixteen years.   Dartmouth denies the remaining allegations in Paragraph 3. Answering further, Dartmouth states that relevant personnel at Dartmouth during the time period when Plaintiffs allege these Former Professors engaged in conduct targeting them, i.e., 2014-2017, were not aware of any allegations comparable to the serious misconduct alleged in the Complaint until, at the earliest, April 2017, when several students asked for a meeting with the Chair of the Department and the Department's Director of Graduate Studies.   To the extent that any of the Plaintiffs' few, isolated allegations that predated April 2017 were raised with administrators (e.g., in 2002), Dartmouth has determined that prompt action was in fact taken in response.   The College had no reason to believe, based on these few isolated (and old) incidents, that the serious misconduct alleged by Plaintiffs might occur years later.   Dartmouth strongly denies that it "did nothing and ignored" complaints, or that it "ratif[ied] . . . violent and criminal acts of its professors."   Indeed, in the isolated instances where it was aware of any allegations – which are in no way commensurate with those now alleged by these Plaintiffs – Dartmouth responded promptly.

4.    Dartmouth admits that a group of male and female graduate students came forward in April 2017 to present certain concerns that the College took very seriously, but otherwise denies the allegations in Paragraph 4.   Answering further, Dartmouth says that the allegation as pleaded fails to acknowledge the prompt response and assistance provided by Dartmouth faculty and other personnel as soon as allegations were brought to light.   The basis for the denial, and the actual chronology covering some of the key steps regarding the report and immediate aftermath, is as follows:

On April 3, 2017, a student emailed Department Chair Bucci[2] and asked him to meet with a group of graduate students about "some departmental concerns."  Chair Bucci and Director Wheatley immediately arranged for a meeting, in lab space in the Mathematics Department, the next day, April 4.  Chair Bucci and Director Wheatley took extra steps to ensure a location away from the Department for the comfort of the students.  Eight students attended (5 women, 3 men), including three of the Plaintiffs, along with Chair Bucci and Director Wheatley.  At the meeting, the students identified various categories of concern, including non-consensual behavior, inappropriate comments, pressure to consume alcohol, pressure to socialize, and a recent incident involving public groping.  The students did not identify the faculty members or the alleged victims by name at that meeting.  Chair Bucci and Director Wheatley asked if they could contact the Dean of Faculty and Title IX office to share the concerns and asked if the students would be willing to follow up by meeting with the Title IX Coordinator.  The students agreed.  Director Wheatley promptly contacted the Title IX Coordinator.  Chair Bucci promptly reported the matter to Associate Dean Hull, who encouraged Chair Bucci to contact the Title IX Coordinator, relayed the report to Michael Mastanduno, the Dean of the Faculty, and relayed the report to Elizabeth Smith, who was soon to become the Dean of the Faculty.  Associate Dean Hull also reached out to the Title IX Coordinator directly, making clear that he was aware of the situation and that the administration was prepared to coordinate and assist in dealing with the matter.  Chair Bucci and Director Wheatley met with the Title IX Coordinator on April 6, 2017.  Chair Bucci, Director Wheatley, and the Title IX Coordinator arranged for and attended a meeting with the students the following day, April 7, 2017.

---

[2] Capitalized terms not otherwise defined in an answer have the same meaning as used in the allegations of the Complaint.

5.      Denied.   Answering further, Dartmouth states that the students who raised the issues discussed in Paragraph 4 above expressed concern about maintaining their anonymity, and made it clear that they did not want other faculty members (other than Chair Bucci and Director Wheatley) to be notified of the allegations, or students to be moved to different labs, until after the June 8, 2017 Standings Meeting.  This is the annual meeting at which the faculty discuss the progress of each graduate student in the program and for which the faculty must submit a written evaluation for each of their students.  Indeed, during an update meeting that Director Wheatley had with the students on April 27, 2017, the students made an express request that the College's then-General Counsel wait to send out emails to faculty or other information that might alert the Former Professors to an investigation until after the Standings Meeting.

Nevertheless, Dartmouth took steps to begin the investigation promptly while remaining mindful of the students' request and took steps to find new advisors for several students who requested that they do so, even in cases (e.g., with respect to Plaintiff Brietzke) where the student had made clear that she did not wish for a transfer to be executed until after the Standings Meeting.

With respect to the alleged sexual assault of Plaintiff Chauhan, Dartmouth cannot possibly possess knowledge or information sufficient to form a belief as to the truth of the allegation, but is aware that many facts regarding the alleged sexual assault are disputed, both by Former Professor Whalen and by another woman present and participating in the event alleged in this Paragraph.

6.      Dartmouth denies the first sentence with respect to the number of complainants. Answering further, Dartmouth states that 21 complainants participated in the Title IX Investigation.  Dartmouth denies the second sentence of Paragraph 6.  With respect to the third

sentence, Dartmouth admits that the New Hampshire Attorney General issued a news release on or about October 31, 2017, stating that it would be conducting a criminal investigation relating to allegations of sexual misconduct reported against three professors, whom Dartmouth understands to be the Former Professors.

7.      With respect to the first sentence of Paragraph 7, Dartmouth admits that it hired an outside attorney to conduct three thorough, independent investigations (collectively, the Title IX Investigation) regarding allegations that had been made against the three Former Professors, and lacks knowledge or information sufficient to form a belief about the truth of the allegation regarding what an unidentified person or persons told Plaintiffs.  Dartmouth denies the second sentence of Paragraph 7.

Answering further, Dartmouth states that at the time Former Professor Heatherton retired and Former Professors Kelley and Whalen resigned, Dartmouth's Dean of the Faculty had taken the extreme (but warranted) step of recommending their termination; however, the College's faculty disciplinary process – which consists of several levels of review – was ongoing and not yet completed.  Dartmouth did not unilaterally stop the investigation, nor did it "allow" the retirement or resignations.   As the College was not in a position to stop employees from resigning or retiring and the formal disciplinary process is dependent upon the employees remaining employees, the formal disciplinary process was rendered moot.  The College did not conclude any separation agreements with or pay severance to the Former Professors and its sole remaining recourse against them was to maintain the prohibition against their access to Dartmouth property and events, which the College has continued to this day and will continue going forward.

8.      Dartmouth does not possess knowledge or information sufficient to admit or deny the allegations of Paragraph 8, except to deny that any such conduct occurred with regard to all of the Department's tenured professors or applied to all students.

9.      To the extent that Paragraph 9 can be construed to contain allegations to which a response is required, denied.  Answering further, Dartmouth says that it is actively pursuing voluntary steps to ensure that all students, female and male, are able "to engage in rigorous scientific study without fear of being sexually harassed and sexually assaulted."  This includes, for example, the new Campus Climate and Culture Initiative ("C3I"), a comprehensive program to create a learning environment free from sexual harassment and the abuse of power, which is the third pillar in a set of initiatives, building on the College's 2015 Moving Dartmouth Forward ("MDF") and 2016 Inclusive Excellence ("IE") programs.

## II.      PARTIES, JURISDICTION, AND VENUE

10.      Dartmouth admits that Plaintiff Rapuano is a natural person, but otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 10.

11.      Dartmouth admits that Plaintiff Chauhan is a natural person, but otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 11.

12.      Dartmouth admits that Plaintiff Brietzke is a natural person, but otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12.

13.     Dartmouth admits that Plaintiff Brown is a natural person, but otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 13.

14.     Dartmouth admits that Plaintiff Courtney is a natural person, but otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 14.

15.     Dartmouth admits that Plaintiff Evans is a natural person, but otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15.

16.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16.

17.     Dartmouth admits that it is a non-profit corporation that exists under the laws of New Hampshire that maintains its principal place of business in this District, as stated, but Dartmouth otherwise denies the allegations in Paragraph 17.   Further answering, Dartmouth states that its legal name is "The Trustees of Dartmouth College," a corporation created by royal charter.

18.     Dartmouth admits that this Court has subject matter jurisdiction inasmuch as Title IX claims present a federal question, but Dartmouth denies that Plaintiffs have stated a claim upon which relief can be granted under that statute or any of its causes of action, and as a result, Dartmouth denies that this Court has proper jurisdiction with respect to Plaintiffs' common-law claims.

19.     Admitted.

20.     Dartmouth denies, as set forth in this Answer, the allegations of "unlawful practices complained of herein" and "events or omissions giving rise to Plaintiffs' claims," but otherwise admits that venue vests in this District.

### III.     COMMON FACTUAL ALLEGATIONS

21.     With respect to the first sentence of Paragraph 21, Dartmouth admits that Dartmouth College is a private Ivy League academic institution located in the town of Hanover, New Hampshire.  With respect to the second sentence of Paragraph 21, Dartmouth admits that its undergraduate admission rate was 8.7% for the Class of 2022, admits that it is competitive, and states that as of Fall 2017 it had total enrollment of 6,509 students.  Dartmouth specifically denies that there was an entity called the "Predators' Club" as alleged in the section heading.

22.     Dartmouth admits that the Department performs cutting-edge and innovative research; admits that the Department is housed primarily in Moore Hall, which was built in 1999 and has been described as state-of-the-art and as having cost $27 million to construct; and admits that in 1999, Dartmouth became the first liberal arts college in the nation to own and operate a functional magnetic resonance imaging device strictly for research purposes.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 22.  Answering further, Dartmouth states that the Former Professors were only three (3) among 25 full-time faculty members in the Department at the time of their departure.

23.     Dartmouth admits that Former Professor Heatherton was the most senior of the three Former Professors; that he was a prolific researcher; that he was chosen for Dartmouth's Champion International Professorship; that he served as the Department Chair from 2004 through 2005; and that he assisted in obtaining a $21.8 million grant in 2005 to establish a center for cognitive and educational neuroscience, which was at the time the largest peer-reviewed

research grant ever made to Dartmouth.   Dartmouth denies the remaining allegations in Paragraph 23, and specifically denies that there was an entity called the "predatory club" or that Dartmouth was aware of or indifferent to improper actions alleged in the Complaint.

24.     Dartmouth admits that Former Professor Kelley joined the Department in 2000 and that Former Professor Whalen joined the Department in 2005, and that both of these Former Professors received tenure.   Dartmouth denies the remaining allegations in Paragraph 24 and specifically denies that there was an entity called the "predatory club" or that Dartmouth was aware of or indifferent to improper actions alleged in the Complaint.   Answering further, Dartmouth states that any suggestion that the Department promotes men and does not promote women is wrong.   To the contrary, within the last 20 years, of the four (4) women who were considered for tenure in the Department, only one (1) was denied.   During that same period, eight (8) men were considered for tenure in the Department, and two (2) were denied.

25.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25, including (among other reasons) because it is unclear what is intended by the undefined word "instrumental."

26.     Denied.   Answering further, Dartmouth states that Dartmouth's supervisory faculty or administrators were not informed of allegations that the Former Professors had engaged in "pervasive sexual harassment and gender-based discrimination" as alleged in the Complaint until after students came forward with information in April 2017.   Immediately after the initial meeting on April 4, 2017, Dartmouth faculty, staff, and administrators began prompt and comprehensive action consistent with the students' desire to remain anonymous and not to report the investigation to the Former Professors at that time.   To the extent that any of the Plaintiffs' few, isolated allegations that predated April 2017 were raised with administrators

13

(e.g., in 2002), Dartmouth has determined that prompt action was in fact taken in response.  The College had no reason to believe, based on these few isolated (and old) incidents, that the serious misconduct alleged by Plaintiffs might occur years later.  Indeed, in the isolated instances where it was aware of any allegations – which are in no way commensurate with those now alleged by these Plaintiffs – Dartmouth responded promptly.

27.     Dartmouth admits that Former Professor Heatherton was named the Champion International Professor in 2002 and that he was named as Chair of the Department in 2004. Dartmouth denies all remaining allegations in Paragraph 27, as discussed more fully in response to Paragraphs 28 and 29 below.

