## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**KRISTINA RAPUANO, VASSIKI CHAUHAN, SASHA BRIETZKE, ANNEMARIE BROWN, ANDREA COURTNEY, MARISSA EVANS, JANE DOE, JANE DOE 2, and JANE DOE 3,**

*Plaintiffs, on behalf of themselves and all others similarly situated,*

v.

**TRUSTEES OF DARTMOUTH COLLEGE,**

*Defendant.*

**Hon. Landya B. McCafferty, U.S.D.J.**

CASE NO. 1:18-cv-01070 (LM)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE PROPOSED CLASS SETTLEMENT

**Table of Contents**

INTRODUCTION ..................................................................................................................1

I.     BACKGROUND AND PROCEDURAL HISTORY.......................................................2

       A.   Factual Background................................................................................................2

       B.   Procedural History.................................................................................................3

       C.   Public Response ....................................................................................................4

       D.   Settlement Negotiations and Discovery ...............................................................4

II.    KEY TERMS OF THE PROPOSED SETTLEMENT ....................................................6

       A.   Class Definition ....................................................................................................6

       B.   $14 Million Non-Reversionary Settlement Fund and Class Member Payments..........7

       C.   Comprehensive Programmatic Relief ...................................................................9

       D.   Attorneys' Fees and Costs, Service Awards, and Payment to Settlement
            Administrator.........................................................................................................9

III.   THE COURT SHOULD CERTIFY THE PROPOSED RULE 23 CLASS FOR
       PURPOSES OF SETTLEMENT, APPOINT REPRESENTATIVE PLAINTIFFS
       AS SETTLEMENT CLASS REPRESENTATIVES, AND APPOINT SANFORD
       HEISLER SHARP, LLP AS CLASS COUNSEL ..............................................................10

       A.   General Standards................................................................................................10

       B.   Numerosity is Satisfied .......................................................................................12

       C.   Commonality is Satisfied ....................................................................................12

       D.   The Class Representatives' Claims Are Typical of the Class ..............................14

       E.   Rule 23 (a)(4) and Rule 23(g) Are Satisfied—The Class Representatives and
            Class Counsel Will Fairly and Adequately Protect the Class's Interests ..................14

       F.   The Requirements of Rule 23 (b)(3) Are Satisfied ..............................................15

            1.   Common Issues Predominate.....................................................................15

            2.   Class Settlement is Superior to Alternate Methods of Adjudication ..............17

       G.   The Court Should Appoint Plaintiffs Rapuano, Chauhan, Brietzke, Brown,
            Courtney, Evans, Jane Doe, and Jane Doe 2 as Class Representatives and
            Appoint Sanford Heisler Sharp, LLP as Class Counsel Under Rule 23 (g)..............19

IV.    THE PROPOSED SETTLEMENT IS PRESUMPTIVELY FAIR AND SHOULD
       BE PRELIMINARILY APPROVED UNDER RULE 23(e)...........................................20

       A.   The Settlement is Presumptively Fair and Should Be Preliminarily Approved..........21

1.  The Settlement is Based on Arm's Length Negotiations Conducted After Extensive Investigation and the Exchange of Ample Information.........21

2.  Counsel Is Highly Experienced in Similar Litigation and its Considered Opinion Regarding the Settlement Is Entitled to Significant Weight.............24

3.  The Settlement Falls Well Within the Range of Possible Approval...............24

B.  While the Court Need Not Consider the Final Approval Factors, These Factors Clearly Support Preliminary Approval of the Proposed Settlement .........................26

1.  This is a Complex Litigation Involving Significant Risk; Litigation is Likely to Span Years and Require More than a Decade' Worth of Discovery .......................................................................................................27

2.  The Proposed Settlement Treats Class Members Equitably and Utilizes a Fair and Reasonable Allocation Plan That Strongly Supports Approval 28

3.  The Proposed Settlement Provides Adequate Relief and Exceeds the Likely Result of Continued Litigation ............................................................30

4.  The Court Can Only Assess Objections After the Notice Period ...................32

5.  The Proposed Allocation of Attorneys' Fees and Expenses and the Provision for Reasonable Service Awards Do Not Undermine the Fairness of the Settlement and Warrant Preliminary Approval ......................32

V.  THE PROPOSED FORM AND METHOD OF NOTICE OF THE CLASS SETTLEMENT SHOULD BE APPROVED ....................................................................35

CONCLUSION....................................................................................................................36

## **TABLE OF AUTHORITIES**

**Cases**

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ................................................................ 10, 17

*Applegate v. Formed Fiber Techs., LLC*, No. 2:10-CV-00473-GZS, 2012 WL 3065542
  (D. Me. July 27, 2012) ................................................................................................... 12

*Baugh v. Robert Morris Univ.*, No. 2:16-CV-00430, 2018 WL 5828834 (W.D. Pa.) ................ 32

*Beck v. Boeing* Co., No. 00–CV–301P (W.D. Wash. Oct. 8, 2004) ....................................... 34

*Bellifemine v. Sanofi-Aventis*, No. 07 Civ. 2207(JGK), 2010 WL 3119374 (S.D.N.Y.
  Aug. 6, 2010) ........................................................................................................... 15, 34

*Betancourt v. Advantage Human Resourcing, Inc.*, No. 14-cv-01788-JST, 2015 WL
  12661922 (N.D. Cal. Aug. 28, 2015) .................................................................................. 33

*Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324 (D. Mass. 2015) .................................... passim

*Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201 (N.D. Ill. 2014) ........................................ 16

*Briski v. Hersey*, No. C 17-02675, 2017 WL 4418866 (N.D. Cal. Oct. 5, 2017) ...................... 31

*Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195 (D.N.H. 2009) .............................. 17, 28

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ........................................ 27

*Clough v. Revenue Frontier, LLC*, No. 17-CV-411-PB, 2019 WL 2527300 (D.N.H. June
  19, 2019) .......................................................................................................... 12, 13, 14, 15

*Crane v. Sexy Hair Concepts, LLC*, No. CV 17-10300-FDS, 2019 WL 2137136 (D.
  Mass. May 14, 2019) ..................................................................................................... 22

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) ................................................. 22

*Del Sesto v. Prospect Chartercare, LLC*, No. CV 18-328 WES, 2019 WL 2162083
  (D.R.I. May 17, 2019) .............................................................................................. 20, 21, 24

*Doe #1 by Parent #1 v. N.Y.C. Dep't of Educ.*, No. No. 16-CV-1684, 2018 WL 3637962
  (E.D.N.Y. July 31, 2018) ................................................................................................ 23

*Doe v. Johns Hopkins Hosp.*, No. 24C13001041, 2014 WL 4147208 (Md. Cir. Ct. July
  21, 2014) ................................................................................................................. 25, 29

*Doe v. Roman Catholic Diocese of Covington*, No. 03-CI-00181, 2006 WL 250694 (Ky.
  Cir. Ct. Jan. 31, 2006) .................................................................................................. 19

*Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019) ....................................... 23

*Dziennik v. Sealift, Inc.*, No. 05-CV-4659(DCI)(MDG), 2007 WL 1580080 (E.D.N.Y.
  May 29, 2007) ............................................................................................................ 18

*Fox v. Pittsburg State Univ.*, No. 2:14-CV-02606, 2016 WL 11033455 (D. Kan.) .................. 32

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174 (W.D.N.Y. 2005) ...................................... 33

*García-Rubiera v. Calderón*, 570 F.3d 443 (1st Cir. 2009) ........................................... 12, 14

*Geis v. Walgreen Co.*, Civ. No. 07-4238, 2010 WL 11570447 (D.N.J. Sept. 30, 2010)............ 33

*George v. Nat'l Water Main Cleaning Co.*, No. 10-CV-10289, 2014 WL 1004109 (D.
  Mass. Mar. 17, 2014) ................................................................................................... 16

*Gordan v. Mass. Mut. Life Ins. Co.*, No. 13-CV-30184-MAP, 2016 WL 11272044 (D. Mass. Nov. 11, 2016) ............................................................................................................. 33

*Gulbankian v. MW Mfrs., Inc.*, No. 10-10392, 2014 WL 7384075 (D. Mass. Dec. 29, 2014) ........................................................................................................................... 22, 24

*Hill v. State St. Corp.*, No. Civ. 09-12146-, 2015 WL 127728 (D. Mass. Jan. 8, 2015) ........ 24, 32

*Hochstadt v. Bos. Sci. Corp.*, 708 F. Supp. 2d 95 (D. Mass. 2010) ...................................... 11, 20

*Holt v. FoodState, Inc.*, No. 17-cv-637-LM (D.N.H. Dec. 20, 2018) ........................................... 11

*Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103 (D.D.C. 2017) ........................................... 13, 14

*Hughes v. Regents of Univ. of Colorado*, 967 F. Supp. 431 (D. Colo. 1996) .............................. 32

*In re Air Crash Disaster at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1115, (D.S.C. 1997) .................................................................................................................................. 31

*In re Amtrak Train Derailment in Phila., Pa.*, No. 15-MD-2654, 2016 WL 1359725 (E.D. Pa. Apr. 6, 2016) ......................................................................................................... 11

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*, No. 12-md-2320-PB, 2015 WL 7282543 (D.N.H. Nov. 16, 2015) ......................... 27, 30

*In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36 (D.N.H. 2015) ................... 16

*In re Fid./Micron Sec. Litig.*, 167 F.3d 735 (1st Cir. 1999) ....................................................... 32

*In re Gen. Motors Co. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ........................................................................................................................... 33

*In re Lucent Tech., Sec. Litig.*, 327 F.Supp.2d 426 (D.N.J. 2004) .............................................. 33

*In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005) ...................... 11, 12

*In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016) ................................................................................................................................... 23

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ................................................ 15, 16, 17

*In re Ocean Power Techs., Inc.*, No. 3:14-CV-2016 WL 6778218 (D.N.J. Nov. 15, 2016) ................................................................................................................................... 22

*In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012) ............................. 24

*In re Puerto Rican Cabotage Antitrust Litig.*, 269 F.R.D. 125 (D.P.R. 2010) ................. 11, 17, 23

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) ............................................. 11, 33

*In re Revco Sec. Litig.*, No. 851, 89CV593, 1992 WL 118800 (N.D. Ohio May 6, 1992) ................................................................................................................................... 34

*In re StockerYale, Inc. Secs. Litig.*, No. 1:05-cv00-177-SM, 2007 WL 4589772 (D.N.H. Dec. 18, 2007) ....................................................................................................................... 33

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) ..................... 26, 27

*Ingram v. Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001) ..................................................... 34

*James E. Longa Revocable Tr. v. Sprint Commc'ns Co. L.P.*, No. 11-CV-172-JD, 2012 WL 5303296 (D.N.H. Oct. 25, 2012) ..................................................................................... 10

*Jane Doe 30's Mother v. Bradley*, 64 A.3d 379 (Del. Super. Ct. 2012) ........................... 19, 29, 30

*Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254 (D.N.H. 2013) ................ 12

*Lauture v. A.C. Moore Arts & Crafts, Inc.* ................................................................................ 33

*Lazar v. Pierce*, 757 F.2d 435 (1st Cir. 1985) ................................................................ 2, 11, 20

