*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JANUARY 21, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
KRISTINA RAPUANO, VASSIKI         *
CHAUHAN, SASHA BRIETZKE,          *
ANNEMARIE BROWN, ANDREA           *
COURTNEY, MARISSA EVANS, JANE     *  18-cv-01070-LM
DOE, JANE DOE 2, AND JANE DOE     *  October 17, 2019
3,                                *  10:13 a.m.
            Plaintiffs,           *
                                  *
            v.                    *
                                  *
TRUSTEES OF DARTMOUTH COLLEGE,    *
                                  *
            Defendant.            *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SETTLEMENT CONFERENCE
BEFORE THE HONORABLE LANDYA B. McCAFFERTY

Appearances:

For the Plaintiffs:          David Sanford, Esq.
                             Nicole Wiitala, Esq.
                             Steven J. Kelly, Esq.
                             Sanford Heisler Sharp LLP

                             C. Kevin Leonard, Esq.
                             Douglas Leonard & Garvey PC

For the Defendant:           Joan A. Lukey, Esq.
                             Justin J. Wolosz, Esq.
                             Choate Hall & Stewart LLP

Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             U.S. District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603) 225-1442

```
1                    P R O C E E D I N G S

2              (Off-the-record chambers conference held from

3    10:08 a.m. until 10:11 a.m.)

4              THE CLERK:  This court is in session and has

5    for consideration a preliminary approval of a settlement

6    in civil matter 18-cv-1070-LM, Kristina Rapuano, et al

7    vs. Trustees of Dartmouth College.

8              THE COURT:  Okay.  Let me just have counsel

9    introduce themselves for the record.  Just state your

10   name and spell your last name for our court reporter.

11             MR. LEONARD:  Good morning, your Honor.  Kevin

12   Leonard as local counsel from Douglas, Leonard & Garvey.

13   Last name is L-e-o-n-a-r-d.

14             MR. SANFORD:  Good morning, your Honor.  David

15   Sanford of Sanford, Heisler, Sharp, S-a-n-f-o-r-d, for

16   the plaintiffs.

17             MS. WIITALA:  Good morning, your Honor.

18   Nicole Wiitala, W-i-i-t-a-l-a, for the plaintiffs.

19             MR. KELLY:  Good morning, your Honor.  Steve

20   Kelly, K-e-l-l-y, for the plaintiffs.

21             THE COURT:  Okay.

22             MS. LUKEY:  Good morning, your Honor, Joan

23   Lukey, with me, my partner Justin Wolosz for the

24   defendant trustees.  And I just wanted to alert the

25   Court that in the event there are specific questions
```

1    that are unique to class action procedure here,

2    Mr. Wolosz will address them as opposed to me.

3                THE COURT:  Okay.  All right.

4                MR. WOLOSZ:  And Wolosz is W-o-l-o-s-z.

5                THE COURT:  All right.  Excellent.

6                Let me -- my approach to this kind of hearing

7    is to really give you a sense of what my questions are

8    and then have you be fairly direct in your responses.

9    And then I will give you an opportunity at the end to

10   say whatever it is you'd like to say, direct my

11   attention to anything that you want me to read or think

12   about.

13               So let me -- let me just sort of set the stage

14   by way of the three stages in this process.

15               This is the first of three stages.  This is

16   where you are proposing a settlement and asking for

17   preliminary approval.  And as part of that, you're

18   asking me to -- really to conditionally certify a

19   settlement class; the second stage would involve notice

20   to the class and give class members the fair opportunity

21   to object or appear at a fairness hearing; and then the

22   final stage would be final court approval of the

23   settlement.

24               Now, oddly, Rule 23 really did not outline

25   this process until 2018, recently, and the -- provided a

1  standard for the preliminary approval process.  That

2  standard is now set out in Rule 23(e)(1)(B) and moving

3  parties must show that -- essentially, a likelihood that

4  the Court will approve the settlement proposal and

5  certify the class.

6          So the focus of the hearing today, really, is

7  on the likelihood -- really, the likelihood on the

8  merits, if you will, of this class certification.

9          So I'm going to have some questions for you at

10  the outset about whether or not to certify this class.

11  And I can tell you that there are -- as you can imagine,

12  there's much momentum, positive momentum, behind this

13  settlement proposal that you both have filed and that

14  you both are litigating jointly right now in support of

15  and there are numerous positives to commend this

16  settlement, which I don't need to go over.  I'm sure

17  you're both aware of them.  But certainly it allows the

18  women victims to maintain anonymity and privacy as

19  absent class members rather than forcing them to file

20  their own lawsuits and publicly disclose sensitive and

21  highly personal facts.

