## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **KRISTINA RAPUANO, VASSIKI CHAUHAN, SASHA BRIETZKE, ANNEMARIE BROWN, ANDREA COURTNEY, MARISSA EVANS, JANE DOE, JANE DOE 2, and JANE DOE 3,**<br><br>*Plaintiffs, on behalf of themselves and all others similarly situated,*<br><br>v.<br><br>**TRUSTEES OF DARTMOUTH COLLEGE,**<br><br>*Defendant.* | Hon. Landya B. McCafferty, U.S.D.J.<br><br>CASE NO. 1:18-cv-01070 (LM) |

## SUPPLEMENTAL BRIEFING IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE PROPOSED CLASS SETTLEMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

I.   COMMON FACTUAL ALLEGATIONS ............................................................. 2

    A.   The Plaintiffs and the Class Endured the Same Sexually Explicit Language and Conduct by the Three Former Professors ............................................... 3

    B.   Dartmouth's Alleged Failure to Adequately Respond to Complaints Affected All Class Members in the Same Way ................................................ 6

    C.   The Plaintiffs and Class All Suffered the Same Injury—Exposure to a Hostile Environment—as a Result of the Professors' Conduct and Dartmouth's Alleged Inaction ................................................................... 7

II.  LEGAL STANDARDS ......................................................................................... 8

    A.   The Rule 23 Factors are Relaxed at the Settlement Stage ........................ 8

    B.   Differences in Damages Do Not Preclude Certification .......................... 11

    C.   Class Members' Injuries Need Not Be Identical; Differences in the Degree or Seriousness of Harm Go to Damages ...................................... 13

III. COURTS FREQUENTLY CERTIFY ANALOGOUS CASES ................................. 16

    A.   *Brown v. Cook County* (Hostile Work Environment) ............................. 16

    B.   *Howard v. Cook County Sheriff's Office* (Hostile Work Environment) .................. 18

    C.   *Brand v. Comcast Corp., Inc.* (Hostile Work Environment) .................... 19

    D.   *Connor B. ex rel. Vigurs v. Patrick* (District of Massachusetts) ............................ 21

    E.   *Brown v. Nucor Corp.* (Fourth Circuit: Hostile Work Environment and Promotion Discrimination) ..................................................................... 22

    F.   *Lecenat v. Perlitz* (Sex Abuse Class Action) ......................................... 23

    G.   *Jane Doe 2 v. The Georgetown Synagogue et al.*; *Jane Doe 30's Mother v. Bradley*; and *Doe v. The John Hopkins Hospital* (Certified Sex Abuse Class Actions) ............................................................................................ 25

IV.  COMMONALITY AND PREDOMINANCE ARE SATISFIED .............................. 26

    A.   The Plaintiffs and the Class All Suffered the Same Injury; they Need Not Suffer Harm to the Same Degree ............................................................. 26

    B.   Commonality is Satisfied ........................................................................ 28

    C.   Predominance is Satisfied ....................................................................... 31

    D.   In a Litigated Case, this Court Could Bifurcate the Liability and Damages Phases Under *Teamsters* and Legions of Similar Cases .......................... 33

V.   *HURT V. SHELBY COUNTY BOARD OF EDUCATION* WAS A LITIGATED CLASS ACTION (NOT A SETTLEMENT CLASS) THAT WAS DECIDED ON GROUNDS AND FACTS INAPPLICABLE HERE; THUS, IT SHOULD BE DISREGARDED ................................................................................................ 34

A. The *Hurt* Court Denied Certification Primarily on the Basis of Numerosity and Ascertainability, Which Are Not at Issue Here ........................................................ 35

B. The *Hurt* Court Improperly Focused its Inquiry on the Plaintiffs' Injuries Rather than the Absence of Common Contentions; Unlike This Case, There Were No Common Allegations Demonstrating that Most Absent Class Members Were Exposed to a Hostile Environment ................................................. 35

C. *Hurt* Does Not Undermine Plaintiffs' Common Questions ..................................... 36

**CONCLUSION** ....................................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ................................................................. passim

*Applegate v. Formed Fiber Techs., LLC*, No. 2:10-CV-00473-GZS, 2012 WL 3065542
    (D. Me. July 27, 2012) ........................................................................................... 12, 13, 28

*Augustin v. City of Philadelphia*, 318 F.R.D. 292 (E.D. Pa. 2016) .............................................. 15

*Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 348 (D. Mass. 2015)...................................... 10

*Bezdek v. Vibram USA Inc.*, 809 F.3d 78 (1st Cir. 2015).......................................................... 10

*Brand v. Comcast Corp., Inc.*, 302 F.R.D. (N.D. Ill. 2014).................................................. passim

*Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195 (D.N.H. 2009) ....................................... 32

*Brown v. Cook Cty.*, No. 17 C 8085, 2019 WL 3776150 (N.D. Ill. Aug. 12, 2019) ............ passim

*Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009)................................................................ 29

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015)................................................... 22, 23, 33, 37

*Brown v. Yellow Transp., Inc.*, No. 08 C 5908, 2011 WL 1838741 (N.D. Ill. May 11,
    2011) .................................................................................................................... 29, 33

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ................................................. 12

*Clough v. Revenue Frontier, LLC*, No. 17-CV-411-PB, 2019 WL 2527300 (D.N.H. June
    19, 2019) ................................................................................................................... 29

*Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288 (D. Mass. 2011) ................................. passim

*Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30 (D. Mass. 2011)................................ 21, 22, 30

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ................. 32

*Doe v. The John Hopkins Hosp.*, No. 24C13001041, 2014 WL 4147202 (Md. Cir. Ct.
    Sep. 19, 2014) ............................................................................................................. 26

*E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059 (C.D. Ill. 1998) ................. 34

*Employees Committed For Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423
    (W.D.N.Y. 2005) ........................................................................................................ 33

*Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F. Supp. 3d 277 (D. Mass.
    2015)......................................................................................................................... 11

*Hoffer v. Jones*, 323 F.R.D. 694 (N.D. Fla. 2017)..................................................................... 15

*Howard v. Cook Cty. Sheriff's Office*, No. 17 C 8146, 2019 WL 3776939 (N.D. Ill. Aug.
    12, 2019) ............................................................................................................... passim

*Hurt v. Shelby Cty. Bd. of Educ.*, No. 2:13-CV-230-VEH, 2014 WL 4269113 (N.D. Ala.
    Aug. 21, 2014) ..................................................................................................... 34, 35, 36

*Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, No. CV JKB-16-3025, 2019 WL
    3183651 (D. Md. July 15, 2019)....................................................................................... 11

*In re Amtrak Train Derailment in Phila., Pa.*, No. 15-MD-2654, 2016 WL 1359725 (E.D.
    Pa. Apr. 6, 2016) ........................................................................................................... 8

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices
    Litig.*, No. 12-MD-2320-PB, 2015 WL 7282543 (D.N.H. Nov. 16, 2015) ............................. 10

*In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ................................................. 15, 27, 28

*In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36 (D.N.H. 2015)............... 12, 13

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019)................... 9, 10, 31, 34

*In re Lupron Mktg. and Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass 2005)......................... 28

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 270 F.R.D. 30 (D. Me. 2010)........... 10

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) .................................................. passim

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633-SI, 2019
WL 3410382 (D. Or. July 29, 2019) .......................................................................... 9
*In re Volkswagen & Audi Warranty Extension Litig.*, 273 F.R.D. 349 (D. Mass. 2011) ............ 10
*Jane Doe 2 v. The Georgetown Synagogue et al.*, Civ. No. 2014 CAB 8073 (D.C. Super.
Ct. 2018) .................................................................................................................. 25
*Jane Doe 30's Mother v. Bradley*, 64 A.3d 379 (Del. Super. Ct. 2012) ................................. 25, 27
*Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254 (D.N.H. 2013) ................ 29
*Kis v. Covelli Enterprises, Inc.*, No. 4:18-CV-434, 2019 WL 3369124 (N.D. Ohio July
26, 2019) ................................................................................................................... 11
*Kogan v. Allstate Fire & Cas. Ins. Co.*, No. C15-5559 BHS, 2019 WL 2084425 (W.D.
Wash. Mar. 15, 2019) ................................................................................................ 10
*Lecenat v. Perlitz*, No. 3:13-CV-01132, 2019 WL 3451571 (D. Conn. Feb. 11, 2019)... 23, 24, 27
*Marrero-Rolon v. Puerto Rico Elec. Power Auth.*, No. CV 15-1167-JAG, 2018 WL
4740202 (D.P.R. Sept. 30, 2018) ............................................................................... 13
*MAZ Partners LP v. Shear*, No. CV 11-11049-PBS, 2016 WL 183519 (D. Mass. Jan. 14,
2016) ........................................................................................................................ 12
*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) .................... 12, 16, 35
*Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356 (D. Md. 2004) ................................. 29
*Ouadani v. Dynamex Operations E., LLC*, No. CV 16-12036, 2019 WL 4384061 (D.
Mass. Sept. 13, 2019) ................................................................................................ 13
*Pantelyat v. Bank of Am., N.A.*, No. 16-CV-8964 (AJN), 2019 WL 402854 (S.D.N.Y. Jan.
31, 2019) ................................................................................................................... 11
*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ................................................................. 15
*Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894 (N.D. Ill. 2016) ................... 13
*Roberts v. TJX Cos., Inc.*, No. 13-CV-13142-ADB, 2016 WL 8677312 (D. Mass. Sept.
30, 2016) ................................................................................................................... 10
*Robinson v. Carolina First Bank NA*, No. 7:18-CV-02927-JDA, 2019 WL 719031
(D.S.C. Feb. 14, 2019) ............................................................................................... 9
*Rosas v. Sarbanand Farms, LLC*, 329 F.R.D. 671 (W.D. Wash. 2018) ................................... 33
*Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174 (D.D.C. 2017) ..................................... 8
*Scruggs v. Garst Seed Co.*, 587 F.3d 832 (7th Cir. 2009) ................................................... 26
*Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144-SMR-SBJ, 2019 WL 617791 (S.D.
Iowa Feb. 14, 2019) ............................................................................................... 9, 11
*Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125 (9th Cir. 2016) .......................................... 16, 35
*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ................................................ passim
*Van Lith v. iHeartMedia + Entm't, Inc.*, No. 11:16-CV-00066-SKO, 2017 WL 1064662
(E.D. Cal. Mar. 20, 2017) ........................................................................................... 8
*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...................................................... passim
*Wilfong v. E.E.O.C.*, No. 00-CV-0680-DRH, 2001 WL 1728985 (S.D. Ill. Dec. 27,
2001) ........................................................................................................................ 34

**Statutes**

Federal Rule of Civil Procedure 23 .................................................................................... 8

**Other Authorities**

2 NEWBERG ON CLASS ACTIONS.......................................................................................... 31
2018 Advisory Committee's Notes to Rule 23(e)............................................................. 8, 9, 34
4 NEWBERG ON CLASS ACTIONS................................................................................... 8, 9, 11

## **INTRODUCTION**

On October 17, 2019, this Court held a Class Settlement Preliminary Approval Hearing ("Hearing"). At the Hearing, the Court requested that the Plaintiffs submit supplemental briefing to address the Court's questions regarding commonality and predominance.

