UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Kristina Rapuano et al.

     v.                             Civil No. 18-cv-1070-LM
                                           Opinion No. 2020 DNH 013
Trustees of Dartmouth College


# O R D E R

Plaintiffs Kristina Rapuano, Vassiki Chauhan, Sasha Brietzke, Annemarie Brown, Andrea Courtney, Marissa Evans, Jane Doe, Jane Doe 2, and Jane Doe 3 bring this suit on their own behalf and on behalf of a putative class against the Trustees of Dartmouth College ("Dartmouth"). Plaintiffs bring claims under Title IX, 20 U.S.C. § 1681 et seq., and New Hampshire common law, alleging that Dartmouth was aware that three professors in the Psychological and Brain Sciences Department created a sexually hostile education environment for female students and that Dartmouth did not take adequate steps to protect its students or stop the professors' misconduct. Plaintiffs move for preliminary approval of a comprehensive class action settlement in this matter under Federal Rule of Civil Procedure 23(e). Doc. no. 47. Dartmouth does not oppose the motion. On October 17, 2019, the court held a hearing on plaintiffs' motion. Plaintiffs subsequently filed supplemental briefing as

allowed by the court.  For the following reasons, the court grants plaintiffs' motion for preliminary approval of the class action settlement.

**STANDARD OF REVIEW**

I.  <u>Preliminary Approval Versus Final Approval</u>

Court approval of a class action settlement proceeds in two stages.  See <u>Michaud v. Monro Muffler Brake, Inc.,</u> No. 2:12-CV-00353-NT, 2015 WL 1206490, at *8 (D. Me. Mar. 17, 2015); 4 William B. Rubenstein, <u>Newberg on Class Actions</u> § 13.10 (5th ed. 2019).  First, the parties present a proposed settlement to the court for "preliminary approval" and ask the court to make a preliminary determination regarding class certification.  <u>See</u> Rubenstein, <u>supra</u>, § 13.10.  At this preliminary stage, the court must determine whether it "will likely be able to": (1) certify the class for purposes of judgment on the proposed settlement; and (2) approve the settlement proposal under Rule 23(e)(2).  Fed. R. Civ. P. 23(e)(1)(B).  If the court is satisfied on both inquiries, the court should "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement.  Fed. R. Civ. P. 23(e)(1)(B).  After notice to the class, the court holds a fairness hearing at which class members may appear to support or object to the proposed settlement.  <u>See</u> Rubenstein, <u>supra</u>, § 13.10.

Second, the court must decide whether to grant final approval of the proposed settlement.  Under Rule 23(e)(2), the court may grant final approval of a class action settlement if it can certify the proposed class, see Amchem Products, Inc. v. Windsor, 521 U.S. 591, 621 (1997), and if it finds that the proposed agreement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2).

Prior to amendment of Rule 23(e) in 2018, the rule did not specify what standard the court should apply at the preliminary approval stage.  See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 330 F.R.D. 11, 28 (E.D.N.Y. 2019).  In the absence of explicit direction in the rule, most courts applied a "less stringent" or more "lax" standard at the preliminary approval stage regarding the requirements for class certification and approval of the proposed settlement.  See, e.g., Ross v. Lockheed Martin Corp., 267 F. Supp. 3d 174, 191 (D.D.C. 2017); Cotter v. Lyft, Inc., 193 F. Supp. 3d 1030, 1035-36 (N.D. Cal. 2016).

In 2018, Rule 23(e) was amended to provide a standard governing preliminary approval.  As outlined above, Rule 23(e)(1)(B) now provides that, in order to preliminarily approve the settlement, the court must find that it "will likely be able to" certify the class for the purposes of settlement and find that the settlement is fair, reasonable, and adequate.  Fed. R.

Civ. P. 23(e)(1)(B).  Since the amendment, a growing number of courts have interpreted this "likelihood standard" as "more exacting" than the relaxed standard courts applied prior to the amendment.  In re Payment Card Interchange, 330 F.R.D. at 28 n.21; see also In re GSE Bonds Antitrust Litig., __ F. Supp. 3d ___, 2019 WL 5848960, at *1 (S.D.N.Y. Nov. 7, 2019); In re Premera Blue Cross Customer Data Sec. Breach Litig., No. 3:15-MD-2633-SI, 2019 WL 3410382, at *1 (D. Or. July 29, 2019); O'Connor v. Uber Techs., Inc., No. 13-CV-03826-EMC, 2019 WL 1437101, at *4 (N.D. Cal. Mar. 29, 2019); Stoddart v. Express Servs., No. 212CV01054KJMCKD, 2019 WL 414489, at *5 (E.D. Cal. Feb. 1, 2019).

This court agrees that the "likelihood" standard spelled out in Rule 23(e) demands a searching—not a relaxed—inquiry. Indeed, the Advisory Committee Notes to the 2018 amendment state that "The decision to give notice of a proposed settlement to the class is an important event.  It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object."  See Fed. R. Civ. P. Rule 23(e), Adv. Commt. Notes, 2018 Amdnt. (emphasis added).  Further, it makes little practical sense for a district court to conduct a less rigorous inquiry at the preliminary approval stage.  As explained by one district court:

> If the district court, by taking a quick look rather
> than a careful one, misses a serious flaw in the
> settlement, the parties and the court will waste a
> great deal of money and time notifying class members
> of the agreement, only to see it rejected in the end,
> requiring the parties to start over.  The same is true
> if the district court does identify a potentially
> serious flaw at the preliminary stage but waits until
> final approval to conclude that it's fatal.  What's
> worse, if a court waits until the final approval stage
> to thoroughly assess the fairness of the agreement,
> momentum could have a way of slanting the inquiry, in
> a manner that deprives the class members of the court
> protection that Rule 23 demands.

Cotter, 193 F. Supp. 3d at 1036.  Given these considerations, this court will conduct a careful review at this preliminary stage to ensure that it will likely be able to approve the settlement and certify the class after the final hearing.  This determination remains preliminary in the sense that it is subject to any additional information—including further factual development or objections by class members—that may come to light prior to or during the fairness hearing.  See id. at 1036-37; Rubenstein, supra, § 13.18.