28.     With respect to the first three sentences of Paragraph 28, Dartmouth admits that a former faculty member has stated that in 2002, when she was at Dartmouth, a graduate student told the former faculty member that Former Professor Heatherton groped the student's breasts at a social event during a Department graduate recruitment weekend in February 2002, "while stating that she was not doing very well in her work."  Dartmouth further admits that the former faculty member reported some information regarding the alleged incident to then-Associate Dean Richard Wright.  Dartmouth states that Former Professor Heatherton was reprimanded for the incident by the Dean of Faculty and counseled as to the strong adverse results if the conduct were repeated.  Further answering, the student involved in the incident refused to file a complaint, despite the request that she do so.  Dartmouth lacks knowledge or information sufficient to form a belief about the remaining allegations in the first three sentences of Paragraph 28 (including allegations regarding precisely what occurred during the alleged incident).  With respect to the fourth sentence of Paragraph 28, Dartmouth admits that in 2002 Former Professor Heatherton was appointed as Champion International Professor, and

14

Dartmouth lacks knowledge or information sufficient to form a belief about Plaintiffs' characterization of the timing in relation to the alleged report.

29.     With respect to the first two sentences of Paragraph 29, Dartmouth admits that a male and female graduate student have said that, in late 2002 or early 2003, Former Professor Heatherton approached them either from the side or from behind, and grabbed their buttocks – one in each hand – and that the female student has said that former Chair Hughes told her "not to make a fuss" about the matter.  Dartmouth also admits that Former Professor Heatherton was promoted to Chair of the Department in 2004.  Dartmouth lacks knowledge or information sufficient to form a belief with regard to the remaining allegations in Paragraph 29, in particular because Chair Hughes cannot recall the specific incident.  Answering further, while considering such unsolicited touching inappropriate, Dartmouth does not understand the conduct alleged in this Paragraph to have been sexual in nature or to have been perceived by the male or female student as sexual in nature.

30.     Dartmouth lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, including because (among other reasons) the allegations lack sufficient specificity that might allow Dartmouth to offer a more detailed response. Answering further, Dartmouth continues to work to determine whether any such complaint was made, but as yet has not located any such complaint.

31.     Dartmouth denies the first two sentences of Paragraph 31.  With respect to the third sentence of Paragraph 31, Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations to the extent they are referring to specific actions alleged to have been undertaken by the Former Professors.  With respect to the fourth and fifth sentences of Paragraph 31, Dartmouth lacks knowledge or information sufficient to form a belief about the

truth of the allegations regarding feelings held by unidentified women; and Dartmouth denies that the allegations are correct with respect to all female students in the Department.

Answering further, Dartmouth states that it is unclear what this allegation means by "hiring practices." If the claim refers to hiring of faculty, there is no evidence of discrimination. All faculty searches, finalist lists, and offers are approved by the Institutional Diversity and Equity officer prior to any hiring. Over the past 20 years, there have been fourteen (14) male junior faculty members hired in the Department, and ten (10) female junior faculty members.

If this claim refers to acceptance of graduate students, there is likewise no evidence of discrimination. All graduate students are evaluated against a minimum standard by the Graduate Committee, which used the GRAD threshold (above 50th percentile in verbal and quantitative) at the time the graduate student Plaintiffs were admitted. All graduate students also must be accepted by the Graduate Committee and must have approval of the Graduate Dean's Office before making admissions offers. Individual faculty do not make those decisions.

If this practice refers to the hiring of undergraduate research assistants, Dartmouth states that all three of the Former Professors' labs had male and female research assistants, almost all (if not all) of college age. To the extent that there are more research assistants in labs that are female, that trend is Department-wide, because females are disproportionately represented in the psychology major (at times making up as much as 80% of undergraduate psychology majors). Thus, the premise that the Former Professors selected young, female students more than another demographic category is the case for all labs in psychology simply due to the demographics of the population, and certainly would not suggest that administrators had some reason to suspect discriminatory practices.

32.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 to the extent they are referring to specific actions alleged to have been undertaken by all three of the Former Professors.  Dartmouth denies that such activity occurred with respect to all students, or all female students, in the Department.

33.     With respect to the first and second sentences of Paragraph 33, Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations to the extent they are referring to specific comments alleged to have been made by the Former Professors, and Dartmouth denies that such activity occurred with respect to all female students in the Department.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in the third sentence of Paragraph 33.

34.     Denied.   Answering further, Dartmouth states that there is no evidence that Director Wheatley, Chair Bucci, or other administrators with supervisory authority knew prior to April 2017 and the ensuing Title IX Investigation that the Former Professors engaged in such alleged actions.   Dartmouth states that no such alleged conduct came to the attention of administrators with supervisory authority before April 2017, at which point Dartmouth took prompt and appropriate action.

35.     With respect to the first sentence of Paragraph 35, Dartmouth admits that Chair Bucci may have stated at times that, in his opinion, Former Professor Whalen crossed professional boundaries by socializing with students, but Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations to the extent they are referring to specific actions alleged to have been undertaken by the Former Professors, and Dartmouth denies that such activity occurred with respect to all students, or all female students, in the Department.  With respect to the second sentence of Paragraph 35, Dartmouth is aware

now of allegations that Former Professor Kelley at times took the cell phone of students or other professors and sent messages purporting to come from the owner of the phone, but Dartmouth otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this sentence, including the frequency with which Former Professor Kelley engaged in such conduct or specific instances thereof.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 35.

36.    Dartmouth is without information sufficient to form a belief about the truth of the first sentence in Paragraph 36, except to say that the Title IX Investigation identified information suggesting that each named Former Professor engaged in at least some sexual relationships according to some students, including at least two Plaintiffs, who were interviewed during Dartmouth's Title IX Investigation following the April 2017 meeting.  The second sentence is denied.

37.    Dartmouth is unaware of any faculty having made such statements and on that basis denies Paragraph 37; however, Dartmouth lacks knowledge or information sufficient to confirm that no faculty member, at any time, has done so.

38.    With respect to the first sentence of Paragraph 38, Dartmouth admits that some individuals have described Former Professor Whalen using these terms, admits that Chair Bucci has noted in the past that Former Professor Whalen hugs him when he sees him, and admits that Associate Dean Hull at some time came to perceive Former Professor Whalen as a "flirt." Dartmouth denies that Associate Dean Hull described Former Professor Whalen using the other terms and lacks knowledge or information sufficient to form a belief about the remaining allegations in this first sentence of Paragraph 38.  With respect to the second sentence of

Paragraph 38, Dartmouth admits that Chair Bucci may have stated at times that, in his opinion, Former Professor Whalen crossed professional boundaries by socializing with students, and admits (as discussed in response to Paragraph 45 below) that at one point Associate Dean Hull reprimanded Former Professor Whalen for conducting lab meetings with graduate students at a local bar.  Dartmouth denies the remaining allegations in the second sentence of Paragraph 38. Dartmouth denies the allegations in the third sentence of Paragraph 38.

39.     Denied.  Dartmouth specifically denies that the Department had a "party culture" and that any such practice was "well-known and blatantly ignored by Dartmouth administrators."

40.     Dartmouth denies that the Department had a "party culture" or that examples of that "'party culture' abound."  With respect to the remainder of the first four sentences of Paragraph 40, Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding particular actions of the Former Professors, but denies that such actions occurred Department-wide, with respect to all female students in the Department, or with the contemporaneous knowledge of supervisors with authority.  With respect to the fifth sentence of Paragraph 40, Dartmouth admits that Associate Dean Hull learned in January 2010 that the Former Professors had in the past engaged in drinking with prospective graduate students (male and female), but denies that Associate Dean Hull took no action to investigate or stop the activity and denies the remaining allegations in this sentence.

Answering further, Dartmouth states that upon learning that the Former Professors had engaged in drinking with prospective graduate students, Associate Dean Hull spoke to each of the Former Professors and told them personally never to engage in such activity again.  Associate Dean Hull reiterated this instruction during a Department Faculty Meeting on January 13, 2010 (at which all three Former Professors were present), also saying that for prospective students

who are of legal age he would approve of the Department paying for one drink with dinner, but that otherwise faculty are "not to drink with prospectives."  In a subsequent email, Chair Bucci reiterated this policy to Former Professor Kelley.  Department fiscal records for at least the next four years indicate that the average Department expenditure on alcohol for Friday and Saturday night dinners with prospective students was $4.08 and $4.07 per student (respectively), indicating approximately one drink per person.

41.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41 to the extent they are referring to specific actions alleged to have been undertaken by the Former Professors.  Dartmouth denies that such activity occurred with respect to all female students in the Department.

42.     With respect to the first sentence of Paragraph 42, Dartmouth admits that it now knows that Former Professor Kelley hosted students at social gatherings at his house and that he had a bar in the basement.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 42.

43.     Dartmouth incorporates by reference its response to Paragraph 45, below, regarding a report that Former Professor Whalen was conducting lab meetings in a local bar. Dartmouth otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43 to the extent they are referring to specific actions alleged to have been undertaken by the Former Professors.  Dartmouth denies that such activity occurred with respect to all students, or all female students, in the Department.

44.     Dartmouth denies the first sentence of Paragraph 44.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of Paragraph 44.

45.     Denied.  Answering further, Dartmouth states that during Associate Dean Hull's first year as Department Chair (July 2009-June 2010), one of Former Professor Whalen's graduate students informed Associate Dean Hull that Former Professor Whalen was holding lab meetings in a bar.  The student stated that she felt uncomfortable with this practice, that she felt there was implicit pressure to drink at these meetings, and that she felt she had to attend such meetings in order to have access to her advisor.  Associate Dean Hull immediately confronted Former Professor Whalen about this practice and told him that it was unprofessional and had to stop.  In that conversation, Associate Dean Hull made it clear that no student should have to go to an environment where he or she feels uncomfortable in order to have access to an advisor, nor should others who are comfortable in that environment have de facto greater access to their advisors.  Other than this report, neither Associate Dean Hull nor Director Wheatley received complaints of the type alleged in this Paragraph 45.

46.     Dartmouth denies the first sentence of Paragraph 46.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second and third sentences of Paragraph 46, but denies that, if such statements were made, they were supported by, or condoned by, the Department or the College.

Answering further, Dartmouth states that there is no evidence that Dartmouth or its administrators had knowledge of any serious misconduct in the Department comparable to the allegations of the Complaint prior to when the students first reported such conduct in April 2017, much less evidence that Dartmouth or its administrators condoned or "emboldened" the conduct. Indeed, it is difficult to understand how Plaintiffs or their counsel can assert such an allegation given Plaintiffs' own prior statements made before the parties were engaged in litigation.  For

example, in an unsolicited, May 29, 2018 email to Associate Dean Hull, one of the Plaintiffs stated the following (among other things):

> I'd like to make sure that I'm 100% clear in conveying that you have been a far more impactful ally to all of us than I imagine you know. We're all grieving what we could have done *if we'd known better*, but the truth is that *there was nothing that you could have done that you didn't do*. I sincerely believe that your speaking up against unacceptable behavior *as it came to light* did change the course of events for the better for many of us, as I know it did for me. (emphasis added)

47.    Denied.    Answering further, Dartmouth states that at no time during the referenced annual meetings of the graduate students from the Department did students raise concerns about sexual harassment, abuse of female students, or inappropriate student/advisor relationships. To the contrary, the graduate students in the Department are asked to participate in an anonymous survey each year, in connection with these annual meetings. The anonymous surveys ask students to provide ratings and comments regarding a number of topics, ask students to identify areas where the Department is doing well and areas where the Department needs to improve, and provide an opportunity for students to give any other comments they wish to share anonymously. None of the anonymous survey responses for the referenced three-year period preceding April 2017 raises any issue regarding sexual harassment, abuse of female students, inappropriate student/advisor relationships, or any of the other items in this allegation. Any suggestion that such issues were raised (at the annual meeting or otherwise) and ignored is wrong and unfair to Director Wheatley, Chair Bucci, and the many professors and administrators who had nothing to do with the alleged misconduct and who, indeed, sought to take corrective action as soon as the alleged misconduct was brought to their attention. Although at times there were issues raised regarding Former Professor Kelley's mentoring, including (primarily) his lack of responsiveness and unavailability, these concerns were addressed by Associate Dean Hull with Former Professor Kelley directly.

48.     Denied.  Answering further, Dartmouth states that Plaintiff Rapuano sent an email to Provost Dever on or about the referenced date that referred more generally to "challenges pertaining to sexism in science and academia."  The email did not identify the Former Professors by name, nor did it provide specific allegations.  Provost Dever responded and suggested (among other things) that Plaintiff Rapuano could contact the Title IX Coordinator.  To the best of Dartmouth's knowledge, Plaintiff Rapuano did not respond and did not follow up with the Title IX Coordinator or otherwise at that time.