*Lecenat v. Perlitz*, No. 3:13-cv-01633-RNC, 2019 WL 3451571 (D. Conn. Feb. 11, 2019) ........................................................................................................................................ 19

*LeGoff v. Trustees of Bos. Univ.*, 23 F. Supp. 2d 120 (D. Mass. 1998) ................................ 30

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ........................................ 23

*M3 Power Razor Sys. Mktg. & Sales Practice Litig.*, 270 F.R.D. 45 (D. Mass. 2010) .............. 21

*Mack v. Suffolk Cty.*, 191 F.R.D. 16 (D. Mass. 2000) ............................................................ 12

*Marrero-Rolon v. P.R. Elec. Power Auth.*, No. Civ. 15-1167(JAG), 2018 WL 4740202 (D.P.R. Sept. 30, 2018) ........................................................................................................ 16

*Monthei v. Morton Bldgs., Inc.*, No. 4:01-CV-305100-WHA, 2003 WL 21212641 (S.D. Iowa Mar. 26, 2003) ............................................................................................................ 32

*Pan v. Qualcomm, Inc.*, No. 16-cv-1885, 2017 WL 3252212 (S.D. Cal. July 31, 2017) ............. 24

*Ramirez v. DeCoster*, 203 F.R.D. 30 (D. Me. 2001) ............................................................ 19

*Roberts v. TJX Cos., Inc.*, No. 13-cv-13142-ADB, 2016 WL 8677312 (D. Mass. Sept. 30, 2016) .................................................................................................................... 22, 23, 28

*Rolland v. Cellucci*, 191 F.R.D. 3 (D. Mass. 2000) .............................................................. 24

*Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174 (D.D.C. 2017) ...................................... 10

*Saunders v. Getchell Agency, Inc.*, No. 1:13-CV-00244(JDL), 2015 WL 1292594 (D. Me. Mar. 23, 2015) .............................................................................................................. 16

*Scott v. First Am. Title Ins. Co.*, No. CIV. 06-CV-286-JD, 2008 WL 4820498 (D.N.H. Nov. 5, 2008) ........................................................................................................ 10, 20, 21, 24

*Scovil v. FedEx Ground Package Sys., Inc.*, No. 1:10-CV-515-DBH, 2014 WL 1057079 (D. Me. Mar. 14, 2014) ........................................................................................................ 33

*Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648 (N.D. Ill. 2006) .................................... 13, 19

*Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-md-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) ...................................................................................... 18

*Stephens v. US Airways Grp., Inc.*, 102 F.Supp.3d 222 (D.D.C. 2015) .................................. 33

*Thorsen v. Cty. of Nassau*, 722 F. Supp. 2d 277 (E.D.N.Y. 2010) ........................................ 31

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036 (2016) .................................................... 16

*United States v. City of Portsmouth*, No. 09-CV-283-PB, 2013 WL 595929 (D.N.H. Feb. 15, 2013) ....................................................................................................... 2, 11, 20

*Van Lith v. iHeartMedia + Entm't, Inc.*, No. 11:16-CV-00066-SKO, 2017 WL 1064662 (E.D. Cal. Mar. 20, 2017) .................................................................................................... 11

*Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194(CM), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ............................................................................................................. 15, 24

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................... 12

*Wellens v. Daiichi Sankyo, Inc.*, No. C 13-581, 2016 WL 8115715 (N.D. Cal. Feb. 11, 2016) ........................................................................................................................................ 24

*Wells v. Allstate Ins. Co.*, 557 F.Supp.2d 1 (D.D.C. 2008) .................................................. 33

*Worthington v. CDW Corp.*, No. C-1-03-649, 2006 WL 8411650 (S.D. Ohio May 22, 2006) ...................................................................................................................... 33

*Zolkos v. Scriptfleet, Inc.*, No. 12 Civ. 8230, 2014 WL 7011819 (N.D. Ill. Dec. 12, 2014) ............................................................................................................................. 15

**Rules**

Fed. R. Civ. P. 23 ............................................................................................ passim

**Other** Authorities

1 Newberg on Class Actions § 3:20 (5th ed.) .................................................. 13

4 *Newberg on Class Actions* § 13:18 (5th ed.) ........................................... 10, 11

7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005) ................................................................................................................ 16

Christopher Krebs et al., *Campus Climate Survey Validation Study*, Bureau of Justice Statistics Research and Development Series (2016) ................................ 18

Jayne S. Ressler, *#worstplaintiffever: Popular Public Shaming and Pseudonymous Plaintiffs*, 84 TENN. L. REV. (2017) ....................................................... 19

Jayne S. Ressler, *Privacy, Plaintiffs, and Pseudonyms: The Anonymous Doe Plaintiff in the Information Age*, 53 U. KAN. L. REV. (2004) ........................... 19

Report of the Co-Chairs Chai R. Feldblum & Victoria A. Lipnic, *Select Task Force on the Study of Harassment in the Workplace*, U.S. Equal Employment Opportunity Commission (2016) ................................................................................. 18

## INTRODUCTION

Plaintiffs Kristina Rapuano, Vassiki Chauhan, Sasha Brietzke, Annemarie Brown, Andrea Courtney, Marissa Evans, Jane Doe, Jane Doe 2, and Jane Doe 3 ("Plaintiffs") are current or former students in the Department of Psychological and Brain Sciences ("PBS" or "the Department") at Defendant Dartmouth College ("Dartmouth" or "Defendant") (collectively, "Parties"). Plaintiffs allege that Dartmouth systematically failed to protect them and other female students from the sexual predations of three tenured professors who were known serial harassers in violation of Title IX and New Hampshire common law.

Plaintiffs[1] now seek, and Dartmouth does not oppose, preliminary approval of a comprehensive class action settlement that provides substantial programmatic and monetary relief. After extensive arm's length negotiations, the Parties have entered into a proposed Stipulation and Agreement of Settlement ("Agreement") (Exhibit 1 to the Declaration of Deborah K. Marcuse) that affords meaningful and prompt relief to approximately 90 women who are current or former graduate or undergraduate students at Dartmouth. The Settlement entails extensive forward-looking measures to ensure that similar circumstances do not recur. Further, class members who do not opt out of the Settlement will each receive a base payment and will have the option of applying for an equitable *pro rata* share of a $14 million non-reversionary settlement fund through a confidential claims process that takes into account their individual experiences and allegations.

This Court should preliminarily approve the proposed Settlement in accordance with the

---

[1] To the extent necessary, Plaintiffs respectfully request the Court's leave to file this Motion and Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of the Proposed Class Action Settlement. (*See, e.g*, Marcuse Decl. ¶¶ 25-28.) In an Endorsed Order dated September 16, 2019, the Court approved the Parties' Proposed Briefing Schedule (Dkt. 45) that provided for the submission of "Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement" and "Plaintiffs' Motion for Final Approval." (*See* Marcuse Decl. ¶ 26 and Dkt. 45 ¶¶ 1, 3.) This process is consistent with other filings stating that Plaintiffs will move for approval of the proposed Settlement. (Marcuse Decl. ¶ 25.) Dartmouth does not oppose Plaintiffs' Motions for Preliminary and Final Approval of the Proposed Settlement. (*Id*. ¶ 29.)

First Circuit's "strong and clear policy in favor of encouraging settlements," *United States v. City of Portsmouth*, No. 09-CV-283-PB, 2013 WL 595929, at *2 (D.N.H. Feb. 15, 2013), "particularly where class actions are involved." *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985). The motion and accompanying exhibits demonstrate that the Settlement represents the optimal outcome, especially given the substantial risks and delays associated with continued litigation. The Court should therefore authorize notice to Class Members for their feedback on the Settlement. (*See* Marcuse Decl., Exs. 2-3 (Proposed Class Notices).)

To effectuate the Settlement and resolution of this action, Plaintiffs respectfully request that the Court enter the Proposed Order Granting Preliminary Approval (*id.*, Ex. 5) and preliminarily certify the proposed Class for settlement purposes under Rule 23 (b)(3) of the Federal Rules of Civil Procedure (*infra* § III); appoint Sanford Heisler Sharp, LLP as Class Counsel and Plaintiffs Rapuano, Chauhan, Brietzke, Brown, Courtney, Evans, Jane Doe, and Jane Doe 2 as Settlement Class Representatives (*infra* § III(G)); preliminarily approve the Settlement Agreement as potentially coming within the range of reasonableness (*infra* § IV); approve the dissemination of the Class Notice to Class Members (*infra* § V); and schedule a final approval hearing.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A.     <u>Factual Background</u>

The nine Plaintiffs are female scientists who are current or former students affiliated with Dartmouth's PBS Department, where they worked with former tenured professors Todd Heatherton, William Kelley, and Paul Whalen (the "Three Former Professors" or the "Professors"). Plaintiffs allege that Dartmouth knowingly permitted these three prominent (and well-funded) professors to treat its female scholars as sex objects for years: leering at, groping, sexting, and even raping female students in the Department. (*See, e.g.,* Dkt. 28, First Amended

Complaint ("FAC").) Plaintiffs allege that Dartmouth was long on notice of the Professors' misconduct, having received numerous complaints of pervasive sexual harassment and gender-based discrimination dating back to 2002, but failed to take appropriate action. (*Id*. ¶ 3.) Plaintiffs and other female students were harmed as a result.

As alleged in the Complaint: In early April 2017, a group of female graduate students (including several Plaintiffs) contacted Dartmouth's Title IX office and detailed instances of sexual harassment and assault by the Professors. (*Id*. ¶ 4.) Dartmouth failed to adequately respond to these complaints, and as a result, the harassment continued unabated as students continued to work with or among the Professors for nearly four months. (*Id*.) Over several months, approximately 27 complainants came forward to participate in the Title IX investigation. (*Id*. ¶ 6.) The Three Former Professors eventually resigned and/or retired in July 2018. (*Id*. ¶ 7.)

### B.   Procedural History

On November 15, 2018, Plaintiffs Rapuano, Chauhan, Brietzke, Brown, Courtney, Evans, and Jane Doe sued Dartmouth in the United States District Court for the District of New Hampshire alleging class-based claims for hostile environment and gender discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX") and breach of fiduciary duty and negligent supervision and retention under New Hampshire law. (Dkt. 1.)[2] Dartmouth filed an Answer on January 15, 2019 (Dkt. 24). The Court endorsed the Parties' Rule 26 Discovery Plan on February 12, 2019 (Dkt. 25) and Electronic Discovery Protocol on March 4, 2019 (Dkt. 27). The Parties exchanged initial disclosures on April 15, 2019. (Marcuse Decl. ¶ 18.)

---

[2] Between December 7, 2018 and January 8, 2019, the original seven Plaintiffs (Rapuano, Chauhan, Brietzke, Brown, Courtney, Evans, and Jane Doe) filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Marcuse Decl. ¶ 14.) These Charges were also docketed with the New Hampshire Commission for Human Rights as complaints under the New Hampshire Law Against Discrimination. (*Id*.) The EEOC issued Notice of Suit Rights letters on June 13, 2019. (*Id*.)