22          It contains a provision, significant amount of

23  money in terms of programmatic relief at Dartmouth.  It

24  provides closure and some sense of vindication while

25  also avoiding litigation.

1          So all the momentum, really, frankly, points

2    in the direction of approval, but the one hurdle is just

3    the certification of the class and whether or not it

4    meets the legal requirements.  So that's going to be the

5    focus of the hearing today.

6          I have studied -- I have studied the other

7    main substantive issues with respect to this settlement

8    proposal and the majority of the other issues look to be

9    solid and look to be likely to be approved.

10          The problem or at least the hurdle for me at

11    this point is just class certification.  So primarily

12    the issue of predominance and commonality -- and my

13    sense is that there really aren't many cases out there

14    where judges have opined -- and I'm hopeful that you can

15    tell me that I'm wrong about this, I just haven't found

16    them yet -- where judges have opined that this kind of

17    class in a Title IX or even a Title VII type case, this

18    type of class meets the commonality and predominance

19    requirements.

20          I will say that those cases that have approved

21    and certified such a class seem to be cases like this

22    one where both sides are in agreement, where all the

23    momentum for all the reasons I just stated points in the

24    direction of everybody wanting to approve the

25    settlement, including the Court, and so there really

1    isn't a great deal of analysis, legal analysis, on the

2    question of commonality and predominance, which are the

3    two issues that I'm struggling with.

4             So I think maybe the best place to start is

5    just talking about the definition of the class and how

6    the class is defined.

7             And I will tell you that a case that is fairly

8    close in terms of being on point, a Title IX case, a

9    very disturbing case, as this one is, involving fourth

10   graders in Shelby County, Alabama.  It's called *Hurt v*

11   *Shelby County*.  And I'm hopeful that you're prepared to

12   tell me why that case is wrong and why it is applying

13   the *Walmart* case incorrectly.  Because if it's not

14   wrong, that presents somewhat of a legal hurdle for the

15   Court.

16            And, again, I'm eager to have more cases --

17   have you point me to more cases -- frankly, cases that

18   are post-*Walmart*, which would be I think post 2011, on

19   this question.  And it may be that ultimately you're

20   empty-handed and what it may take is just for you to --

21   to explain to me today or perhaps in subsequent briefing

22   why *Hurt* is just wrong.  And hopefully you're prepared

23   to help me with that question.

24            But let me go right to the definition of your

25   class.

1          Okay.  Of course, I'm at page 6 of your joint

2     brief and I'm looking at the definition of the class.

3          Now, in *Hurt*, the class was described as

4     fourth grade students who had been abused, sexually

5     abused, by this teacher who had been teaching at the

6     school for some 25 years.  So students who'd been abused

7     physically, students who had witnessed the abuse, or

8     students who otherwise encountered the abuse.

9          And, again, I'm doing that from the top of my

10    head, but I could lay that out for you more

11    specifically.

12         And the Court in *Hurt* used that definition as

13    a real starting point in terms of analyzing why it

14    doesn't meet the *Walmart* commonality test and it's

15    because they didn't suffer from the same injury.  So

16    ultimately it comes down to that.  Here you've got the

17    class and the dates end on the day that the three

18    professors were terminated or left, August 31st of 2017.

19         Where does the April 1, 2012, date come from?

20    Is that -- that wasn't apparent to me from --

21         MR. SANFORD:  Well, your Honor, the class

22    period, as defined in the papers before the Court, was

23    really the subject of a lot of debate and negotiation in

24    three days of settlement talks, too, with Judge Morrill.

25         Plaintiffs wanted to go back further.

1    Defendant wanted it to be a shorter class period.  And

2    ultimately we resolved --

3                THE COURT:  Okay.

4                MR. SANFORD:  -- on the three-year lookback

5    prior to the statutory period beginning under law at

6    2015.

7                THE COURT:  Okay.

8                MR. SANFORD:  So it was a negotiated

9    compromise.