Commonality and predominance are easily satisfied where, as here, Plaintiffs allege that all Class Members were subjected to the same conduct (constant sexual banter, sexual innuendo, and pressure to participate in a lewd drinking culture) by a small handful of actors: three tenured professors and certain high-ranking members of the administration who allegedly declined to stop the misconduct. *See infra* Section I (setting forth common factual allegations applicable to the class). All Class Members have therefore suffered the same alleged injury: exposure to a hostile environment created by the same course of injurious conduct. *See infra* Section IV(A). Differences in the *degree* or seriousness of harm go to damages—and these differences do not defeat certification. *See infra* Section II(B).

Neither commonality nor predominance require identical injuries. *See infra* Section II(C). The First Circuit has recognized this: "Even in cases where the issue of *injury-in-fact* [not just damages calculation] presents individual questions, it does not necessarily follow that . . . class action treatment is therefore unwarranted." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011) ("it is not uncommon for courts in this circuit to certify class actions in which alleged systemic deficiencies resulted in harms that manifested themselves differently among different segments of the plaintiff class."). **Indeed, similar class actions have been certified by courts in recent years—and after the Supreme Court's *Wal-Mart v. Dukes* decision.** *See infra* Section III.

Even after the recent amendments to Federal Rule of Civil Procedure 23(e)(1), the Rule 23 requirements for class certification are relaxed when certification is sought for settlement purposes only. *See infra* Section II(A). Nonetheless, Plaintiffs have identified common questions (*infra* Section IV(B)) and demonstrated that those common questions predominate (*infra* Section IV(C)).

Finally, as discussed herein, *Hurt v. Shelby County* (which was not a settlement class) is factually and legally distinguishable and does not require the Court to jettison the class settlement. *See infra* Section V. This Court should instead seek guidance from more recent cases where, as here, common allegations of exposure to a hostile environment were asserted and supported certification (*supra* Section III).

## I.      COMMON FACTUAL ALLEGATIONS

On May 1, 2019, Plaintiffs filed a First Amended Complaint (Dkt. 28) ("FAC") that set forth common factual allegations describing the hostile environment at Dartmouth. All Class Members were in the Department of Psychological and Brain Sciences ("PBS") at Dartmouth College. The alleged hostile environment was created by former tenured professors Todd Heatherton, William Kelley, and Paul Whalen (the "Three Former Professors" or the "Professors"), all of whom were also in the PBS Department. All Class Members worked for or among the Three Former Professors. The Class Members and the Three Professors worked together in the Department's labs and attended professional conferences and events together.

The following sections summarize some (but not all) of the common allegations pertaining to the Professors' and Dartmouth's conduct as it applied to all Class Members. The recitation below is limited to the allegations in the First Amended Complaint; these allegations do not include all of the information set forth in the Title IX investigative reports (consisting of 300 pages

summarizing interviews with 27 complainants and 118 witnesses), collected through conversations with at least 36 witnesses, or received through Freedom of Information Act (FOIA) requests.

**A.**     **The Plaintiffs and the Class Endured the Same Sexually Explicit Language and Conduct by the Three Former Professors**

The Three Former Professors regularly initiated inappropriate sexual conversations in front of and about their female students. For example, the Professors openly competed to have "the hottest lab," claiming bragging rights if the women who worked in their lab were "hotter" than in other professors' labs. (*Id*. ¶¶ 35, 169, 314.)  They discussed how "hot" their own students were and ranked the "hotness" of other female students in the Department—remarking on their physical attributes and clothing choices (*id*. ¶¶ 169, 215, 265, 314), commenting on the size of students' breasts and whether they "needed a boob job," and discussing their preferred breast shape (*id*. ¶ 215). Kelley publicly rated the desirability of women in the Department—including graduate students, undergraduate students, and faculty—according to whether he would "bang" them (*id*. ¶¶ 37, 200, 314). He often employed the "Papi scale" to rate women, by which—as Kelley explained *to his students*—a "0" rating meant he "would never bang" under any circumstances, a "1" rating meant "hot enough that you would bang her if her personality was excellent," and a "2" rating meant "so hot you would bang her no matter what she was like." (*Id*. ¶ 37, 200.)

The Professors routinely injected themselves into the sexual lives of their female students, such as taking "bets" on how long female students could make their relationships last (*id*. ¶¶ 38, 213) and, in the presence of students and colleagues, advising female students to "just screw" other members of the lab (*id*. ¶ 196). Whalen openly questioned his female students about their sex lives, demanding to know how many sexual partners they'd had, the size of their husband's penises, and whether they would have sex with particular male graduate students. (*Id*. ¶¶ 172, 213.)

Kelley and Whalen openly conducted sexual relationships with their students. (*Id*. ¶ 40.) This prompted several students to complain (*id*. ¶¶ 32, 34), and rumors of inappropriate relationships between students and the Professors circulated widely among students and faculty (*id*. ¶¶ 97, 199, 319).[1] The Professors uniformly ignored students' personal and professional boundaries.[2] This behavior led faculty to describe Dartmouth as "the capital of sexism" and liken the Department to a fraternity house of which the Professors were self-appointed co-presidents (*id*. ¶ 41). Dartmouth administrators and students described the Professors as being "touchy," "a flirt," "a hugger," "handsy," and "completely lacking" in professional boundaries (*id*. ¶ 42).

In addition, the Three Professors conditioned faculty mentorship and support on student participation in the alcohol-saturated "party culture" they created (*see, e.g.*, *id*. ¶¶ 44-53). They pressured their young female graduate students to accompany them to local bars and purchased drinks for them, encouraging them to drink late into the night. (*Id*. ¶ 46.) Female students were invited to late night hot tub parties at Kelley's house and parties at Whalen's house; women were then encouraged to drink excessively and then sleep at the Professors' homes (*id*. ¶ 48). Lab meetings and one-on-one advising meetings took place at bars; when meetings did take place in the labs, it was expected that alcohol would be served (*id*. ¶¶ 48-50).[3] Female students who were

---

[1] *See id*. at ¶ 97 (rumors of a sexual relationship between Plaintiff Rapuano and Kelley spread to students and faculty in the Department); ¶ 319 (administrator acknowledged he'd always been aware of "rumors" of a sexual relationship between Jane Doe 3 and Kelley); ¶ 199 (Kelley spread a false rumor that one Plaintiff and Whalen were in a sexual relationship); *cf. id*. ¶ 75 (other professionals in the field claimed that rumors of sexual misconduct, a heavy drinking culture, poor student/faculty boundaries, and a "boys' club" environment in the Department had circulated for years).

[2] *See id*. ¶ 39 (accessing cell phones without permission to send inappropriate messages on students' behalf; demanding that students act as a personal masseuse; taking female students shopping and purchasing dresses and shoes for them); ¶ 174 (texting students repeatedly until they agreed to stop working and accompany him to bars); ¶ 187 (walking down the hall singing, "Who wants a pregnancy test?"); ¶ 220 (frequently telling female students that he "loved" them).

[3] Students were flown across the country for conferences and then urged to skip the conference events to drink with the Professors. (*Id*. ¶¶ 49, 184, 298; *see also id*. ¶ 185 (pressuring students to attend "mandatory fun" events such as pajama parties and "boozy lunches"); ¶ 286 (meetings coined "Bill and Todd's Excellent Adventures" were hosted on Friday and revolved around drinking rather than science).

willing to partake in these activities were rewarded with academic attention, resulting in benefits to their careers, while those who refrained were ignored and neglected academically or publicly labeled by the Professors as a "bitch" (*id*. ¶ 50).

After the initial seven Plaintiffs filed their Complaint on November 15, 2018, other individuals associated with the Department came forward and shared their own experiences as victims of the Three Professors (*id*. ¶¶ 75-78). Multiple former students publicly corroborated the environment described by Plaintiffs—including the rampant "sex-talk," the "party culture that spiraled so out of control," sexual relationships with students, and other actions in the lawsuit. In fact, students described the Professors' conduct as "*entirely normalized*" at Dartmouth. (*Id*. ¶ 76 (a former student also wrote "[t]he victims of this culture are much greater in number than 7").) One former student published an article in which she explained that "[t]he seeds of the current allegations were already sown 15 years ago," when the Professors routinely pushed students' boundaries by initiating sexual conversations, joking about the details of students' sex lives, and pressuring students to drink excessive amounts of alcohol. (*Id*. ¶ 76.) Other professionals in the field affirmed that rumors of sexual misconduct, a heavy drinking culture, poor student/faculty boundaries, and a "boys' club" environment in the Department had circulated for years. (*Id*. ¶ 75.)[4]

In December 2018, nearly 800 members of the Dartmouth community (including current and former students, faculty, and staff) signed an open letter condemning Dartmouth's failure to protect its students from sexual assault and harassment that stated, in part: "As members of the Dartmouth community spanning several generations, we are acutely aware that these were not isolated incidents, but rather part of an institutional culture that minimizes and disregards sexual

---

[4] *See also id*. ¶ 77 (One such individual said that Whalen made inappropriate comments to his partner and showed her photos of his graduate students while discussing how "hot" they were. Another individual wrote: "I sought advice from at least 20 people and the supermajority of them mentioned Whalen, Kelley, and Heatherton. This was not a few victims sharing their own stories—this information was widely known . . . the groping sounded rampant[.]").

violence and gender harassment . . . . We stand, outraged, in solidarity with the courageous individuals who filed this lawsuit, and with the countless students, staff, and faculty who have endured sexual violence and gender harassment throughout Dartmouth's history." (*See id*. ¶ 78 (citing https://www.nhpr.org/sites/nhpr/files/201812/statement_of_support-final.pdf).)

## B. Dartmouth's Alleged Failure to Adequately Respond to Complaints Affected All Class Members in the Same Way

Dartmouth's alleged failure to adequately respond to complaints affected all Class Members in the same way: the hostile environment continued unabated throughout the class period.