II.  Settlement Class Certification Versus Litigation Class Certification

To certify either a settlement class or a litigation class, the court must find that the requirements of Federal Rule of Civil Procedure 23 are met.  See Amchem, 521 U.S. at 620-21.  Rule 23(a) states four threshold certification requirements applicable to all class actions: (1) numerosity; (2)

commonality; (3) typicality; and (4) adequacy.  See Fed. R. Civ.
P. 23(a); Amchem, 521 U.S. at 613.  In addition to Rule 23(a)'s
threshold requirements, a party seeking certification must also
show that the action falls into one of the categories outlined
in Rule 23(b).  Amchem, 521 U.S. at 614.  Plaintiffs seek to
certify under Rule 23(b)(3).  To qualify for certification under
that rule, the proponents of the action must show that common
questions of law or fact "predominate over any questions
affecting only individual members" and that class resolution is
"superior to other available methods for fairly and efficiently
adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3);
Amchem, 521 U.S. at 615.

Although these requirements apply to both settlement and
litigation class certifications, a district court should apply
the criteria differently depending on the purpose of
certification.  See Amchem, 521 U.S. at 619-21; In re Hyundai &
Kia Fuel Econ. Litig., 926 F.3d 539, 556 (9th Cir. 2019); see
also Fed. R. Civ. P. 23(e)(1), Adv. Commt. Notes, 2018 Amdnt.
Specifically, when considering whether to certify a class for
the purposes of settlement only, a court "need not inquire
whether the case, if tried, would present intractable management
problems."  Amchem, 521 U.S. at 620.  On the other hand, other
aspects of Rule 23—for example, those preventing overbroad class
definitions—deserve "undiluted, even heightened attention" in

6

the settlement context.  Id.  Thus, a district court should apply the Rule 23 requirements differently——in some ways more leniently, in other ways more vigorously——when it is certifying a class for the purposes of settlement only.  See id. at 619-21; In re Hyundai, 926 F.3d at 556-57.

Plaintiffs argue that the Rule 23 certification standard is "relaxed" when the court is certifying a class for settlement purposes only.  Doc. no. 49 at 14.  However, the cases plaintiffs cite for this assertion support the proposition, explained above, that the certification requirements apply differently in the context of settlement, not that the standard is less rigorous.  See, e.g., In re Hyundai, 926 F.3d at 556-58; In re Premera Blue Cross, 2019 WL 3410382, at *2; Swinton v. SquareTrade, Inc., No. 418CV00144SMRSBJ, 2019 WL 617791, at *12 (S.D. Iowa Feb. 14, 2019).[1]  In sum, the court will apply the Rule 23 certification requirements here differently, but not necessarily more leniently, because plaintiffs seek certification for the purposes of settlement only.

---

[1] Plaintiffs also rely heavily on the statement in Newburg on Class Actions that the "standards for certification are laxer at settlement."  Doc. no. 49 at 14 (quoting 4 Newburg on Class Actions § 13.18).  This statement may reflect how some courts have treated certification for settlement purposes since Amchem. However, it is directly contradictory to the Supreme Court's statement in Amchem that, although settlement is a relevant consideration, it "does not inevitably signal that class-action certification should be granted more readily than it would be were the case to be litigated."  Amchem, 521 U.S. at 620 n.16.

**BACKGROUND**

The named plaintiffs are current or former Dartmouth students affiliated in some way with the Psychological and Brain Sciences Department ("the Department") where they worked with former tenured professors Todd Heatherton, William Kelley, and/or Paul Whalen ("the professors"). Plaintiffs allege that Dartmouth knowingly allowed the professors to create and normalize a culture of sexual harassment of female students in the Department. The professors' alleged misconduct ranged in severity from comments about female students' appearance to sexual assault. Plaintiffs allege that the professors also routinely conditioned their mentorship and advising services to female students on the students' acquiescence to sexual advances or participation in binge-drinking or party culture. Plaintiffs claim that Dartmouth received multiple reports of the professors' sexual harassment but took no meaningful action to reprimand the professors or to protect the students.

In April 2017, a group of female students informed Dartmouth's Title IX office of the professors' rampant sexual harassment. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving

Federal financial assistance." 20 U.S.C. § 1681(a). Sexual harassment is a form of discrimination prohibited by Title IX. See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 673 (1999).

Following the April 2017 report, Dartmouth initiated a formal investigation into the allegations against the professors. All three professors either resigned or retired in July 2018. Plaintiffs commenced this suit as a putative class action in November 2018. Their amended complaint asserts the following claims on behalf of the putative class: violations of Title IX (counts one and two); breach of fiduciary duty (count three); and negligent supervision and retention (count four).[2]

## DISCUSSION

Plaintiffs request that the court grant preliminary approval of the proposed class action settlement. In making this determination, the court must consider whether it will "likely" be able to certify the proposed class and approve the proposed settlement. See Fed. R. Civ. P. 23(e)(1)(B).

---

[2] The amended complaint also asserts two additional claims against Dartmouth: a claim of quid pro quo sexual harassment under Title IX on behalf of all named plaintiffs (count five); and a claim of retaliation under Title IX on behalf of Chauhan, Brietzke, Brown, Evans, and Jane Doe (count six).

I.  <u>Preliminary Class Certification</u>

The court first turns to whether it will "likely" be able to certify the proposed class for the purposes of settlement. <u>See</u> Fed. R. Civ. P. 23(e)(1)(B).

A. <u>Class Definition</u>

Plaintiffs propose preliminary certification of the following class:

(A)  All current and former women graduate students at Dartmouth who meet any of the following criteria:

(i)  Between April 1, 2012 and August 31, 2017 were graduate advisees of one [or] more of Todd Heatherton, William Kelley, and/or Paul Whalen (i.e., the "Three Former Professors");

(ii)  Between April 1, 2012 and August 31, 2017 were teaching or research assistants for one or more of the Three Former Professors;

(iii)  Were graduate students in [the Department] who, between April 1, 2012 and August 31, 2017, (i) coauthored at least one paper with one or more of the Three Former Professors based on research physically conducted in the lab during that time period, or (ii) co-authored at least three papers with one or more of the Three Former Professors; OR

(iv)  Were graduate students in [the Department] between March 31, 2015 and August 31, 2017 who do not fit within categories (i)-(iii), but who will attest that they experienced dignitary, emotional, educational and/or professional harm during this period as a result of the misconduct of one or more of the Three Former Professors.