49.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49, particularly given that, based on the allegations, the graduate students had this discussion among themselves and did not inform anyone at Dartmouth at that time.

50.     Dartmouth admits the first two sentences of Paragraph 50 and denies the third sentence of Paragraph 50.  Answering further, Dartmouth states that on April 3, 2017, a student emailed Chair Bucci and asked him to meet with a group of graduate students about "some departmental concerns."   Chair Bucci and Director Wheatley immediately arranged for a meeting, in lab space in the Mathematics Department, the next day, April 4.  Chair Bucci and Director Wheatley took extra steps to ensure a location away from the Department for the comfort of the students.  Eight students attended (5 women, 3 men), including three of the Plaintiffs, along with Chair Bucci and Director Wheatley.  At the meeting, the students identified various categories of concern, including non-consensual behavior, inappropriate comments, pressure to consume alcohol, pressure to socialize, and a recent incident involving public groping.  The students did not identify the faculty members or the alleged victims by name. Chair Bucci and Director Wheatley asked if they could contact the Dean of Faculty and Title IX

office to share the concerns and asked if the students would be willing to follow up by meeting with the Title IX Coordinator.  The students agreed.  Director Wheatley promptly contacted the Title IX Coordinator.  Chair Bucci promptly reported the matter to Associate Dean Hull, who encouraged Chair Bucci to contact the Title IX Coordinator, relayed the report to Michael Mastanduno, the Dean of the Faculty, and relayed the report to Elizabeth Smith, who was soon to become the Dean of the Faculty.  Associate Dean Hull also reached out to the Title IX Coordinator directly, making clear that he was aware of the situation and that the administration was prepared to coordinate and assist in dealing with the matter.  Chair Bucci and Director Wheatley met with the Title IX Coordinator on April 6, 2017.  Chair Bucci, Director Wheatley, and the Title IX Coordinator arranged for and attended a meeting with the students the following day, April 7, 2017.

51.     Denied.  Answering further, Dartmouth states that the students who raised the issues discussed in Paragraph 50 above expressed concern about maintaining their anonymity until after the June 2017 Standings Meeting.  Indeed, for some time the students openly questioned whether they would even ask that the matters be formally investigated.  At a minimum, they asked that no other faculty members (other than Chair Bucci and Director Wheatley) be notified of the allegations and that they not be moved to different labs until after the June 8, 2017 Standings Meeting.  This is the annual meeting at which the faculty discuss the progress of each graduate student in the program and for which the faculty must submit a written evaluation for each of their students.  The students discussed this timing on April 27, 2017, during one of the many update meetings that Director Wheatley had with the students.  At that meeting, the students made an express request that Director Wheatley ask the College's then-

General Counsel to wait to send out emails to faculty or other information that might alert the Former Professors to an investigation until after the Standings Meeting.

While respecting the students' request that their identity not be shared with the Former Professors, Dartmouth nevertheless took steps to begin the investigation promptly, and took steps to find new advisors for several students who requested that they do so. For example, Director Wheatley began working with Plaintiff Brietzke in early May 2017 to find a new advisor, even though the students had requested that the transfers (and notification of an investigation) not occur until after the Standings Meeting.

With respect to the alleged sexual assault of Plaintiff Chauhan, Plaintiff Chauhan was not present at either the April 4, 2017 or April 7, 2017 meetings. Dartmouth lacks knowledge or information sufficient to form an independent conclusion, but is aware that many facts regarding the alleged sexual assault are disputed, both by Former Professor Whalen and by another woman present and participating in the event alleged in this Paragraph.

52.     Denied.   Answering further, Dartmouth states that, as explained above, the students requested that no person in the faculty (other than Chair Bucci and Director Wheatley) be made aware of their concerns and asked that they not be moved to different labs until after the June 8, 2017 Standings Meeting. Dartmouth expressly denies that the College suggested that the alleged victims "continue[] working with their harassers," much less that it urged them to do so "for nearly four months."

53.     Dartmouth denies that it "waited nearly four months" before notifying the Former Professors.   Further answering, as set forth above, including in response to Paragraph 51, Dartmouth states that it was the students who requested that the Former Professors not be notified until after the June 8, 2017 Standings Meeting, at which the faculty discuss the progress

of each graduate student in the program and for which the faculty must submit a written evaluation for each of their students.  The students further requested expressly that Director Wheatley ask the College's then-General Counsel to wait to send out emails to faculty or other information that might alert the Former Professors to an investigation until after the Standings Meeting.  Respecting those requests, Dartmouth promptly began the Title IX Investigation. Based on the information elicited in that investigation, Dartmouth admits that the Dean of the Faculty notified the Former Professors of allegations against them on July 20, 2017.  Dartmouth further admits that on July 28, 2017, the Dean of the Faculty notified Former Professors Kelley and Whalen that they were placed on administrative leave pending resolution of the Title IX Investigation, that they were relieved of instructional duties, committee service, advising responsibility, and required department meetings, and that their access to campus was restricted except by prior arrangement of the College.  Answering further, Dartmouth states that on July 31, 2017, the Dean of the Faculty notified Former Professor Heatherton that he was being relieved of any instructional service or advising responsibilities during his sabbatical leave for academic year 2017-2018, and that he was restricted from campus pending resolution of the Title IX Investigation.

54.    Dartmouth denies the first sentence of Paragraph 54.  With regard to the second sentence in Paragraph 54, Dartmouth lacks knowledge or information sufficient to form a belief as to what motivated the students who posted flyers.  Dartmouth admits the allegations in the last sentence of Paragraph 54.

55.    Dartmouth admits that the New Hampshire Attorney General issued a news release on or about October 31, 2017, saying that it would be conducting a criminal investigation relating to allegations of sexual misconduct reported against three professors, whom Dartmouth

understands to be the Former Professors.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 55.

56.     Dartmouth admits the first sentence of Paragraph 56 and admits that Investigator Davis is on the "approved" list of United Educators.  Dartmouth denies the remaining allegations in Paragraph 56, and notes that Dartmouth neither sought nor received coverage for the Title IX Investigation from its insurer.

57.     Denied.   Answering further, Dartmouth states that information was provided voluntarily by Plaintiffs (and was never "demanded"), that Plaintiffs were specifically advised that Investigator Davis would be discussing their allegations with the Former Professors and sharing documentation they voluntarily provided with the Former Professors, and that Plaintiffs consented thereto.

58.     Dartmouth admits that Investigator Davis conducted interviews of Plaintiffs and others in order to understand their allegations, and admits that Investigator Davis did not affirmatively "encourag[e] them to seek legal counsel."   Dartmouth denies the remaining allegations in Paragraph 58.  Answering further, Dartmouth states that Plaintiffs repeatedly were advised by the Title IX office that they could have advisors (including attorneys), that Investigator Davis was not acting as an attorney, but as an investigator, and that all information was provided voluntarily by Plaintiffs.  Plaintiffs were specifically advised that Investigator Davis would be discussing their allegations with the Former Professors, Plaintiffs consented thereto, and Dartmouth was obligated to conduct the Title IX Investigation in order to address Plaintiffs' complaints appropriately.

59.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59 regarding misdirected documents or conclusions and

continues to search for additional information regarding this allegation.   Dartmouth denies, however, that the Title IX office generally failed to protect Plaintiffs' privacy, says that the office attempted to do so, but acknowledges that administrative errors can and do sometimes happen in virtually all offices.

60.   Dartmouth admits that Plaintiff Brown is a "Reporting Party" in Investigator Davis' report regarding Former Professor Whalen.  Dartmouth denies the remaining allegations in Paragraph 60.  Answering further, Dartmouth states that Plaintiffs were specifically advised that Investigator Davis would be discussing their allegations with the Former Professors and sharing documentation they voluntarily provided with the Former Professors, and that Plaintiffs consented thereto.

61.   Dartmouth admits that Investigator Davis provided Dartmouth with reports concerning her findings regarding each of the Former Professors in January 2018, February 2018, and March 2018, respectively, and admits that individuals identified as Reporting Parties were provided with redacted copies of the reports and given the opportunity to comment. Dartmouth also admits that Investigator Davis made findings that the Former Professors had violated Dartmouth's policies and procedures in certain circumstances.  Dartmouth denies the remaining allegations in Paragraph 61.

Answering further, Dartmouth states that the copy of the reports given to each Reporting Party included general background information and the sections of the reports pertaining to his or her specific allegations, as well as Investigator Davis' findings related to those allegations. Redactions were applied to protect the privacy and confidentiality of information provided by other Reporting Parties.

62.     Dartmouth admits that the faculty hearing panel scheduled a hearing for July 2018 regarding Former Professor Whalen, and that before that hearing could occur (and before any hearing regarding Former Professors Kelley or Heatherton could occur), Former Professors Whalen and Kelley resigned, and Former Professor Heatherton retired.  Dartmouth denies that it "suspended" the disciplinary process, or that it affirmatively "permitted" the Former Professors to retire and resign.  Dartmouth denies the remaining allegations, if any, in Paragraph 62.

Answering further, Dartmouth states that the retirement and resignation decisions were made by the Former Professors alone.  As a result, the remainder of the College's formal disciplinary process was rendered moot.  The College did not conclude any separation agreements with or pay severance to the Former Professors and its sole remaining recourse against them was to maintain the prohibition against their access to Dartmouth property and events, which the College has continued to this day and will continue going forward.

63.     Dartmouth denies the first and third sentences in Paragraph 63.   Answering further, Dartmouth states that as early as April 7, 2017, Dartmouth's Title IX Coordinator began answering questions and providing support and guidance regarding the Title IX process to those students who came forward with complaints.  The students were never "implicitly discouraged" by the Title IX Coordinator from proceeding.  To the contrary, and among other things, Director Wheatley and Chair Bucci made clear in April 2017 shortly after the initial meetings that they would work with the students to address lab assignment and advisor changes as a result of the Title IX Investigation (which Director Wheatley began to do as early as May 2017), and ensure that the students' funding would never be in doubt, even if they were required to sever their ties to the Former Professors and change labs.  On this latter point, Director Wheatley and Chair Bucci assured the students that, if necessary, the Department would use the reserve funding

account for this purpose.  Director Wheatley and Chair Bucci also assured the students that they could have an extra year to complete their graduate studies if they felt it was necessary as the result of lab or advisor changes – and several students have accepted this accommodation.

With respect to the second sentence of Paragraph 63, Dartmouth admits that when a group of students initially came forward in April 2017, the Title IX Coordinator was Heather Lindkvist; that from August 1, 2017 through April 5, 2018, a different individual served in that role; and that beginning on April 5, 2018, a third individual, who is currently the Title IX Coordinator, began in that role.  Dartmouth denies the remaining allegations, if any, in the second sentence of Paragraph 63.

64.    Denied.   Answering further, Dartmouth states that it has taken a number of actions to determine what happened and to ensure that any misconduct can be prevented in the future.   Among other things, while waiting for the end of the Title IX Investigation and disciplinary procedures, Chair Bucci met with students, faculty, and administrators on numerous occasions to chart a course for enacting preventive measures.  Further ideas were generated from the National Academies' report on sexual misconduct.  On September 12, 2018, Chair Bucci called the first faculty meeting of the year and presented a list of action items to the Department for discussion and endorsement.  Chair Bucci also has created a department-wide Inclusivity, Diversity, and Climate Committee ("IDCC") consisting of faculty, staff, and students, to direct the process forward.  This committee first met on October 9, 2018 and has met approximately every two weeks since.  The IDCC provides information to the Department on an ongoing basis, including, most recently, encouraging the Department to attend an implicit bias training webinar and directing the Department to a "Diversity" tab on its webpage that continues to be updated with useful information and documents.  The Department also held a department-wide meeting

on October 3, 2018 for a Title IX training session and discussion (facilitated by the current Title IX Coordinator). Chair Bucci also has provided the Department faculty and students with regular updates on progress via emails and meetings. The most recent update was via email to the graduate students on November 29, 2018 and provides a summary of specific progress to date.