On May 1, 2019, Plaintiffs filed their FAC—adding two new Named Plaintiffs, Jane Doe 2 and Jane Doe 3. (Dkt. 28.) Dartmouth moved to oppose the two new Plaintiffs' use of pseudonyms on May 14, 2019. (Dkt. 34.) Plaintiffs filed their response to Dartmouth's opposition to their use of pseudonyms on May 21, 2019 (Dkts. 36, 37), and Dartmouth promptly filed a notice of its intent to file a surreply (Dkt. 38). On May 24, 2019, the Parties jointly moved for a stay of all deadlines while they attempted to resolve the matter through private mediation. (Dkt. 39.)

C.     **Public Response**

The filing of this lawsuit received immediate and widespread media attention from major national and international news outlets. As alleged in the First Amended Complaint, former students corroborated Plaintiffs' allegations of a hostile academic environment perpetuated by the Former Professors and other professionals in the field claimed that rumors of sexual misconduct, a heavy drinking culture, poor student/faculty boundaries, and a "boys' club" environment in the Department had circulated for years. (Dkt. 28 ¶¶ 75-77.) On December 6, 2018, nearly 800 members of the Dartmouth community (including current and former undergraduate students, graduate students, faculty, and staff) signed an open letter to President Hanlon and the Board of Trustees condemning Dartmouth's failure to protect its students from sexual assault and harassment. (*Id.* at ¶ 78.)[3]

D.     **Settlement Negotiations and Discovery**

To avoid unnecessary litigation, cost, and expense, the Parties agreed to engage in private mediation. The Parties retained a well-known and experienced mediator familiar with New

---

[3] The letter, issued by the Dartmouth Community Against Gender Harassment and Sexual Violence, stated, in part: "As members of the Dartmouth community spanning several generations, we are acutely aware that these were not isolated incidents, but rather part of an institutional culture that minimizes and disregards sexual violence and gender harassment. . . . We stand, outraged, in solidarity with the courageous individuals who filed this lawsuit, and with the countless students, staff, and faculty who have endured sexual violence and gender harassment throughout Dartmouth's history." *See* https://www.nhpr.org/sites/nhpr/files/201812/statement_of_support-final.pdf.

Hampshire law, the Honorable Robert Morrill (Ret.), to assist them in their negotiations. The Parties participated in two full days of mediation before Judge Morrill on July 24, 2019 and July 25, 2019. (Marcuse Decl. ¶ 31.) The negotiations continued in-person on July 26, 2019 and remotely by phone and email thereafter. (*Id*. ¶ 32.) On August 6, 2019, the Parties issued a joint press release announcing that a settlement had been reached on all material terms. (*Id*. ¶ 33.) The Settlement Agreement was dually executed by all Parties and filed with this Court on September 10, 2019. (*Id*. ¶ 34; *see also* Dkt. 45-1.)

After extensive analysis and deliberation, the Plaintiffs and their Counsel are of the opinion that the Settlement described in the Settlement Agreement is fair, reasonable, and adequate, and provides absent class members with the opportunity for substantial recovery while maintaining their anonymity and confidentiality. (Marcuse Decl. ¶ 43; Declaration of David W. Sanford ("Sanford Decl.") ¶ 21.) The Plaintiffs and their Counsel recognize that, in the absence of an approved settlement, they will face lengthy litigation that would consume considerable time and resources and present all Parties with ongoing risks and uncertainties. (Marcuse Decl. ¶ 45; Sanford Decl. ¶ 22.) Plaintiffs' Counsel and the Class Representatives believe that the Settlement serves the Class's best interest based on all the facts and circumstances, including: the risks of litigation; the uncertainty of class certification in the absence of settlement; the enormous costs associated with continued litigation; the time necessary to achieve a final resolution through trial and any appeals and the potential for significant delay therein; the complexity of Plaintiffs' claims; and the significant benefits accruing to the Class under the Settlement.  (Marcuse Decl. ¶ 46; Sanford Decl. ¶ 23; *see also infra* § IV(B)(1).)

## II.    KEY TERMS OF THE PROPOSED SETTLEMENT

Under the terms of the proposed Settlement, Dartmouth will pay $14,000,000 to fund the monetary settlement of Plaintiffs' and the Class's claims in this case (*infra* § II(B)) and will also undertake significant programmatic measures and reforms (*infra* § II(C).)

### A.    Class Definition

The Settlement Class is comprised of women who are currently or were formerly graduate or undergraduate students who, during the applicable time frame, worked with or were harmed by the misconduct of the Three Former Professors. Specifically, the Class is defined as:

A.  All current and former women graduate students at Dartmouth who meet any of the following criteria:

   (i)    between April 1, 2012 and August 31, 2017 were graduate advisees of one or more of Todd Heatherton, William Kelley, and/or Paul Whalen (i.e., the "Three Former Professors");

   (ii)   between April 1, 2012 and August 31, 2017 were teaching or research assistants for one or more of the Three Former Professors;

   (iii)  were graduate students in the Psychological and Brain Sciences Department who, between April 1, 2012 and August 31, 2017, (i) co-authored at least one paper with one or more of the Three Former Professors based on research physically conducted in the lab during that time period, or (ii) co-authored at least three papers with one or more of the Three Former Professors; OR

   (iv)   were graduate students in the Psychological and Brain Sciences Department between March 31, 2015 and August 31, 2017 who do not fit within categories (i)-(iii), but who will attest that they experienced dignitary, emotional, educational and/or professional harm during this period as a result of the misconduct of one or more of the Three Former Professors.

B.  All current and former women undergraduate students at Dartmouth who, between April 1, 2012 and August 31, 2017, worked as research assistants for one or more of the Three Former Professors. As used herein, "research assistants" includes individuals working on an honors thesis or independent research study in one or more of the Three Former Professors' labs.

(Agreement ¶ 2.) As indicated above, the class period begins on April 1, 2012 (for those who worked with the Professors) or March 31, 2015 (for those who were in the PBS Department but

did not work directly with the Professors); the period ends on August 31, 2017 (shortly after the Professors were removed from campus).

**B.**    **$14 Million Non-Reversionary Settlement Fund and Class Member Payments**

Under the proposed Settlement, Dartmouth will make a total non-reversionary payment of $14,000,000 ("Class Settlement Amount")[4] to fund the settlement of all Plaintiffs' and Class Members' claims against Dartmouth, including all claims for attorneys' fees and costs. (*See id*. ¶ 10.) Class Members remain free to pursue separate claims against the Former Professors. (*Id*.¶ 4.)

Pursuant to the Settlement, Class Members are eligible to receive two types of payments: Base Payments and Supplemental Payments. (*See id.*  ¶¶ 19-20.) The Settlement allows individual Class Members to receive substantial monetary payments without undertaking undue burdens. For example, if 30% of the Class (approximately twenty-seven individuals) choose to submit optional Claim Forms, the average Supplemental Payments will be approximately $322,592 per person following deduction of the anticipated attorneys' fees and costs, settlement administration expenses, and service awards. The process for recovering payments is structured to enable Plaintiffs and Class Members to vindicate their rights requiring while avoiding unnecessary deterrents to participation in the Settlement by Class Members, such as requiring them to come forward publicly. (Marcuse Decl. ¶ 44.) This reduces the potential for re-traumatization and avoids unnecessary deterrents to participation in the Settlement.

***Base Payments*:** Each Class Member is entitled to receive a base payment of $1,000. (Agreement ¶ 19.) Class Members who worked directly with the Former Professors are presumed to have suffered a baseline level of injury from exposure to the alleged hostile environment and

---

[4] Uncashed checks or other residual funds will be handled as follows: If the total amount is greater than $50,000, the Settlement Administrator will  make a second distribution to Class Members in accordance with the *pro rata* allocation determined by the Independent Claims Expert; if less than $50,000, the unused funds will be paid to a *cy pres* recipient organization supporting and/or advocating for victims of sexual assault. (Agreement ¶ 22.)

will receive this payment automatically; students who did not work directly with the Former Professors are not considered to be Class Members unless they attest to experiencing harm.[5]

***Supplemental Payments***: Each Class Member will be eligible to receive a Supplemental Payment (which is in addition to the Base Payment) if she chooses to complete a Claim Form describing the alleged harm she suffered. (*Id*. ¶ 20; Marcuse Decl. ¶ 54 and Exs. 2, 3.) An Independent Claims Expert ("Claims Expert") will determine the allocation of Supplemental Payments based on the information provided in each Class Member's written statement (including all facts that pre- or post-date the class period) and any supporting documentation that is provided. (*Id*. ¶ 20.) The amount of each Supplemental Payment will be determined by the Claims Expert based on nine factors pertaining to the severity and duration of the hostile environment alleged by each Class Member (including the merits and overall likelihood of success of her claims) and the resulting harms, including emotional distress and physical sickness and/or physical injuries that she suffered; functional impairment that impacted her studies, work and/or related activities; impairment to her personal life (including familial, social, or romantic relationships); economic losses; and required future medical or mental health treatment. (*Id.*) Class Members also have the option of submitting additional supporting documentation to the Claims Expert. (*Id.*) Plaintiffs' Counsel proposes that Maria C. Walsh, Esq., who has substantial experience in this area, serve in the role of Claims Expert.[6] (*See* Marcuse Decl. ¶ 55 and Ex. 4 (Walsh Resume).)

The proposed Settlement allows women to maintain their anonymity and privacy by receiving compensation as absent class members rather than forcing them to file their own lawsuits publicly disclosing highly sensitive and personal allegations (that may involve sexual assault,

---

[5] Women who fall *solely* within Paragraph (2)(a)(iv) of the Class definition must attest to dignitary, emotional, educational and/or professional harm. To avoid confusion, they will receive a separate Class Notice describing their rights and options in this matter. (Marcuse Decl. ¶ 53 and Ex. 3; *see also infra* § V.)

[6] Prior to being retained, Ms. Walsh will perform a conflict check on all participants who submit a Claim Form.

sexual harassment, and extreme emotional distress) that will be intensely scrutinized by the media, the scientific community, and the public. Indeed, this case has already been the subject of extensive media coverage. *See supra* § I(C).

### C.    **Comprehensive Programmatic Relief**

In addition to the monetary payment, Dartmouth will undertake the following measures that carry an additional monetary value of approximately $1,500,000:

- Dartmouth will provide an additional $1,000,000 to the Provost's Diversity Recruitment Fund and expand the allowable use of this fund to support the hiring of faculty with expertise in gender and racial discrimination and violence;

- Dartmouth will add two additional members to the External Advisory Committee ("EAC"), which is intended to provide the independent external oversight of the progress of the Campus Climate and Culture Initiative (C3I). Dartmouth and the Plaintiffs will jointly propose nominees for these positions. The EAC will be asked to recommend whether other mechanisms to solicit input and feedback from the broadest cross-section of the community are needed, and will be asked to recommend whether other advisory structures (e.g. a separate internal-external Advisory Board) would better advance the goals of C3I. The EAC and the Provost will participate in meetings with the Plaintiffs to receive recommendations and ensure continuing dialogue and feedback on the implementation of these programmatic measures.