10               THE COURT:  All right.  Thank you for that.

11               Okay.  So you've got -- you've got the nine

12   named representatives and the descriptions of what

13   occurred to them are just -- is just egregious and

14   abhorrent.  And so the question becomes as in the *Hurt*

15   case, do -- are -- is the harm that was suffered by

16   those nine class representative plaintiffs, is that

17   typical; is that -- and the definition of the class, as

18   in the class in *Hurt*, would suggest that the harm is

19   different for different class plaintiffs because (iv)

20   certainly lays out graduate students within a certain

21   time frame who don't fit the above categories, which

22   don't talk in terms of injury, I'm not suggesting that,

23   but -- but are defined in terms of what type of injury

24   they will attest to: dignitary, emotional, educational,

25   and/or professional harm during this period.

1          And so, now, you know, *Hurt* is a District of

2     Alabama case and it's construing the *Walmart* decision.

3     It is a Title IX case, so ultimately I paid close

4     attention to it as I prepared for this.

5          So that would really be -- that's my main

6     question today and I'm -- I'm eager to hear -- hear from

7     counsel on how you would respond to that *Walmart-Hurt*

8     argument that the injury is different or could be

9     different for each plaintiff in the class.  Certainly

10    the harm to the nine named plaintiffs is somewhat

11    similar, but, again, you would know from discovery, from

12    investigation, what kind of harm these class -- putative

13    class members suffered and how different it would be.

14         So that's really the main -- in my mind, the

15    main hurdle in terms of preliminary approval and I -- I

16    will not deny approval without giving you an opportunity

17    to fully brief this issue after this hearing today, if

18    that's something that you think would help.  It's also

19    possible you may be able to dispel my concerns right

20    now.

21         So go ahead.

22         MR. SANFORD:  Okay.  Well, thank you, your

23    Honor.  I appreciate that.

24         We would like an opportunity to brief that

25    issue, if that is okay with the Court.

1      THE COURT:  That would be very helpful to the

2  Court.

3      MR. SANFORD:  Yes.

4      I have been enlisted to appear today before

5  the Court at the last minute.  Deborah Marcuse was

6  scheduled to be here, but she had a physical issue that

7  prevented her from coming.

8      So I am not prepared to argue the nuances of

9  *Hurt*.  I am, however, familiar with *Walmart* and I am

10  familiar with the way in which *Walmart* could be applied

11  to this case.  So if I may start with that, your Honor.

12      THE COURT:  Go right ahead.  Go right ahead.

13      MR. SANFORD:  *Walmart* was a case that involved

14  the certification of a class involving over one million

15  people, I think upwards of 1.5 million people throughout

16  the country.  And a central issue in the *Walmart* case

17  involved the discretionary autonomy given regional and

18  local managers to make pay and promotion decisions with

19  respect to its workforce.

20      The court held, 5-4 -- Supreme Court held 5-4

21  against certification, arguing that that level of

22  discretionary autonomy was not sufficient in order to

23  meet the commonality standard; there had to be a common

24  nexus or glue, in the words of Justice Scalia, to hold

25  everything together in order to show the ultimate basis

1   and question for -- relating to a discriminatory

2   environment.  And that is precisely what we have here in

3   this case, meaning Justice Scalia's concern about the

4   glue.

5           The glue in this case involves Dartmouth being

6   aware of the environment as a result of many complaints

7   being lodged going back to the early 2000s and going all

8   the way through the statutory period.  And the question,

9   one, is whether Dartmouth was aware of the complaints;

10  and, two, whether it acted in a way that was sufficient

11  under the law in light of those complaints.

12          I think the evidence is indisputable based on

13  the investigation notes and based on class counsel's

14  investigation that Dartmouth knew over the period of

15  time in question about the behavior of three professors.

16  And I think it's also without question as far as class

17  counsel is concerned that Dartmouth did not meet its

18  obligations under the law to deal with those complaints.

19          And so the question -- the common question for

20  purposes of class certification is, you know, whether

21  Dartmouth knew and what it did about its knowledge, if

22  anything.  And the evidence in this case suggests that

23  commonality is met and predominance is met because that

24  question of what Dartmouth knew and what it did in light

25  of its knowledge really predominates over any

1    individualized issues or defenses that may come up.

2         So under the -- under the law, class

3    certification law generally in this country as it's been

4    applied by courts, I don't think there's any question

5    that plaintiffs in this case meet the commonality and

6    predominance requirements.

7         How that relates to *Hurt*, again, your Honor,

8    we'd be very happy to brief for the Court.

9         THE COURT:  Okay.  The court in *Hurt* starts

10   out by quoting from *Walmart* and basically quotes the

11   section of *Walmart* talking about commonality requiring

12   the plaintiff to demonstrate that the class members have

13   suffered the same injury.  And that that goes to the

14   commonality question.