Plaintiffs allege that Dartmouth received <u>at least</u> seven complaints regarding the Three Professors prior to 2012 (when the class period begins): (1) a 2002 complaint after Heatherton grabbed a female graduate student's breasts and told her that she was "not doing very well" in her work in the lab during a public recruiting event for the Department; (2) a late 2002/early 2003 complaint by a female graduate student after Heatherton groped her behind at a bar; (3) in approximately 2004, a female graduate student reported that Kelley and Jane Doe 3 were in a sexual relationship that made her "very uncomfortable"; (4) upon information and belief, additional students complained about the relationship between Kelley and Jane Doe 3 between 2005 and 2007; (5) a complaint relating to discrimination and sexual harassment against Kelley in 2005; (6) between 2006 and 2010, a female graduate student complained that Whalen was depriving her of career opportunities that were instead given to another student with whom he flirted and favored; and (7) between July 2009 and June 2010, a female graduate student complained that she was uncomfortable with lab meetings being held in bars and felt pressured to drink with the Professors. (*See id.* ¶¶ 30-34; Dkt. 24 at ¶ 45.)  In addition to these complaints,

Plaintiffs allege that high ranking members of its administration were specifically aware of serious misconduct by the Three Professors including a pattern of sexual relationships with students.[5]

Dartmouth did not take any significant action against the Professors in response to these various alleged complaints. It did not remove them from campus or take other meaningful steps to curb their behavior (*id*. ¶ 29). As a result, the harassment continued unabated: all Class Members, including the Plaintiffs, worked with or among the Three Professors in or after 2012 and were exposed to the same toxic environment. Eventually, in April 2017, a group of students filed a Title IX complaint that ultimately led to this action (*id*. ¶ 56).

C.   **The Plaintiffs and Class All Suffered the Same Injury—Exposure to a Hostile Environment—as a Result of the Professors' Conduct and Dartmouth's Alleged Inaction**

The Plaintiffs allege that the Class Members all suffered the *same* injury: exposure to a highly sexualized academic environment permeated with sexually offensive and degrading behavior that was normalized by the Three Professors (*supra* Section I(A) (describing, *inter alia*, inappropriate comments about female students' physical attributes, attractiveness, and personal sex lives)) and permitted to flourish due to the alleged knowledge and deliberate inaction of high ranking members of Dartmouth's administration (*supra* Section I(B)).

The allegations in the Amended Complaint are the product of extensive fact-gathering conversations with the nine Named Plaintiffs and 36 witnesses as well as the review of voluminous (300 page) Title IX investigation reports and other publicly available information. This abundance of evidence, coupled with the close proximity in which all Class Members worked, supports the

---

[5]  *See, e.g.*, *id*. ¶ 30 (knowledge of discriminatory hiring practices within the Department), ¶ 38 (knowledge that the Professors routinely injected themselves into the sexual lives of their female students); ¶ 40 (knowledge of Kelley and Whalen's inappropriate relationships with students); ¶ 45 (knowledge of Kelley and Whalen's "tradition" of taking prospective female students out drinking, purportedly to observe how the students "handled themselves" while drunk); ¶ 42 (knowledge of Professors being, *inter alia*, "touchy" and "handsy"); ¶ 43 (administrator witnessed Whalen attempting to kiss a woman who worked in his lab).

conclusion that the alleged hostile environment created by the Three Professors and Dartmouth was common to all Class Members. Dartmouth's alleged inaction allowed and contributed to this Department-wide hostile environment. The Plaintiffs and the Class Members thus all share a common claimed injury arising out of a common nucleus of facts.

## II.    LEGAL STANDARDS

### A.    <u>The Rule 23 Factors are Relaxed at the Settlement Stage</u>

Federal Rule of Civil Procedure 23(e)(1), as recently amended, provides that preliminary approval of a class settlement should be granted so long as "the court will *likely* be able to . . . certify the class *for purposes of judgment on the proposal*." Fed. R. Civ. P. 23(e)(1)(B)(ii) (emphasis added). Historically, courts have found that certifying a class for settlement purposes satisfies the Rule 23 requirements **more easily** than a contested motion for certification.[6] Indeed, the 2018 Advisory Committee's Notes to Rule 23(e) explicitly acknowledge this practice: **"the standards for certification differ for settlement and litigation purposes[.]"** NEWBERG ON CLASS ACTIONS has extensively analyzed how the 2018 amendments affect the standards for class certification in the settlement context. NEWBERG observes that courts in the settlement context have typically taken a more lenient approach and opines that the amendments should be seen to endorse this practice:

> It is unlikely that requiring a court to ensure that final certification will be "likely," as the 2018 amendments do, will significantly alter these [] realities. Indeed, the 2018 Advisory Committee notes arguably support this laxer approach in stating

---

[6] *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997) ("Settlement is relevant to a class certification."); *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017) ("Most courts have held that a less stringent standard applies at the preliminary approval phase with regard to the requirements for class certification."); *Van Lith v. iHeartMedia + Entm't, Inc.*, No. 1:16-CV-00066-SKO, 2017 WL 1064662, at *7 (E.D. Cal. Mar. 20, 2017) ("a cursory approach appears the norm when courts address motions for preliminary approval.") (quotations and alterations omitted); *In re: Amtrak Train Derailment in Phila., Pa.*, No. 15-MD-2654, 2016 WL 1359725, at *4 (E.D. Pa. Apr. 6, 2016) ("The Court agrees with the [plaintiffs] that a settlement class can be preliminarily certified based on a less rigorous analysis than that necessary for final certification. Courts may conduct a less demanding review at the preliminary certification stage.").

that, "Although the standards for certification differ for settlement and litigation purposes, the court cannot make the decision regarding the prospects for certification without a suitable basis in the record." **The obvious implication of that sentence is that the standards for certification are laxer at settlement, as that is the _only_ reading that makes sense of the sentence's second clause noting the need for a suitable record**.

4 NEWBERG ON CLASS ACTIONS § 13:18 (5th ed.) (emphasis added). The Advisory Committee Notes thus indicate that while the standards are lower, they are not non-existent: there must still be a "suitable basis" for certifying. *Id.* (Such a basis exists here because Plaintiffs' allegations are drawn from an extensive record of interviews and investigations, *see supra* Section I). As NEWBERG further recognizes, "[t]he second part of Rule 23(e)(1)'s standard states that the court must make a preliminary determination that it will be able to 'certify the class for purposes of judgment on the proposal.' **This phrase references the idea that the court is not being asked to certify a trial class . . . but only a settlement class.**" *Id.*

Courts continue to recognize that the Rule 23 factors are relaxed when certifying a class for settlement purposes. *See, e.g.*, *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) ("But whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement. A class that is certifiable for settlement may not be certifiable for litigation[.]"); *Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144-SMR-SBJ, 2019 WL 617791, at *5, 12 (S.D. Iowa Feb. 14, 2019) ("These changes are mostly form over substance . . . Although Rule 23(b)(3) does not prescribe separate considerations for classes that are to be certified for settlement purposes only, '[s]ettlement is relevant to a class certification.'") (citing *Amchem*, 521 U.S. at 619 and Advisory Committee Notes).[7]

---

[7] *See also In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633-SI, 2019 WL 3410382, at *2 (D. Or. July 29, 2019) ("The criteria for class certification are applied differently in litigation classes and settlement classes."); *Robinson v. Carolina First Bank NA*, No. 7:18-CV-02927-JDA, 2019 WL 719031, at *3 (D.S.C. Feb. 14, 2019) ("Courts have recognized that "a potential settlement is a relevant consideration when considering class certification. If not a ground for certification *per se*, certainly settlement should be a factor, and an

Notably, in evaluating the fairness of a class settlement, courts routinely consider the risks of obtaining certification of a trial class if the litigation were to proceed on the merits. *See, e.g., In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*, No. 12-MD-2320-PB, 2015 WL 7282543, at *12 (D.N.H. Nov. 16, 2015) ("Had this case not settled, the parties would likely next brief and argue a class certification motion . . . there is substantial uncertainty whether that motion could succeed[.]") (citation omitted); *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 348 (D. Mass. 2015), *aff'd,* 809 F.3d 78 (1st Cir. 2015) ("plaintiffs faced significant hurdles in pursuing the litigation to trial. Indeed, these hurdles suggested to the plaintiffs that settling prior to class certification and trial might present a better outcome."); *Roberts v. TJX Cos., Inc.*, No. 13-CV-13142-ADB, 2016 WL 8677312, at *7 (D. Mass. Sept. 30, 2016) ("There are numerous stages during the litigation at which certification could fail."). Clearly, the risk of non-certification is not a factor that could be considered if the Rule 23 factors were applied as stringently in connection with certification of a settlement-only class as on a contested motion for certification.

Moreover, it is well established that the "manageability" factor is not a consideration when certifying a class for settlement purposes. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").[8] **This remains true after the 2018 amendments to Rule 23(e).** *See In re Hyundai*, 926 F.3d at 556-57 ("manageability is not a concern in certifying a settlement class where, by

---

important factor, to be considered when determining certification.") (citation omitted); *cf. Kogan v. Allstate Fire & Cas. Ins. Co.*, No. C15-5559 BHS, 2019 WL 2084425, at *3 (W.D. Wash. Mar. 15, 2019) ("pre-certification class settlements are not persuasive as to any question currently before the Court because evaluating a settlement is an entirely different exercise than evaluating evidence submitted in support of certification.").

[8] *See also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 270 F.R.D. 30, 35 (D. Me. 2010) (same); *In re Volkswagen & Audi Warranty Extension Litig.*, 273 F.R.D. 349, 354 (D. Mass. 2011) (same).

definition, there will be no trial."); 4 NEWBERG ON CLASS ACTIONS § 13:18 (noting that the "blackletter text of the 2018 Rule" supports the conclusion that courts need not consider trial manageability).[9] There is no more manageable form of adjudication than a voluntary settlement with an efficient and equitable extrajudicial claims process.

Finally, a more relaxed application of the Rule 23 factors at the settlement stage is appropriate where, as here, there is no indication of collusion between the parties or disadvantage to absent class members. In *Amchem*, the Supreme Court cautioned against certifying a settlement class without a suitable inquiry into the Rule 23 factors in order to prevent collusion and unfair settlements that disadvantage absent class members. *See, e.g.*, *Amchem*, 521 U.S. at 620, 623. Here, there is no hint of collusion. The Settlement represents an excellent result for the class (including those who would otherwise be outside the statute of limitations) and provides for substantial monetary awards and robust programmatic relief. (*See, e.g.*, Dkt. 47-3.)