> (B) All current and former women undergraduate students at Dartmouth who, between April 1, 2012 and August 31, 2017, worked as research assistants for one or more of the Three Former Professors. As used herein "research assistants" includes individuals working on an honors thesis or independent research study in one or more of the Three Former Professors' labs.

Doc. no. 47-3 at 11-12.

As discussed at the hearing, the court is most focused on whether the proposed class can meet the element of commonality under Rule 23(a) and the requirement of predominance under Rule 23(b)(3).[3] The court will nevertheless address each of the certification requirements below.

## B. Rule 23(a) Requirements

### i. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Clough

---

[3] At the hearing, the court raised concerns about whether commonality and predominance could be met in this case because whether each class member experienced a hostile education environment would require an individualized inquiry. Plaintiffs filed a supplemental memorandum on this topic following the hearing. The court has considered that briefing in reaching its decision.

v. Revenue Frontier, LLC, No. 17-CV-411-PB, 2019 WL 2527300, at
*3 (D.N.H. June 19, 2019) (quoting Garcia-Rubiera v. Calderon,
570 F.3d 443, 460 (1st Cir. 2009)).  Plaintiffs attest that the
proposed class consists of approximately 90 current or former
graduate and undergraduate students who worked with the
professors during the class period.  This satisfies the
numerosity requirement.

    ii.  Commonality

Rule 23(a)(2) asks whether there are "questions of law or
fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The
Supreme Court examined this requirement for class certification
in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).
That case involved a putative nationwide class action on behalf
of 1.5 million female employees of Wal-Mart who claimed that
Wal-Mart violated Title VII by discriminating against them in
pay and promotion on the basis of their sex.  Id. at 342-43.
The Supreme Court stated that demonstrating commonality requires
proof that all class members "have suffered the same injury."
Id. at 350 (internal quotation marks omitted).  The Court
explained that this means that the "claim must depend upon a
common contention."  Id.  That "common contention" must be
"capable of classwide resolution—which means that determination
of its truth or falsity will resolve an issue that is central to

the validity of each one of the claims in one stroke." Id. In
illustrating this test, the Court gave two examples that would
have satisfied the "same injury" requirement in Dukes: "the
assertion of discriminatory bias on the part of the same
supervisor" and "a companywide discriminatory pay and promotion
policy." Id. at 350, 359.

These examples describe injurious conduct by the defendant,
not the type or extent of damages suffered by class members.
Consequently, the Supreme Court's examples clarify that to
suffer "the same injury," class members need not necessarily
have experienced the same damages. In fact, the Fifth Circuit
has interpreted the two examples offered in Dukes as
demonstrating that "the same injury" test "can be satisfied by
an instance of the defendant's injurious conduct, even when the
resulting injurious effects—the damages—are diverse." In re
Deepwater Horizon, 739 F.3d 790, 810-11 (5th Cir. 2014). Other
courts have similarly held that the "same injury" requirement
from Dukes is satisfied when all class members were subject to
the same injurious conduct by the defendant. See, e.g., Parsons
v. Ryan, 754 F.3d 657, 678 (9th Cir. 2014); Rodriguez v. Nat'l
City Bank, 726 F.3d 372, 383 (3d Cir. 2013); Soseeah v. Sentry
Ins., No. CIV 12-01091 RB/KK, 2016 WL 7435792, at *4 (D.N.M.
Sept. 6, 2016).

In the Title VII context, courts have found this "same injury" test (and therefore the commonality requirement) satisfied when plaintiffs raised the common contention that the class suffered the same injury of an objectively hostile or abusive work environment.  See Howard v. Cook Cty. Sheriff's Office, No. 17 C 8146, 2019 WL 3776939, at *5-7 (N.D. Ill. Aug. 12, 2019) (finding common question of whether the "ambient harassment" experienced by female employees was sufficiently severe and pervasive to support a hostile work environment claim); Brand v. Comcast Corp., Inc., 302 F.R.D. 201, 218 (N.D. Ill. 2014) (finding commonality met based on common question of "whether [class members] heard racially offensive terms during the course of their employment to the extent that [the comments] constituted a hostile work environment"); Newsome v. Up-To-Date Laundry, Inc., 219 F.R.D. 356, 362 (D. Md. 2004) (finding common question of whether use of racial slurs was severe and pervasive enough to support hostile work environment claim); Jenson v. Eveleth Taconite Co., 139 F.R.D. 657, 665 (D. Minn. 1991) (finding common question of whether a reasonable woman would find that profanity, sexually explicit posters and graffiti, and unwanted touching made the work environment hostile).[4]

---

[4] See also Rodriguez v. Maricopa Cty. Cmty. Coll. Dist., No. CIV 04-2510-PHX-EHC, 2006 WL 89938, at *9 (D. Ariz. Jan. 12, 2006) (identifying common questions as whether employee's derogatory emails were objectively offensive and whether the

Broadly speaking, Title VII and Title IX prohibit analogous conduct.  See Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 540 (1st Cir. 1995), abrogation on other grounds recognized in Martinez v. Cui, 608 F.3d 54, 63 (1st Cir. 2010).  Title VII prohibits discrimination in employment practices on the basis of an individual's race, color, religion, sex, or national origin, and Title IX prohibits discrimination in educational programs on the basis of sex.  See 42 U.S.C. § 2000e-2(a); 20 U.S.C. § 1681(a).  Hostile environment claims under both Title VII and Title IX require proof that plaintiffs were subjected to an objectively hostile work environment——that the discrimination or sexual harassment was so severe, pervasive, and objectively offensive that a reasonable person would consider the environment hostile.  See Rosario v. Dep't of Army, 607 F.3d 241, 246 (1st Cir. 2010) (Title VII); Brown, 68 F.3d at 540 (Title IX).  Evidence that the discriminatory behavior was not isolated or was conducted in the presence of a group of

---

emails, when combined with the employer's response, created a hostile work environment for Latino employees); Bremiller v. Cleveland Psychiatric Inst., 195 F.R.D. 1, 21 (N.D. Ohio 2000)(finding commonality met by common question of whether sexual harassment of female employees created hostile work environment).

employees supports a finding that the workplace was objectively
hostile.  See Brand, 302 F.R.D. at 219.