65. Dartmouth denies the first sentence of Paragraph 65. With respect to the second sentence of Paragraph 65, Dartmouth admits that Plaintiffs' counsel sent a letter to Dartmouth's counsel dated September 12, 2018 (not October 12 as alleged) regarding Plaintiffs' claims and denies that the letter states any sufficient basis for liability as to Dartmouth. With respect to the third sentence of Paragraph 65, Dartmouth admits that Chair Bucci and Director Wheatley convened a meeting on October 17, 2018 with the Department's graduate student body and denies that the meeting was scheduled in response to the Plaintiffs' September 12, 2018 letter. To the contrary, and answering further, neither Chair Bucci nor Director Wheatley were even aware of the Plaintiffs' September 12, 2018 demand letter when they scheduled the October 17 meeting or when they held the October 17 meeting. With respect to the fourth sentence of Paragraph 65, Dartmouth admits that the Title IX Coordinator, Kristi Clemens, was present for part of the October 17, 2018 meeting to facilitate the students' access to Title IX-related information and support resources, and that Chair Bucci discussed several rumors at the meeting, which are addressed more fully in response to Paragraph 66 below. Dartmouth denies any remaining allegations in Paragraph 65. Dartmouth incorporates by reference its response to Paragraph 66 below, which provides additional information about the referenced meeting.

66. Denied. Answering further, Dartmouth states that the October 17, 2018 meeting was not called in response to the September 12, 2018 letter, and that indeed, neither Chair Bucci

31

nor Director Wheatley were even aware of the Plaintiffs' September 12, 2018 demand letter when they scheduled the meeting or when the meeting took place.  The actual events that led to the meeting are as follows:  On October 9, 2018, a graduate student reported that a memo was circulating on Twitter that discussed the matters under investigation and discussed changes Dartmouth and the Department should make to address these issues.  Chair Bucci and Director Wheatley became concerned upon reading the memo, because it contained many inaccuracies. For example, there were inaccuracies related to the speed at which Chair Bucci and Director Wheatley shared with the Title IX Coordinator and the administration the concerns the students raised at the April 4, 2017 meeting.  The memo also incorrectly suggested that some in the Department and College may have previously known about the behavior of the accused Former Professors.  Chair Bucci and Director Wheatley decided to meet with the entire graduate student body (so as not to single anyone out) to discuss these issues and encourage the students to come forward and report such concerns to authorities if they indeed had them, and to highlight the positive steps the Department was making in the wake of the Title IX Investigation – such as creation of the IDCC discussed in response to Paragraph 64.

Two days later, on October 11, 2018, two graduate students informed Chair Bucci that a false rumor was circulating among the graduate students that Chair Bucci had only been helpful and supportive of those who came forward to report the actions of the Former Professors because he knew that he would reap financial benefit, based on the fact that Chair Bucci was selected as the Lincoln Filene Professor of Human Relations when Former Professor Heatherton, the prior holder, retired.  Chair Bucci was concerned that false rumors such as these would compromise the ability of the Department to work together to move forward, and this reinforced the desire to meet with and discuss these concerns with the graduate student body, and to clarify with the

32

students that the money related to the endowed chair is used primarily for graduate programming, sponsoring annual conferences and workshops, and other departmental/community activities.

These were the two primary purposes of the meeting. Chair Bucci also briefly reviewed the timeline of the Title IX Investigation as he understood it to be. Dartmouth denies any suggestion that the meeting was intended for any improper purpose. Such allegations are unfair given that Chair Bucci and Director Wheatley (and others), who are not alleged to have committed wrongdoing, have worked hard in an attempt to address concerns and issues that the students have raised.

67.     Dartmouth denies the allegations of Paragraph 67, denies the implication being suggested, and states that these allegations are misleading and incomplete.

Answering further, Dartmouth states that a search committee was convened to hire two faculty members, only one of which was a replacement for one of the three Former Professors, and 158 applications were submitted for the two positions. The committee evaluated candidates based on qualifications consistent with the advertisement – computational social science. At one time, the list included eleven (11) candidates, two (2) of whom were women. It was then expanded to be twelve (12) candidates, three (3) of whom were women, and subsequently narrowed to six (6) candidates total, two (2) of whom were women. The allegation also fails to acknowledge that the committee contacted four (4) senior women in the relevant field and expressly asked them to apply. Moreover, this is only the most recent search that the Department has undertaken. For example, a professor was hired in the Systems and Behavioral Neuroscience Group in the Department following a search in the 2016-2017 timeframe. That search committee interviewed four (4) candidates (two (2) men and two (2) women), offered the position to one of

the women, and when she turned it down, offered the position to the second woman, who accepted.

**IV.     FACTUAL ALLEGATIONS**

**A.     <u>Kristina Rapuano's Factual Allegations</u>**

68.     Admitted.

69.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 69.

70.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 70.  Answering further, Dartmouth acknowledges that the Title IX Investigator, and the faculty hearing panel that adopted the Title IX Investigator's findings in Former Professor Whalen's case, credited Plaintiff Rapuano's allegations regarding Former Professor Whalen's sexual conduct.  However, Dartmouth, being aware of evidence of disputed facts, does not believe that it can or should usurp the jury's role as factfinder.

Answering further, Dartmouth states that some of the specific factual allegations set forth in this and many of the paragraphs that follow overlap with allegations students raised during the Title IX Investigation.  As a result of the Title IX Investigation, Dartmouth's Dean of the Faculty took the extreme (but warranted) step of recommending that the Former Professors be terminated; however, the College's faculty disciplinary process – which consists of several levels of review – was ongoing and not yet completed at the time Former Professor Heatherton retired and Former Professors Kelley and Whalen resigned.  Since that time, and in connection with efforts undertaken to respond to this lawsuit, Dartmouth has continued to investigate the allegations against the Former Professors.

For many of the specific factual allegations alleged (a number of which relate to personal interactions with the Former Professors), Dartmouth lacks knowledge or information sufficient to

form a belief that would allow it to expressly admit or deny.  Nevertheless, Dartmouth does deny that it ever supported or condoned any misconduct by the Former Professors, or that it failed to address complaints the Plaintiffs brought to its attention.

71.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 71.

72.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 72.

73.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73.

74.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 74.

75.      Dartmouth admits the first and second sentences of Paragraph 75.  With respect to the third and fourth sentences in Paragraph 75, Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations.

76.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 76.

77.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the specific allegations in Paragraph 77.

78.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 78.

79.      Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79.

80.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80.

81.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 81.

82.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82, except to admit that it now understands that Former Professor Kelley had an approximately two-year intimate relationship with Plaintiff Rapuano in violation of Dartmouth's prohibition on relationships between faculty members and graduate students under their academic supervision.

83.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 83.

84.     Dartmouth admits that Former Professor Kelley and Plaintiff Rapuano exchanged sexually explicit text messages.

85.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 85.

86.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 86.

87.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 87.

88.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 88.

89.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89.

90.     Dartmouth admits that Plaintiff Rapuano applied for and was awarded a six-month Graduate Research Opportunities Worldwide ("GROW") fellowship from the National Science Foundation ("NSF") to conduct research with Morten Kringelbach at Aarhus University in Denmark beginning in July 2016.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegation as to why she sought that fellowship.

91.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 91.

92.     Dartmouth admits the first sentence of Paragraph 92.  Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent a text message to Plaintiff Rapuano on April 30, 2016 that stated, "A courteous, respectful grad student would have shared the piece with her advisors in advance.  You can sign my name on your form."  Answering further, Dartmouth says that the text does not appear to be a violent berating of Plaintiff Rapuano; however, Dartmouth lacks knowledge or information sufficient to form a belief as to any other communication.

93.     Dartmouth admits that, to the best of its knowledge, Plaintiff Rapuano sent the referenced email containing the quoted language on May 2, 2016.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 93.

94.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 94.

95.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 95.

96.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 96.

97.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 97.

98.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations of the first three sentences of Paragraph 98.  Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent the referenced email containing the quoted language on July 21, 2016.

99.     Dartmouth admits that, to the best of its knowledge, Plaintiff Rapuano sent an email to Former Professor Kelley stating, "I'm just terrified that if we don't find a way to separate them that my academic success becomes contingent on personal relations."  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, if any, in Paragraph 99.

100.    Dartmouth admits that, to the best of its knowledge, Plaintiff Rapuano sent an email to Former Professor Heatherton containing the quoted language and additional language, including, "I just wanted to keep you in the loop with some things that have been going on, and hopefully get your feedback and advice on how to handle a very difficult situation.  . . . I'm feeling pretty stuck and am not exactly sure what the most appropriate next course of action would be.  . . . I'm also worried that if I do anything here that is separate, Bill will perceive this as me 'switching labs' (something he's alluded to before) and would not welcome me back into Kellerton in that scenario."  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 100.

101.    Dartmouth admits that, to the best of its knowledge, Former Professor Heatherton sent an email to Plaintiff Rapuano that stated, "I just saw Bill.. told him something was obviously up in the lab… tension you can cut with knife.  He was pissy but seems to think problem is you vs. Jeremy.  Just FYI.  I told him he needs to solve this and told him part of the problem is that he is social with both of you.  Please keep this quiet."  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 101.

102.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 102.

103.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 103.

104.    Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano an email containing the quoted language.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 104.

105.    Dartmouth admits that, to the best of its knowledge, Plaintiff Rapuano sent the referenced email containing the quoted language.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 105.

106.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 106.

107.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 107.

108.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 108.

109.    Denied.  Answering further, Dartmouth states that Plaintiff Rapuano sent an email to Provost Dever on or about the referenced date that referred more generally to "challenges pertaining to sexism in science and academia."  The email did not identify the Former Professors by name, nor did it provide specific allegations.  Provost Dever responded and suggested (among other things) that Plaintiff Rapuano could contact the Title IX Coordinator.  To the best of Dartmouth's knowledge, Plaintiff Rapuano did not respond and did not follow up with the Title IX Coordinator or otherwise at that time.

110.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 110.

111.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 111.

112.    Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano text messages containing the quoted language.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 112.

113.    Dartmouth admits the first sentence of Paragraph 113.  Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano a text message that contains the quoted language.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 113.

114.    Dartmouth admits that, to the best of its knowledge, Plaintiff Rapuano sent Former Professor Kelley a text message that included the quoted language.  Dartmouth lacks

knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 114.

115.    Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano a text message that included the quoted language.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 115.

116.    Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano text messages that included the quoted language.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 116.

117.    Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano a text message that states in part, "I'm not asking you to leave.  But if I'm being honest, I'll be happier for you when you're gone."   Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 117.

118.    Dartmouth denies the first sentence of Paragraph 118.  With respect to the second sentence of Paragraph 118, Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano a text message that states, "Guess I have a reputation." Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second sentence of Paragraph 118.

119.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 119.   Answering further, Dartmouth states that this allegation provides helpful context.   Plaintiff Rapuano alleges that improper activities she

suffered began in 2015, yet she did not realize that others were victims of sexual misconduct until two years later, in March or April 2017. The fact that alleged victims themselves were unaware that their peers were facing what they describe as similar misconduct from the same professors is evidence that, despite non-specific allegations to the contrary, any such conduct was not open, obvious, known, or condoned by other faculty, administrators, or the College more broadly.

120.    Dartmouth admits that Plaintiff Rapuano was one of the students who met with Chair Bucci and Director Wheatley on April 4, 2017 and that she was one of the students who met with Chair Bucci, Director Wheatley, and the Title IX Coordinator on April 7, 2017. Dartmouth denies the remaining allegations in Paragraph 120.

121.    Denied.   Answering further, Dartmouth states that the students who voiced concerns in April 2017, including Plaintiff Rapuano, expressed concern about maintaining their anonymity, and asked that no other faculty members (other than Chair Bucci and Director Wheatley) be notified of the allegations and that they not be moved to different labs until after the June 8, 2017 Standings Meeting, at which the faculty discuss the progress of each graduate student in the program and for which the faculty must submit a written evaluation for each of their students.  Indeed, during an update meeting that Director Wheatley had with the students on April 27, 2017, the students made an express request that the College's then-General Counsel wait to send out emails to faculty or other information that might alert the Former Professors to an investigation until after the Standings Meeting.  Nevertheless, Dartmouth did take steps to begin the investigation promptly, and took steps to find new advisors for several students who requested that they do so, even in cases (such as Plaintiff Brietzke) where the students had made clear that they did not wish for a transfer to be executed until after the Standings Meeting.

122.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 122.

123.    Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano text messages on April 26, 2017 that included the quoted language. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 123.

124.    Dartmouth admits that, to the best of its knowledge, Former Professor Kelley sent Plaintiff Rapuano text messages on May 8, 2017 that included the quoted language.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 124.