- Within one year, Dartmouth, in connection with the EAC, will review its partnership with WISE and determine whether to (a) add an additional WISE staff on campus, or (b) as an alternative, provide $500,000 in support to WISE over a five year period.

(*See* Exhibit A to Agreement; *see also* Marcuse Decl. ¶ 57.)

### D.    **Attorneys' Fees and Costs, Service Awards, and Payment to Settlement Administrator**

Per the Settlement, Plaintiffs' Counsel will apply to the Court for (a) reimbursement of litigation costs and expenses, (b) attorneys' fees, (c) settlement administration and Independent Claims Expert costs, and (d) service awards. (*See* Agreement ¶¶ 14-15.) Counsel estimates that its litigation expenses, including those incurred by the Settlement Administrator and the Independent Claims Expert, will not exceed $300,000. (Marcuse Decl. ¶ 58.) Counsel's request for attorneys' fees—incurred in connection with investigation, litigation, formal and informal discovery,

negotiations, and settlement of this matter—will not exceed 35% of the Total Settlement Amount. (Agreement ¶ 14.) Finally, Counsel will seek Service Awards of up to $75,000 for each Plaintiff in recognition of the significant time and effort that she expended, the enormous benefit she provided to the Class, and the risks she incurred in coming forward to assert and pursue claims on behalf of the Class. (Agreement ¶ 15.) The Court need not rule on Counsel's anticipated request for fees and expenses, administration costs, and service awards at this juncture; Counsel will file a formal application for the Court's consideration prior to the final approval hearing.

### III. THE COURT SHOULD CERTIFY THE PROPOSED RULE 23 CLASS FOR PURPOSES OF SETTLEMENT, APPOINT REPRESENTATIVE PLAINTIFFS AS SETTLEMENT CLASS REPRESENTATIVES, AND APPOINT SANFORD HEISLER SHARP, LLP AS CLASS COUNSEL

#### A.     General Standards

The Court may certify a class for settlement purposes. Certifying a class for settlement purposes satisfies the Rule 23 requirements more easily than a contested motion for certification. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997) ("Settlement is relevant to a class certification."); *James E. Longa Revocable Tr. v. Sprint Commc'ns Co. L.P.*, No. 11-CV-172-JD, 2012 WL 5303296, at *1-2 (D.N.H. Oct. 25, 2012) (conditionally certifying a settlement class at preliminary approval stage); *Scott v. First Am. Title Ins. Co.*, No. CIV. 06-CV-286-JD, 2008 WL 4820498, at *2 (D.N.H. Nov. 5, 2008) (same); *see also Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191-92 (D.D.C. 2017) ("Most courts have held that a less stringent standard applies at the preliminary approval phase with regard to the requirements for class certification."); Advisory Committee's Notes to Fed. R. Civ. P. 23(e)(1) ("the standards for certification differ for settlement and litigation purposes"); 4 Newberg on Class Actions § 13:18 (5th ed.) ("The obvious

implication . . . is that the standards for certification are laxer at settlement, as that is the only reading that makes sense of the sentence's second clause noting the need for a suitable record.").[7]

"[T]o certify a class under Rule 23 (b)(3), a court must find that the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), as well as the predominance and superiority requirements of Rule 23(b)(3), have been satisfied." *Holt v. FoodState, Inc.*, No. 17-cv-637-LM (D.N.H. Dec. 20, 2018) (Dkt. 22 at 2) (McCafferty, J.). Nonetheless, the "First Circuit has consistently recognized a strong and clear policy in favor of encouraging settlements." *City of Portsmouth*, 2013 WL 595929, at *2 (citing cases). This is especially true in the class action context. *See Lazar*, 757 F.2d at 440 ("[W]e should point to the overriding public interest in favor of the voluntary settlement of disputes, particularly where class actions are involved."); *In re Puerto Rican Cabotage Antitrust Litig.*, 269 F.R.D. 125, 130 (D.P.R. 2010) ("the law favors class action settlements"); *Hochstadt v. Bos. Sci. Corp.*, 708 F. Supp. 2d 95, 102 (D. Mass. 2010) (same); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 68 (D. Mass. 2005) (same); *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005).

Here, the action focuses on Dartmouth's common course of conduct in allegedly failing to adequately investigate and address the Professors' prevalent and longstanding acts. Any issues regarding damages (which, as a general matter, are not a proper basis for denying certification) are fully resolved by the Settlement—which not only provides adequate collective relief but establishes a fair, equitable, and manageable basis for determining each Class Member's share.

---

[7] *See also Van Lith v. iHeartMedia + Entm't, Inc.*, No. 11:16-CV-00066-SKO, 2017 WL 1064662, at *7 (E.D. Cal. Mar. 20, 2017) ("a cursory approach appears the norm when courts address motions for preliminary approval.") (quotations and alterations omitted); *In re: Amtrak Train Derailment in Phila., Pa.*, No. 15-MD-2654, 2016 WL 1359725, at *4 (E.D. Pa. Apr. 6, 2016) ("The Court agrees with the [plaintiffs] that a settlement class can be preliminarily certified based on a less rigorous analysis than that necessary for final certification. Courts may conduct a less demanding review at the preliminary certification stage."); 4 Newberg on Class Actions § 13:18 & n.11 ("courts have long held that because this preliminary certification analysis is non-final, it could accordingly be more cursory.") (citing cases).

### B.     Numerosity is Satisfied

"No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23 (a) has been met." *Clough v. Revenue Frontier, LLC*, No. 17-CV-411-PB, 2019 WL 2527300, at *3 (D.N.H. June 19, 2019) (quoting *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009)). Because the class here consists of approximately 90 current and former students, the numerosity requirement is easily satisfied. (Marcuse Decl. ¶ 42.)

### C.     Commonality is Satisfied

Just "[a] single question of law or fact common to the members of the class will satisfy the commonality requirement." *Clough*, 2019 WL 2527300, at *3 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011)); *Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 265 (D.N.H. 2013) ("a court need find only a 'single common question'"). Moreover, class members need not have identical claims, suffer identical injuries, or have identical damages: "Where class members have different degrees of injury or even where defenses might exist only as to particular individuals, commonality has been found for class certification." *Applegate v. Formed Fiber Techs., LLC*, No. 2:10-CV-00473-GZS, 2012 WL 3065542, at *6 (D. Me. July 27, 2012); *see also In re Lupron*, 228 F.R.D. at 88 ("Rule 23 (a) does not require that every class member share every factual and legal predicate of the action."); *Mack v. Suffolk Cty.*, 191 F.R.D. 16, 23 (D. Mass. 2000) ("Rule 23(a)(2) . . . does not require that class members' claims be identical.") "Ultimately, when the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." *Howard v. Liquidity Servs.*

*Inc.*, 322 F.R.D. 103, 118 (D.D.C. 2017) (quoting 1 Newberg on Class Actions § 3:20 (5th ed.)) (quotations omitted).

This action presents numerous questions common to the Class, and answering each question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Clough*, 2019 WL 2527300, at *3. Common questions include: (i) whether Dartmouth has engaged in unlawful, systemic sex discrimination and facilitated a hostile educational environment that violates Title IX; (ii) whether the Three Professors engaged in conduct that constituted a hostile environment under Title IX; (iii) whether Dartmouth has violated the Title IX and other legal rights of its female students by failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of discrimination in the educational environment; (iv) whether the harassment permitted and facilitated by Dartmouth interfered with the work or educational opportunities normally available to students; (v) whether an "appropriate person" had knowledge of the sexual harassment and hostile environment, including such knowledge of facts that would reasonably indicate substantial risk to any female students, and failed to adequately respond; (vi) whether Dartmouth acted with deliberate indifference to the notice of harassment; (vii) whether Dartmouth had a fiduciary duty with the class; (viii) whether Dartmouth owed the class a duty of care; (ix) whether Dartmouth breached the fiduciary duty and duty of care owed to the class; and (x) whether Dartmouth knew or should have known that it fostered a hostile academic environment. *See also* FAC ¶ 337 (detailing other common questions).

These common questions, which target the same alleged misconduct by Dartmouth, satisfy Rule 23 (a)(2). *See Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 660 (N.D. Ill. 2006) ("plaintiffs have presented a sufficient showing that despite their varied experiences and

circumstances the class members do share at least one common question: whether there existed an overarching and pervasive hostile work environment at [the defendant-Company].").

### D.      The Class Representatives' Claims Are Typical of the Class

The "typicality" requirement in Rule 23 (a)(3) is satisfied where the class representatives' claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory." *Clough*, 2019 WL 2527300, at *4 (quoting *García-Rubiera*, 570 F.3d at 460). Notably, typicality "is not destroyed merely by factual variations." *Howard*, 322 F.R.D. at 118.

Here, the Class Representatives pursue the same claims as the Class based on the same legal theories and the same alleged course of conduct: that Dartmouth knew about and was deliberately indifferent to the conduct of the Three Professors, thereby ratifying their conduct and allowing to persist a hostile environment that interfered with and undermined the class members' educational experiences. Because the Class Representatives have experienced the same type of injury as the Class Members and proceed under the same legal theory, typicality is satisfied. *Id.*

### E.      Rule 23 (a)(4) and Rule 23(g) Are Satisfied—The Class Representatives and Class Counsel Will Fairly and Adequately Protect the Class's Interests

The adequacy requirement is also satisfied. This requirement has two prongs: First, the interests of the representative party should not conflict with the interests of any of the class members. *Clough*, 2019 WL 2527300, at *4.  Second, class counsel should be "qualified, experienced and able to vigorously conduct the proposed litigation." *Id.*

***First,*** there are no conflicts between the Class Representatives and the Class. Throughout the pendency of this action, the Class Representatives have adequately and vigorously represented their fellow female class members. They have spent significant time assisting their counsel, providing information regarding Dartmouth's policies and practices, providing pertinent

documents, and assisting in settlement negotiations. (Marcuse Decl. ¶ 60.)

**_Second_**, Plaintiffs' Counsel, Sanford Heisler Sharp, LLP ("SHS") is highly experienced and well-versed in complex class litigation. (*Id.* ¶ 12; Sanford Decl. ¶¶ 5-16 and Ex. A.) Courts across the country have recognized SHS's experience in complex class action litigation and its skilled and effective representation. *See, e.g.*, *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194(CM), 2010 WL 4877852, at *10 (S.D.N.Y. Nov. 30, 2010) (recognizing SHS as having "just the sort of established record contemplated by the Rules."); *Zolkos v. Scriptfleet, Inc.*, No. 12 Civ. 8230(GF), 2014 WL 7011819, at *5 (N.D. Ill. Dec. 12, 2014) ("Sanford Heisler is very experienced in complex class and collective litigation . . . and has been repeatedly recognized for its skilled and effective representation"); *Bellifemine v. Sanofi-Aventis*, No. 07 Civ. 2207(JGK), 2010 WL 3119374, at *1 (S.D.N.Y. Aug. 6, 2010) (recognizing SHS as having "'an established record of 'competent and successful prosecution of large . . . class actions'") (citation omitted). Thus, Class Counsel "is qualified, experienced and able to vigorously conduct the proposed litigation." *Clough*, 2019 WL 2527300, at *4.