15        And some of the questions that you're linking

16   to with respect to the defendant's awareness of, and

17   deliberate indifference toward, those questions were, I

18   think, also raised in *Hurt* and the court in *Hurt*

19   essentially looked at the different -- the different

20   injuries and said, because the plaintiffs, class

21   plaintiffs, suffered different injuries, there's just no

22   way they can meet the -- the *Walmart* standard because

23   some were actually molested and some were simply exposed

24   to that toxic environment.

25        So I'm going to give you just some quotes at

1   the end of the decision.  This -- the Court says, and I

2   quote:  Material factual differences prevail between the

3   named plaintiffs and the putative class.  Each of the

4   named plaintiffs claims to have suffered direct physical

5   molestation at Mr. Acker's hands.

6           Such is not necessarily the case with the

7   class they seek to represent.  The class would include a

8   potentially large group of female students whose

9   participation in the case depends simply on their

10  membership within one of Mr. Acker's fourth grade

11  classes over the roughly 25 years he taught.

12          As noted, this group would include female

13  students who had no awareness of Mr. Acker's abuse

14  whatsoever; they may have, indeed, a Title IX claim

15  against the board for placing them in such a situation,

16  but their injuries are distinct from the named

17  plaintiffs.

18          And that is the basis of the holding of the

19  *Hurt* court and the *Hurt* court essentially denies

20  certification on that basis.

21          So --

22          MR. SANFORD:  Well, your Honor, a few things.

23          First, I would note for the Court that *Walmart*

24  does not overturn *Teamsters*.  *Teamsters* is a Supreme

25  Court case going back to the 1970s.

1          And in the *Teamsters* case, which was a class

2     discrimination matter, the Court acknowledged that there

3     could be a two-stage process, one determining liability

4     and one determining damages, and there's nothing in

5     *Walmart* that contravenes *Teamsters*.

6          And I would say that similarly here, when

7     you're dealing with damage issues, essentially,

8     injuries, to individuals giving rise to certain damages,

9     I think that's distinct from the question of classwide

10    liability, which is recognized, again, in *Teamsters* as a

11    separate issue.

12         So the question is can we establish classwide

13    liability through common questions meeting the

14    commonality and predominance requirements, recognizing

15    that individuals may not have identical injuries.

16         I don't think *Walmart* suggests that everyone

17    affected in a class has to be identical injuries.  If

18    that were the case I think there would never be any

19    class certified.  There are going to be certain people

20    in this class who suffered dignitary harm.  There are

21    going to be certain people who suffered physical harm.

22    There's -- there are going to be certain people who

23    suffered emotional harm or educational setbacks or some

24    combination of those.

25              THE COURT:  Will there be any people in the

1   class, the putative class, who suffered no harm?

2               MR. SANFORD:  In our class?

3               THE COURT:  Yes.

4               MR. SANFORD:  Not that I'm aware of, and if

5   that were the case, they wouldn't receive any money.

6   Because there's a class -- there's a group of

7   individuals who have to attest as part of the process

8   that they were harmed in some way in order to just get a

9   thousand dollar base payment.  And if they can't do

10  that, then they would not take under the terms of the

11  settlement agreement.

12              THE COURT:  Okay.  I thought that under the

13  class definition it included a set of named students and

14  that those all received that base thousand dollar --

15              MR. SANFORD:  The named -- the named

16  individuals on the caption do; the -- the --

17              THE COURT:  Okay.

18              MR. SANFORD:  -- class representatives do.

19  But in terms of the class members, there is a group that

20  fell outside the orbit -- they were in the department,

21  but fell outside the orbit of the three professors.

22  With respect to that group, if they didn't suffer any

23  harm because they just weren't a part of any activities

24  or didn't witness anything, then presumably they would

25  not be able to sign an affidavit under oath saying that

1    they did and, therefore, they would not receive any

2    money under the terms of the settlement agreement.

3              THE COURT:  Okay.  So you're talking about in

4    the definition of the class, A(iv), those individuals?

5              MR. SANFORD:  If I may, your Honor, is that --

6              MS. WIITALA:  Correct.

7              MR. SANFORD:  Yes, that's correct, from my

8    colleague.

9              THE COURT:  A(i), any graduate student advisee

10   of Heatherton, Kelley, or Whalen between those dates,

11   those are all presumed to be victims?