### B.    Differences in Damages Do Not Preclude Certification

It is axiomatic that differences in damages do not defeat class certification. As the First Circuit has held, "the Supreme Court in *Amgen* and the circuits in other cases have made clear that the need for some individualized determinations at the liability and damages stage does not defeat class certification." *In re Nexium*, 777 F.3d at 21 (1st Cir. 2015); *Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F. Supp. 3d 277, 291 (D. Mass. 2015) ("Calculating the precise amount of damages owed to each class member may also require some individualized inquiry. But this task also does not stand in the way of class certification."); *Applegate v. Formed Fiber Techs.,*

---

[9] *See also Swinton*, 2019 WL 617791, at *12 ("any manageability issues that might or might not arise at trial from proving liability, injury and damages on behalf of the class members are not relevant to the certification of a settlement class.") (quoting *Amchem*, 521 U.S. at 620); *Pantelyat v. Bank of Am., N.A.*, No. 16-CV-8964 (AJN), 2019 WL 402854, at *2 (S.D.N.Y. Jan. 31, 2019) (manageability is not a consideration at the settlement stage*); Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, No. CV JKB-16-3025, 2019 WL 3183651, at *4 (D. Md. July 15, 2019) (same); *Kis v. Covelli Enterprises, Inc.*, No. 4:18-CV-434, 2019 WL 3369124, at *14 n.32 (N.D. Ohio July 26, 2019) (same).

*LLC*, No. 2:10-CV-00473-GZS, 2012 WL 3065542, at *6 (D. Me. July 27, 2012) ("the fact that class members suffered different damages does not bar class certification.").[10] As the Seventh Circuit has recognized (and courts in this Circuit have adopted):

> **It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages.** If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined . . . the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *see also MAZ Partners LP v. Shear*, No. CV 11-11049-PBS, 2016 WL 183519, at *7 (D. Mass. Jan. 14, 2016) (same); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 76 (D.N.H. 2015) (same).[11]

When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016); *see also In re Nexium*, 777 F.3d at 21 ("Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.") (citation omitted); *Applegate*, 2012 WL 3065542, at *6 ("a difference in damages arising from a disparity in injuries among the plaintiff class does not

---

[10] *See also, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012) ("requiring common proof of damages for class members . . . is not required.").

[11] Alternatively, even without finding predominance, the Court may certify common liability questions under Rule 23(c)(4) and resolve remaining issues—such as damages—individually. The parties' settlement here removes the need for any such individual-phase inquiries. And class' members rights are fully protected by the notice and opt-out rights provided by the settlement and by Rule 23.

preclude [commonality or] typicality.").

**C.      Class Members' Injuries Need Not Be Identical; Differences in the Degree or Seriousness of Harm Go to Damages**

Numerous courts (including the First Circuit) have made clear that identical injuries are not required for class certification. **"Even in cases where the issue of *injury-in-fact* [not just damages calculation] presents individual questions, it does not necessarily follow that they *predominate* over common ones and that class action treatment is therefore unwarranted."** *In re Nexium*, 777 F.3d at 21 (citations omitted) (emphasis added); *In re Dial*, 312 F.R.D. at 76 (same); *Marrero-Rolon v. Puerto Rico Elec. Power Auth.*, No. CV 15-1167-JAG, 2018 WL 4740202, at *8 (D.P.R. Sept. 30, 2018) (same); *Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894, 911 (N.D. Ill. 2016) ("the fact that separate determinations concerning the harms suffered by class members would be necessary does not mean individualized issues predominate.").

Nor does commonality require identical injuries: **"Where class members have different degrees of injury or even where defenses might exist only as to particular individuals, commonality has been found for class certification."** *Applegate*, 2012 WL 3065542, at *6; *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011) ("it is not uncommon for courts in this circuit to certify class actions in which alleged systemic deficiencies resulted in harms that manifested themselves differently among different segments of the plaintiff class."). The same is true for the typicality requirement.[12]

---

[12] This Court did not request supplemental briefing on typicality. Nonetheless, it is well settled that typicality does not require identical injuries: "[D]ifference in damages arising from a disparity in injuries among the plaintiff class does not preclude typicality." *Applegate*, 2012 WL 3065542, at *6; *Ouadani v. Dynamex Operations E., LLC*, No. CV 16-12036, 2019 WL 4384061, at *8 (D. Mass. Sept. 13, 2019) (typicality "is not highly demanding because the claims only need to share the same essential characteristics, and need not be identical."). Indeed, "Rule 23(a)(3) tolerates even significant differences between the named plaintiff and the proposed class members[.]" *Id.* ; *see also Connor B.*, 272 F.R.D. at 296 ("[T]he fact that the harms alleged by named Plaintiffs may differ in some respects from those suffered by unnamed Plaintiffs does not undermine typicality."); *Brown v. Cook Cty.*, No. 17 C 8085, 2019 WL

The Supreme Court's use of the term "same injury" in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (quoting a 1982 case, *Falcon*) does not mean that class members must now suffer identical harm; it means instead that they have been subject to *the same allegedly unlawful practices* and thus pursue claims based on a "common contention." *Dukes*, 564 U.S. at 350.[13] The Fifth Circuit, interpreting the "same injury" language in *Dukes*, has made clear that the same type of wrongful conduct can satisfy the "same injury" requirement:

> Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute "the same injury." This is confirmed by the example given by the Supreme Court in the above passage from *Wal–Mart*, "discriminatory bias on the part of the same supervisor," which is itself not a type of damages, but an instance of injurious conduct that violates Title VII. Later in the same decision, the Supreme Court stated that another type of injurious conduct on the part of the defendant, "a companywide discriminatory pay and promotion policy," would also have satisfied the "same injury" test for commonality under Rule 23(a)(2).

> Accordingly, as these two examples from *Wal–Mart* demonstrate, **the legal requirement that class members have all "suffered the same injury" can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse.** . . . the principal requirement of *Wal–Mart* is merely a single common contention that enables the class action "to generate common *answers* apt to drive the resolution of the litigation." These "common answers" may indeed relate to the injurious effects experienced by the class members, **but they may also relate to the defendant's injurious conduct.**

---

3776150, at *10 (N.D. Ill. Aug. 12, 2019) (differences in degree of injury did not defeat typicality because "the plaintiffs' claims all share the same essential characteristics: they each allege that they were subject to a hostile work environment.").

[13] Reading *Dukes* to require identical injury would undo the established *Teamsters* method of proof in pattern-or-practice discrimination cases—affirmatively endorsed by the *Dukes* Court. *Dukes*, 564 U.S. at 352 n.7, 358, 366-67. Under the *Teamsters* model, the court first conducts a class liability phase to determine whether defendant has engaged in discrimination as a matter of standard operating procedure ("the regular rather than the unusual practice"). If so, the burden shifts to defendant to prove that individual members of the class are not actual victims of its discriminatory practices. This formulation presupposes that some class members may not have been injured by defendants' unlawful pattern of conduct. *See Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

*In re Deepwater Horizon*, 739 F.3d 790, 810–11 (5th Cir. 2014) (certifying settlement class) (emphasis added); *see also id*. at 812 (finding commonality: "Although all of the factual and legal questions identified by the district court are more closely related to [defendant's] injurious conduct than to the injurious effects experienced by the class members, they nonetheless demonstrate that the class members claim to have suffered the 'same injury' in the sense that *Wal–Mart* used this phrase.").[14]

Indeed, cases can be certified even when some class members have suffered ***no injury at all***. *See Tyson Foods*, 136 S. Ct. at 1050 (certifying class despite defendants' arguments that there was no mechanism to identify *uninjured* class members who should not recover); *In re Nexium*, 777 F.3d at 21-22 ("it is difficult to understand why the presence of uninjured class members at the preliminary stage should defeat class certification . . . Defendants' objections to certifying a class including uninjured members run counter to fundamental class action policies."). As the First Circuit explained in *In re Nexium*:

> Numerous courts have certified plaintiff classes even though the plaintiffs have not been able to use common evidence to show harm to all class members . . . **cases from our sister circuits and this circuit hold that the presence of a de minimis number of uninjured class members is permissible at class certification. In fact, as one court has recognized at certification, a class will often include persons who have not been injured by the defendant's conduct**; indeed, this is almost inevitable because at the outset of the case many of the members of the class

---

[14] *See also Augustin v. City of Philadelphia*, 318 F.R.D. 292, 299 (E.D. Pa. 2016) ("**The focus of the commonality inquiry is not on the strength of each plaintiff's claim but instead is on whether the defendant's conduct was common as to all of the class members.** Thus, commonality has been found to be present even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and when some members claims were arguably not even viable. In other words, there may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant.") (citations and quotations omitted) (emphasis added); *Cf. Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("although a presently existing risk may ultimately result in different future harm for different inmates—**ranging from no harm at all to death**—every inmate **suffers exactly the same constitutional injury** when he is exposed to a single statewide [DOC] policy or practice that creates a substantial risk of serious harm.") (emphasis added); *Hoffer v. Jones*, 323 F.R.D. 694, 697-98 (N.D. Fla. 2017) ("Plaintiffs' claims are focused on [d]efendant's policy of non-treatment . . . **Although each inmate may be differently situated (e.g., one may have a broken toe, and another a broken rib), they each suffer from the same injury**: being subject to the five-year delay.") (emphasis added).

may be unknown, or if they are known still the facts bearing on their claims may
be unknown.

*In re Nexium*, 777 F.3d at 25 (citations omitted). "At worst, the inclusion of some uninjured class

members is inefficient, but this is counterbalanced by the overall efficiency of the class action

mechanism." *Id.* at 22. *See also, e.g., Torres v. Mercer Canyons, Inc.,* 835 F.3d 1125, 1136 (9th

Cir. 2016); *Messner*, 669 F.3d at 823-26 (7th Cir. 2012).

Of course, any efficiency or case management challenges presented by such uninjured

members are not present in the settlement context. A fair and adequate settlement entirely

eliminates manageability issues and is the ultimate in efficiency.

## III.   COURTS FREQUENTLY CERTIFY ANALOGOUS CASES

Certification here would be far from an anomaly. In fact, courts frequently certify similar

cases, even in the non-settlement context, and even where class members' injuries differ.