Like the Title VII cases cited above, plaintiffs' Title IX
claim of a hostile education environment is premised on the
common contention that the professors' sexual harassment was
severe, pervasive, and objectively offensive enough that a
reasonable person would find that it created a hostile or
abusive educational environment.  Specifically, plaintiffs
allege that the professors normalized a highly sexualized
culture in the Department by:

- favoring the hiring of young, attractive female
  students to work in their labs and openly debating who
  had "the hottest lab";
- favoring female students who participated in frequent
  drinking binges, engaged in sexual banter, and
  tolerated unwanted touching;
- shunning or retaliating against women who would not
  participate in drinking binges or who rebuffed sexual
  advances;
- openly commenting on female students' appearance,
  including ranking their attractiveness in front of
  other students;
- and openly carrying on sexual relationships with
  female students.

The professors directed this behavior at more than just the
named plaintiffs and often engaged in this behavior in group
settings or in public.  See, e.g., doc. no. 28 at ¶¶ 169, 183,
187.  These allegations raise the common question whether the
professors' sexualized comments and conduct were severe,

pervasive, and objectively offensive enough for a reasonable person to consider the educational environment hostile.

Importantly, this is not a case where plaintiffs seek class certification on a hostile environment claim based on the geographically dispersed and varied conduct of many different supervisors—circumstances under which other courts have found commonality lacking. For example, in Elkins v. Am. Showa Inc., 219 F.R.D. 414 (S.D. Ohio 2002), plaintiffs sought to certify a class of female employees who worked at one manufacturing plant over a several year period, id. at 416. The court found that the women could not establish commonality on their Title VII hostile work environment claim because they failed to "show a common pattern or practice, or an equally egregious level, of sexual harassment among the various areas of the plant, among the employees supervised by different supervisors and working with different co-workers, and among the employees on different shifts." Id. at 424.

Unlike in Elkins, all putative class members here worked with one or more of the professors and were therefore exposed to the same misconduct. See Dukes, 564 U.S. at 350 (suggesting that "the assertion of discriminatory bias on the part of the same supervisor" could satisfy commonality); see also Newsome, 219 F.R.D. at 361 ("The plaintiff's burden with respect to commonality is not onerous when few decision makers at one work

location are involved."). Even though some class members may only have worked with one of the professors, all three professors are alleged to have engaged in substantially the same degrading and sexualized behavior.

Additionally, while in Elkins it appeared that there were merely pockets of hostility dispersed throughout the plant, plaintiffs here claim that the professors collectively created a climate of harassment that pervaded the entire Department, infecting both public and private meetings and formal and informal gatherings. Cf. Elkins, 219 F.R.D. at 424. Based on plaintiffs' allegations, the professors' misconduct created a baseline of equally egregious sexual harassment to which all class members were subjected.

There is no doubt, however, that class members experienced the professors' sexual harassment to different degrees. For example, several of the named plaintiffs allege that they were subjected to unwanted touching, while others allege that they were forced into nonconsensual intercourse. But the fact that class members experienced the hostile environment differently does not defeat a finding of commonality. See Applegate v. Formed Fiber Techs., LLC, No. 2:10-CV-00473-GZS, 2012 WL 3065542, at *6 (D. Me. July 27, 2012) ("Where class members have different degrees of injury or even where defenses might exist only as to particular individuals, commonality has been found

for class certification."); Brand, 302 F.R.D. at 218 ("A hostile work environment may be experienced differently from one person to the next, but it is nonetheless a single unlawful practice under Title VII." (internal quotation marks omitted)).

In sum, the court is convinced that whether the professors' conduct was sufficiently severe, pervasive, and objectively offensive enough to constitute an objectively hostile education environment is a common question that satisfies the commonality requirement of Rule 23(a)(2).  Plaintiffs need only articulate a single common question to meet the commonality requirement. Dukes, 564 U.S. at 359.  That requirement is met here.


iii. Typicality

Next, plaintiffs must show "typicality" or that their claims or defenses are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  To be typical, the representative plaintiffs' claims must "arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and [be] based on the same legal theory." Garcia-Rubiera, 570 F.3d at 460 (internal quotation marks, brackets, and ellipsis omitted).  The representative plaintiffs' claims and those of absent class members need not be identical; they need only "share the same essential characteristics." Ouadani v. Dynamex Operations E., LLC, ___ F.

Supp. 3d. ___, 2019 WL 4384061, at *8 (D. Mass. Sept. 13, 2019)
(internal quotation marks omitted).  As with commonality, "a
difference in damages arising from a disparity in injuries among
the plaintiff class does not preclude typicality."  Applegate,
2012 WL 3065542, at *6; see also Dukes, 564 U.S. at 349 n.5
(explaining that the commonality and typicality requirements
tend to "merge").

Courts have found typicality satisfied where a group of
putative class members are exposed to the systematic failures of
an institution.  See Connor B. ex rel. Vigurs v. Patrick, 272
F.R.D. 288, 293 (D. Mass. 2011) (finding typicality met where
entire class of children in custody of department of children
and families were exposed to unreasonable risk of harm);
Bremiller, 195 F.R.D. at 21-22 (finding typicality met where
representative plaintiff and class members experienced the same
kind of sexual harassment that employer failed to address).
Here, the class representatives[5] and absent class members were
exposed to the same risk of harm (the professors' sexual
harassment) by Dartmouth.  And the class representatives' and
absent class members' claims all rely on the same legal theories

---

[5] The proposed class representatives are: Rapuano, Chauhan,
Brietzke, Brown, Courtney, Evans, Doe, and Doe 2.  Jane Doe 3,
although a named plaintiff, is not a proposed class
representative.

and arise from the same course of conduct: the professors'
normalization of sexual harassment of female students that
Dartmouth facilitated through its inaction.  These facts support
a finding of typicality.  See Brown v. Cook Cty., No. 17 C 8085,
2019 WL 3776150, at *10 (N.D. Ill. Aug. 12, 2019) (finding
typicality met when all class members' claims shared common
characteristic of alleging that they were subject to hostile
work environment as a result of defendants' failure to address
sexualized behavior by inmates in the jail).