125.    Dartmouth specifically denies the allegation that it took no action to respond to or investigate the concerns students, including Plaintiff Rapuano, voiced in April 2017.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 125.

126.    Denied.

127.    Dartmouth denies the second and third sentences of Paragraph 127.  With respect to the first sentence of Paragraph 127, Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations, including to the extent that such information may be found in Plaintiff Rapuano's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.

128.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 128.

129.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 129, including to the extent that such information may be found in Plaintiff Rapuano's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.

**B.    Vassiki Chauhan's Factual Allegations**

130.    Admitted.

131.    Dartmouth admits that a group of male and female graduate students came forward in April 2017 to present certain concerns that the College took very seriously, but otherwise denies the allegations in Paragraph 131.  Answering further, Dartmouth states that on April 3, 2017, a student emailed Chair Bucci and asked him to meet with a group of graduate students about "some departmental concerns."  Chair Bucci and Director Wheatley immediately arranged for a meeting, in lab space in the Mathematics Department, the next day, April 4.  Chair Bucci and Director Wheatley took extra steps to ensure a location away from the Department for the comfort of the students.  Eight students attended (5 women, 3 men), including three of the Plaintiffs, along with Chair Bucci and Director Wheatley.  At the meeting, the students identified various categories of concern, including non-consensual behavior, inappropriate comments, pressure to consume alcohol, pressure to socialize, and a recent incident involving public groping.  The students did not identify the faculty members or the alleged victims by name. Chair Bucci and Director Wheatley asked if they could contact the Dean of Faculty and Title IX office to share the concerns and asked if the students would be willing to follow up by meeting with the Title IX Coordinator.  The students agreed.  Director Wheatley promptly contacted the Title IX Coordinator.  Chair Bucci promptly reported the matter to Associate Dean Hull, who encouraged Chair Bucci to contact the Title IX Coordinator, relayed the report to Michael Mastanduno, the Dean of the Faculty, and relayed the report to Elizabeth Smith, who was soon to

become the new Dean of the Faculty. Associate Dean Hull also reached out to the Title IX Coordinator directly, making clear that he was aware of the situation and that the administration was prepared to coordinate and assist in dealing with the matter. Chair Bucci and Director Wheatley met with the Title IX Coordinator on April 6, 2017. Chair Bucci, Director Wheatley, and the Title IX Coordinator arranged for and attended a meeting with the students the following day, April 7, 2017. Plaintiff Chauhan was not present at either the April 4, 2017 or April 7, 2017 meetings.

132.   Dartmouth denies the first sentence of Paragraph 132. Answering further, Dartmouth states that the students who raised the issues in April 2017 expressed concern about maintaining their anonymity, and asked that no other faculty members (other than Chair Bucci and Director Wheatley) be notified of the allegations and that the students not be moved to different labs until after the June 8, 2017 Standings Meeting, at which the faculty discuss the progress of each graduate student in the program and for which the faculty must submit a written evaluation for each of their students. Indeed, during an update meeting that Director Wheatley had with the students on April 27, 2017, the students made an express request that the College's then-General Counsel wait to send out emails to faculty or other information that might alert the Former Professors to an investigation until after the Standings Meeting.

Nevertheless, Dartmouth did take steps to begin the investigation promptly while remaining mindful of the students' request and took steps to find new advisors for several students who requested that they do so, even in cases (such as Plaintiff Brietzke) where the students had made clear that they did not wish for a transfer to be executed until after the Standings Meeting.

With respect to the second sentence of Paragraph 132, Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations.  Answering further, Dartmouth acknowledges that the Title IX Investigator, and the faculty committee that adopted the Title IX Investigator's findings in Former Professor Whalen's case, credited Plaintiff Chauhan's allegations regarding Former Professor Whalen's sexual conduct, and Dartmouth acted swiftly to remove him in part on that basis.  However, Dartmouth, being aware of evidence of disputed facts, including evidence beyond that tendered by the Former Professors, does not believe that the Title IX Investigator, or the faculty hearing panel to the extent applicable, can or should usurp the jury's role as factfinder in the context of this lawsuit.

133.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 133.

134.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 134.  Answering further, however, Plaintiff Chauhan's allegations as contained in Paragraph 134 vary markedly from those she voluntarily provided during the Title IX Investigation.  In addition, Dartmouth says that many facts regarding the alleged sexual assault are disputed, both by Former Professor Whalen and by another woman who was present and participating in the event alleged in this Paragraph.

135.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 135.  Answering further, however, Plaintiff Chauhan's allegations as contained in Paragraph 135 vary markedly from those she voluntarily provided during the Title IX Investigation.  In addition, Dartmouth says that many facts regarding the alleged sexual assault are disputed, both by Former Professor Whalen and by another woman who was present and participating in the event alleged in this Paragraph.

136.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 136.

137.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 137.

138.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 138, including to the extent that such information may be found in Plaintiff Chauhan's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.

139.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 139.

140.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 140.

141.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 141.

142.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 142.

143.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 143.

144.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 144.

145.    Except as set forth in response to Paragraph 35, Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 145.

146.    Dartmouth denies that drinking, socializing, and enduring inappropriate behavior "was the sole route to building and maintaining necessary relationships with [Plaintiff Chauhan's] faculty advisors."  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 146.

147.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 147.

148.    Dartmouth admits that Plaintiff Chauhan contacted the Title IX office and requested to deliver a victim impact statement during Former Professor Whalen's disciplinary hearing, but Dartmouth lacks knowledge or information sufficient to form a belief about the remaining allegations in the first sentence of Paragraph 148, including (among other reasons) because it is unclear what is intended by the undefined words "multiple times."  Dartmouth denies the second sentence of Paragraph 148.  Answering further, Dartmouth states that at the time Former Professor Heatherton retired and Former Professors Kelley and Whalen resigned, Dartmouth's Dean of the Faculty had taken the extreme (but warranted) step of recommending their termination; however, the College's faculty disciplinary process – which consists of several levels of review – was ongoing and not yet completed.  Dartmouth did not unilaterally stop the investigation, nor did it "allow" the retirement or resignations.   The retirement and resignation decisions were made by the Former Professors, and as a result the remainder of the College's formal disciplinary process was rendered moot.  The College did not conclude any separation agreements with or pay severance to the Former Professors and its sole remaining recourse against them was to maintain the prohibition against their access to Dartmouth property and events, which the College has continued to this day and will continue going forward.

149.     Dartmouth admits the first sentence of Paragraph 149.  Dartmouth denies the second and third sentences of Paragraph 149.

150.     Dartmouth admits that Plaintiff Chauhan is originally from India and that she came to Dartmouth after earning her Master's degree in Italy.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the first four sentences of Paragraph 150, including to the extent that such information may be found in Plaintiff Chauhan's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.  Dartmouth denies the fifth and sixth sentences of Paragraph 150.  Answering further, Dartmouth states that information was provided voluntarily by Plaintiff Chauhan (and was not "demanded"), and that Plaintiff Chauhan was specifically advised that Investigator Davis would be discussing her allegations with Former Professor Whalen and sharing documentation she voluntarily provided with him and his attorneys.

151.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 151.  Answering further, Dartmouth says that the premise of this paragraph is inaccurate as set forth in response to Paragraph 150.

C.     **Sasha Brietzke's Factual Allegations**

152.     Admitted.

153.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 153.

154.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 154.

155.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 155.

156.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 156.

157.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 157.

158.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 158.

159.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 159.

160.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 160.

161.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 161.

162.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 162.

163.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 163.

164.    Dartmouth admits that a group of male and female graduate students came forward in April 2017 to present certain concerns that the College took very seriously, but otherwise denies the allegations in Paragraph 164.  Answering further, Dartmouth states that on April 3, 2017, a student emailed Chair Bucci and asked him to meet with a group of graduate students about "some departmental concerns."  Chair Bucci and Director Wheatley immediately arranged for a meeting, in lab space in the Mathematics Department, the next day, April 4.  Chair Bucci and Director Wheatley took extra steps to ensure a location away from the Department for

the comfort of the students.  Eight students attended (5 women, 3 men), including three of the

Plaintiffs, along with Chair Bucci and Director Wheatley.  At the meeting, the students identified

various categories of concern, including non-consensual behavior, inappropriate comments,

pressure to consume alcohol, pressure to socialize, and a recent incident involving public

groping.  The students did not identify the faculty members or the alleged victims by name.

Chair Bucci and Director Wheatley asked if they could contact the Dean of Faculty and Title IX

office to share the concerns and asked if the students would be willing to follow up by meeting

with the Title IX Coordinator.  The students agreed.  Director Wheatley promptly contacted the

Title IX Coordinator.  Chair Bucci promptly reported the matter to Associate Dean Hull, who

encouraged Chair Bucci to contact the Title IX Coordinator, relayed the report to Michael

Mastanduno, the Dean of the Faculty, and relayed the report to Elizabeth Smith, who was soon to

become the new Dean of the Faculty.  Associate Dean Hull also reached out to the Title IX

Coordinator directly, making clear that he was aware of the situation and that the administration

was prepared to coordinate and assist in dealing with the matter.  Chair Bucci and Director

Wheatley met with the Title IX Coordinator on April 6, 2017.  Chair Bucci, Director Wheatley,

and the Title IX Coordinator arranged for and attended a meeting with the students the following

day, April 7, 2017.

165.    Denied.  Answering further, Dartmouth states that the students who raised the

issues in April 2017 expressed concern about maintaining their anonymity, and asked that no

other faculty members (other than Chair Bucci and Director Wheatley) be notified of the

allegations and that the students not be moved to different labs until after the June 8, 2017

Standings Meeting, at which the faculty discuss the progress of each graduate student in the

program and for which the faculty must submit a written evaluation for each of their students.

Indeed, during an update meeting that Director Wheatley had with the students on April 27, 2017, the students made an express request that the College's then-General Counsel wait to send out emails to faculty or other information that might alert the Former Professors to an investigation until after the Standings Meeting.

Nevertheless, Dartmouth did take steps to begin the investigation promptly while remaining mindful of the students' request and took steps to find new advisors for several students who requested that they do so, even in cases (such as Plaintiff Brietzke) where the students had made clear that they did not wish for a transfer to be executed until after the Standings Meeting.

166.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 166.

167.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 167.

168.    With respect to the first sentence of Paragraph 168, (i) Dartmouth admits that Plaintiffs' counsel sent a letter to Dartmouth's counsel dated September 12, 2018 (not October 12 as alleged) regarding Plaintiffs' claims and denies that the letter states any sufficient basis for liability as to Dartmouth; (ii) Dartmouth admits that Chair Bucci and Director Wheatley convened a meeting on October 17, 2018 with the Department's graduate student body, and denies that the meeting was scheduled in response to the Plaintiffs' September 12, 2018 letter; (iii) Dartmouth admits that the Title IX Coordinator, Kristi Clemens, was present for part of the October 17, 2018 meeting; and (iv) Dartmouth admits that Plaintiff Brietzke attended the October 17, 2018 meeting.  With respect to the second sentence of Paragraph 168, Dartmouth specifically denies that the meeting was an "attempt to disparage the victims and discourage

them from pursuing legal action." Answering further, Dartmouth incorporates by reference its response to Paragraph 66 above, which provides additional information about the referenced meeting. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second sentence of Paragraph 168.

169. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 169.

170. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 170.

**D.      Annemarie Brown's Factual Allegations**

171. Admitted.

172. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 172.

173. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 173.

174. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 174.

175. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 175.

176. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 176.

177. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 177.

178. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 178.

179.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 179.

180.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 180.

181.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 181.

182.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 182.

183.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 183.

184.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 184.

185.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 185.

186.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 186.

187.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 187.

188.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 188.

189.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 189.

190.    Dartmouth admits that Former Professor Whalen extended certain academic deadlines for Plaintiff Brown.  Answering further, Dartmouth says that it understands that he did so because he believed that she needed more time to complete her work.  For example, although graduate students typically complete their first experiments by the end of their first year or mid-way through their second year, Dartmouth understands that Plaintiff Brown did not complete her first experiment at Dartmouth until she was in the fourth year of the graduate program.  During a Standings Meeting in June 2013, "concerns [were] expressed by [the] entire faculty" about Plaintiff Brown's progress in the program.  Dartmouth otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 190.