Accordingly, both Rule 23(a)(4) and Rule 23(g) are satisfied.

### F.   The Requirements of Rule 23 (b)(3) Are Satisfied

#### 1.   Common Issues Predominate

Rule 23 (b)(3) "requires merely that common issues predominate, not that all issues be common to the class." *Clough*, 2019 WL 2527300, at *6. "The rule does <u>not</u> require a plaintiff seeking class certification to prove that each element of her claim is susceptible of classwide proof." *Id.* (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) (emphasis in original)). As the Supreme Court recently stated:

> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23 (b)(3)

even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-124 (3d ed. 2005)).

Predominance is met here because the determination of whether Dartmouth discriminated against female students by facilitating a hostile environment and failing to appropriately handle evidence and complaints of harassment is the central question common to each and every Class Member's claim. Moreover, the alleged conduct at issue here—that of both Dartmouth and the Three Former Professors—is common to all Class Members. Thus, "the fundamental question that predominates is a common question, namely whether there was a hostile work environment in plaintiffs' workplace." *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 223-24 (N.D. Ill. 2014).

Notably, as the First Circuit makes clear, "[w]here common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied." *In re Nexium*, 777 F.3d at 21 (ellipses and citation omitted); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 76 (D.N.H. 2015) (same); *see also Marrero-Rolon v. P.R. Elec. Power Auth.*, No. Civ. 15-1167(JAG), 2018 WL 4740202, at *8 (D.P.R. Sept. 30, 2018); *Saunders v. Getchell Agency, Inc.*, No. 1:13-CV-00244(JDL), 2015 WL 1292594, at *8 (D. Me. Mar. 23, 2015) (same); *George v. Nat'l Water Main Cleaning Co.*, No. 10-CV-10289, 2014 WL 1004109, at *4 (D. Mass. Mar. 17, 2014) (same). Differences in damages do not defeat predominance. *See In re Nexium*, 777 F.3d at 21 ("Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.") (citation omitted).

Here, common questions of liability clearly predominate over individualized issues. For example, whether Dartmouth received prior complaints about the Three Former Professors will

dictate whether the "actual knowledge" requirement of Title IX is met. *See Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 208 (D.N.H. 2009) ("actual knowledge" satisfied by prior complaints or "knowledge about the alleged harasser's conduct toward others which indicates some degree of risk that the harasser would subject the plaintiff to similar treatment.") (citing cases). Likewise, whether Dartmouth adequately responded to such complaints will determine the "deliberate indifference" requirement. *See id*. at 212 (the "deliberate indifference" prong may be satisfied where "the [school district] was deliberately indifferent in its response to either the earlier complaints against [the professor] by others, the later complaints against [the professor] by [plaintiff], or both."). While class members may have sustained different damages, this does not defeat predominance under First Circuit law. *See In re Nexium*, 777 F.3d at 21.

### 2. Class Settlement is Superior to Alternate Methods of Adjudication

The superiority requirement in Rule 23 (b)(3) "aims to provide for the 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court.'" *In re P.R. Cabotage Antitrust Litig.*, 269 F.R.D. at 140 (quoting *Amchem,* 521 U.S. at 617). Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to the superiority of a class action, including: whether individual class members wish to bring, or have already brought, individual actions; the desirability of concentrating the litigation of the claims in the particular forum; and manageability concerns. Fed. R. Civ. P. 23(b)(3) Significantly, the manageability factor weighs strongly in favor of settlement because there is no more manageable form of adjudication than a voluntary settlement with an efficient and equitable extrajudicial claims process. *Cf. Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

Here, class treatment is superior to other methods of adjudication. The maintenance of individual lawsuits by Class Members would be unmanageable, costly, and an inefficient use of judicial resources. Thus, "both fairness and efficiency support class certification, where otherwise the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies." *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-md-02503, 2017 WL 4621777, at *21 (D. Mass. Oct. 16, 2017) (quotations omitted).

Counsel is unaware of any individual actions that have been instituted by Class Members. (Marcuse Decl. ¶ 47.) Regardless, class treatment is superior where, as here, class members will benefit from a statute of limitations that has been extended for purposes of settlement. *See infra* § IV(B)(3). In addition, this action is "best litigated in a single forum, given the number of [class members] affected and their geographic dispersion." *Dziennik v. Sealift, Inc.*, No. 05-CV-4659(DCI)(MDG), 2007 WL 1580080, at *12 (E.D.N.Y. May 29, 2007). Moreover, the class action vehicle provides class members with the opportunity for an expeditious resolution as opposed to protracted litigation.

Finally, class treatment is particularly salient in a case such as this one where Class Members who have been harmed (including sexually assaulted or sexually harassed) by the practices at issue are likely to be deterred from pursuing individual claims and publicly stepping forward as victims of sexual assault.[8] The Settlement allows for women to receive compensation

---

[8] It is well-established that sexual assault, workplace harassment, and other forms of sexual misconduct are vastly underreported. *See* Report of the Co-Chairs Chai R. Feldblum & Victoria A. Lipnic, *Select Task Force on the Study of Harassment in the Workplace*, U.S. Equal Employment Opportunity Commission (2016), *available at* https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf ("Roughly *three out of four* individuals [avoid making any formal complaint] . . . because they fear disbelief of their claim, inaction on their claim, blame, or social or professional retaliation."); Christopher Krebs et al., *Campus Climate Survey Validation Study*, Bureau of Justice Statistics Research and Development Series 107 (2016), https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf (across nine schools that were surveyed, only 4.3% of sexual battery incidents and 12.5% of rape incidents were formally reported). This is particularly true in this Internet era. *See* Jayne S. Ressler, *#worstplaintiffever: Popular Public*

as absent class members—and to obtain the benefit of programmatic measures—without openly revealing or detailing their allegations. *See Doe v. Roman Catholic Diocese of Covington*, No. 03-CI-00181, 2006 WL 250694, at *5 (Ky. Cir. Ct. Jan. 31, 2006) (certifying sex abuse case: "The class action procedure has encouraged a large number of people to come forward who would otherwise never have done so had they been left to their individual devices."); *Jane Doe 30's Mother v. Bradley*, 64 A.3d 379, 385 (Del. Super. Ct. 2012) (noting that certification in a sex abuse action was proper where class members "would have been emotionally traumatized by separate litigation and trials"); *cf. Ramirez v. DeCoster*, 203 F.R.D. 30, 37 (D. Me. 2001) ("In the absence of a class action, it is likely that most members of the class will never have any recovery.").[9]

Accordingly, the Court should grant certification for settlement purposes.

### G.   The Court Should Appoint Plaintiffs Rapuano, Chauhan, Brietzke, Brown, Courtney, Evans, Jane Doe, and Jane Doe 2 as Class Representatives and Appoint Sanford Heisler Sharp, LLP as Class Counsel Under Rule 23 (g)

Plaintiffs have actively developed this case and vigorously represented the interests of the Class. They have provided Counsel with information to help prepare and advance the case, responded to multiple information requests, and represented the Class in settlement discussions. Accordingly, the Court should appoint Plaintiffs Rapuano, Chauhan, Brietzke, Brown, Courtney,

---

*Shaming and Pseudonymous Plaintiffs*, 84 TENN. L. REV. 779, 802-03, 808 (2017) (explaining that a "plaintiff's identity and her claim can swiftly be revealed to millions of people"; internet shaming is like "being forced to wear a digital scarlet letter or being branded or tattooed."); Jayne S. Ressler, *Privacy, Plaintiffs, and Pseudonyms: The Anonymous Doe Plaintiff in the Information Age*, 53 U. KAN. L. REV. 195, 219 (2004) (noting that potential plaintiffs may forfeit the opportunity to seek justice out of fear of publicity in the Internet age and decline to initiate litigation).

[9] *See also Lecenat v. Perlitz*, No. 3:13-cv-01633-RNC, 2019 WL 3451571, at *15 (D. Conn. Feb. 11, 2019) (certifying sex abuse case: "Given that this is a settlement class, questions of superiority regarding a class trial are no longer germane . . . It would be inefficient for each Settlement Class Member to separately prove his or her claims . . . Moreover, the claims of all Settlement Class Members are subject to the same potentially dispositive defenses."); *Smith*, 234 F.R.D. at 667 & n.17   (superiority requirement was satisfied in hostile work environment class action because, *inter alia*, "duplicative litigation also creates the undesirable risk of inconsistent determinations on common issues"; "individual lawsuits would compel court after court to hear the same evidence as to an employer's patterns of assertedly discriminatory conduct"; and "one of the main justifications for class actions as such is the unfair tactical advantages that can be conferred on defendants by forcing the institution of individual actions").

Evans, Jane Doe, and Jane Doe 2 as Settlement Class Representatives.

The Court should also appoint Sanford Heisler Sharp, LLP as Class Counsel under Fed. R. Civ. P. 23(g). SHS has substantial experience in successfully prosecuting class actions, particularly those in the context of gender discrimination. (Sanford Decl. ¶¶ 9-16 and Ex. A.) Both before and throughout this litigation, Class Counsel has conducted a full and thorough investigation of this matter including allegations spanning more than sixteen years. (Marcuse Decl. ¶¶ 35-39.) Class Counsel has zealously represented the interests of the Class and committed substantial resources to the resolution of the class claims. (Sanford Decl. ¶¶ 19, 24.)

## IV.   THE PROPOSED SETTLEMENT IS PRESUMPTIVELY FAIR AND SHOULD BE PRELIMINARILY APPROVED UNDER RULE 23(e)

Courts favor the settlement of complex class action litigation. *See Lazar*, 757 F.2d at 440 (recognizing the "overriding public interest in favor of the voluntary settlement of disputes, particularly where class actions are involved"); *Portsmouth*, 2013 WL 595929, at *2 ("The First Circuit has consistently recognized a strong and clear policy in favor of encouraging settlements"); *Hochstadt*, 708 F.Supp.2d at 102 ("the law favors class action settlements").

"Rule 23 (e)(2) permits the Court to approve a class action settlement only if the proposed agreement is fair, adequate, and reasonable. At the preliminary approval stage, however, a less rigorous standard applies: **the Court need only determine whether the settlement *appears to fall within the range of possible final approval*.**" *Del Sesto v. Prospect Chartercare, LLC*, No. CV 18-328 WES, 2019 WL 2162083, at *1 (D.R.I. May 17, 2019) (citations and quotations omitted) (emphasis added). For present purposes, the Court considers whether the proposed settlement is "**illegal**," "**collusive**," or contains "**obvious deficiencies**." *Scott v. First Am. Title Ins. Co.*, No. CIV. 06-CV-286-JD, 2008 WL 4820498, at *3 (D.N.H. Nov. 5, 2008) ("For purposes of preliminary approval, the court considers whether the proposed settlement is illegal or collusive.")

(emphasis added); *see also, e.g.*, *In re M3 Power Razor Sys. Mktg. & Sales Practice Litig.*, 270 F.R.D. 45, 62 (D. Mass. 2010) (the Court need only "examine the proposed settlement for obvious deficiencies"). A proposed settlement is presumptively fair and "falls within the range of possible final approval" if **(1)** it was negotiated at arm's length by parties with sufficient information (*infra* § IV(A)(1)); **(2)** Class Counsel is experienced in class action litigation (*infra* § IV(A)(2)); and **(3)** the settlement is neither illegal nor collusive and the terms appear to be facially reasonable and adequate (*infra* § IV(A)(3).) These factors all strongly support approval here. Thus, the Settlement should be submitted to the Class for their input and potential endorsement.