12             MS. WIITALA:  Correct.

13             MR. SANFORD:  Yes, that's correct, your Honor.

14             THE COURT:  Okay.  And the discovery that

15   you've done, the investigation, would support that?

16             MR. SANFORD:  Yes, your Honor.

17             THE COURT:  Okay.  So there's no graduate

18   advisee of any of these people who would not qualify for

19   the $1,000 base?

20             MR. SANFORD:  Correct.

21             THE COURT:  Okay.  Same for teaching or

22   research assistants with those three people?

23             MR. SANFORD:  That is correct.

24             MS. WIITALA:  Correct.

25             MR. SANFORD:  Yes, your Honor.

1          THE COURT:  Okay.  And then the same for the

2    graduate students in that department.

3          I didn't quite understand the coauthorship

4    requirement, but I'm sure there's some reason for that

5    in terms of limiting the scope of this.  But, A(i),

6    (ii), and (iii) all get the base amount.

7          Can you tell me a little bit about A(i), (ii),

8    and (iii) in terms of what the discovery and

9    investigation revealed?  Certainly the nine -- the

10   complaint in the case would certainly suggest each

11   individual named plaintiff felt and noticed the toxic

12   environment, I think on day one, which would lead one to

13   believe that other members would -- other students would

14   as well, but I'm just curious what kind of sort of

15   pervasiveness there was with respect to the

16   investigation.

17          MR. SANFORD:  I think my colleagues here could

18   speak more to the details of that, but as I understand

19   it, your Honor, this is a fairly tight-knit, small group

20   that interacted quite a lot formally and informally,

21   both in the class and outside of the class and

22   interacted socially, both -- just among students and

23   between students and faculty.

24          And in that context, there were a lot of

25   interactions between and among students and faculty that

1  were inappropriate.  And many of those students -- I

2  don't know that every single one of them, but certainly

3  many, and we believe the majority of them, witnessed at

4  one point or another inappropriate behavior,

5  inappropriate behavior during interactions with alcohol,

6  inappropriate behavior as a result of groping and sexual

7  innuendo.

8          And so I think that in light of the

9  investigation as we understand it, the Title IX

10  investigation at Dartmouth, the internal investigation

11  by Dartmouth, our own investigation, which included,

12  your Honor, 36 conversations with 36 distinct

13  individuals -- or, actually, more than 36 conversations,

14  but conversations with 36 different witnesses to the

15  behavior by people who experienced it themselves or

16  witnessed it occurring on campus or off campus.

17          So there is enough there to support an

18  environmental claim, a hostile environment claim.  These

19  aren't, obviously, isolated incidents that go way back.

20  They're repeated incidents that occurred over many, many

21  years and reported over many, many years.

22          MR. KELLY:  David -- if I could add, your

23  Honor --

24          THE COURT:  Sure.

25          MR. KELLY:  -- just the -- with regard to the

1    professional interactions, there was a lot of evidence

2    revealed, as Mr. Sanford said, in the Title IX

3    investigation, in our investigation, and even in our

4    interactions with our clients where academic attention

5    by these three professors was conditioned upon two

6    things: number one, sort of acquiescing to sexual

7    advances, but number two was being part of this drinking

8    culture in which, you know, the -- in order to get

9    attention, academic attention, from these three

10   professors, you had to go drinking with them and you had

11   to go to their parties at their house where

12   inappropriate jokes were being told, where sexual

13   advances were being made.

14            So there's a lot of evidence that if you

15   worked with these individuals professionally as a woman

16   that, you know, even if they weren't sexual -- you know,

17   actively, you know, sexually harassing the student that

18   they were subjecting as a -- as an advisee or as someone

19   who was working professionally with these women, you

20   were being subjected to these -- you know, this hostile

21   environment.

22            THE COURT:  Okay.  Thank you.  I -- in

23   researching some of the cases, I did find -- and, again,

24   this would be another area, I think, that would help me

25   if you addressed it in some way in further briefing.

1   This is an older case, 2002, *Elkins vs. Showa*, and let

2   me tell you where that's from.  It's Ohio, Western

3   Division, Ohio.  And what the plaintiffs failed to do in

4   that case, it seems to me the plaintiffs could

5   successfully do in this case.