### A.   ___Brown v. Cook County___ **(Hostile Work Environment)**

A hostile work environment class comprised of assistant public defenders was recently

certified in *Brown v. Cook Cty.*, No. 17 C 8085, 2019 WL 3776150 (N.D. Ill. Aug. 12, 2019)

arising from exhibitionist attacks perpetrated by detainees. "Although *each attack was different*, a

common theme emerged: detainees targeted [class members] for attacks that involved exposing

their penises and masturbating while making eye contact with or otherwise directing their conduct

toward their target. These attacks were commonly accompanied by *verbal threats and,*

*occasionally, physical contact*." *Id*. at *2 (emphasis added).

*Commonality was satisfied* based on common questions "regarding several of the

defendants' policies and their effects on the plaintiffs' work environment," such as, *inter alia*,

whether (1) exhibitionist attacks were so severe or pervasive as to alter the conditions of

employment and create a hostile or abusive working environment; (2) the plaintiffs were

discouraged from reporting attacks; and (3) the defendants exhibited an unreasonable delay in discovering and remedying the environment. *Id*. at *9. "Any one of these or several other common questions presented by the plaintiffs will 'resolve an issue that is central to the validity of each claim,' thus satisfying the commonality requirement." *Id*. (citation omitted).[15]

*Predominance was satisfied* because "nearly all" of the underlying elements of the claim "are subject to common resolution." *Id*. at *13. The court rejected the defendants' argument that some class members worked in divisions where attacks occurred far more infrequently—in other words, that those class members suffered a different hostile work environment (or different injuries). *Id*. at *14. **"Although there will no doubt be some factual variation between the claims of [class members in different facilities], both have alleged a common injury: employment discrimination caused by the [defendants'] policies that allegedly created a hostile work environment."** *Id*. at *11. And "[t]he fact that some members of the plaintiff class did not work . . . in the divisions of the jail most severely impacted . . . does not mean that they were uninjured by the alleged hostile work environment the attacks created." *Id*. at *14.

Predominance was not defeated by the fact that some class members did not experience exhibitionist attacks firsthand and only heard about them from others: These class members **"may have simply been injured to a lesser extent—an issue better suited for resolution at a later stage of the litigation."** *Id*. at *11; *see also id*. at *14 ("even secondhand accounts are relevant, and they may, in some cases, be independently actionable.") (citation omitted).

So too, here, all class members are affected by Dartmouth's alleged policy and practice of neglecting and failing to address the Professors' behavior. Whether they personally fell prey to the

---

[15] Typicality was also satisfied. *See id*. at *10 ("typicality does not require perfect identity of claims. Here, the plaintiffs' claims all share the same essential characteristics: they each allege that they were subject to a hostile work environment as a result of the defendants' policies, which they say exacerbated—or at least failed to address—[exhibitionist attacks] by detainees[.]").

Professors' misdeeds or were subjected to a hostile environment short of advances or physical contact (even if only second-hand), all have suffered a common injury, even if to differing degrees.

      **B.**    ***Howard v. Cook County Sheriff's Office* (Hostile Work Environment)**

In *Howard v. Cook Cty. Sheriff's Office*, No. 17 C 8146, 2019 WL 3776939 (N.D. Ill. Aug. 12, 2019), the court certified a hostile work environment class of 2,000 women who alleged that "the defendants failed to curtail sexual harassment by male detainees," including "exhibitionist masturbation, sexual epithets and threats, and sexual violence." *Id*. at *1-2. Some class members experienced these incidents of sexual harassment more frequently or directly than others. *Id*. at *6. The court found that evidence of "ambient harassment" was sufficient for commonality and predominance, despite differences in harm. *Id*. at *5, 7.

<u>*Commonality was satisfied*</u> because class members worked "in an environment highly permeated with sexually offensive and degrading behavior, that is, a highly sexualized atmosphere in which crude and offensive sexual behavior is common and employees see that it is normative, whether specifically directed at them or not." *Id*. at *7. **"[E]vidence of widespread sexual harassment by detainees shows that there is at least one common question**—whether the ambient harassment experienced by female employees . . . is sufficiently severe and pervasive to support a Title VII hostile work environment claim—whose answer will drive the resolution of the litigation." *Id*. at *7; *see also id*. at *9 ("Other common questions include whether the detainees' harassment occurred because of sex and whether there is a basis for employer liability based on the defendants' failure to adopt reasonable policies to combat the harassment.").[16]

---

[16] Typicality was also satisfied. "Although . . . direct harassment differs from ambient or secondhand harassment, that difference is a matter of degree rather than of kind . . . the underlying claim of harassment and the role of the defendants' policies in allegedly permitting that harassment are the same." *Id*. at *7. "[P]laintiffs' claims share the same essential characteristics as those of the class as a whole." *Id*.

The court distinguished *Dukes* because defendants' common practices—ignoring employee complaints, and failing to adequately train supervisors or discipline offending inmates—"are the glue that binds the putative class members' claims together[.]" *Id*. at *6. In addition, the class members "all work within a single complex . . . The fact that the[y] frequently occupy the same work environments, even if only briefly, provides a much stronger basis for [] certification[.]" *Id*.

Likewise, *predominance was satisfied* because "the plaintiff's evidence of ambient harassment makes such classwide resolution possible[.]" *Id*. at *9. The court explicitly rejected the defendants' argument that the class members "experienced the hostile work environment differently" and thus were "too differently situated" for class treatment: "[T]he fact that some of the putative class members may have experienced more direct or severe harassment does not defeat predominance under Rule 23(b)(3)." *Id*. Finally, the court noted that the proposed class was "sufficiently geographically and temporally confined[.]" *Id*.

This case is similar. Differences in the way class members experienced the same overall hostile environment are too tenuous to defeat certification.

## C. *Brand v. Comcast Corp., Inc.* (Hostile Work Environment)

In *Brand v. Comcast Corp. Inc.*, the court certified a hostile work environment class consisting of approximately 350 African American employees who worked out of a single facility. *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201 (N.D. Ill. 2014).

The court found *commonality satisfied* by the frequent use of derogatory terms and racially offensive language directed towards or in the presence of class members. *Id*. at 219. Specifically:

> Given the number of named plaintiffs and putative class members who heard the use of the [racially offensive words], along with the vast majority who heard other terms claimed to have been racially offensive, plaintiffs have provided evidence sufficient to establish 'significant proof' of the common question of whether a hostile work environment existed for African–American employees . . . **All in all,**

> **plaintiffs have sufficiently alleged that there is a common question among [class members] about whether they heard racially offensive terms during the course of their employment to the extent that they constituted a hostile work environment.**

*Id.* (citing *Dukes*, 564 U.S. at 354). Further common questions included "whether management failed to respond to and remedy complaints," which "affects all employees at the facility in essentially the same way." *Id.* at 221. Finally, the court noted that the working conditions at the facility presented a common question. *Id.* at 220 (the "hostile working conditions at a single place of employment are a single unlawful practice . . . by its nature, the issue of the condition of the [] facility presents a concern common to any employee working there.") (citations omitted).

The fact that the degree of harm varied between class members did not preclude certification because the "high percentage of plaintiffs and putative plaintiffs for this case who heard epithets that they considered to be and that a reasonable person could find to be racially motivated ***constitutes a common claimed injury***" sufficient for class certification purposes. *Id.* at 219 (emphasis added). This was true even if the offensive phrases were not experienced firsthand by all class members. *Id.* at 218. "A hostile work environment may be experienced differently from one person to the next, but it is nonetheless 'a single unlawful practice under Title VII.'" *Id.*

*Predominance was also satisfied.* The court found that the prevalence of racially-abusive language also supported predominance. *Id.* at 224. "[D]amages may differ. . . but this do[es] not undermine the fact that the fundamental question that predominates is a common question, namely whether there was a hostile work environment in plaintiffs' workplace." *Id.* at 223-24.

Similarly, here, Plaintiffs sufficiently demonstrate that they and the class members worked in a single educational environment (one Department) laden with gender-based mistreatment and abuse. This gives rise to common questions which predominate over any individual issues.

### D.      *Connor B. ex rel. Vigurs v. Patrick* **(District of Massachusetts)**

In *Connor B.*, the District of Massachusetts certified a class of approximately 8,500 foster

children who were "exposed to potential harm as a result of systemic deficiencies within DCF

[Department of Children and Families]." *Connor B.*, 272 F.R.D. at 292.

The defendants argued that class treatment was inappropriate because the class members

(including the plaintiffs) suffered different degrees of injury—or no injury at all. *Id.* at 295-96.

The court rejected these arguments: "the existence of differences among members of the Plaintiff

class does not make certification improper. In fact, **it is not uncommon for courts in this circuit**

**to certify class actions in which alleged systemic deficiencies resulted in harms that**

**manifested themselves differently among different segments of the plaintiff class."** *Id.* at 297

(collecting cases). In *Connor*, "Plaintiffs have satisfied the requirement of commonality by

alleging that various flaws within DCF, outlined with specificity in the complaint, expose the entire

Plaintiff class to an unreasonable risk of harm[.]" *Id.* at 295 ("Plaintiffs need not prove how each

policy or failure has harmed each member of the class at this stage.").[17]

Following the Supreme Court's *Dukes* decision, the defendants moved to decertify the

class. *See Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30 (D. Mass. 2011). The defendants

argued that "dissimilarities" among the class members defeated commonality. *Id.* at 34. The court

squarely rejected this argument and refused to decertify:

> Unlike the plaintiffs in *Wal–Mart,* who did not allege any specific, overarching
> policy of discrimination, Plaintiffs have alleged specific and overarching systemic
> deficiencies within DCF that place children at risk of harm . . . These systemic
> shortcomings provide the "glue" that unites Plaintiffs' claims. Thus, this class of
> 8,500 children within the custody of a single agency in a single state that suffers
> from the same overarching systemic deficiencies is fundamentally different from
> the class in *Wal–Mart,* which consisted of one and a half million class members

---

[17] Likewise, "the fact that the harms alleged by named Plaintiffs may differ in some respects from those suffered by
unnamed Plaintiffs does not undermine typicality." *Connor B.*, 272 F.R.D. at 296.

spread out across the country in thousands of stores with varying regional policies.

*Id.* (citations omitted).

Here, as in *Connor*, Plaintiffs have demonstrated that Dartmouth's common practices (e.g. allegedly declining to adequately respond to complaints) exposed the entire class to a hostile work environment; the fact that these harms "manifested themselves differently" among certain class members does not undermine certification.