It is true that the class representatives' experiences are
likely illustrative of the most serious incidents of sexual
harassment perpetrated by the professors and allowed by
Dartmouth.  For example, plaintiff Rapuano alleges that
Professor Kelley coerced her into a two-year relationship with
him during which Kelley had intercourse with Rapuano while she
was too intoxicated to consent, consistently sent her graphic
text messages, and conditioned his academic advisement on
Rapuano's continued sexual relationship with him.  See doc. no.
28 at ¶¶ 86-125.  While the class representatives' experiences
include extreme examples of harassment, they are also emblematic
of the baseline of sexual harassment that pervaded the
Department.  See, e.g., id. at ¶¶ 172, 196.  In other words, the
representative plaintiffs experienced the barrage of comments
about their appearance and sex lives, unwanted touching, and

forced drinking that was the common experience of the class, as well as even more severe forms of harassment. See Brown, 2019 WL 3776150, at *11 (finding typicality despite fact that some class members experienced fewer sexually harassing incidents and therefore were injured to a lesser extent than others). The class representatives' claims are therefore typical of the class.

iv. Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement has two prongs: (1) "that the interests of the representative party will not conflict with the interests of any of the class members"; and that chosen counsel "is qualified, experienced and able to vigorously conduct the proposed litigation." Clough, 2019 WL 2527300, at *4 (internal quotation marks omitted).

With respect to the first prong, the court has not identified any way in which the class representatives' interests conflict with those of the unnamed class members. Nevertheless, the court notes an unusual aspect of this class action: two of the class representatives (Jane Doe and Jane Doe 2) are proceeding under pseudonyms. The court previously raised concerns about the prospect of a pseudonymous plaintiff acting

as a class representative.  See Endorsed Order (Nov. 30, 2018).
The court's reservation was based on the important role class
representatives play as the public face of the class action.
Putative class members have an interest in knowing the
identities of all class representatives so that they may assess
whether the representatives adequately represent them and
whether they wish to participate in the action.  See In re
Ashley Madison Customer Data Sec. Breach Litig., No. 2669, 2016
WL 1366616, at *4-5 (E.D. Mo. Apr. 6, 2016) (ruling that
plaintiffs could not proceed pseudonymously as class
representatives because the class members and public had
interest in knowing who was guiding and directing the
litigation).

     The court's concerns, however, are assuaged by the terms of
the proposed settlement agreement.  A provision in the proposed
settlement agreement allows putative class members to gain
confidential access to Jane Doe's and Jane Doe 2's identities.
Doc. no. 47-3 at 21-22.  This provision adequately preserves
each class member's right to know who is leading the class
action while still maintaining Jane Doe's and Jane Doe 2's
privacy.  Given this provision, the court permits Jane Doe and
Jane Doe 2 to serve as pseudonymous class representatives.[6]

---

     [6] The court observes that there remain two outstanding
motions for leave for Jane Doe 2 and Jane Doe 3 to proceed under

Turning to the second prong of the adequacy inquiry, the court is convinced that proposed class counsel, Sanford Heisler Sharp, LLP, is eminently qualified to spearhead this class action settlement. Sanford Heisler Sharp has extensive experience in litigating class actions of this nature. See doc. no. 47-8 & 47-9. It has demonstrated that experience through its performance in this litigation thus far. The adequacy requirements of Rule 23(a)(4) are satisfied.

C. Rule 23(b)(3) Requirements

As explained above, to certify a class under Rule 23(b)(3), plaintiffs must demonstrate the "predominance" of common issues over individual issues and the "superiority" of resolving the dispute via a class action. Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) includes a non-exhaustive list of factors the court should consider in making its "predominance" and "superiority" assessments:

---

pseudonyms, to which Dartmouth objected prior to the parties' mediation. Doc. nos. 29-30, & 34. The proposed settlement agreement states that the parties agree to file a joint motion requesting that the Jane Doe and Jane Doe 2 pseudonyms continue to be used on the public docket and that the parties agree that Jane Doe 3 may also proceed pseudonymously. Doc. no. 47-3 at 24-25. In light of the parties' assent and the court's approval, further motions need not be filed on this issue. The court grants the motions to proceed under a pseudonym filed by Jane Doe 2 and Jane Doe 3 (doc. nos. 29 & 30) and approves the continued use of a pseudonym for Jane Doe. The court also grants plaintiffs' related motion to seal (doc. no. 32).

> (A) the class members' interests in individually
> controlling the prosecution or defense of separate
> actions;
> (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class
> members;
> (C) the desirability or undesirability of
> concentrating the litigation of the claims in the
> particular forum; and
> (D) the likely difficulties in managing a class
> action.

Fed. R. Civ. P. 23(b)(3). Because the court is considering certification for the purposes of settlement only, it need not consider the final factor, the "manageability" of the class action. Amchem, 521 U.S. at 620.


i. Predominance

The predominance inquiry requires the court to examine "the relation between common and individual questions in a case." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016). An individual question is one where "members of a proposed class will need to present evidence that varies from member to member." Id. (internal quotation marks omitted). By contrast, a common question is one where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." Id. (internal quotation marks and brackets omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate" the action is proper under Rule 23(b)(3)—

even though other important matters, such as damages, will have to be tried separately.  Id. (internal quotation marks omitted). On the other hand, if individualized questions appear to overwhelm common ones, certification is not appropriate.  In re Nexium Antritrust Litig., 777 F.3d 9, 21 (1st Cir. 2015). Although Rule 23(b)(3) requires common issues to predominate, it "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible of classwide proof."  Id. (quoting Amgen Inc. v. Conn. Ret. Plans and Tr. Funds, 568 U.S. 455, 469 (2013)).