191.    Denied.    Answering further, Dartmouth states that Plaintiff Brown contacted Chair Bucci on August 22, 2013 to request a meeting.  Plaintiff Brown and Chair Bucci met on August 23, 2013.  On September 16, 2013, Plaintiff Brown emailed Chair Bucci and stated, "I also wanted to drop you a line and let you know that things are going a lot better with the Paul partnership - I talked with him after our talk about the possibility of getting a secondary advisor, and although he was alright with the idea, he thought it might not be necessary.  I'm still interested in pursuing it, but have been holding off for the time being as the need is no longer immediate.  He's been incredibly supportive and attentive to my productivity ever since we talked, so things are looking pretty great at the moment.  Thanks again, so much, for all of your help - I'm sure I'll be in touch again."  This indicates not only that Chair Bucci supported Plaintiff Brown in obtaining a secondary advisor, but also that Plaintiff Brown was the individual who told Former Professor Whalen about the idea, not Chair Bucci.  Moreover, at the time of these communications, Chair Bucci was neither the Director of the Graduate Program nor the Department Chair and so was not in a position of authority to assign a secondary advisor.  When

Chair Bucci later held these roles, he explicitly reminded graduate students at yearly meetings and orientations that he recommended they have a secondary advisor and would assign one to anyone who wished to have one.

192.   Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in the sentences preceding the last sentence of Paragraph 192.   With regard to the last sentence, Dartmouth reiterates its understanding that Former Professor Whalen pushed back deadlines for Plaintiff Brown to allow her to complete her work.

193.   Dartmouth admits the first sentence of Paragraph 193.   Dartmouth denies the second sentence of Paragraph 193.

194.   Dartmouth admits that Investigator Davis interviewed Plaintiff Brown on October 22, 2017.   Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 194.

195.   Dartmouth admits the first sentence of Paragraph 195.   Dartmouth admits that Plaintiff Brown sent an email to Chair Bucci on April 9, 2018 which stated, "I'd like to check in with you about the department's needs for upcoming teaching appointments after this term." Dartmouth admits that Chair Bucci sent an email to Plaintiff Brown on April 17, 2018 which stated, "I really don't have much to say at this point….still very much up in the air as to whether we will get Paul, Bill, Todd back for next year.   So until that happens, I can't say for sure." Dartmouth denies the remaining allegations in Paragraph 195.

196.   Denied.   Answering further, in April 2018, while the disciplinary processes against the Former Professors were pending, Chair Bucci needed to find replacements to teach the Former Professors' courses for the Fall 2018.   Former Professor Kelley's PSYC 60: Brain Imaging course was an elective course for both psychology and neuroscience majors, essential

training for many neuroscience majors who intend to do honors research, and one of several courses that can fill the "culminating experience" requirement; therefore, it was essential that Chair Bucci find a replacement professor for this course and that he do so in time to allow students to register for the course. Chair Bucci asked an adjunct faculty member who had previously served multiple times as a teaching assistant in Former Professor Kelley's PSYC 60: Brain Imaging course to teach that course in Fall 2018, in place of Former Professor Kelley. In contrast, to Chair Bucci's knowledge, Plaintiff Brown had neither been a teaching assistant for nor taught a Brain Imaging course. Former Professor Whalen was scheduled to teach an upper-level elective, which could be canceled if Former Professor Whalen did not return to Dartmouth in time for the Fall 2018 term. Chair Bucci assigned Former Professor Whalen's course, PSYC 43: Emotion, to Professor Meghan Meyer, a tenure-track faculty member, who initially requested to teach this course. On July 6, 2018, after it was clear that Former Professor Whalen would not be returning to teach the course, Professor Meyer emailed Chair Bucci to request whether Plaintiff Brown could teach the PSYC 43: Emotion course and Professor Meyer could teach another course she was interested in. On July 17, 2018, Chair Bucci emailed Plaintiff Brown to offer her the position teaching the PSYC 43: Emotion course, which Plaintiff Brown accepted the same day. Plaintiff Brown taught the course in the Fall 2018 term. Subsequently, Chair Bucci offered Plaintiff Brown additional teaching assignments, including a Cognition course and a Methods course.

197. Dartmouth denies the first sentence of Paragraph 197. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 197, including to the extent that such information may be found in Plaintiff

Brown's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.

198.    Dartmouth denies the second and third sentences of Paragraph 198.  Answering further, Dartmouth states that Plaintiffs were specifically advised that Investigator Davis would be discussing their allegations with the Former Professors and sharing documentation they voluntarily provided with the Former Professors.  Dartmouth admits that Plaintiff Brown is a "Reporting Party" in Investigator Davis' report regarding Former Professor Whalen.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the first and fourth sentences of Paragraph 198, including to the extent that such information may be found in Plaintiff Brown's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.

199.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 199, including to the extent that such information may be found in Plaintiff Brown's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.

E.    **Andrea Courtney's Factual Allegations**

200.    Admitted.

201.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 201.

202.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 202.

203.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 203.

204.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 204.

205.     Dartmouth admits that Plaintiff Courtney and Plaintiff Rapuano each worked in Former Professor Kelley's lab.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 205.

206.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 206.

207.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 207.

208.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 208.

209.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 209.

210.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 210.

211.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 211.

212.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 212.

213.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 213.

214.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 214.

215.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 215.

216.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 216.

217.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 217.

218.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 218.

219.    Dartmouth admits that a group of male and female graduate students came forward in April 2017 to present certain concerns that the College took very seriously, but otherwise denies the allegations in Paragraph 219.  Answering further, Dartmouth states that on April 3, 2017, a student emailed Chair Bucci and asked him to meet with a group of graduate students about "some departmental concerns."  Chair Bucci and Director Wheatley immediately arranged for a meeting, in lab space in the Mathematics Department, the next day, April 4.  Chair Bucci and Director Wheatley took extra steps to ensure a location away from the Department for the comfort of the students.  Eight students attended (5 women, 3 men), including Plaintiff Courtney, Plaintiff Rapuano, and one other Plaintiff, along with Chair Bucci and Director Wheatley.  At the meeting, the students identified various categories of concern, including non-consensual behavior, inappropriate comments, pressure to consume alcohol, pressure to socialize, and a recent incident involving public groping.  The students did not identify the faculty members or the alleged victims by name.  Chair Bucci and Director Wheatley asked if they could contact the Dean of Faculty and Title IX office to share the concerns and asked if the students would be willing to follow up by meeting with the Title IX Coordinator.  The students

agreed.  Director Wheatley promptly contacted the Title IX Coordinator.  Chair Bucci promptly

reported the matter to Associate Dean Hull, who encouraged Chair Bucci to contact the Title IX

Coordinator, relayed the report to Michael Mastanduno, the Dean of the Faculty, and relayed the

report to Elizabeth Smith, who was soon to become the new Dean of the Faculty.  Associate

Dean Hull also reached out to the Title IX Coordinator directly, making clear that he was aware

of the situation and that the administration was prepared to coordinate and assist in dealing with

the matter.  Chair Bucci and Director Wheatley met with the Title IX Coordinator on April 6,

2017.  Chair Bucci, Director Wheatley, and the Title IX Coordinator arranged for and attended a

meeting with the students the following day, April 7, 2017.

220.    Denied.  Answering further, Dartmouth states that the students who raised the

issues in April 2017, including Plaintiff Courtney, expressed concern about maintaining their

anonymity, and asked that no other faculty members (other than Chair Bucci and Director

Wheatley) be notified of the allegations and that the students not be moved to different labs until

after the June 8, 2017 Standings Meeting, at which the faculty discuss the progress of each

graduate student in the program and for which the faculty must submit a written evaluation for

each of their students.  Indeed, during an update meeting that Director Wheatley had with the

students on April 27, 2017, the students made an express request that the College's then-General

Counsel wait to send out emails to faculty or other information that might alert the Former

Professors to an investigation until after the Standings Meeting.

Nevertheless, Dartmouth did take steps to begin the investigation promptly while

remaining mindful of the students' request and took steps to find new advisors for several

students who requested that they do so, even in cases (such as Plaintiff Brietzke) where the

students had made clear that they did not wish for a transfer to be executed until after the Standings Meeting.

Dartmouth specifically denies any suggestion that it "encouraged" the students to continue working with the Former Professors.  Such allegations are both wrong and unfair given that Chair Bucci, Director Wheatley, and others, who are not alleged to have committed wrongdoing, have worked hard in an attempt to address concerns and issues that the students have raised.

221.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 221, including to the extent that such information may be found in Plaintiff Courtney's medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.

**F.    Marissa Evans's Factual Allegations**

222.    Dartmouth admits the first sentence of Paragraph 222.  With respect to the second sentence, Dartmouth admits that Plaintiff Evans majored in Neuroscience and that she worked as an unpaid research assistant in Former Professor Kelley's lab during the 2015-2016 academic year, and as a paid research assistant in Former Professor Kelley's lab in the winter of 2017. Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in the third sentence of Paragraph 222.

223.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 223, including to the extent that such information may be found in Plaintiff Evans' medical records, to which relevant Dartmouth personnel and Dartmouth's counsel have not been given access.  Answering further, Dartmouth states that other records located to date have revealed no information regarding the assault alleged in Paragraph 223 or a report by Plaintiff Evans of the alleged assault.

224.     Dartmouth denies Paragraph 224.   Answering further, Dartmouth states that relevant Dartmouth personnel and Dartmouth's counsel have not been given access to Plaintiff Evans' medical records, and other records located to date have revealed no information regarding the assault alleged in Paragraph 224 or a report by Plaintiff Evans of the alleged assault.

225.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 225.

226.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 226.

227.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 227.

228.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 228.

229.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 229.

230.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 230.

231.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 231.

232.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 232.

233.     Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 233.

234.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 234.

235.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 235.

236.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 236.

237.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 237.

238.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 238.

239.    Denied.  Answering further, Dartmouth states that the decision regarding Plaintiff Evans' honors thesis was made by the Neuroscience Steering Committee.  Many (if not all) of the professors serving on that Committee were not aware that Plaintiff Evans was participating in the Title IX process, and/or were not aware of allegations she may have made as part of that process.  Neither the Committee nor any of its members was directed or pressured by anyone at Dartmouth to allow any allegation Plaintiff Evans had made to impact the decision.  The Committee members made the decision based on their honest assessment of Plaintiff Evans' performance.  There is no evidence whatsoever that retaliation played any role.

240.    Dartmouth denies the first sentence of Paragraph 240, as Plaintiff Evans did not "easily" pass the oral defense of her honors thesis, although Professors Maue and Green did say that her performance was passable.  Dartmouth admits that Professors Maue and Green, the faculty judges, agreed that a recommendation that Plaintiff Evans pass with honors should be

given to the Neuroscience Steering Committee for their review and consideration.   Dartmouth denies the remaining allegations in Paragraph 240.

241.    Dartmouth denies the first sentence of Paragraph 241, as Professor Maue never "refused to provide" a signature.  Dartmouth admits that Plaintiff Evans emailed Professor Maue to request his signature for her honors thesis, says that it currently lacks knowledge or information sufficient to form a belief about the truth of the allegation that Professor Maue did not respond, and denies that this impacted Plaintiff Evans' submission of her honors thesis, as is described in more detail in Dartmouth's response to Paragraph 242 below.

242.    Denied.  Answering further, Dartmouth states that at no time did the Neuroscience Steering Committee (or its members) tell Plaintiff Evans that she "received a failing grade on her thesis."   The Chair of the Committee did convey that Plaintiff Evans had not been awarded "honors" for her thesis.  Moreover, the allegation regarding the timing of Plaintiff Evans' thesis submission is incorrect.  The thesis was due the last day of classes, which was Wednesday, May 30, 2018.  Some students were having difficulty with copying and printing at a local vendor, so the Committee offered an extension, until Friday, June 1, 2018.  Hearing reports of continued difficulty with the printer, the Committee emailed the students and gave them another extension – until Monday, June 4, 2018 at 9:00 AM, which was two hours before the Neuroscience Steering Committee was meeting, at 11:00 AM, to discuss the awarding of honors.  The email also stated that if a student was having difficulty meeting this deadline, he/she should contact the Chair of the Committee or the Department Administrator and inform them of such.  Plaintiff Evans failed to meet this extended deadline, and further she did not contact the Chair of the Committee or the Department Administrator to say that she was unable to meet the 9:00 AM cutoff, after which the Chair of the Committee emailed her again on June 4, 2018 at 11:13 AM

stating that he still had not received her thesis or heard from her.  The Committee then voted not to award her honors, and the Chair of the Committee informed Plaintiff Evans of this decision via email at 1:13 PM that day.