Nothing more is required. Nonetheless, the proposed Settlement also meets the final approval factors of Rule 23 (e), underscoring the result achieved for the Class. *See infra* § IV(B).

### A.      The Settlement is Presumptively Fair and Should Be Preliminarily Approved

There is "a presumption that a settlement is within the range of reasonableness"—thus meeting the fairness considerations at the preliminary approval stage—when it has been negotiated at arm's length by experienced counsel after the exchange of sufficient information. *See Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 343 (D. Mass. 2015), *aff'd,* 809 F.3d 78 (1st Cir. 2015). If these factors are met and the terms of the settlement, "on their face . . . appear fair, reasonable, and adequate," preliminary approval is warranted. *See Del Sesto*, 2019 WL 2162083, at *1; *Scott*, 2008 WL 4820498, at *3 ("the court is satisfied that the proposed settlement is neither illegal nor collusive. The structure of payment . . . appears to be fair, reasonable, and adequate."). Thus, Class Members should be given notice of the Settlement and an opportunity to weigh in on its terms.

### 1.   The Settlement is Based on Arm's Length Negotiations Conducted After Extensive Investigation and the Exchange of Ample Information

The Parties engaged in two full days of private mediation with the Honorable Robert Morrill (Ret.), an experienced and renowned mediator familiar with New Hampshire Law, to assist

them in reaching the proposed Settlement. Following these mediation sessions, the Parties finalized the settlement though an additional day of in-person negotiations and other extensive communications. (Marcuse Decl. ¶¶ 30-32, 34.) Where, as here, the Settlement is the product of mediation with an experienced mediator, there is a presumption of fairness and arm's length negotiations. *See, e.g., Roberts v. TJX Cos., Inc.*, No. 13-cv-13142-ADB, 2016 WL 8677312, at *6 (D. Mass. Sept. 30, 2016) ("the participation of an experienced mediator[] also supports the Court's finding that the Settlement is fair, reasonable, and adequate.").[10]

Additionally, the Parties have exchanged sufficient information "to make an intelligent judgment about settlement." *Bezdek*, 79 F. Supp. at 348. Indeed, the Parties exhaustively investigated the facts underlying Plaintiffs' allegations before and during this litigation. (Marcuse Decl. ¶¶ 35-39; Sanford Decl. ¶ 19.) Dartmouth retained an independent investigator who, over the course of 11 months, interviewed dozens of witnesses, reviewed electronic messages, collected records, and prepared written reports concerning the conduct of the Three Professors. (Marcuse Decl. ¶ 36.) Plaintiffs' Counsel, which conducted its own factual investigation, had access to many of the same materials as Dartmouth's investigator, and received copies of her written reports. (*Id.* ¶ 37.) Plaintiffs' Counsel reviewed the three investigative reports (totaling 299 pages in length) as well as drafts, revisions, and exhibits. (*Id.*) Plaintiffs' Counsel also spoke with at least 36 witnesses and reviewed extensive records and documents provided by the Plaintiffs and witnesses; information received through Freedom of Information Act (FOIA) requests to the U.S. Department

---

[10] *See also Crane v. Sexy Hair Concepts, LLC*, No. CV 17-10300-FDS, 2019 WL 2137136, at *2 (D. Mass. May 14, 2019) ("the Parties negotiated the Settlement fairly and honestly at arms' length and with the assistance of an experienced mediator and experienced counsel"); *Gulbankian v. MW Mfrs., Inc.*, No. 10-10392, 2014 WL 7384075, at *7 (D. Mass. Dec. 29, 2014) ("negotiations leading to this Agreement were conducted diligently and at arms length with the facilitation of a respected and experienced neutral mediator."); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (A "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."); *In re Ocean Power Techs., Inc.*, No. 3:14-CV-2016 WL 6778218, at *11 (D.N.J. Nov. 15, 2016) ("[T]he participation of an independent mediator in settlement negotiations virtually insures [sic] that the negotiations were conducted at arm's length and without collusion between the parties.") (citing cases).

of Education and the Office for Civil Rights; policy documents, handbooks, and other publicly available information on Dartmouth's website or located through internet searches; and researched related media articles and blog or social media postings. (*Id.* ¶ 38.)

The Parties exchanged further information through written correspondence; phone calls; in-person meetings; detailed mediation statements and exhibits submitted by the Plaintiffs; three full days of in-person negotiations; the exchange of initial disclosures; and the detailed Complaint, Answer, and First Amended Complaint filed in this action. (*Id.* ¶ 39.)

Thus, "the parties exchanged sufficient information over the course of the mediation process to ensure that both sides were making an informed decision regarding the adequacy of the settlement. The parties say that they exchanged extensive informal discovery and documents, and Class Counsel represent that they interviewed numerous witnesses and class members." *Roberts*, 2016 WL 8677312, at *5 (finding the settlement was **_presumptively fair_** where: (i) "the parties exchanged large amounts of information and documents"; (ii) "[b]oth sides conducted their own analyses"; (iii) the parties "engaged in an all-day mediation session under the direction of an experienced class action mediator"; and (iv) when an immediate settlement was not reached at mediation, "the parties continued to negotiate over the next several months"); *In re P.R. Cabotage Antitrust Litig.*, 269 F.R.D. at 141 (finding a presumption of fairness where the parties engaged in informal discovery and the settlement negotiations "were long and arduous, spanning a considerable time-period."), *final approval granted*, 815 F. Supp. 2d 448.[11]

---

[11] *See also Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886, 898 (6th Cir. 2019) ("courts have held that settlements are permissible where, 'notwithstanding the status of discovery, plaintiffs' negotiators had access to a plethora of information regarding the facts of their case.'") (citation omitted); *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436-37 (3d Cir. 2016) ("significant informal discovery" was sufficient for class counsel to "assess the value" of the claims and negotiate a fair settlement); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) ("formal discovery is not . . . necessary . . . where the parties have sufficient information to make an informed decision about settlement."); *Doe #1 by Parent #1 v. N.Y.C. Dep't of Educ.*, No. No. 16-CV-1684, 2018 WL 3637962, at *10 (E.D.N.Y. July 31, 2018) ("Although the parties did not engage in formal discovery in this action, Plaintiffs' counsel represent that they nonetheless conducted a thorough investigation . . . the court is satisfied that the

### 2. Counsel Is Highly Experienced in Similar Litigation and its Considered Opinion Regarding the Settlement Is Entitled to Significant Weight

Sanford Heisler Sharp, LLP has extensive expertise litigating and settling gender discrimination class actions.[12] Thus, Counsel's recommendation that the Settlement is favorable to the Class is entitled to "significant weight" and supports a preliminary presumption of fairness. *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000) ("When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight."); *Hill v. State St. Corp.*, No. Civ. 09-12146, 2015 WL 127728, at *7 (D. Mass. Jan. 8, 2015) (same); *Gulbankian*, 2014 WL 7384075, at *3 (same); *Bezdek*, 79 F. Supp. 3d at 348 ("I find that the parties had a sufficient understanding of the merits of the case in order to engage in informed negotiations, particularly where plaintiffs' counsel are skilled and experienced").

### 3. The Settlement Falls Well Within the Range of Possible Approval

The Court should conclude that the settlement benefits are sufficiently robust to support submission of the Agreement to the Class. *See Del Sesto*, 2019 WL 2162083, at *1 ("On their face, these terms appear fair, reasonable, and adequate"); *Scott*, 2008 WL 4820498, at *3. At the final approval stage, the Court will have the opportunity to fully assess the sufficiency of the settlement

---

settlement was procedurally fair."); *In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (finding an initial presumption of fairness where the plaintiffs' counsel "conducted informal discovery" prior to filing the complaint and amended complaint and reviewed records provided by defendant).

[12] *See, e.g.*, *Jane Doe 2 v. The Georgetown Synagogue et al.*, Civil Action No. 2014 CAB 8073 (D.C. Super. Ct. 2018) (the court concluded the case by praising the work of counsel on the case, stating, "I commend you highly for the work that you've done, the skill that you've demonstrated, and for the significant outcome that has occurred as a result of those efforts."); *Pan v. Qualcomm, Inc.*, No. 16-cv-1885, 2017 WL 3252212, at *5 (S.D. Cal. July 31, 2017) ("Counsel has significant class action litigation experience—especially regarding gender discrimination—in state and federal court."); *Wellens v. Daiichi Sankyo, Inc.*, No. C 13-581, 2016 WL 8115715, at *2 (N.D. Cal. Feb. 11, 2016) ("The Court confirms its previous finding that the Settlement Agreement is the result of arms-length negotiations between experienced counsel representing the interests of Plaintiffs and Defendant, after thorough factual and legal investigation."); *Velez*, 2010 WL 4877852, at *10 ("[Sanford Heisler] has just the sort of established record contemplated by the Rules."); *id.* at *16 ("Both Parties were represented by experienced counsel with substantial experience in employment class action litigation. Class Counsel has been recognized by numerous courts for their work in securing similar class action settlements."); *see also* Sanford Decl. ¶¶ 9-16 and Ex. A.

amount by considering the potential recovery as well as the strength of the case and the risks and burdens of further litigation. At this stage, the Court has more than a sufficient basis to find that the proposed Settlement comes well within the range of possible approval and the $14 million settlement amount represents a highly successful outcome for the Class.

The Settlement provides for substantial monetary and non-monetary relief to Class Members. *See infra* §§ IV(B)(2)-(3) (detailing the significant benefits provided by the Settlement). In the absence of settlement, the complexity of this case and the novel legal theories make continued litigation an inherently risky, costly, and timely undertaking. *See infra* § IV(B)(1). Moreover, the Settlement is structured in a manner that allows Class Members to stay anonymous, while providing confidential information that will permit their individual experiences and circumstances to drive the awards. (*See* Agreement ¶ 20; *infra* § IV(B)(2).) Indeed, in *Doe v. Johns Hopkins Hosp.*, No. 24C13001041, 2014 WL 4147208, at *1 (Md. Cir. Ct. July 21, 2014), the court granted final approval of a sex abuse settlement in which class members received payments between $1,750 and $26,048 after going through a similar confidential claims process.[13] And, here, the Settlement preserves Class Members' ability to sue the Professors themselves for additional relief. (Agreement ¶ 4.)

Because the proposed Settlement was negotiated at arm's length by experienced counsel, is neither illegal nor collusive nor obviously deficient, and falls within the range of possible final approval, it should be preliminarily approved and submitted to the Class for its feedback.

---

[13] *See* Moriah Balingit, *A gynecologist secretly photographed patients. What's their pain worth?*, WASHINGTON POST (Jan. 14, 2017), https://www.washingtonpost.com/local/education/a-gynecologist-secretly-photographed-patients-whats-their-pain-worth/2017/01/14/35bcf156-d45e-11e6-a783-cd3fa950f2fd_story.html?utm_term=.6e659ab81eec.