6          In *Elkins*, the plaintiffs failed to offer any

7   evidence that established that it was a plant, that

8   there was plant -- the plantwide environment was hostile

9   and the evidence failed to show a common practice or

10  pattern or an equally egregious level of sexual

11  harassment among the various areas of the plant, among

12  the employees supervised by different supervisors, and

13  working with different coworkers and among the employees

14  on different shifts.

15         So that -- that language seemed to at least

16  give me a theory on which I could hang a commonality

17  finding, but I -- I would -- again, it would be

18  something that would be helpful to have from -- from you

19  in a -- in a jointly filed brief after this hearing.

20         And it does predate *Walmart*, but it -- it at

21  least gave me a theory on which to hang a commonality

22  finding.

23         Numerosity I don't see as an issue.  I think

24  that's established.

25         And adequacy, again, I -- the question of

1    adequacy, I think, is answered on the face of your --

2    of your pleading, your brief.

3            The interests of the representative parties

4    will not conflict with the interests of any class

5    members, number one, and chosen counsel's qualified,

6    experienced and able to vigorously conduct the

7    litigation or ultimately the settlement.

8            The questions, again, that I had were just --

9    were commonality and predominance.

10           And I interrupted you, so I want to make sure,

11   Mr. Sanford, that you get an opportunity to finish.  I'm

12   going to ask -- I believe it would be Mr. Wolosz who

13   would address the procedural questions with respect to

14   the class and then ask you both to just direct me to

15   whatever else you want to direct my attention to in

16   terms of any aspect of this preliminary approval

17   process.

18           I just wanted to make sure you knew where my

19   hang-up was, at least in terms of trying to find the

20   rationale for the finding of commonality and

21   predominance.

22           MR. SANFORD:  Thank you, your Honor.  No, we

23   are more than happy to brief the issue and address the

24   Court's concerns.  And I don't know that I have anything

25   further to add at this point.

1           THE COURT:  Okay.  All right.

2           MR. SANFORD:  Thank you.

3           THE COURT:  Attorney Lukey, it would be

4  Attorney Wolosz?

5           MS. LUKEY:  Attorney Wolosz.  Thank you.

6           THE COURT:  Thank you.

7           MR. WOLOSZ:  Thank you, your Honor.  Just very

8  briefly.

9           So as the defendant here, you know, we're a

10 little differently situated.  We assent to the relief

11 we're not opposing, but, you know, if this were to be a

12 contested motion for class certification, we would be.

13 And I think the law is clear that that's okay and, in

14 fact, the 2018 amendment includes some commentary that

15 says that, that the position taken in connection with

16 settlement is irrelevant if later on there needs to be a

17 contested, but --

18           THE COURT:  I noted in the brief that you

19 indicated that you would strongly disagree with

20 certification were this case fully litigated and not

21 settled.  So I was eager to hear on what basis would you

22 strongly disagree with certification and is it along the

23 lines of some of my questions or is it -- can you

24 elucidate?

25           MR. WOLOSZ:  Well, I think it is -- so if we

1    were in a different universe, if this were a contested

2    motion for class certification, I think that we would go

3    through each of these elements and we would have a

4    number of arguments to make in opposition.

5           We are not -- and you said your brief; it's

6    actually the plaintiffs' brief.  We're -- again, the

7    college is not opposing certification and certainly

8    supports, you know, and assents to the approval of the

9    settlement.  It's a settlement agreement that the

10   college has signed.  But it's a -- you know, it's a

11   difficult position for us to argue forcefully against

12   class certification because we are -- we're not opposed

13   to it.  And I think --

14          THE COURT:  It may help the Court, though, to

15   hear what some of your arguments are, allow them to

16   respond, and then I would give them an opportunity to

17   further brief the question and I would then write my

18   order, presumably approving the settlement, with a

19   rationale for commonality and predominance that makes

20   legal sense to me and is consistent with the law.

21          Obviously I -- I could simply just provide

22   approval, but there is this legal hurdle that I have to

23   find a likelihood that this class is a class I would

24   certify under the law.  And so I will be following the

25   law in deciding whether I approve the certification and

1   so it may help the Court if you could articulate --

2           MR. WOLOSZ:  Sure.

3           THE COURT:  -- for the Court what you see to

4   be some of the strongest cases that you would rely on

5   and arguments that you would make and then I would allow

6   plaintiffs to give me the counter to that and even

7   further brief that.

8           MR. WOLOSZ:  So, perhaps I can start with the

9   *Amchem* chemicals United States Supreme Court case,

10  because it obviously factors in here since we are

11  talking about settlement and since that's the case that

12  said that the Court still has to go through the elements

13  of class certification.