### E.   <u>*Brown v. Nucor Corp.* (Fourth Circuit: Hostile Work Environment and Promotion Discrimination)</u>

In *Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015), the plaintiffs sought to certify a small class of 100 individuals alleging a hostile work environment and promotion discrimination. After the district court denied certification, the Fourth Circuit reversed, finding that commonality had been met under *Dukes*. *Id.* at 898. In distinguishing the case from *Dukes*, the court noted:

> In contrast to *Wal–Mart*, this litigation concerns approximately 100 class members in a single steel plant in Huger, South Carolina. The class members shared common spaces . . . and were subject to hostile plant-wide policies and practices . . . **a more centralized, circumscribed environment generally increases the uniformity of shared injuries . . . That is particularly the case where, as discussed further below, the entire Nucor plant was allegedly infected by express racial bias and stereotypes—a culture that management took few affirmative steps to meaningfully combat.**

*Id.* at 910 (emphasis added).

The Fourth Circuit found that *common injuries existed*. The court recognized that "[t]he record additionally indicates numerous complaints of discrimination made to the plant's general manager, who allegedly did little to nothing in response. **Such alleged tolerance of discrimination from top management at the plant supports the workers' contention of a class-wide injury that affected them all.**" *Id.* at 910.[18] The also court found that a common

---

[18] *See also id.* at 917 ("The workers have also presented sufficient evidence of a practice of *inaction* by the general manager who ignored the evidence of, and complaints regarding, discrimination in promotions at the plant . . . The

injury—exposure to a racially hostile environment—existed where the plaintiffs "provided substantial **evidence of unadulterated, consciously articulated, odious racism throughout the Nucor plant**, including affirmative actions by supervisors and a widespread attitude of permissiveness of racial hostility. The examples in the record are ubiquitous[.]" *Id*. at 912.

The Fourth Circuit explained that plaintiffs' anecdotal evidence of discrimination "provide[d] precisely the 'glue' of commonality that *Wal–Mart* demands." *Id*. at 914. "Here, where substantial evidence suggests a pattern of engrained discriminatory decision-making that consistently disadvantaged black workers at Nucor, to deny class certification would significantly weaken Title VII as a bulwark against discrimination." *Id*. at 915.

Here, Plaintiffs have alleged that the PBS Department was infected with sexism and hostility arising from the Professors' inappropriate conduct (*supra* Section I(A)) and Dartmouth's alleged inadequate response to complaints (*supra* Section I(B)). This is sufficient for certification.

## F.     *Lecenat v. Perlitz* (Sex Abuse Class Action)

After the Rule 23 amendments went into effect, the court in *Lecenat v. Perlitz*, No. 3:13-CV-01132, 2019 WL 3451571 (D. Conn. Feb. 11, 2019) certified a settlement class of children who were sexually abused at a school. The *Lecenat* class was comprised of all persons who "were subject to Sexual Abuse." *Id*. at *1. In certifying the class, the court acknowledged the victims' varying degrees of injury: "For purposes of this Settlement Class definition . . . 'Sexual Abuse' means **all forms of sexual-related contact, molestation, touching, fondling, behavior, activity, interaction, exploitation, coercion, threats, and/or grooming**; included in this definition are physical assault and/or battery in connection with such abuse[.]" *Id*. In granting preliminary

---

workers have sufficiently alleged that such a uniform policy of managerial inaction also contributed to racial disparities in promotions decisions.").

approval, the court was "*fully satisfied that the requirements for conditional certification to class have been met*. . . In particular, I think that common questions do predominate over any individual questions[.]" *See Lecenat* (No. 3:13-CV-01132), Dkt. 1074, Preliminary Approval Tr. at 31:1-5 (emphasis added). The court later granted final approval (*id.* at Dkt. 1089).

The court found that "there are questions of fact and law common to the Settlement Class (*e,g.,* whether Defendants are liable for any Sexual Abuse covered by the Settlement Class)"[19] and that typicality and predominance factors were satisfied. *Lecenat*, 2019 WL 3451571, at *1. As to predominance, the court accepted plaintiffs' argument that "the most significant issues in these cases pertain to the relationships between the Defendants, on the one hand, and [the harasser], on the other, and the degree to which Defendants may be held liable for their conduct . . . Such issues overwhelm the purely individualized issues *pertaining to the details of the abuse suffered* by each member of the class." *See Lecenat* (No. 3:13-CV-01132), Dkt. 1063-1, Memorandum of Law at 15 (emphasis added).

*Lecenat* thus supports certification in this case: Even if the degree of alleged harm varies between class members (as in *Lecenat*), common liability issues clearly predominate over individualized ones (such as the details of the abuse suffered by each class member and their resulting harms).

---

[19] Specifically, the *Lecenat* plaintiffs identified the following common questions: "(a) whether Defendants owed a duty to the minor children at PPT; (b) whether Defendants were negligent in failing to protect the minor children at PPT from Perlitz's conduct; (c) whether Defendants were negligent in hiring Perlitz; (d) whether Defendants were negligent in supervising Perlitz; (e) whether the Defendants who supervised Father Carrier were negligent in supervising Father Carrier; (f) whether the Defendants were in a fiduciary relationship with the minor children at PPT; (g) whether Connecticut law applies to the claims against Father Carrier; (h) whether any Defendant is entitled to volunteer immunity; and (i) whether it was foreseeable that, in the absence of safeguards, impoverished minor children in Haiti would be sexually abused." *See Lecenat* (No. 3:13-CV-01132), Dkt. 1063-1, Memorandum of Law at 12-15 (emphasis added).

G.    *Jane Doe 2 v. The Georgetown Synagogue et al.*; *Jane Doe 30's Mother v. Bradley*; and *Doe v. The John Hopkins Hospital* **(Certified Sex Abuse Class Actions)**

In *Jane Doe 30's Mother v. Bradley*, 64 A.3d 379 (Del. Super. Ct. 2012), the court found that class treatment was appropriate in evaluating the settlement of the claims of 7,000 patients who were harmed by a physician. In *Bradley*, **"[t]he abuse ranged from inappropriate touching and unnecessarily intrusive physical examinations to rape**. Some of the abuse was captured on film by an elaborate video taping system Dr. Bradley installed in his medical office." *Id.* at 383. There, "the Court was satisfied that class certification was appropriate" because, *inter alia*, "the claims . . . arising from the harm caused by Dr. Bradley were largely based on the same factual and legal predicates" and "the class representative, Jane Doe 30, would fairly and adequately protect the interests of the class as her claims were ***serious, reflective of the most seriously injured members of the class***." *Id*. at 385. The court further noted that there were "common threads that run through the claims[.]" *Id*. Here, too, there can be little question that Plaintiffs' claims represent the worst manifestations of the Professors' class-wide conduct.

In *Jane Doe 2 v. The Georgetown Synagogue et al.*, Civ. No. 2014 CAB 8073 (D.C. Super. Ct. 2018) (in which Plaintiffs' counsel here, Sanford Heisler Sharp, LLP, also served as Class Counsel) the court certified a settlement class of approximately 700 individuals in a case arising from the criminal voyeurism of a Rabbi who, over multiple years, videotaped women without their knowledge or consent while they undressed at a Jewish ritual bath that he oversaw. Women in the class suffered varying injuries: Some knew for a fact that they had been taped, as documented by law enforcement authorities, and others did not; further, some were more seriously traumatized than others, requiring treatment by a medical professional or counselor. The settlement accounted for such differences. Still, the court found that "[c]ommonality has been satisfied as the Class Members share common questions of law or fact, such as whether Defendant Freundel videotaped

females without their consent and whether Defendant Freundel acted as an agent or employee of any of the Defendants within the course and scope of his employment." (*See* Exhibit A (Final Approval Order) at 14.)[20]

Finally, *Doe v. The John Hopkins Hosp.*, No. 24C13001041, 2014 WL 4147202 (Md. Cir. Ct. Sep. 19, 2014) certified a sex abuse class action for settlement purposes. The class consisted of over 12,000 patients secretly photographed or videotaped by a physician. The court granted preliminary approval (*see* 2014 WL 4147208) and final approval (*see* 2014 WL 5040602) of the settlement.

## IV.   COMMONALITY AND PREDOMINANCE ARE SATISFIED

### A.   The Plaintiffs and the Class All Suffered the Same Injury; they Need Not Suffer Harm to the Same Degree

Plaintiffs and the Class all share a common injury: exposure to a hostile environment. "A hostile work environment may be experienced differently from one person to the next, but it is nonetheless a single unlawful practice under Title VII." *Brand*, 302 F.R.D. at 218 (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (quotations omitted)). The environment Class Members were exposed to, which was permeated with sexualized language and conduct, "**constitutes a common claimed injury**." *Brand*, 302 F.R.D. at 219; *see also Brown*, 2019 WL 3776150, at *11 (the class shared "a common injury: employment discrimination . . . that allegedly created a hostile work environment"). **"[T]he existence of differences among members of the Plaintiff class does not make certification improper. In fact, it is not uncommon for courts in this circuit to certify class actions in which alleged systemic deficiencies resulted in harms that manifested themselves differently among different segments of the plaintiff class."**

---

[20] Likewise, the court held, "[t]ypicality is satisfied as Plaintiffs' claims or defenses were that of the other members of the class and their injuries arose from the unauthorized and personally invasive videorecording of the ritual bath in the National Capital Mikvah facility." *Id.*

*Connor B*, 272 F.R.D. at 297.

Courts in similar cases have granted certification, post-*Dukes*, while explicitly recognizing that class members suffered varying degrees of harm. *See, e.g., Brown*, 2019 WL 3776150, at *11 (different degrees of harm—individuals who were "injured to a lesser extent"—was an issue "better suited for resolution at a later stage of the litigation"; the class shared "a common injury: employment discrimination . . . that allegedly created a hostile work environment"); *Howard*, 2019 WL 3776939, at *9 ("the fact that some of the putative class members may have experienced more direct or severe harassment does not defeat predominance under Rule 23(b)(3)."); *Bradley*, 64 A.3d at 382, 385 (certifying class where "[t]he abuse ranged from inappropriate touching and unnecessarily intrusive physical examinations to rape"; certification was appropriate because "the claims . . . arising from the harm caused by [the offending physician] were largely based on the same factual and legal predicates," creating "common threads that run through the claims."); *Lecenat*, 2019 WL 3451571, at *1 (certifying settlement class of individuals who suffered varying harm ranging from "grooming" to threats and coercion to outright sexual molestation ).