    To assess whether common questions predominate, the court begins by examining the elements of plaintiffs' claims.  See Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011).  Plaintiffs' lead claim is that Dartmouth violated Title IX by creating a hostile education environment for class members.  To prove a hostile education environment claim under Title IX, a plaintiff must show that: (1) plaintiff was a student; (2) who was subjected to sexual harassment; (3) based on her sex; (4) that the sexual harassment was "sufficiently severe and pervasive to create an abusive educational environment;" and (5) a basis for institutional liability exists.  Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002).  The fourth prong—whether a hostile education environment existed—calls for both objective and subjective

proof.  Keskinidis v. Univ. of Mass. Bos., 76 F. Supp. 3d 254, 257 (D. Mass. 2014).  A plaintiff must demonstrate that the harassment was so severe and pervasive that a reasonable person would find the environment hostile or abusive and that the plaintiff subjectively perceived the environment to be abusive such that it altered the conditions of her educational experience.  Brown, 68 F.3d at 540.  To satisfy the final prong of institutional liability, a plaintiff must prove that the educational institution received federal financial assistance and that "a school official authorized to take corrective action had actual knowledge of the harassment, yet exhibited deliberate indifference to it."  Frazier, 276 F.3d at 65-66.

All but one of these elements is susceptible to classwide proof.  All class members are or were, by definition, students at Dartmouth.  With respect to proof that all class members were subjected to sexual harassment based on their sex, plaintiffs have alleged that the professors normalized a culture of objectifying women that permeated the entire Department.  See doc. no. 28 at ¶¶ 35-40.  This allegation can be proven on a classwide basis.  See Howard, 2019 WL 3776939, at *9 (identifying as common question whether class members were subjected to sexual harassment because of their sex).  And, as the court explained in detail supra, whether the sexual

harassment was severe and pervasive enough for a reasonable person to find the environment hostile is a common question.

The elements underlying institutional liability can also be proven on a classwide basis.  It appears undisputed that Dartmouth is an educational institution that receives federal financial assistance.  Next, with regard to "actual knowledge," plaintiffs allege that Dartmouth received multiple reports of sexual harassment by all three professors prior to the beginning of the class period in 2012.  Whether these reports gave "actual knowledge" of the harassment to an official "who at a minimum ha[d] authority to address" the alleged harassment is a common question.  Brodeur v. Claremont Sch. Dist., 626 F. Supp. 2d 195, 207 (D.N.H. 2009).  That question will be answered in the same way for the entire class because the relevant reports of harassment preceded the class period.

Likewise, whether Dartmouth responded with "deliberate indifference" to knowledge of the existence of such sexual harassment is a common question.  The timing of the reports of harassment on which plaintiffs rely is critical to the analysis.  As noted above, all the reports of harassment were made prior to the class period.  Consequently, whether Dartmouth reacted to those reports with deliberate indifference, by, for example, failing to investigate or conducting an inadequate investigation into the reports, will depend upon Dartmouth's conduct prior to

the class period—making Dartmouth's conduct the same with
respect to all class members.  See, e.g., Brown, 2019 WL
3776150, at *13 (finding that whether employer responded to
complaints of sexual harassment ineffectively constituted common
question); Armstrong v. Whirlpool Corp., No. 3:03-1250, 2007 WL
676694, at *5 (M.D. Tenn. Mar. 1, 2007) (common question raised
about whether defendant had a general practice of not responding
to plaintiffs' complaints of a hostile work environment, which
was created or at least tolerated by supervisors).

    The element of plaintiffs' hostile education environment
claim that cannot be proven on a classwide basis is whether each
individual class member subjectively perceived the educational
environment as hostile enough to interfere with her enjoyment of
educational benefits and opportunities.  Plaintiffs' damages too
will likely vary and require individualized proof.  But "the
need for some individualized determinations at the liability and
damages stage does not defeat class certification." In re
Nexium Antitrust Litig., 777 F.3d at 21.  The court is persuaded
that the elements of liability requiring individualized
determinations do not predominate over the common questions
discussed above—especially those pertaining to Dartmouth's
institutional liability.  See Brown, 2019 WL 3776150, at *13
(concluding that subjective element of hostile work environment
claim would not predominate over other common questions); Brand,

[302 F.R.D. at 223-24](#) (fact that damages differed among plaintiffs did not undermine that the "fundamental question" of whether there was an objectively hostile work environment predominated).

Notably, if plaintiffs were seeking certification for litigation purposes, the need to litigate the individualized issue of each class members' subjective perception of the environment would likely present manageability issues at trial. Here, however, the proposed settlement will obviate the need to litigate this individualized issue and therefore manageability concerns do not undermine a finding of predominance.  See [In re Hyundai and Kia Fuel Econ. Litig.,](#) [926 F.3d at 558](#).  The court is satisfied that common questions predominate over individual issues with respect to the Title IX hostile education environment claim.

Plaintiffs assert three other claims on behalf of the class: violation of Title IX based on gender discrimination in the terms and conditions of education (count two); breach of fiduciary duty (count three); and negligent retention and supervision (count four).  The court has reviewed the elements of each of these claims and concludes that common questions—some of which overlap with issues of law or fact relevant to the hostile education environment claim—predominate over any

individualized aspects of the claims.  The court will provide a brief analysis of each claim.

In count two, plaintiffs allege a second violation of Title IX.  They assert that, by allowing the professors' misconduct, Dartmouth subjected class members to different terms and conditions of education based on their gender in violation of Title IX.  To prove a prima facie case of differential treatment under Title IX, a plaintiff must show that she "was excluded from participation, denied the benefits of, or subjected to discrimination in an educational program, that the program receives federal assistance, and that the exclusion was on the basis of [her] sex." Vaughan v. Vermont Law Sch., Inc., No. 2:10-CV-276, 2011 WL 3421521, at *4 (D. Vt. Aug. 4, 2011), aff'd, 489 F. App'x 505 (2d Cir. 2012).  As discussed above, whether discrimination occurred on the basis of sex can be determined on a classwide basis and it is undisputed that Dartmouth receives federal financial assistance.  On the other hand, whether each class member was excluded from participation, denied benefits, or otherwise discriminated against in an educational program would likely involve an individualized finding.  But like the subjective element of the hostile educational environment claim discussed above, the need for some individualized findings does not defeat predominance.  See In re Nexium Antitrust Litig., 777 F.3d at 21.