The late submission was only one factor that the Committee considered; there were a number of other factors that went into the decision not to award Plaintiff Evans "honors" status, including those set forth in response to Paragraph 245 below.  Moreover, despite Plaintiff Evans' claim that the delay was caused by her inability to obtain a signature on the thesis, the printer confirmed that Plaintiff Evans did not pay for and retrieve her thesis until 2:38 PM on Monday, June 4, 2018, after the Neuroscience Steering Committee had met and made its decision not to award her honors status.

243.    Dartmouth denies the first sentence of Paragraph 243, except it admits that a meeting did occur with Plaintiff Evans along with Chair Bucci, Professor Taube, and Catherine Cramer (not "Dave Kramer" as stated in the first sentence of Paragraph 243), at which Plaintiff Evans asked that the "no honors" decision be reversed.  Dartmouth specifically denies that there was ever a "decision to fail" Plaintiff Evans and denies the second sentence of Paragraph 243.

Answering further, Dartmouth states that this allegation is inaccurate and unfair.  The Neuroscience Steering Committee reached a considered decision that Plaintiff Evans' performance was not worthy of honors status.  Plaintiff Evans, however, expressed a strong desire to graduate with honors.  In a good faith attempt to comply with her request (in a manner that would be fair), after the referenced meeting, Plaintiff Evans was given a choice either to accept grades of A- and B+ for two semesters of independent study (which would be without honors status) or accept a grade of C+ for two semesters, with honors.  The Committee believed that its decision was justified based on Plaintiff Evans' performance.

244.    Dartmouth admits that Plaintiff Evans wrote to President Hanlon seeking to appeal the decision of the Neuroscience Steering Committee and admits that the quoted language is contained in her appeal letter.   Dartmouth lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence of Paragraph 244.  With respect to the third sentence of Paragraph 244, Dartmouth admits that a petition was placed on a webpage, but denies that the content of the petition is accurate.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 244.

Answering further, Dartmouth states that President Hanlon referred Plaintiff Evans' appeal letter to Associate Dean Hull, consistent with his practice with grade change requests. Associate Dean Hull reviewed the matter of Plaintiff Evans' grade and honors status in response to her letter.  Associate Dean Hull disagreed with the process that the Neuroscience Steering Committee had followed, inasmuch as he found that the Committee is not responsible for assigning a grade and thus should not have offered her the alternatives discussed in response to Paragraph 243.  Rather, that responsibility of assigning a grade falls to the primary advisor, who in this case was Professor Green; the responsibility of the Committee is then to decide whether the student will graduate with an award of "honors," "high honors," or "no honors."   After consulting with Professor Green regarding the grade he would assign for Plaintiff Evans' work (without regard to honors status), Associate Dean Hull instructed the registrar to assign those grades:  a B+ for the Winter 2017 term, and an A- for the Spring 2018 term.

245.    Dartmouth admits that Plaintiff Evans received grades of B+ and A- for two semesters and that the Neuroscience Steering Committee did not reverse its decision that

Plaintiff Evans would not receive "honors."  Dartmouth denies the remaining allegations, if any, in Paragraph 245.

Answering further, Dartmouth states that, following the Committee's June 4, 2018 meeting, Plaintiff Evans submitted her thesis and submitted her required poster, along with explanations for why their submission was tardy.  Accordingly, and in light of Associate Dean Hull's decision, the Neuroscience Steering Committee met on July 11, 2018 in order to reconsider the decision of "no honors."  The Committee ultimately decided that its decision of "no honors" should stand.  The letter informing Plaintiff Evans of this decision discusses, among other things, (1) her tardiness in submitting a progress report that was due in February 2018; (2) her absence at an Honors information meeting in April; (3) her absence at a mandatory Neuroscience poster session (a requirement for receiving honors); (4) the timing of her thesis submission; and (5) her failure to initiate significant effort to contact appropriate people when it became apparent she was going to miss deadlines.  Again, Dartmouth strongly denies that the decision not to grant honors had any relationship to Plaintiff Evans' participation in the Title IX Investigation, or that it constituted improper retaliation.

246.    Dartmouth admits the first sentence of Paragraph 246.  Dartmouth denies that Plaintiff Evans' honors thesis "failed" because she received passing grades for the course, and on that basis Dartmouth denies the second sentence of Paragraph 246.

247.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 247.

**G.**      **Jane Doe's Factual Allegations**

248.    Admitted.

249.    Admitted.

250.    Dartmouth admits the first sentence in Paragraph 250.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the second sentence in Paragraph 250.

251.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 251.

252.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 252.

253.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 253.

254.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 254.

255.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 255.

256.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 256.

257.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 257.

258.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 258.

259.    Denied.

260.    Denied.

261.    Denied.    Answering further, Director Wheatley contacted Plaintiff Doe when Former Professor Whalen was placed on administrative leave to discuss Plaintiff Doe's lab

assignment.   Upon information and belief, Plaintiff Doe had been unaware of the students' complaints against the Former Professors, or the pending investigation into Former Professor Whalen's conduct specifically, prior to this July 2017 conversation with Director Wheatley. Plaintiff Doe discussed with Director Wheatley the possibility of transferring into Professor Luke Chang's lab.  Professor Chang, like Plaintiff Doe, studies emotion perception.  Plaintiff Doe was working with Professor Chang on an emotion neuroimaging project.  Professor Chang's lab was the only lab for which Plaintiff Doe had a preexisting advisory relationship on a shared project. Additionally, Professor Chang took over Former Professor Whalen's grant, due to the fact that his research interests and expertise were consistent with the projects on Former Professor Whalen's grant.  Plaintiff Doe continued to be paid from this grant.

262.    Denied.

263.    Dartmouth admits that Investigator Davis interviewed Plaintiff Doe on August 3, 2017 and March 7, 2018.  Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 263.

264.    Denied.  Answering further, Dartmouth states that Jane Doe requested to transfer out of Professor Chang's lab only after she performed poorly and began to receive failing grades from Professor Chang.

265.    Dartmouth admits that Plaintiff Doe requested to transfer into Professor David Kraemer's lab in the Education Department, and that Professor Kraemer agreed to accept her. Dartmouth denies that Professor Kraemer's lab "was more aligned with her background and field of science."   Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 265.

266.    Dartmouth admits that Director Wheatley agreed to allow Plaintiff Doe to switch labs.   Answering further, Dartmouth states that Director Wheatley facilitated the transfer by explaining to Professor Kraemer that Plaintiff Doe would remain funded by Department funds despite the fact that she would be transferring into a different department (Education), thereby eliminating any financial barrier to Plaintiff Doe moving into his lab.   Dartmouth denies the remaining allegations in Paragraph 266.   Answering further, in his capacity as Department Chair, Chair Bucci has no role in approving or denying a student's request to switch labs.   Neither Chair Bucci nor Director Wheatley "refused" to let Plaintiff Doe transfer labs; rather, Plaintiff Doe failed out of the graduate program before the transfer could be accomplished.

267.    Denied.   Answering further, Dartmouth states that Plaintiff Doe was given a terminal year during which she could receive her Master's degree and reapply to the Ph.D. program.   The change in her degree status occurred due to an automatic process that is triggered whenever a student receives more than two grades of "low pass" ("LP").   This policy is delineated in the PBS Grad Guide, which Plaintiff Doe received.   Students are permitted to reapply for the Ph.D. program if this occurs.

Plaintiff Doe received three LP grades.   Her third LP was for her qualifying exam, a requirement for the Ph.D. program.   She was removed from the Ph.D. program pursuant to the automatic policy as a result of her poor performance.

268.    Dartmouth admits that Plaintiff Doe met with Chair Bucci and Director Wheatley separately on June 14, 2018 to discuss the LP she received on her qualifying exam and her automatic removal from the Ph.D. program.   Dartmouth denies the remaining allegations, if any, in Paragraph 268.

Answering further, Dartmouth states that on June 13, 2018, Professor Kraemer sent Plaintiff Doe the feedback from her qualifying exam and then met with Plaintiff Doe to explain both the rules related to getting an LP on the exam and the rules related to removal from the Ph.D. program after receiving three LP grades.  Professor Kraemer advised Plaintiff Doe that any revision of her exam would not be helpful, given the overall quality of her work, but told Plaintiff Doe that she had a terminal year during which she could receive her Master's degree and reapply to the Ph.D. program.   He also assured Plaintiff Doe that he and other Dartmouth faculty and administrators (including Director Wheatley, Professor Chang, and Chair Bucci) would support her in moving forward from this event, and he encouraged Plaintiff Doe to speak with Director Wheatley.  Plaintiff Doe met separately with Director Wheatley and Chair Bucci the following day.

269.    Denied.

270.    Dartmouth admits that Director Wheatley stated she did not have a choice in Plaintiff Doe's removal from the Ph.D. program.  Answering further, Dartmouth states that Plaintiff Doe's three LP grades resulted in her automatic removal from the Ph.D. program per stated Department policy.  Director Wheatley did not remove Plaintiff Doe from the Ph.D. program; Plaintiff Doe's performance resulted in her automatic removal.  Dartmouth admits that Director Wheatley asked Plaintiff Doe what she would present for the second part of her qualifying exams.  Answering further, Dartmouth states that a requirement to complete the graduate program is to pass a second qualifying exam, which entails presenting Dartmouth data. Plaintiff Doe did not have a complete and finalized dataset from Dartmouth at that time, and she was planning to spend several months at Duke to collect data that, at the time, was not in

collaboration with a Dartmouth professor and could not be used for her qualifying exam presentation.   Dartmouth denies the remaining allegations in Paragraph 270.

271.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 271.

**V.     CLASS ACTION ALLEGATIONS**

272.    Dartmouth re-alleges and incorporates by reference each and every response to each and every aforementioned paragraph as if fully set forth herein.

273.    Dartmouth admits that Plaintiffs have purported to bring this lawsuit pursuant to the referenced rules, but denies that this case can be certified or maintained as a class action.

274.    Denied.

**A.     Rule 23 Class Definition**

275.    Dartmouth admits that Plaintiffs have purported to bring this lawsuit pursuant to the referenced rules, but denies that this case can be certified or maintained as a class action, using this or any class definition.

276.    Dartmouth reserves the right to respond further if Plaintiffs attempt to assert a modified class definition or class period in the future.

**B.     Efficiency of Class Prosecution of Class Claims**

277.    Denied.

278.    Dartmouth admits that Plaintiffs must prove the items set forth in the first sentence of Paragraph 278 (among others) in order to recover on their individual claims, but denies that the questions are "common" for class certification purposes, or that this case can be maintained as a class action.   Dartmouth denies the remaining allegations, if any, contained in Paragraph 278.

279.    Denied.

280.    Denied.

281.    Denied.

**C.      Numerosity and Impracticability of Joinder**

282.    Denied.

283.    Denied.

**D.      Common Questions of Law and Fact**

284.    Denied.

285.    Denied, although Dartmouth agrees that Plaintiffs must prove certain of these items (among others) in order to recover on their individual claims.  Dartmouth denies that these are "common" issues that "predominate," and denies that this case can be maintained as a class action.  Dartmouth denies the remaining allegations, if any, contained in Paragraph 285.

**E.      Typicality of Claims and Relief Sought**

286.    Denied.

287.    Dartmouth admits that Plaintiffs' proposed class definition would encompass this group, but denies that this case can be certified or maintained as a class action, using this or any class definition.

288.    Denied.

289.    Denied.

290.    Denied.  Dartmouth specifically denies that Plaintiffs are entitled to any of the requested relief.

**F.      Adequacy of Representation**

291.    Denied.

292.    Denied.

293.    Although Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 293, Dartmouth denies that this case can be certified or maintained as a class action with Plaintiffs or any other person serving as putative class representative.

294.    Denied.

**G.    Requirements of Rule 23(b)(2)**

295.    Denied.

296.    Denied.

**H.    Requirements of Rule 23(b)(3)**

297.    Denied.

298.    Denied.

299.    Denied.

300.    Denied.

## VI.    COUNTS

### COUNT ONE

**ALLEGED VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,
AS AMENDED -
SEXUAL HARASSMENT – HOSTILE EDUCATIONAL ENVIRONMENT**
*(On Behalf of All Plaintiffs, Class Representatives and Class Members)*

301.    Dartmouth re-alleges and incorporates by reference each and every response to each and every aforementioned paragraph as if fully set forth herein.