**B.**     **While the Court Need Not Consider the Final Approval Factors, These Factors Clearly Support Preliminary Approval of the Proposed Settlement**

The Court need not proceed past this analysis; nothing more is required at the *preliminary approval* stage. *See, e.g., Bezdek*, 79 F. Supp.3d at 343. Nonetheless, even at this preliminary stage, the proposed Settlement is fair, reasonable, and adequate under the Rule 23 (e) considerations and case law. At the *final approval* stage, the fairness analysis is guided by Rule 23(e), which states that a district court should approve a class settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:"

> **(A)** the class representatives and class counsel have adequately represented the class;
>
> **(B)** the proposal was negotiated at arm's length;
>
> **(C)** the relief provided for the class is adequate, taking into account:
>
>> **(i)** the costs, risks, and delay of trial and appeal;
>>
>> **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> **(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> **(iv)** any agreement required to be identified under Rule 23 (e)(3); and
>
> **(D)** the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23 (e)(2). Prior to the amended Rule 23 (e) taking effect in late 2018, courts applied similar multi-factor tests to determine the fairness of a proposed settlement. In the First Circuit, there is "neither a fixed checklist of factors nor any specific litmus test" in determining whether a settlement meets the requirements of Rule 23(e)(2). *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007). Some courts in this Circuit have considered the following factors: "(1) risk, complexity, expense and duration of the case; (2) comparison of the proposed settlement with the likely result of continued litigation; (3) reaction of the class to the settlement; (4) stage of the litigation and the amount of discovery completed; and (5) quality of counsel and

conduct during litigation and settlement negotiations." *Id.* at 259-60 (applying "a more concise list" of the considerations in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).

> **1. This is a Complex Litigation Involving Significant Risk; Litigation is Likely to Span Years and Require More than a Decade' Worth of Discovery**

The complexity, expense, and likely duration of this case clearly favors approval. *See* Fed. R. Civ. P. 23(c)(2)(C)(i) (at final approval, courts should take into account "the costs, risks, and delay of trial and appeal"); *In re Tyco*, 535 F. Supp. 2d at 259 (considering "risk, complexity, expense and duration of the case"). This action, which is based on a hostile academic environment theory under Title IX, is perhaps the first of its kind—and, thus, is an inherently complex and risky undertaking. *See Tyco*, 535 F. Supp. 2d at 260 (finding this factor satisfied where it was "a risky case for both sides" due to "an uncertain legal environment" and a case theory that put plaintiffs "at the cutting edge of a rapidly changing" and "still-developing" area of law). Because "the law remains in flux," it is "by no means certain that [P]laintiffs would have prevailed if they had taken the case to trial and attempted to defend any favorable verdict on appeal." *Id.*

In addition, "[b]oth parties maintain that their claims or defenses would prevail at trial . . . Absent settlement, the parties could likely resolve these ongoing disputes only through additional motion practice, discovery, and, potentially, trial." *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*, No. 12-md-2320-PB, 2015 WL 7282543, at *11 (D.N.H. Nov. 16, 2015). Plaintiffs face considerable risks in establishing class-wide liability and in obtaining certification of the proposed class action. The parties would have to litigate class certification (and likely decertification) motions, as well as dispositive motions. If liability is established, Plaintiffs would also have to establish damages. But for the Settlement, Defendants would strongly dispute the propriety of Rule 23 certification. (Sanford Decl. ¶ 22; Marcuse Decl. ¶ 45.) Even if the Court were to grant certification, maintaining certification through trial could

continue to present challenges. (Sanford Decl. ¶ 22; Marcuse Decl. ¶ 45.). These facts strongly support preliminary approval of the Settlement.

In addition, discovery in this case would likely be protracted and enormously expensive and burdensome.  Plaintiffs allege that Dartmouth knew about the conduct of the Professors for well over a decade and received complaints about sexual misconduct as early as 2002. (*See* FAC ¶¶ 28-29; *see also id*. ¶¶ 31-34 (alleging additional complaints in 2003, 2004, 2005, and between 2006 and 2010).) Because the "actual knowledge" requirement under Title IX may be satisfied by prior complaints, *Brodeur*, 626 F. Supp. 2d at 208, Plaintiffs would seek—and may be entitled to—discovery going back to 2002. Moreover, the vast number of witnesses, reporting parties, administrators, faculty, and staff alleged to have knowledge of the events giving rise to this litigation would require the Parties to take and defend dozens of depositions and collect and review documents from dozens of custodians. The Parties would also be required to incur significant expert costs. The scope of discovery would likely drive this litigation to continue for several years while multiplying the costs for all Parties.

Here, absent settlement, "the parties would need to propound and respond to discovery requests, take time-consuming depositions, and engage in motion practice related to class certification and summary judgment, all before preparing for what would likely be a lengthy trial. The proposed Settlement avoids the significant time and expense that they would incur preparing this case for trial on the merits." *Roberts*, 2016 WL 8677312, at *6. Thus, the risk, complexity, expense, and duration all weigh in favor of approving the proposed Settlement.

## 2. The Proposed Settlement Treats Class Members Equitably and Utilizes a Fair and Reasonable Allocation Plan That Strongly Supports Approval

The proposed allocation plan and method of distributing relief to class members is fair, effective, and does not impermissibly favor some members over others. *See* Fed. R. Civ. P.

23(e)(2) (C)(ii) and 23(e)(2)(D).

The plan distributes compensation to class members in a manner that is equitable and far less invasive than protracted litigation. (*See, e.g.*, *supra* § II(B).) An experienced third-party neutral will apply a common set of criteria to Class Members' confidential submissions and distribute the settlement funds as she sees fit. (Agreement ¶¶ 20-21.) This independent evaluation process ensures that "the apportionment of relief among class members takes appropriate account of differences among their claims." Advisory Committee Notes to Rule 23(e)(2)(D). Indeed, courts regularly approve analogous class action settlements utilizing a similar allocation plan and claims process. *See Jane Doe 30's Mother*, 64 A.3d 379, 388-89 (approving sex abuse settlement with a similar claims process: class members submitted a claim form; a claims administrator then determined each class member's equitable *pro rata* share based on the information provided and after considering five factors); *Johns Hopkins Hosp.*, 2014 WL 4147208 and *supra* n.14 (claims adjudicator allocated varied settlement payments to class members after making an independent assessment of the information provided through a claims process).

In contrast, if this matter were to proceed in court, Plaintiffs and Class Members would be subject to discovery and could be called to testify at trial. Their identities, and extremely sensitive and personal details relating to sexual abuse and trauma, would likely be publicly exposed and revisited in excruciating detail through litigation. (Marcuse Decl. ¶ 44; Nov. 30, 2018 Endorsed Order limiting the use of a pseudonym to pretrial proceedings.) In a case such as this, "the emotional costs of litigation cannot be ignored. The victims in this case are young, impressionable and already traumatized. Further litigation would exacerbate the trauma and very likely blow the lid off the patient confidentiality that has been so carefully maintained and protected throughout

the litigation thus far. This settlement allows the victims to avoid paying these devastating costs."

*Jane Doe 30's Mother*, 64 A.3d at 395-96.

### 3. The Proposed Settlement Provides Adequate Relief and Exceeds the Likely Result of Continued Litigation

Another consideration at the final approval stage is whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C) (enumerating four factors for consideration). Where, as here, a proposed settlement "provides a benefit equal to, or greater than, what class members would likely achieve through continued litigation," this factor *per se* supports settlement approval. *In re Colgate-Palmolive*, 2015 WL 7282543, at *10.

***First***, and very notably, the Settlement includes a class definition—dating back to 2012—that is broader than what the statute of limitations would normally allow. *See* Settlement ¶ 2; *LeGoff v. Trustees of Bos. Univ.*, 23 F. Supp. 2d 120, 127 (D. Mass. 1998) (three-year statute of limitations under Title IX). Without this Settlement, it is virtually guaranteed that many individuals with claims that are otherwise outside the statute of limitations will not be entitled to *any* relief.

***Second***, the Settlement allows Class Members to receive significant monetary payments. For example, if the Court approves all anticipated deductions (e.g. fees, costs, settlement administration expenses, and service awards), and every single Class Member receives a Base Payment, the remaining funds provide for substantial Supplemental Payments: If 30% of the Class submits Claim Forms, the average Supplemental Payment will be approximately $322,592 per person; if *each and every* Class Member submits a Claim Form (which is unlikely), the average Supplemental Payment will be approximately $96,777. These payments are especially significant because, as discussed above, the Plaintiffs and Class face great risks and obstacles in proving liability and damages. *See supra* § IV(B)(1). There would be no guarantee of a more favorable outcome. Indeed, the "added cost of litigation, combined with the risks inherent in pursuing [the]

30

claim[s] . . . demonstrate palpable uncertainty that a more favorable result could be obtained through litigation." *Bezdek*, 79 F. Supp. 3d at 345.

***Third***, the programmatic relief provided by the Settlement strongly supports approval. "Injunctive relief has been recognized as a meaningful component of a settlement agreement." *Bezdek*, 79 F. Supp. 3d at 346. Under the Settlement, Dartmouth must undertake steps to increase its efforts to hire diverse faculty (including by committing an additional $1,000,000 to a recruitment fund); ensure a continuing dialogue with Plaintiffs and members of the Dartmouth community to facilitate the creation of a safe and inclusive campus; and include an additional WISE staff member on campus or provide $500,000 to WISE. (*See* Ex. A to Agreement.) This programmatic relief carries an additional monetary value of approximately $1,500,000. (Marcuse Decl. ¶ 57.)

***Finally***, the Settlement provides considerable relief to the Class Members that will be distributed in a matter of months, rather than after years of further litigation and appeals. While the range of possible awards cannot be determined with certainty, the class' recovery here is highly substantial in relation to the potential damages at trial. This is particularly true in light of the risks involved with continued litigation. *See supra* § IV(B)(3). Even if Plaintiffs prevailed over a long course of litigation and established class-wide liability, damages would be sharply disputed. Cases involving emotional distress damages have returned widely varying verdicts and are especially hard to predict. *See, e.g.*, *Thorsen v. Cty. of Nassau*, 722 F. Supp. 2d 277, 293 (E.D.N.Y. 2010) (recognizing the "wide range" of awards); *In re Air Crash Disaster at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1115, 1129 (D.S.C. 1997) ("damages for emotional distress are perhaps the most difficult damages to quantify"); *Briski v. Hersey*, No. C 17-02675, 2017 WL 4418866, at *4 (N.D. Cal. Oct. 5, 2017) ("awards for emotional damages [can] span a wide range"); *Monthei v.*

*Morton Bldgs., Inc.*, No. 4:01-CV-305100-WHA, 2003 WL 21212641, at *10 (S.D. Iowa Mar. 26, 2003) ("the case law can be plumbed to find a wide range of emotional distress verdicts").[14]

### 4.   The Court Can Only Assess Objections After the Notice Period

Another factor, the Class Members' reaction to the settlement, cannot be assessed until formal settlement notice is distributed to the class. Nevertheless, at this point, it may be noted that the Plaintiffs support the Settlement and no Class Member has expressed any opposition.