14          THE COURT:  What case is that?

15          MR. WOLOSZ:  That's the *Amchem* chemicals.

16          THE COURT:  Yes, okay.

17          MR. WOLOSZ:  It's 521 U.S. 591, vs. Windsor.

18          And one thing that that case says is that --

19  is that you need not consider issues involving

20  manageability at trial --

21          THE COURT:  Right.

22          MR. WOLOSZ:  -- if you're talking about

23  approval of a settlement.  That's very important here,

24  because that would be a big factor that we would point

25  to in opposing a litigated class certification.  We

1   would say because of the differences -- you know, even

2   if folks were exposed to the same type of thing, even if

3   plaintiffs could prove that on a classwide basis, we

4   would say at some point there has to be a presentation

5   and it would need to be kind of a plaintiff-by-plaintiff

6   presentation and that raises significant manageability

7   issues with respect to trial.

8          We don't have to do that because the Court was

9   clear that when there's a settlement, you don't have to

10  worry about the manageability at trial and, in fact, the

11  settlement agreement sets forth the way in which

12  plaintiffs have proposed to deal with those differences

13  and to have them presented and addressed, as you pointed

14  out, in a confidential manner.

15         In terms of the other elements, commonality

16  and predominance, we would be pointing to those same

17  differences.  We would be saying that, you know, the --

18  the nature of this type of allegation is specific to

19  what the exposure was and, in particular, how the

20  individual was harmed by it.

21         I don't necessarily agree that damages --

22  differences in damages are irrelevant.  We would say if

23  this were a contested motion that that overstates it a

24  bit, that you do need to actually dig into whether there

25  is -- there's a commonality of harm and whether the --

1    there's some mechanism to deal with the damages, but,

2    again, that bumps up against the manageability at trial.

3            So these are arguments we would present in a

4    full-throated way if this were a litigated motion for

5    class certification that we don't have to here.

6            And I'd add one other thing, your Honor.

7    There's a -- there's a recent en banc opinion from the

8    Ninth Circuit.  This is the *In re: Hyundai and Kia Fuel*

9    *Economy Litigation*.  And I think that's important

10   because it talks about how the nature of a settlement is

11   something that you validly consider when going through

12   even the other elements of class certification.

13           The *Amchem* chemicals case is a little

14   confusing on that point because what the U.S. Supreme

15   Court said is it said -- and this was an asbestos

16   litigation, so it's very different from here.  There

17   were going to be tens, if not hundreds of thousands of

18   people in the class.

19           And the Court said, well, you still have to do

20   the Rule 23 analysis.  You don't have to do trial

21   manageability, that's something you don't have to worry

22   about; but the other elements, you have to go through

23   them because there are going to be people precluded from

24   bringing claims down the road and so you need to be sure

25   that there's a valid basis for certification.

1          But what the Supreme Court also said is that

2     it was -- it was appropriate that the -- the court below

3     had looked at the existence of a settlement, at least

4     when performing some of those analyses.

5          So it was a little unclear what exactly they

6     were saying, how the settlement factors in.  They're

7     clearly saying you can't just say as long as there's a

8     settlement, dispense with Rule 23.  You still have to go

9     through the elements.

10          THE COURT:  It's a less rigorous analysis is

11     what you're saying?

12          MR. WOLOSZ:  Well, so --

13          THE COURT:  I note you had cases in the brief

14     or plaintiffs' brief about that and I didn't know if

15     that was still good law after the 2018 amendment.  And

16     that certainly is helpful to the Court that I -- it

17     doesn't have to be as rigorous an analysis.

18          MR. WOLOSZ:  Yes.

19          THE COURT:  Would you suggest that's still the

20     law?

21          MR. WOLOSZ:  I would.  And so this Ninth

22     Circuit case, *In re: Hyundai* -- I'll note, your Honor,

23     that in your *Holt vs. FoodState* case, where you talked

24     about *Amchem* chemicals and you talked about the

25     obligation to go through the elements, you had cited --

1   that was a different issue; you were dealing with a

2   nationwide class and whether differences in state laws

3   would defeat certification.

4            And you talked about how courts have come down

5   different ways and you cited a Ninth Circuit panel

6   opinion in the *In re: Hyundai* case, which had denied

7   certification or, actually, the Ninth Circuit panel and

8   I think reversed and said, no, you can't certify a

9   nationwide class because there are differences between

10  class members because there's a bunch of different

11  states.