As used in *Dukes*, "same injury" means *the same type of wrongful conduct*—here, gender-based hostility and bias directed towards the Class. *See In re Deepwater Horizon*, 739 F.3d at 810-11 (interpreting *Dukes*: "the legal requirement that class members have all "suffered the same injury" can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse"). The effects experienced by each Class Member can take different forms. *Id*.; *Connor B*, 272 F.R.D. at 297 (certifying class even where the common conduct "resulted in harms that manifested themselves differently"). **In short, the**

same "_**wrong**_"—here, the alleged gender-biased conduct of the Three Professors and Dartmouth (_infra_ Sections II(A)-(B))—constitutes the _**same injury**_ under _Dukes_.[21]

Here, all Class Members who worked directly with the Former Professors are presumed to have suffered a baseline level of injury from exposure to the alleged hostile environment and thus will receive a base payment ($1,000) automatically; students who did not work directly with the Former Professors are not considered to be Class Members unless they attest to experiencing harm. (Dkt. 47-1 at 7-8.)  Variations in the _degree_ of harm suffered by Class Members will be aptly accounted for by the Independent Claims Expert as part of the claims process. (_See id_. at 8.)

###   B.   Commonality is Satisfied

The law does not require identical injuries or identical degrees of harm. "Where class members have different degrees of injury or even where defenses might exist only as to particular individuals, commonality has been found." _Applegate_, 2012 WL 3065542, at *6; _see also In re Deepwater Horizon_, 739 F.3d at 812 ("Although all of the factual and legal questions identified by the district court are more closely related to [defendant's] injurious conduct than to the injurious effects experienced by the class members, they nonetheless demonstrate that the class members claim to have suffered the 'same injury' in the sense that _Wal–Mart_ used this phrase."); _In re Lupron Mktg. and Sales Practices Litig._, 228 F.R.D. 75, 88 (D. Mass. 2005) ("Rule 23(a) does not require that every class member share every factual and legal predicate of the action."). In addition,

---

[21] The two examples provided by _Dukes_ as "common contentions" that amount to the "same injury" make clear that identical injuries-in-fact are not required. _See Dukes_, 564 U.S. at 350, 359 (examples include "the assertion of discriminatory bias on the part of the same supervisor" or "a companywide discriminatory pay and promotion policy"). The first example, "assertion of discriminatory bias on the part of the same supervisor," focuses on whether the class experienced _the same wrongful conduct_ (bias by a single supervisor)—not whether the class experienced the same _effects_ of that conduct or how that bias manifested itself across class members. Likewise, a "discriminatory pay and promotion policy" can result in varying degrees of harm—for example, whether class members experienced discrimination in pay or promotion or both, or whether class members were wrongfully denied one promotion or multiple promotions—but all class members experienced _the same wrongful conduct_: they were subjected to policies that disadvantaged women.

"Plaintiffs need not prove how each policy or failure has harmed each member of the class at this stage." *Connor B.*, 272 F.R.D. at 295.

Just "[a] single question of law or fact common to the members of the class will satisfy the commonality requirement." *Clough v. Revenue Frontier, LLC*, No. 17-CV-411-PB, 2019 WL 2527300, at *3 (D.N.H. June 19, 2019) (quoting *Dukes*, 564 U.S. at 369); *Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 265 (D.N.H. 2013) ("a court need find only a 'single common question'"). Here, Plaintiffs identify multiple common questions:

- ***Whether the Plaintiffs and class members were subject to sexually offensive language and conduct that created a hostile educational environment***. *See Brand*, 302 F.R.D. at 219 ("there is a common question among [class members] about whether they heard [] offensive terms during the course of their employment to the extent that they constituted a hostile work environment."); *see also Howard*, 2019 WL 3776939, at *7 (whether "ambient harassment" constituted a hostile work environment was a common question where there was evidence of "a highly sexualized atmosphere in which crude and offensive sexual behavior is common and employees see that it is normative").[22]

- ***Whether Dartmouth failed to adequately investigate or respond to complaints and incidents, thus ratifying and perpetuating the Professors' conduct*** *See Brown*, 2019 WL 3776150, at *9 (common questions included whether defendants had a practice of ignoring

---

[22] *See also Brown v. Nucor Corp.*, 576 F.3d 149, 158 (4th Cir. 2009) (reversing denial of class certification and finding commonality satisfied on hostile work environment claims where there was "sufficient evidence to indicate that all of the black employees were affected by the comments and actions of the white employees and supervisors in other departments."); *Brown v. Yellow Transp., Inc.*, No. 08 C 5908, 2011 WL 1838741, at *5 (N.D. Ill. May 11, 2011) ("the Plaintiffs allege that various racially hostile incidents were witnessed first-hand by multiple people, and discussed and shared with many others. For this reason, the commonality requirement is satisfied."); *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 362 (D. Md. 2004) (certifying hostile work environment class: "defendants directed racially hostile speech at class members . . . the plaintiffs have made a sufficient showing of wide-spread and pervasive racial hostility at [the company] to satisfy the commonality requirement.").

complaints and failing to remedy harassment); *Brand*, 302 F.R.D. at 221 ("whether management failed to respond to and remedy complaints" presents another common question). Here, Dartmouth's alleged failure to respond to complaints "affects all [class members] at [Dartmouth] in essentially the same way." *Brand*, 302 F.R.D. at 221. Where, as here, Plaintiffs have "alleged specific and overarching systemic deficiencies within [Dartmouth] that place [class members] at risk of harm . . . These systemic shortcomings provide the 'glue' that unites Plaintiffs' claims" under *Dukes*. *See Connor B.*, 278 F.R.D. at 34.

These questions drive the litigation under Title IX. If the case were litigated, Plaintiff would seek to establish through common proof applicable to all class members: (i) that the Three Professors engaged in conduct that constituted a hostile environment under Title IX; (ii) that an "appropriate person" had knowledge of their conduct and failed to adequately respond; and (iii) that Dartmouth acted with deliberate indifference to the serious risk of harm to female students.

Moreover, these questions "depend upon a common contention" contemplated by *Dukes*: "the assertion of discriminatory bias on the part of the same supervisor[s]." *Dukes*, 564 U.S. at 350. Here, Plaintiffs allege that they were subjected to a hostile environment by a small and discrete subset of individuals: three professors who created the environment and several high ranking members of Dartmouth administration who knowingly allowed it to persist. All Class Members were in the same Department as the Three Professors; all worked with or among the Professors; and all were harmed in the same way by Dartmouth's alleged course of inaction.

These allegations provide a "common contention" envisioned by *Dukes* and establish that "claims can productively be litigated at once." *Dukes*, 564 U.S. at 350. Because Plaintiffs' claims concern the legality of a single, class-wide course of conduct, the common liability questions presented in this case are "capable of classwide resolution"—in other words, the "determination

of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

### C.  Predominance is Satisfied

When certifying a class for settlement purposes, courts need not consider the "manageability" factor of Rule 23(b)(3)(D). *See Amchem*, 521 U.S. at 620; *In re Hyundai*, 926 F.3d at 556–57. "**What this means is that in settlement class actions, because *manageability* need not be a concern, *predominance*—the main focus of manageability—recedes in importance as well**." 2 NEWBERG ON CLASS ACTIONS § 4:63 (emphasis added).

The Supreme Court has recently explained the difference between an "individual" and "common" question: "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, 136 S. Ct. at 1045.

In the First Circuit (and elsewhere), courts "generally find the predominance requirement to be satisfied" where "common questions predominate regarding liability." *In re Nexium*, 777 F.3d at 21. But, significantly, "Rule 23(b)(3) does <u>not</u> require a plaintiff seeking class certification to prove that each element of her claim is susceptible of classwide proof." *Id*. Here, the underlying elements of the class' claims (mainly, actual knowledge and deliberate indifference) are "subject to common resolution" using the same evidence for all class members. *See Brown*, 2019 WL 3776150, at *13 (predominance satisfied where "nearly all" of the elements of the cause of action were "subject to common resolution").

Whether Dartmouth received prior complaints about the Three Professors and whether Dartmouth adequately responded to those complaints are both common questions under *Tyson*. Plaintiffs allege that Dartmouth received multiple complaints *prior* to the start of the class period

in 2012 (*see supra* Section I(B)); if proven true, this evidence will establish the "actual knowledge" requirement for each class member.[23]  And, if, as Plaintiffs allege (*supra* Section I(B)), Dartmouth's response to these pre-2012 complaints was inadequate (e.g. caused students to undergo harassment or made them vulnerable to it), that evidence will establish the "deliberate indifference" prong for the entire class.[24]  Because these alleged complaints *preceded* the class period, whether Dartmouth received and was deliberately indifferent to them will establish both "actual knowledge" and "deliberate indifference" for the entire class: **"the same evidence will suffice for each member to make a prima facie showing[.]"** *Tyson Foods*, 136 S. Ct. at 1045. There is no "need to present evidence that varies from member to member." *Id.*

Likewise, whether class members were subject to sexually offensive language and conduct that created a hostile environment is "susceptible to generalized, class-wide proof." *Id.* Where, as here, class members are similarly situated, **"the experiences of a subset of employees can be probative as to the experiences of all of them."**  *Id.* at 1048 ("While the experiences of the employees in *Wal–Mart* bore little relationship to one another, in this case each employee worked in the same facility, did similar work, and was paid under the same policy . . . under these circumstances the experiences of a subset of employees can be probative as to the experiences of all of them."); *Howard*, 2019 WL 3776939, at *9 (noting that the proposed class was "sufficiently geographically and temporally confined"). Here, Plaintiffs allege all class members were exposed to the same sexually offensive and degrading environment—created by the same three professors in a single Department. *See supra* Section I(A). Common proof that will establish, for all class

---

[23] *See Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 208 (D.N.H. 2009) (actual knowledge satisfied by prior complaints).

[24] *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 630 (1999) (deliberate indifference established where the school's response "cause[d] students to undergo harassment or ma[d]e them liable or vulnerable to it"); *Brodeur*, 626 F. Supp. 2d at 212 (deliberate indifference satisfied by inadequate response to earlier complaints).

members, whether the misconduct at issue was "sufficiently severe" to interfere, undermine, or detract from the educational experience. *Tyson Foods*, 136 S. Ct. at 1048; *Howard*, 2019 WL 3776939, at *9 (the common question of "whether all of the putative class members experienced an objectively hostile work environment based on the ambient harassment" predominated).

As set forth above, courts have found the predominance factor met and certified hostile work environment class cases on extremely similar showings. *See, e.g., Howard*, 2019 WL 3776939, at *7, 9; *Brand*, 302 F.R.D. at 224; *Brown*, 2019 WL 3776150, at *13 (the "severity of the harassment underlying the hostile work environment allegations is subject to resolution in a single proceeding.").[25] And, differences in damages and harm do not defeat predominance.