Count three alleges that under New Hampshire law Dartmouth owed its students a fiduciary duty and breached that duty by tolerating or enabling the professors to sexually harass female students, causing them injury. The New Hampshire Supreme Court has held that a college's relationship with its students gives rise to a fiduciary duty "to create an environment in which [the students can] pursue [their] education free from sexual harassment by faculty members." Schneider v. Plymouth State Coll., 144 N.H. 458, 463 (1999). This claim thus involves the common questions of whether Dartmouth owed a fiduciary duty to all class members and whether it breached that duty by failing to enforce grievance procedures, properly investigate reports of abuse, or otherwise protect the students.

Finally, count four alleges negligent supervision and retention. Plaintiffs allege that Dartmouth owed class members a duty of care to protect them from sexual harassment perpetrated by school employees and that it breached that duty by retaining and supervising the professors when it knew, or should have known, that they were unfit to supervise young female students. Under New Hampshire law, an employer may be held directly liable for damages resulting from its negligent hire, retention, or supervision of an employee. See Marquay v. Eno, 139 N.H. 708, 718 (1995); Trahan-Laroche v. Lockheed Sanders, Inc., 139 N.H. 483, 485 (1995). To prove such a claim

in the context of a school employee's alleged sexual harassment of a student, a plaintiff must show that the school owed the plaintiff a duty not to hire or retain employees that it knew or should have known have a propensity to sexually harass students. See Marquay, 139 N.H. at 720.  If a plaintiff can establish that the school knew or reasonably should have known of that propensity, the school will be liable for "the foreseeable sexual abuse of students by that employee." Id.  This claim also raises issues predominantly susceptible to classwide proof: whether Dartmouth owed plaintiffs a duty, whether it knew or should have known (prior to the class period) that the professors had a propensity for sexually harassing female students, and whether the harassment that occurred during the class period was foreseeable based on what Dartmouth knew prior to the class period.  Although damages will vary, that does not defeat a finding of predominance.  See In re Nexium Antitrust Litig., 777 F.3d at 21.  In sum, the vast majority of the elements of plaintiffs' claims can be proven by evidence common to all claims, supporting a finding of predominance.

In conducting the predominance inquiry, courts may also consider whether the class is overbroad in that it includes a substantial number of potentially uninjured class members.  See In re Nexium Antitrust Litig., 777 F.3d at 19; Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1136 (9th Cir. 2016).  Here, the

class is defined in a way that minimizes the potential for inclusion of uninjured class members. All subsets of the class, save one, define class members as graduate or undergraduate students who worked directly with one of the professors—meaning that, by definition, these class members were exposed to the sexualized climate of the Department. The only subset of the class (referred to above in paragraph A(iv) of the class definition) that includes students who did not work directly with the professors requires those putative class members to attest to experiencing harm as a result of the professors' misconduct before they can recover under the settlement agreement. This requirement ensures that all class members were exposed to and harmed by the common injury of the professors' sexual harassment tacitly permitted by Dartmouth.

Despite this well-crafted class definition, it is plausible that there exist some putative class members who were exposed to the professors' misconduct and yet were ultimately not harmed by it. The law is clear, however, that the existence of a de minimis number of potentially uninjured class members will not defeat a finding of predominance. See In re Nexium Antitrust Litig., 777 F.3d at 25 (collecting cases in support); Torres, 835 F.3d at 1136. There is no indication here that there exist more than a de minimis number of potentially uninjured class members. Thus, the court finds that the predominance

requirement of Rule 23(b)(3) is sufficiently met for preliminary certification of the class.

ii. Superiority

Under Rule 23(b)(3), the court must also consider whether a class action is a "superior" method of resolving the suit, taking into account the several factors outlined above. Fed. R. Civ. P. 23(b)(3). The superiority requirement "ensures that litigation by class action will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. CV 14-MD-02503, 2017 WL 4621777, at *21 (D. Mass. Oct. 16, 2017) (internal quotation marks and ellipsis omitted). Typically, in considering superiority, the court compares the prospect of a class action against the alternative of class members pursuing individual suits against the defendant. See George Lussier Enter., Inc. v. Subaru of New England, Inc., No. CIV. 99-109-B, 2001 WL 920060, at *6 (D.N.H. Aug. 3, 2001).

Based on the issues common to all class members as discussed above, a class action would achieve an efficient resolution of the class claims, avoiding unnecessary and duplicative litigation for all parties and the judicial system.

See George Lussier Enter., 2001 WL 920060, at *6; In re Solodyn, 2017 WL 4621777, at *21.  Further, plaintiffs have represented that they are unaware of any individual actions by class members that are currently pending, so a class action would not undermine any ongoing individual suits.

Finally, a classwide resolution is particularly attractive here given the unlikelihood that individual class members would pursue individual suits.  Indeed, some courts have recognized that class adjudication of sexual abuse claims is preferable to individual litigation because it encourages more victims to come forward and avoids re-traumatization.  See Jane Doe 30's Mother v. Bradley, 64 A.3d 379, 382 (Del. Super. Ct. 2012) (approving class action settlement of claims against employer of doctor who sexually abused minor patients in part because the victims "would have been emotionally traumatized by separate litigation and trials"); Doe v. Roman Catholic Diocese of Covington, No. 03-CI-00181, 2006 WL 250694, at *5 (Ky. Cir. Ct. Jan. 31, 2006) (approving class action settlement involving claims against Catholic Diocese that minors were sexually abused by various priests and employees and observing that the class action "encouraged a large number of people to come forward who would otherwise never have done so"); cf. Ramirez v. DeCoster, 203 F.R.D. 30, 37 (D. Me. 2001) (preliminarily certifying for settlement purposes class of migrant workers who alleged

discriminatory employment practices when it was unlikely that class members would achieve any recovery in the absence of a class action).  The court finds that the superiority requirement of Rule 23(b)(3) is met for the purposes of preliminary certification.

In sum, the court finds that it will likely be able to certify the proposed class for the purposes of settlement only. See Fed. R. Civ. P. 23(e)(1)(B)(ii).