302.    Dartmouth admits that the Plaintiffs have alleged this count, but denies that Plaintiffs have stated a claim upon which relief can be granted, denies that this claim is subject to being certified as a class pursuant to Fed. R. Civ. P. 23, and denies that Plaintiffs can establish that Dartmouth is liable based on this or any other cause of action they have alleged.

303.    Admitted.

304.    Denied.

305.    Denied.

306.    Denied.

307.    Denied.

308.    Denied.

309.    Denied.

## COUNT TWO

**ALLEGED VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS
AMENDED —
GENDER DISCRIMINATION IN TERMS AND CONDITIONS OF EDUCATION U.S.C.
§ 1681 *et seq.***
*(On Behalf of Plaintiffs, Class Representatives and Class Members)*

310.    Dartmouth re-alleges and incorporates by reference each and every response to each and every aforementioned paragraph as if fully set forth herein.

311.    Dartmouth admits that the Plaintiffs have alleged this count, but denies that Plaintiffs have stated a claim upon which relief can be granted, denies that this claim is subject to being certified as a class pursuant to Fed. R. Civ. P. 23, and denies that Plaintiffs can establish that Dartmouth is liable based on this or any other cause of action they have alleged.

312.    Admitted.

313.    Denied.

314.    Denied.

315.    Denied.

316.    Denied.

317.    Denied.

318.  Denied.

319.  Denied.

## COUNT THREE

### ALLEGED BREACH OF FIDUCIARY DUTY UNDER NEW HAMPSHIRE LAW
*(On Behalf of All Plaintiffs, Class Representatives and Class Members)*

320.  Dartmouth re-alleges and incorporates by reference each and every response to each and every aforementioned paragraph as if fully set forth herein.

321.  Dartmouth admits that the Plaintiffs have alleged this count, but denies that Plaintiffs have stated a claim upon which relief can be granted, denies that this claim is subject to being certified as a class pursuant to Fed. R. Civ. P. 23, and denies that Plaintiffs can establish that Dartmouth is liable based on this or any other cause of action they have alleged.

322.  Dartmouth admits that Plaintiffs were enrolled at Dartmouth at various times and admits that the purported class definition includes other individuals who were enrolled at Dartmouth on or after March 31, 2015.  Dartmouth denies the remaining allegations, if any, in Paragraph 322.

323.  Denied.

324.  Denied.

325.  Denied.

326.  Denied.

327.  Denied.

328.  Denied.

329.  Denied.

## COUNT FOUR

### ALLEGED NEGLIGENT SUPERVISION AND RETENTION UNDER NEW HAMPSHIRE LAW
*(On Behalf of Plaintiffs, Class Representatives and Class Members)*

330.    Dartmouth re-alleges and incorporates by reference each and every response to each and every aforementioned paragraph as if fully set forth herein.

331.    Denied.

332.    Denied.

333.    Denied.

334.    Denied.

## COUNT FIVE

### ALLEGED VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS AMENDED - *QUID PRO QUO* SEXUAL HARASSMENT 20 U.S.C. § 1681 *et seq.* *(On Behalf of All Plaintiffs)*

335.    Dartmouth re-alleges and incorporates by reference each and every response to each and every aforementioned paragraph as if fully set forth herein.

336.    Dartmouth admits that the Plaintiffs have alleged this count, but denies that Plaintiffs have stated a claim upon which relief can be granted, and denies that Plaintiffs can establish that Dartmouth is liable based on this or any other cause of action they have alleged.

337.    Admitted.

338.    Denied.

339.    Dartmouth lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding specific actions alleged to have been taken by the Former

Professors toward the Plaintiffs.  Dartmouth denies that such alleged actions would visit liability upon Dartmouth, and denies all remaining allegations contained in Paragraph 339.

340.    Denied.

341.    Denied.

342.    Denied.

343.    Denied.

## COUNT SIX

**ALLEGED VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS
AMENDED —
RETALIATION
20 U.S.C. § 1681 *et seq.*
*(On Behalf of Plaintiffs Chauhan, Brietzke, Brown, Evans, and Doe)***

344.    Dartmouth re-alleges and incorporates by reference each and every response to each and every aforementioned paragraph as if fully set forth herein.

345.    Dartmouth admits that the referenced Plaintiffs have alleged this count, but denies that Plaintiffs have stated a claim upon which relief can be granted, and denies that Plaintiffs can establish that Dartmouth is liable based on this or any other cause of action they have alleged.

346.    Admitted.

347.    Dartmouth admits that Plaintiffs Chauhan, Brietzke, Brown, Evans, and Doe engaged in protected activity by participating in the Title IX Investigation and admits that Dartmouth knew that these Plaintiffs engaged in this protected activity.  Dartmouth denies all remaining allegations in Paragraph 347.

348.    Denied.

349.    Denied.

350.    Denied.

351.    Denied.

## PRAYER FOR RELIEF ON CLAIMS

ANSWER TO PRAYERS FOR RELIEF:    To the extent a response is deemed necessary, Dartmouth denies that Plaintiffs are entitled to any relief and denies all remaining allegations, if any, in the Prayer for Relief.

## VII.    JURY DEMAND

ANSWER:    Dartmouth demands a trial by jury on all issues so triable.

## VIII.    AFFIRMATIVE DEFENSES

Each and every allegation in Plaintiffs' Complaint that is not admitted, including any allegations arguably contained in headings or sub-headings, is expressly denied.  In addition, and without assuming any burden of proof that would not otherwise be placed on Dartmouth, Dartmouth asserts the following separate defenses:

### FIRST DEFENSE (FAILURE TO STATE A CLAIM)

Plaintiffs' Complaint fails to state claims upon which relief can be granted.

### SECOND DEFENSE (STANDING)

Plaintiffs lack standing to bring the claims set forth in the Complaint.

### THIRD DEFENSE (STATUTE OF LIMITATIONS)

Plaintiffs' claims are barred, in whole or in part, to the extent that they were not filed within the period of time mandated by the applicable statutes of limitations.

### FOURTH DEFENSE (SUBJECT MATTER JURISDICTION)

This Court lacks subject matter jurisdiction over some or all of Plaintiffs' claims.

### FIFTH DEFENSE (PROMPT AND EFFECTIVE ACTION)

Without waiving any defenses, Dartmouth has not violated Title IX because it had policies designed to prevent and correct harassment and, upon notice of the alleged conduct in

Plaintiffs' Complaint, Dartmouth took prompt and effective action to respond to the reported conduct.

### SIXTH DEFENSE (REASONABLE CARE/*GEBSER* AFFIRMATIVE DEFENSE)

Plaintiffs' claims are barred, in whole or in part, because Dartmouth exercised reasonable care to prevent and correct promptly any discriminatory or retaliatory conduct.

### SEVENTH DEFENSE (NO DISPARATE TREATMENT/*GEBSER* AFFIRMATIVE DEFENSE)

Plaintiffs were not treated differently than similarly situated individuals outside of their alleged protected classes.

### EIGHTH DEFENSE (NO ACTUAL KNOWLEDGE/*GEBSER* AFFIRMATIVE DEFENSE)

Dartmouth did not have actual knowledge of the alleged harassment.

### NINTH DEFENSE (NATURE OF CONDUCT/*GEBSER* AFFIRMATIVE DEFENSE)

Dartmouth's actions towards Plaintiffs were at all times legitimate, nondiscriminatory, non-pretextual, and non-retaliatory.

### TENTH DEFENSE (NO DELIBERATE INDIFFERENCE)

Dartmouth was not deliberately indifferent to any conduct that might constitute a violation of Title IX.

### ELEVENTH DEFENSE (NOT AN EDUCATION PROGRAM OR ACTIVITY)

Dartmouth cannot be found liable under Title IX for some or all of the alleged conduct in Plaintiffs' Complaint because it occurred off campus and under circumstances over which Dartmouth did not exercise substantial control.

## TWELFTH DEFENSE (INTERVENING ACTS OF THIRD PARTIES)

If Plaintiffs suffered injuries and incurred any expenses as claimed, such injuries and expenses were caused in whole or in part by the actions or omissions of others for whose intervening conduct or negligence Dartmouth is not responsible.

## THIRTEENTH DEFENSE (SUPERSEDING CAUSE)

Any injury to Plaintiffs was caused by the act of third persons whose intervention prevents Dartmouth from being liable for harm to Plaintiffs.

## FOURTEENTH DEFENSE (OUTSIDE SCOPE OF EMPLOYMENT / NO *RESPONDEAT SUPERIOR*)

To the extent that the Former Professors engaged in any of the alleged conduct, it was outside the scope of their employment and therefore Dartmouth cannot be held liable for such conduct.

## FIFTEENTH DEFENSE (FORESEEABILITY)

Plaintiffs' alleged injuries were not foreseeable as a matter of law.

## SIXTEENTH DEFENSE (NO CAUSAL LINK)

Dartmouth did not cause harm to Plaintiffs.

## SEVENTEENTH DEFENSE (NO SPECIAL RELATIONSHIP)

At all relevant times, Dartmouth had no special relationship under the law with Plaintiffs.

## EIGHTEENTH DEFENSE (NO DUTY)

Dartmouth had no duty under common law negligence theories to Plaintiffs.

## NINETEENTH DEFENSE (DUE DILIGENCE/REASONABLE CARE)

Dartmouth exercised due diligence and reasonable care in supervising and retaining the Former Professors.

## TWENTIETH DEFENSE (THIRD PARTY LIABILITY)

If Plaintiffs have been damaged, it is by reason of the acts or omissions of third parties for whose conduct Dartmouth cannot be held liable, not by reason of anything Dartmouth did or failed to do.

## TWENTY-FIRST DEFENSE (FAILURE TO JOIN PARTIES - FED. R. CIV. P. 19)

Plaintiffs have failed to join a party or parties necessary for the just adjudication of their claims under the requirements of Rule 19 of the Federal Rules of Civil Procedure, including but not limited to the men they accuse of sexual assault and/or sexual harassment, because complete relief cannot be accorded among those already parties and the men have an interest in this action and are so situated that disposing of the action in their absence may impair or impede their ability to protect that interest and/or will subject Dartmouth to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of that interest. Defendants therefore reserve all rights under Rule 19, including without limitation to move to join necessary parties or to move to dismiss the Complaint for failure to join indispensable parties.

## TWENTY-SECOND DEFENSE (WORKERS' COMP. BAR)

Some or all of Plaintiffs' claims are barred by the exclusivity provision of the New Hampshire Workers' Compensation Act.

## TWENTY-THIRD DEFENSE (ALTERNATIVE AVAILABLE REMEDIES)

Plaintiffs' common law claims are preempted or barred in whole or in part by available alternative remedies.

## TWENTY-FOURTH DEFENSE (RIGHT TO AMEND)

Plaintiffs' Complaint is set forth in broad and conclusory terms, so Dartmouth cannot fully anticipate all affirmative defenses that may be applicable.   Accordingly, Dartmouth

reserves the right to amend its Answer to add such other further defenses and/or counterclaims as

become available and apparent during the course of discovery in this action.

Respectfully Submitted,

TRUSTEES OF DARTMOUTH COLLEGE

By their attorneys,

/s/ *Joan A. Lukey*

Joan A. Lukey (N.H. Bar ID #16246)
Justin J. Wolosz (*pro hac vice*)
Lyndsey M. Kruzer (*pro hac vice*)
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: (617) 248-5000
Fax: (617) 248-4000
joan.lukey@choate.com
jwolosz@choate.com
lkruzer@choate.com

Date:  January 15, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2019, I caused a true and correct copy of the foregoing Response, filed through the ECF system, to be served electronically on all counsel of record identified on the Notice of Electronic Filing (and below) as registered participants, and that copies will be sent via first class mail to those counsel who are not registered participants on the ECF system.

Charles G. Douglas, III
DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH 03301
(*Served via ECF*)

David Sanford
Nicole Wiitala
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
(*Served via ECF*)

Deborah K. Marcuse
Steven J. Kelley
Austin Webbert
SANFORD HEISLER SHARP, LLP
400 Pratt Street, 8th Floor
Baltimore, MD 21202
(*Served via ECF*)


/s/ *Joan A. Lukey*
Joan A. Lukey