### 5.   The Proposed Allocation of Attorneys' Fees and Expenses and the Provision for Reasonable Service Awards Do Not Undermine the Fairness of the Settlement and Warrant Preliminary Approval

In connection with final approval—*after Class Members have an opportunity to opt out of the Settlement or object to its terms*—Class Counsel will apply for (a) reimbursement of litigation costs incurred in connection with this action, including expenses associated with settlement administration and the claims process; (b) an award of attorneys' fees; and (c) Service Awards to the Plaintiffs for their contributions to the litigation and their services to the class. **The Court need not rule on the proposed requests at this time.** For now, it suffices to say that the Settlement's provisions for fees and costs do not take the Agreement out of the range of approval.

At the final approval stage, Class Counsel and Local Counsel Douglas, Leonard, & Garvey, will seek reimbursement of their reasonable out-of-pocket costs and expenses. "Lawyers who recover a common fund for a class are entitled to reimbursement of litigation expenses that were reasonably and necessarily incurred in connection with the litigation." *Hill*, 2015 WL 127728, at *20 (quoting *In re Fid./Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999)). Counsel currently

---

[14] While Plaintiffs are unaware of similar class actions that have proceeded to trial, jury verdicts for *individual* plaintiffs provide some guidance. *See, e.g.*, *Fox v. Pittsburg State Univ.*, No. 2:14-CV-02606, 2016 WL 11033455 (D. Kan.) (jury verdict of $100,000 on individual plaintiff's Title IX claims); *Baugh v. Robert Morris Univ.*, No. 2:16-CV-00430, 2018 WL 5828834 (W.D. Pa.) (jury verdict of back pay and $100,000 punitive damages for individual plaintiff alleging Title IX claims); *Hughes v. Regents of Univ. of Colorado*, 967 F. Supp. 431, 439 (D. Colo. 1996) (emotional distress damages verdict in Title VII employment discrimination case reduced to $50,000 on remittitur).

estimates that its reimbursable costs—which largely include costs incurred by the Settlement Administrator and Independent Claims Expert in administering the Settlement, expert fees, discovery costs, and mediation expenses—will not exceed $300,000. (Marcuse Decl. ¶ 58.) In addition, Counsel's contemplated fee request (up to 35% of the total monetary Settlement) is within the established norms of class litigation. *See, e.g.*, *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 81 (D. Mass. 2005) ("[I]n this circuit, percentage fee awards range from 20% to 35% of the fund.") (citation omitted); *Scovil v. FedEx Ground Package Sys., Inc.*, No. 1:10-CV-515-DBH, 2014 WL 1057079, at *5 (D. Me. Mar. 14, 2014) (one-third); *In re StockerYale, Inc. Secs. Litig.*, No. 1:05-cv00-177-SM, 2007 WL 4589772 at *6-7 (D.N.H. Dec. 18, 2007) (33%).[15] Moreover, the percentage fee does not account for the significant value of programmatic relief. S*ee, e.g., Gordan v. Mass. Mut. Life Ins. Co*., No. 13-CV-30184-MAP, 2016 WL 11272044, at *2 (D. Mass. Nov. 11, 2016) (approving fee of one-third of class monetary fund, and noting that the fee actually represents much less than one-third of the *total* value of the settlement when considering forward-looking changes to defendants' practices).

Pursuant to the Settlement, Class Counsel anticipates seeking Service Awards for the Plaintiffs in amounts not to exceed $75,000 each. (Agreement ¶ 15.) As the court recognized in *Lauture v. A.C. Moore Arts & Crafts, Inc.*,

---

[15] *See also, e.g., In re Gen. Motors Co. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 822 (3d Cir. 1995) (recognizing that fee awards generally range up to 45% of the settlement); *Stephens v. US Airways Grp., Inc.*, 102 F.Supp.3d 222, 230 (D.D.C. 2015) (granting requested fee of 38% of total settlement); *Wells v. Allstate Ins. Co.*, 557 F.Supp.2d 1, 7 (D.D.C. 2008) (awarding fee amounting to 45% of total recovery); *In re Lucent Tech., Sec. Litig.*, 327 F.Supp.2d 426, 442 (D.N.J. 2004) (observing that "the customary contingent fee would likely range between 30% and 40% of the recovery."); *Geis v. Walgreen Co.*, Civ. No. 07-4238, 2010 WL 11570447, at *20 (D.N.J. Sept. 30, 2010) (awarding 43% of the value of the recovery); *Worthington v. CDW Corp*., No. C-1-03-649, 2006 WL 8411650, at *6 (S.D. Ohio May 22, 2006) (granting request for 38-1/3% fee, in addition to costs, "solidly within the typical 20 to 50 percent range."); *Wright v. Stern*, 553 F.Supp.2d 337, 347 (S.D.N.Y. 2008) (awarding $8 million fee, representing over 38% of total relief, in addition to $999,999.79 in litigation expenses); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 188-89 (W.D.N.Y. 2005) (awarding 38.26% of fund in wage and hour action); *Betancourt v. Advantage Human Resourcing, Inc*., No. 14-cv-01788-JST, 2015 WL 12661922, at *9 (N.D. Cal. Aug. 28, 2015) (noting that a fee of 37.5% of the gross settlement "falls within the range of possible approval").

> Plaintiffs in class . . . actions play a crucial role in bringing justice to those who may otherwise have no access to judicial enforcement of their rights . . . Because a named plaintiff is an essential ingredient of any class action, an incentive or service award can be appropriate to encourage or induce an individual to participate in the suit. . . . Incentive awards serve the important purpose of compensating plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, the public nature of a collective action filing, and any other burdens they sustain. Accordingly, incentive awards are commonly awarded to those who serve the interests of the class.

No. 17-CV-10219-JGD, 2017 WL 6460244, at *2 (D. Mass. June 8, 2017).

Here Plaintiffs have expended considerable time, effort, and resources on behalf of the Class by helping to plan and organize the litigation; consulting with Class Counsel to the benefit of their fellow Class Members; providing extensive and pertinent documents; providing information regarding Dartmouth's policies and practices; assisting in settlement negotiations; and participating in three days of mediation and settlement negotiations. (Marcuse Decl. ¶ 60.) Moreover, Plaintiffs also incurred significant risk in lending their names and their deeply personal accounts of sexual harassment, assault, and trauma to this highly publicized action. (*Id.*) The anticipated Service Awards are reasonable in light of the Plaintiffs' significant contributions and incentive payments awarded in other cases.[16]

The Court need not rule on the proposed service awards now. Plaintiffs will move for approval of the awards simultaneously with their motion for final approval after the class members have had the opportunity to object to the settlement terms.

---

[16] *See, e.g.*, *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving $300,000 awards for each of four plaintiffs in a discrimination case, noting they participated directly in mediation, achieved outstanding settlement, and "took risks, bore hardships, and made sacrifices that absent class members did not"); *Bellifemine*, 2010 WL 3119374, at *7 (awarding $75,000 to plaintiffs for "the time and energy that they have devoted to this case, and the benefit conferred on the Class."); *In re Revco Sec. Litig.*, No. 851, 89CV593, 1992 WL 118800, at *7 (N.D. Ohio May 6, 1992) (awarding $200,000 for serving as class representative); *Beck v. Boeing Co.*, No. 00–CV–301P, Dkt. 1067 at 4 (W.D. Wash. Oct. 8, 2004) (approving award of $100,000 to each of twelve plaintiffs).

## V.   THE PROPOSED FORM AND METHOD OF NOTICE OF THE CLASS SETTLEMENT SHOULD BE APPROVED

In connection with a proposed class action settlement, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort[.]" Fed. R. Civ. P. 23(c)(2)(B). Pursuant to Federal Rules of Civil Procedure,

> The notice must clearly and concisely state in plain, easily understood language: **(i)** the nature of the action; **(ii)** the definition of the class certified; **(iii)** the class claims, issues, or defenses; **(iv)** that a class member may enter an appearance through an attorney if the member so desires; **(v)** that the court will exclude from the class any member who requests exclusion; **(vi)** the time and manner for requesting exclusion; and **(vii)** the binding effect of a class judgment on members under Rule 23 (c)(3).

*Id.* The proposed Class Notices (Marcuse Decl., Exs. 2, 3) fully comply with the requirements of Rule 23 and due process.

The first proposed Notice (Exhibit 2) will be distributed to the vast majority of Class Members. (Marcuse Decl. ¶ 61.) Counsel proposes that a slightly different notice (Exhibit 3) be distributed to a subset of individuals who, pursuant to the Settlement Agreement, must attest that they experienced dignitary, emotional, educational and/or professional harm to qualify as a Class Member and receive a share of the settlement fund. (*See* Agreement ¶¶ 2(a)(iv), 19-20; Marcuse Decl. ¶¶ 53, 61.) This separate notice to be disseminated to these individuals will prevent confusion and make the notice process "clear," "concise" and "easily understood." Fed. R. Civ. P. 23(c)(2)(B).

As required by Rule 23 (c)(2)(B), the proposed Notices adequately put Class Members on notice of the proposed settlement by providing the details of the agreement (including proposed attorneys' fees and costs and service payments) and apprise Class Members of their rights to object to or opt-out of the settlement as well as their right to appear at the final fairness hearing (with

applicable deadlines and procedures for doing so). In addition, the Confidential Claim Form sets forth detailed guidelines and instructions for the submission of written statements for eligibility to receive a supplemental payment. Notice will be made by first-class U.S. mail to the last known addresses in Defendants' records. (Marcuse Decl. ¶ 62.) The Settlement Administrator may also distribute the Notice by email (to the extent email addresses are available). (*Id*.)

Accordingly, the detailed information in the Notices and Confidential Claim Forms are more than adequate and should be approved.

## <u>CONCLUSION</u>

The Settlement Agreement is fair, adequate, and reasonable, and meets the criteria for approval of class action settlements. The Settlement Agreement is the product of arm's length negotiation between experienced counsel, and the benefits of the settlement outweigh the uncertainty and added time and expense that continued litigation of this matter would entail. Plaintiffs therefore respectfully request that the Court grant preliminary approval of the Settlement Agreement and authorize corresponding notice to the Class Members.

Dated:  September 25, 2019                    Respectfully submitted,

*/s/ Deborah K. Marcuse*
Deborah K. Marcuse (admitted *pro hac vice*)
Steven J. Kelley (admitted *pro hac vice*)
Austin L. Webbert (admitted *pro hac vice*)
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7425
dmarcuse@sanfordheisler.com
skelly@sanfordheisler.com
awebbert@sanfordheisler.com

David W. Sanford (admitted *pro hac vice*)

Nicole E. Wiitala (admitted *pro hac vice*)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
nwiitala@sanfordheisler.com

-- *and* --

Charles G. Douglas, III (NH Bar #669)
**DOUGLAS, LEONARD & GARVEY, P.C.**
14 South Street, Suite 5
Concord, NH 03301
Telephone: (603) 224-1988
Fax: (603) 229-1988
chuck@nhlawoffice.com

*Attorneys for Plaintiffs and the Proposed Class*