12           After your Honor issued that opinion citing to

13  that panel decision, the -- the Ninth Circuit took that

14  case in an en banc review and reversed and said --  and

15  said, no, you can certify nationwide because you can

16  consider the settlement.  And here's a quote from that

17  case that -- that case, by the way, is 2019 Westlaw

18  2376831.  And that was issued June 6th, 2019.

19           And here's a quote that I think is important

20  for the Court's current -- the issues currently before

21  the Court:  A class that is certifiable for settlement

22  may not be certifiable for litigation if the settlement

23  obviates the need to litigate individualized issues that

24  would make a trial unmanageable.

25           THE COURT:  Okay.  That's very helpful.

1          MR. WOLOSZ:  So this is -- these are really

2     important principles to us as the defendant because,

3     again, we're in this position where we're not opposing

4     if the settlement is granted.  If the settlement were

5     not granted and we were litigating this case, we would

6     be.  And so that's why I sort of keep coming back to

7     these -- these notions.

8          I'll also note that there's another comment to

9     the 2018 amendment which says -- this is from paragraph

10    12 of the comment -- the comments.  It says:  Although

11    the standards for certification differ for settlement

12    and litigation purposes -- then it goes on to talk about

13    the record.  But there's acknowledgment that the

14    standards for certification differ for settlement and

15    litigation purposes.

16          THE COURT:  Okay.  Excellent.  Thank you very

17    much.  That's very helpful.

18          All right.  Attorney Sanford, would you like

19    to be heard further?

20          MR. SANFORD:  Just briefly, your Honor.

21          I think the *In re: Hyundai* case is

22    instructive, even though it is a Ninth Circuit case, and

23    I also would emphasize the *Amchem* case.  The Supreme

24    Court did hold specifically that settlement is relevant

25    to a class certification.  And that's at 521 U.S.

1    391-619 (sic).

2              The advisory notes, committee notes, to the

3    federal rules clearly hold that the standards differ for

4    settlement.  *Newberg on Class Actions* supports that

5    principle.

6              The First Circuit clearly has come out

7    encouraging settlement in *U.S. v. City of Portsmouth*,

8    which is actually a District of New Hampshire case

9    resolved in 2013, and there's language to that effect as

10   well.

11             So I think we can certainly provide the Court

12   supplemental briefing and scour the literature to give

13   the Court comfort regarding cases not only in this

14   jurisdiction, but in circuits around the country to

15   support the proposition that the -- there is a less

16   rigorous analysis even post-2018.

17             THE COURT:  Excellent.  All right.  This has

18   gone a long way toward making the Court feel as though

19   this -- this may be an easier section of an order to

20   write than I thought before taking the bench, but I will

21   give you the opportunity to make it even easier for me.

22             Would you need 14 days?

23             MR. SANFORD:  14 days would be fine, your

24   Honor.

25             THE COURT:  That would be fine?  Okay.  And

1  there wouldn't be any need for any sort of response, so

2  in 14 days I'll have the issue fully joined and I can

3  get you a written order out.

4          Is there anything else before I get off the

5  bench, though, that we should cover at this -- at this

6  stage?

7          MR. SANFORD:  If I may, your Honor, take a

8  minute?

9          THE COURT:  You may.

10          MR. SANFORD:  Nothing further at this time,

11  your Honor.

12          THE COURT:  Okay.  Attorney Lukey, do you need

13  to be heard?

14          MS. LUKEY:  Nothing from us, your Honor.

15          THE COURT:  You're good.  Okay.  All right.

16  Those were my -- my main concerns and today's gone a

17  long way toward addressing those.  I appreciate that.

18          And everything else in the brief made perfect

19  sense to the Court in terms of what you've done here and

20  I commend counsel for reaching this creative -- this

21  creative settlement in this case.  And now I will do my

22  job in the next stage and get out a decision for you

23  pretty quickly.

24          All right.  I think that's all.  Anything

25  further before I get off the bench?

1          MR. SANFORD:  No, your Honor.

2          MS. LUKEY:  No, thank you, your Honor.

3          THE COURT:  Thank you very, very much.

4    Appreciate it.

5          MS. LUKEY:  Thank you, your Honor.

6          (Proceedings concluded at 10:58 a.m.)

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 10/23/19                    /s/  Liza W. Dubois
                                       LIZA W. DUBOIS, RMR, CRR