### D. In a Litigated Case, this Court Could Bifurcate the Liability and Damages Phases Under *Teamsters* and Legions of Similar Cases

If this were a contested motion seeking class certification for trial purposes, the Court's task would be eased by the burden-shifting regime of *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). *See supra* n.12. Under *Teamsters*, cases can be bifurcated into a class-wide liability and injunctive phase (Phase I) and an individual "remedial" or damages phase (Phase II). If class-wide liability is established, Phase II addresses individual claims and issues such as differences in damages. *See id.* at 361-62.[26] The *Teamsters* model has been applied to cases similar to this one.[27]

---

[25] *See also Brown*, 2011 WL 1838741, at *7 ("[t]he overarching hostile work environment claim depends in large part upon experiences shared by a significant percentage of the putative class."); *Cf. Rosas v. Sarbanand Farms, LLC*, 329 F.R.D. 671, 691 (W.D. Wash. 2018) (finding predominance in hostile work environment case where the "alleged threats and comments" made by defendants were "pervasive" and common to all class members; "[t]herefore, establishing each member's *prima facie* case of [defendants'] liability for creating a hostile work environment would depend on the same evidence of [d]efendants' behavior.").

[26] The Court may either certify the entire case or limit certification to the class liability phase under Rule 23(c)(4). The practical effect is equivalent.

[27] *See Nucor*, 785 F.3d at 914 ("Of course, a plaintiff need not 'offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy.' Instead, a bifurcated class action proceeding allows for a 'liability' stage to first determine whether an employer engaged in a pattern or practice of discriminatory conduct. Upon a finding of liability, a second damages stage allows for the consideration of which individuals were specifically harmed by the policy.") (citing *Teamsters*, 431 U.S. at 360); *Brand*, 302 F.R.D. at 224; *Employees Committed For Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 427-32 (W.D.N.Y. 2005) (finding

Thus, Plaintiffs have demonstrated commonality and predominance. Any individualized issues, such as damages, do not defeat certification.[28]

## V. *HURT V. SHELBY COUNTY BOARD OF EDUCATION* WAS A LITIGATED CLASS ACTION (NOT A SETTLEMENT CLASS) THAT WAS DECIDED ON GROUNDS AND FACTS INAPPLICABLE HERE; THUS, IT SHOULD BE DISREGARDED

In *Hurt v. Shelby Cty. Bd. of Educ.*, No. 2:13-CV-230-VEH, 2014 WL 4269113, at *7 (N.D. Ala. Aug. 21, 2014), the District of Alabama was faced with a hotly **contested** class certification motion—not, as here, a settlement class seeking certification for settlement purposes only. The Rule 23 factors are relaxed at the settlement stage. *See supra* Section II(A) (certifying a class for settlement purposes satisfies the Rule 23 requirements more easily than a contested motion for certification); 2018 Advisory Committee Notes to Rule 23(e) ("the standards for certification differ for settlement and litigation purposes"); *In re Hyundai*, 926 F.3d at 558 ("But whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement. A class that is certifiable for settlement may not be certifiable for litigation[.]"). In addition, the *Hurt* court denied certification on different grounds and under very different facts.

---

hostile work environment claims compatible with the pattern-or-practice framework); *Wilfong v. E.E.O.C.*, No. 00-CV-0680-DRH, 2001 WL 1728985, at *6 (S.D. Ill. Dec. 27, 2001) ("individual differences in each class member's subjective perception and response to harassment does not detract from the satisfaction of the commonality standard. Those differences can be addressed at Stage 2 of the bifurcated proceeding") (citation omitted); *E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1069-070 (C.D. Ill. 1998) (approving *Teamsters* approach in EEOC enforcement action alleging pattern-or-practice claims of hostile work environment).

[28] Any subjective element of a hostile environment claim does not defeat certification and could be addressed in the individual remedial phase of a bifurcated proceeding along with damages. *See, e.g.*, *Brown*, 2019 WL 3776150, at *13 ("the Court is satisfied that the subjective element of the hostile work environment claim will neither predominate nor be particularly complicated for each individual plaintiff to prove. The subjective element may therefore readily be addressed as part of later proceedings, and it does not undermine predominance."); *id.* at *10 (subjective element did not undermine commonality; "there is certainly more than one important issue subject to common resolution"); *Howard*, 2019 WL 3776939, at *9 ("The remaining individual issues do not represent a significant aspect of the litigation and may be appropriately resolved through individual proceedings after the class phase . . . the question of whether the harassment was subjectively offensive . . . will require individual proof, but it does not appear to constitute a substantial dispute in this case."); *Wilfong*, 2001 WL 1728985, at *5-6.

### A.   The *Hurt* Court Denied Certification Primarily on the Basis of Numerosity and Ascertainability, Which Are Not at Issue Here

In *Hurt*, the plaintiffs sought to certify an impermissible fail-safe class of students who "were harassed, abused, or molested," requiring a liability finding to determine class membership. *Hurt*, 2014 WL 4269113, at *7. Solving the issue, however, by limiting the class to known molestation victims would have created a potentially intractable numerosity problem. *Id*. at *9. *Hurt's* analysis could have ended there. Here, in contrast, both numerosity and ascertainability are easily satisfied. *See* Dkt. 47-2 ¶ 50 ("Dartmouth has affirmed that Class Members are identifiable through available records.") and ¶ 42 (the Proposed Class consists of approximately ninety (90) individuals).

### B.   The *Hurt* Court Improperly Focused its Inquiry on the Plaintiffs' Injuries Rather than the Absence of Common Contentions; Unlike This Case, There Were No Common Allegations Demonstrating that Most Absent Class Members Were Exposed to a Hostile Environment

As set forth above, differences in class members' injuries do not defeat certification. A class may even contain uninjured members. It is only the presence of large numbers of uninjured members that presents certification problems. *See, e.g.*, *In re Nexium*, 777 F.3d at 31; *Messner*, 669 F.3d at 824-26. To defeat predominance, there must be "large numbers of class members who were *never exposed to the challenged conduct to begin with*"; it need only be *possible* that members suffered injury, not that they actually did so. *Torres*, 835 F.3d at 1136, 1137 n6. Otherwise, the true focus of the inquiry is whether the claims "depend upon a common contention—for example . . . discriminatory bias on the part of the same supervisor." *Dukes*, 564 U.S. at 350.

In *Hurt*, unlike this case, the vast majority of class members (fourth-grade students of a particular teacher over a twenty-five year period) were apparently uninjured; in fact, they were never really *exposed to the challenged conduct to begin with*. The case concerned physical molestation affecting about 20 actual victims and no indication of a hostile environment pervading

the classroom over the multi-decade class period. There were almost no allegations demonstrating that most absent class members were exposed to *any* degree of a hostile environment. *See* First Am. Compl., *Hurt v. Shelby Cty. Bd. of Educ.*, No. 2:13-CV-00230 (N.D. Ala. Feb. 8, 2013), Dkt. 10. The court rejected the notion that class members were victims simply by being in the general "target area" of the teacher's predations.[29] The court could have resolved the case on this basis.

Thus, in *Hurt*, the appropriate inquiry should not have been on the nature and extent of the individual plaintiffs' and class members' injuries, but rather **whether the *absent class members* were subject to the same allegedly unlawful conduct**. The *Hurt* plaintiffs did not allege that the environment was "highly permeated with sexually offensive and degrading behavior," nor that a "high percentage" of class members were privy to sexually-offensive language. *Howard*, 2019 WL 3776939, at *7; *Brand*, 302 F.R.D. at 219. Plaintiffs make exactly this showing: They provide highly-detailed factual allegations that the Department as a whole was pervaded by the Professors' behavior, in a manner that affected all class members, and further allege that Dartmouth's practice of responding inadequately to complaints allowed the environment to persist. As set forth above, numerous similar cases have been certified based on such "common contentions."

In contrast to *Hurt*, there is absolutely no suggestion here that there is such a high number of uninjured class members among the 90-person class as to overwhelm the benefits of a class action and preclude certification. This is particularly the case given the fact that any potential efficiency and manageability concerns are fully resolved by the parties' settlement.

C.    *Hurt* Does Not Undermine Plaintiffs' Common Questions

While *Hurt* rejected the common questions posed in that case as incompatible with *Dukes*,

---

[29] As the court noted, the class would have included "a potentially large group of female students whose participation in the case depends simply on their membership within one of [the offending teacher's] fourth-grade classes over the roughly twenty-five years he taught . . . **this group would include female students who had no awareness of [the teacher's] abuse whatsoever.**" *Hurt*, 2014 WL 4269113, at *14.

there is a critical distinction here: Plaintiffs' questions depend on a common contention and yield common answers that drive the litigation, as discussed above. Unlike in *Hurt*, all class members experienced a single hostile environment. All worked closely and intimately with the Three Professors and were subject to their pervasive sexualized comments and expectations. In contrast to the elementary school children in *Hurt*, none of the class members were in the dark about the Professors' predilections and conduct and all felt at least second-hand effects and harm from the atmosphere surrounding them—a sufficient basis for liability and certification in hostile environment cases. Moreover, the narrower size and scope of the class (90 identified individuals over a five-year window) tightens the circle of commonality. *Cf., e.g*., *Nucor*, 785 F.3d at 910.

## **CONCLUSION**

There can be little question that the Settlement Agreement is fair, adequate, and reasonable, and meets the criteria for approval of class action settlements. It fully protects the class members' rights and interests and ensures that they have ample redress for their injuries. When viewed properly, there is no reason here for the class certification requirements to hold up a settlement that is highly beneficial to all involved: the parties, the class members, and the Court. Plaintiffs therefore respectfully request that the Court grant preliminary approval of the Settlement Agreement and authorize corresponding notice to the Class Members.


Dated:  October 31, 2019                    Respectfully submitted,

*/s/ Nicole E. Wiitala*
Nicole E. Wiitala (admitted *pro hac vice*)
David W. Sanford (admitted *pro hac vice*)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651

nwiitala@sanfordheisler.com
dsanford@sanfordheisler.com

Deborah K. Marcuse (admitted *pro hac vice*)
Steven J. Kelley (admitted *pro hac vice*)
Austin L. Webbert (admitted *pro hac vice*)
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7425
dmarcuse@sanfordheisler.com
skelly@sanfordheisler.com
awebbert@sanfordheisler.com

*-- and --*

Charles G. Douglas, III (NH Bar #669)
**DOUGLAS, LEONARD & GARVEY, P.C.**
14 South Street, Suite 5
Concord, NH 03301
Telephone: (603) 224-1988
Fax: (603) 229-1988
chuck@nhlawoffice.com

*Attorneys for Plaintiffs and the Proposed Class*