II.  <u>Preliminary Approval of Proposed Settlement</u>

At the final approval stage, the court must be satisfied that the proposed class action settlement is "fair, adequate, and reasonable." Fed. R. Civ. P. 23(e)(2); City P'ship Co. v. Atl. Acquisition Ltd. P'ship, 100 F.3d 1041, 1043 (1st Cir. 1996).  But at this preliminary stage, the court need only be satisfied that it will "likely" be able to make those findings. Fed. R. Civ. P. 23(e)(1)(B).  This threshold may be met by showing that the proposed settlement falls "within the range of possible final approval" and that it is not "illegal or collusive." Scott v. First Am. Title Ins. Co., No. CIV. 06-CV-286-JD, 2008 WL 4820498, at *3 (D.N.H. Nov. 5, 2008); <u>see also</u> Michaud, 2015 WL 1206490, at *9.  Whether the parties have engaged in "sufficient discovery" and whether they have "bargained at arms-length" are important to this inquiry.

*Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 343 (D. Mass. 2015) (internal quotation marks omitted), aff'd, 809 F.3d 78 (1st Cir. 2015).

The court has reviewed the proposed settlement agreement. The settlement offers both monetary and programmatic relief to the proposed class. Dartmouth will pay the class settlement amount of $14,000,000, from which both awards to class members and attorney's fees and costs will be paid. In exchange, all class members who do not opt out of the settlement will release Dartmouth from any and all claims against it arising out of the same factual circumstances that were or could have been asserted in this lawsuit. Class members are not, however, barred from pursuing litigation against the professors individually.

All class members who do not opt out, except those in class (A)(iv) as described above, will receive a base payment of $1,000. Class members who fall in the category described by (A)(iv) of the class definition must submit a claim form attesting that they suffered dignitary, emotional, educational and/or professional harm during the class period as a result of the misconduct of one or more of the professors before they can receive the base payment. All class members are also eligible to receive a supplemental payment in addition to the base payment. To receive a supplemental payment, class members must timely submit a claim form describing the impact the professors'

misconduct had on their lives. These claim forms will be kept confidential and reviewed by an independent claims expert who will determine each class member's pro rata share of the remaining settlement funds. This claims process ensures that all class members receive some recompense and establishes a reasonable and confidential mechanism for apportioning additional compensation according to relative harm suffered.

Dartmouth has also agreed to provide the following programmatic relief: (1) pay an additional $1,000,000 over the next 10 years to the Provost's Diversity Recruitment Fund to assist in hiring diverse faculty with expertise in gender and racial discrimination and violence; (2) add two new positions to Dartmouth's External Advisory Committee to foster independent oversight of the climate and culture at the college; and (3) reevaluate Dartmouth's partnership with WISE (an organization aimed at combating gender-based violence) and either add an additional WISE staff member on campus or provide $500,000 to financially support WISE over a five-year period.

Before reaching these proposed terms, both parties engaged in significant discovery. Dartmouth retained an independent investigator who interviewed dozens of witnesses and collected documentary and electronic evidence over an eleven-month period. Plaintiffs' counsel received copies of that investigator's reports and conducted their own, independent investigation.

Following this discovery, the parties engaged in three full days of mediation with the assistance of the Honorable Robert Morrill.  Additional negotiations followed the mediation before the parties reached the terms of the proposed settlement.  Given the terms of the proposed settlement, the parties' discovery efforts, their arms-length negotiations, and the participation of experienced counsel, the court finds that it will likely be able to find the settlement proposal fair, reasonable, and adequate.  See City P'ship, 100 F.3d at 1043 ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement.").

In addition to preliminarily approving the proposed class action settlement, the court appoints as Class Counsel David W. Sanford, Deborah K. Marcuse, Steven J. Kelley, Nicole E. Wiitala, and Austin L. Webbert of Sanford Heisler Sharp, LLP to represent the class for the purposes of settlement.  It also appoints the following individuals as class representatives: Kristina Rapuano, Vassiki Chauhan, Sasha Brietzke, Annmarie Brown, Andrea Courtney, Marissa Evans, Jane Doe, and Jane Doe 2. And the court appoints Maria C. Walsh to serve as the Independent Claims Expert as defined by the proposed settlement agreement.

III. <u>Notice</u>

Because the court has concluded that it will likely be able to certify the proposed class for the purposes of settlement and approve the proposed settlement, the court orders Class Counsel to direct notice to all class members.  <u>See</u> Fed. R. Civ. P. 23(e)(1)(B).  Under Rule 23(c), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The court has reviewed the two proposed notice forms—one for individuals potentially falling into category (A)(iv), and one for all other putative class members.  Doc. no. 47-4 & 47-5.  The form and substance of these notices complies with Rule 23(c)(2)(B).  The court also approves the form and substance of the proposed Claim Form.  The court appoints Rust Consulting, as suggested by plaintiffs, as the Settlement Administrator, which will provide notice to the class and administer the settlement.

The court directs Class Counsel to send notice by first-class U.S. mail in substantially the same form as presented in document numbers 47-4 & 47-5 to the class on or before February 12, 2020.  The Settlement Administrator may distribute a duplicate notice by email to the extent possible.  Notice shall

also be posted on the Settlement Administrator's website. Dartmouth shall cooperate with Class Counsel and the Settlement Administrator in identifying class members and providing reasonably available contact information. At or before the fairness hearing, Class Counsel shall file proof of dissemination of notice to the class.

**CONCLUSION**

For the foregoing reasons, the court grants plaintiffs' motion for preliminary approval of the proposed class action settlement (doc. no. 47) and finds it likely that the court will be able to certify the proposed class for the purposes of settlement. The court also grants the motions to proceed under a pseudonym filed by Jane Doe 2 and Jane Doe 3 (doc. nos. 29 & 30) and the related motion to seal (doc. no. 32). As explained in detail above, the court has also appointed Class Counsel and Class Representatives. The court directs Class Counsel to distribute notice to the class as outlined above. The court will hold a fairness hearing on June 25, 2020, at 10:00 a.m. to assist the court in determining whether to grant final approval of the proposed class action settlement. Plaintiffs shall file any pleadings in support of final approval, including an application for attorney's fees and costs, no later than May 26, 2020, (30 days prior to fairness hearing) and any supplemental

pleadings no later than June 18, 2020 (7 days prior to the
fairness hearing).

    SO ORDERED.

_____
Landya McCafferty
United States District Judge

January 29, 2020

cc:  Counsel of Record.