# Exhibit 5

UNITED STATES DISTRICT COURT
THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KRISTINA RAPUANO, VASSIKI CHAUHAN, SASHA BRIETZKE, ANNEMARIE BROWN, ANDREA COURTNEY, MARISSA EVANS, JANE DOE, JANE DOE 2, and JANE DOE 3,<br><br>*Plaintiffs, on behalf of themselves and all others similarly situated,*<br><br>v.<br><br>**TRUSTEES OF DARTMOUTH COLLEGE,**<br>*Defendant.* | **Hon. Landya B. McCafferty, U.S.D.J.**<br><br>Case No. 1:18-cv-01070 (LM)<br><br>**DECLARATION OF VASSIKI CHAUHAN** |

I, Vassiki Chauhan, hereby declare as follows:

1. I make this Declaration in support of Plaintiffs' Motion for Final Approval of the Class Settlement and Plaintiffs' Motion For Attorneys' Fees, Costs, and Service Awards.

2. I make this Declaration based upon personal knowledge. If called and sworn as a witness, I would testify competently as to the facts in this Declaration.

3. I am a Plaintiff and a Class Representative in this lawsuit.

**The Steps I Have Taken to Protect the Interests of the Class and the Degree to Which the Class Has Benefitted from those Actions**

4. From the beginning when I joined the suit, I understood that as a Class Representative, I had a duty to ensure that the interests of all class members were protected and that I needed to make decisions with those interests in mind. I understood that this meant that I could not put my own interest before the interests of the Class, if ever there were a conflict between our interests.

5. While I knew it would be a hard road, I chose to be a Class Representative to prevent future harm and to bring some semblance of justice to those who had suffered before me.

1

It bothers me when people blame victim/survivors of sexual violence for not speaking up about their trauma before they are ready, and then call them "brave" and valorize them when they do so. Both behaviors deprive victims/survivors of their humanity and their sense of agency. Being a Class Representative was my own choice, and I made it not because I stand on a moral high ground, but because I was aware that others had suffered in similar ways to me. I happened to be in a position that allowed me to reframe the worst experience of my life in a way that could be meaningful for more people. I understood that I would be required to commit to providing meaningful assistance to our lawyers as the prosecution of this case moved forward.

6.      I believe I have fulfilled, and I continue to fulfill, my duties to the Class. I have been actively involved in the litigation of this case, as described more fully below, and have been in close contact with the attorneys representing the Class in order to monitor and contribute to this case since I joined.

7.      I believe that this settlement brings substantial benefits to the class. The monetary component of the settlement enables class members to receive substantial compensation in a fair and equitable way without having to testify publicly, either in court or at a deposition, about their personal experiences. The very public nature of litigation has had impacts on my personal relationships, my career and most devastatingly, on my mental health. This experience will take me a long time to recover from, and I am truly thankful that other class members don't have to experience any of it.

8.      Serving as a Class Representative has allowed me to look beyond my own interests. The experiences described by the Plaintiffs in this case are painfully prevalent in academia, and it is a very rare occurrence to get any form of closure. We are the lucky few. While I am glad that this Settlement will bring some relief to all Class Members, I am also grateful that it might have

validated the experiences of many victims/survivors who do not have the means to make the decisions we had the privilege to make. The hope of offering that validation, and of making young researchers in academia feel seen, heard and represented has been my fuel.

### The Amount of Time and Effort I Have Expended in this Action

9. Since I first became involved in this litigation in November 2017, I estimate that I have spent over two hundred (200) hours performing actions that benefitted the Class at large, including participating in mediation and helping to craft a plan for Class-wide relief that I am confident will effect meaningful change at Dartmouth and provide meaningful redress for members of the Class. A summary of my activities is as follows:

   a) In the months leading up to the filing of the Complaint, I dedicated many hours to assisting with the investigation of the class action. I carried out multiple full initial investigative interviews with Class Counsel and shared my knowledge of Dartmouth's culture and policies and practices. After my initial interview, my attorneys and I had many calls and exchanged many emails regarding my claims and the class claims.

   b) I helped my attorneys prepare the lengthy Class Action Complaint. I had numerous phone calls with my attorneys, reviewed drafts of the Complaint, and made edits to it before it was filed. I then reviewed the final work product after the Complaint was filed.

   c) After the filing of the Complaint, I conferred with my attorneys to help them prepare my EEOC charge. I reviewed and edited this document before it was filed.

   d) I helped my attorneys prepare the First Amended Complaint and reviewed the final work product after it was filed.

e) I spent a significant amount of time gathering and reviewing documents and other potential information about the case and my claims. I looked for documents in hard copy and in my emails, text messages, and other electronic files. I also turned over access to my personal email accounts and my cell phone—which I found extremely invasive—in the name of service to the Class. I also reviewed documents with my attorneys.

f) I conferred with my attorneys regarding our initial disclosures, including making lists of witnesses and the locations of various documents. I also had conversations with my attorneys about this process.

g) I also prepared for, attended, and actively participated in three full days of mediation and settlement negotiations. I barely slept for three days, and will always remember this period as one of the most challenging ones in my life. Prioritizing the interests of the class and engaging in difficult conversations with other Class Representatives to build consensus was incredibly hard work. Everything I have been able to do has been due to the support of these women. I estimate that I spent about one hundred (100) hours preparing for and participating in the mediation:

  (1) To prepare for the mediation, I drafted and edited a victim impact statement, which was an extremely difficult and re-traumatizing experience; participated in extensive phone calls and conference calls with my attorneys leading up to the mediation; reviewed the Mediation Statement; and worked on a programmatic relief proposal with my attorneys and my expert.

4

      (2)      To attend the mediation, I travelled from New Hampshire to Boston (on July 23, 2019) and then back again (on July 27, 2019).

      (3)      The mediation and settlement negotiations, which I participated in, took place on July 24-26, 2019 (three full days). I worked almost nonstop for these three days. It was during this time that it dawned on me that not only had I managed to conduct graduate research, dedicating time to this case had been like a part time job for three years. The actual mediation sessions and negotiations totaled about thirty (30) hours (10 ½ hours on the first day, 9 ½ hours on the second day, and 10 hours on the third day).

      (4)      During the mediation, I also spent many hours meeting with my attorneys. We met the day before the mediation for several hours. We also met early before each day of negotiations. After each day of mediation concluded, I spent several hours meeting with my attorneys and/or my co-Plaintiffs, sometimes late into the night. I also spoke with our expert in preparation for the next day of negotiations. I barely slept the night before the third day of negotiations and spent almost the entire night working on our programmatic relief proposal—and then spent ten hours negotiating.

h)      After the mediation and negotiation sessions on July 24-26, 2019, settlement negotiations continued for several weeks. I actively participated in these ongoing discussions with my attorneys and spent a significant amount of time working to finalize the settlement.

5

      i)        I then reviewed the Settlement Agreement and related documents.

      j)        I participated in regular conversations with my attorneys throughout the duration of this case, with calls often lasting over an hour and sometimes as often as several times a day. There were also substantial additional communications by way of frequent and regular email correspondence.

      k)        I also met with my attorneys in person on seven occasions (in addition to the day before the mediation). I travelled to New York to meet with my attorneys on November 13-15, 2018; March 20, 2019; March 21, 2019; and March 22, 2019. In April 2018, I met with my attorneys in New Hampshire.

10. Finally, one of the most significant services that I believe I contributed to the Class is that I agreed to be interviewed by several major media outlets covering the case. I ordinarily would have declined to speak with a major news outlet about such an intimate topic, but I believed that it was my duty as a Class Representative to raise awareness about my experiences at Dartmouth and ensure that other members of the class knew about the existence of our class action and could stay informed. A few months preceding this time period, I was steeped in self-doubt, self-blame and denial, and I found myself describing my trauma again and again to national and international news outlets.

## Duties to the Class Going Forward

11. If the settlement is approved, all Plaintiffs will have an ongoing duty to monitor the programmatic relief with Class Counsel for several years. The other Plaintiffs and I will work with Dartmouth in proposing nominees for the External Advisory Committee. We will also meet with the External Advisory Committee to recommend strategies, resources, and/or sources of expertise, and to share any information in any format we believe might be relevant to the C3I initiative. We will also meet with the Provost to ensure continuing dialogue and feedback on the

6

implementation of these programmatic measures. I anticipate spending many hours on these ongoing duties (in addition to the hours I have already expended), and I have been acting as the point person for the Plaintiffs and the Provost's office to facilitate these conversations.

12. In spite of several difficult memories at Dartmouth, I am committed to improving things that can be improved. In addition to discussing policies around sexual harassment with the Provost, I am continuing to spark discussions about the value of graduate student labor as a representative of the department in Dartmouth's Graduate Student Council. I am working with several well intentioned individuals to bring restorative justice to the Department, to the best of our ability. However, the greatest material change I have contributed to comes from the programmatic relief component of the settlement, and the relief that class members are now entitled to. The local non-profit, WISE Upper Valley, that was recognized in the programmatic relief, has been an indispensable source of comfort to me in the most trying of times, and it feels particularly special to encourage Dartmouth to recognize the proximity and the value of this incredible resource. I don't know where I would have been without the support and empathy I got from the WISE campus advocate.

### Negative Effects, Risks, and Stresses of Participating in This Litigation

13. Though I have conviction in the choices I have made so far, participating as a Plaintiff in this action has come with many risks, burdens, and negative effects.

14. The decision to come forward as a named Plaintiff in a publicly filed case was very difficult. I was terrified of continuing to pursue my Ph.D. in the department after brining a lawsuit against Dartmouth. I was aware that my decision was going to irreparably hurt my career, and as a woman of color and non-citizen of the US, the odds were already stacked against me. I was nervous that my loved ones would have to bear the burden of my decision. It was also difficult to

entertain the possibility that my colleagues might resent me for shedding a negative light on the Department, and blame me for the loss of funding, recruitment and reputation. I was nervous about hurting the people that I cared about, and about letting down the people who believed in me. It was even more difficult to anticipate the pity and/or disbelief I might encounter in response to my report of sexual assault. The hardest thing to entertain was that in spite of putting the entire weight of my identity behind my decision to come forward, nothing would change. However, I ultimately chose to use my real name because I thought it would lend credibility to my experiences.  I also wanted to ensure that if someone saw themselves in my experience, they would know exactly who to reach out to.  I hope that as more and more individuals with different identities and backgrounds share their stories, the world will become more accepting of those differences and open to unanticipated narratives. My hope was to demonstrate that it is possible for women of color, albeit for one with substantial caste, class and educational privilege, to seek recourse through the legal system.

15.     Given the close-knit nature of my field, I took substantial risks in my own career by stepping forward in this lawsuit.  I can't remember the number of times I have been given the advice that I should establish my place in academia before making an attempt to "fix it," and I chose to act in direct contradiction to that advice. I have also made the decision to leave academia, which I believe is, at least in part—possibly in large part—due to my experiences as a Plaintiff in this lawsuit.  I sense that my name will continue to be associated with this lawsuit within my scientific community, and while I am not ashamed of that, I am not keen on living with that baggage either. I have missed out on important professional relationships because several people have automatically assumed that I "need time," and there have been stretches of time when the work I have had to do for the lawsuit has exceeded my capacity of staying focused, concentrated

and motivated. I have deeply enjoyed conducting research about the human brain and behavior, but because of the lawsuit, a life path that includes research for research's sake does not feel like an option for me anymore. This feels like a sacrifice, because it is not just a loss of a career, but of a dream I had since I was 14 years old.

16.   My parents used to be very proud that I was pursuing a Ph.D. in an Ivy League University. In India, it is more difficult to obtain a U.S. Visa for higher education than to get accepted at an American University, and at times I have felt that by coming forward, I was "wasting" an opportunity at the "American dream" that so many others have been denied. However, I want to live in a world where people who are at greater risk aren't more tolerant of abuse, and speaking up was a way to picture a different world. Coming forward has potentially cost me not just my career of choice, but my ability to continue working in the country that has been home for the last five years.

17.   Like other jobs, professional networks are really important in academia. Recommendation letters are an integral part of continued funding and finding new opportunities. In my highly concentrated, competitive field of research, the number of available positions is limited, and support from senior scientists matters. Even as the Department is healing from collective trauma and grappling with the implications of the events in the past several years, I don't have an easy time living in Hanover or being productive in my place of work (Dartmouth campus). I am hyper vigilant of who I might run into, as I am aware that several individuals hold me responsible for Dr. Dave Bucci's tragic demise. Several professors have extended their time and their support, but continuing to work on my Ph.D. is not a pleasant or enjoyable experience. Early on, I used to journal repeatedly about relishing the fact that nobody could take away my passion for science from me, but even that sentiment has dissipated over time. Now, all I want to do is to

retain the skills that I have acquired while maintaining my mental health. Thankfully, I still love analyzing data and writing code.

18.     This case was widely covered by major media outlets.  The highly publicized nature of this lawsuit made participating as a Plaintiff extremely stressful, taxing, and traumatic.  A google search of my name yields results describing, in detail, deeply personal accounts of the sexual harassment, assault, and trauma that I experienced.

19.     I was attacked on social media for coming forward.  Even though our public filing came amidst a cultural moment when the American people were more receptive to stories of sexual harassment and violence than they have ever been before, some of my worst fears came true. A victim-blaming mentality was demonstrated by strangers in the "comment" sections of national and international media outlet websites. Internet comments about the credibility of our complaints given the perceived attractiveness of the Plaintiffs were commonplace. We were heralded as heroes or liars—nothing in between. The focus of a lot of comments, and even the articles themselves, were the salacious details of our allegations rather than the important facts we attempted to raise about the impact of power differentials in academia. Most prevalent was the comment that we were "doing it all for money."

20.     In addition to the response on social media in the wake of the public filing, a particularly trying incident was *The New York Times*' decision to publish an article in January 2020, speculating about the relationship between the tragic loss of Dr. Dave Bucci and our lawsuit. This article acted as ammunition for social media attacks on us. In the time when all I wanted to experience was grief, solidarity and self-reflection, and be a source of support to my friends who were close to Dr. Bucci, I was attacked in a very public manner.

21. The emotional distress that comes with being a Plaintiff in this type of case cannot be understated. I have been deeply depressed and contemplated self-harm. Every cell of my body is exhausted. Throughout this lawsuit, I have had to recount my experiences over and over and over again. The re-traumatization that comes from that is debilitating.

22. When we filed this lawsuit, I was (and still am) pursuing my PhD at Dartmouth. We filed the lawsuit a year and a half ago, and all this time, I have had to go to work on Dartmouth's campus. I have lost friends and colleagues who disagree with my decision to be a Plaintiff. It has been uncomfortable for me to come to campus every day knowing that some people are discussing the credibility of my claims, or thinking that I am responsible for the death of their colleague. Some people just pity me. It feels like every semblance of professionalism has dissipated. I am aware that some of the discomfort, even paranoia, that I experience while pursuing my Ph.D. might come from within, but the effect that this state of mind has on my work is very real and very tangible.

23. Being a Plaintiff has also had an impact on my relationships with my family. When we publicly filed our lawsuit in November 2018, there was a heavy snowstorm in New York, but it was a day that I woke up with a sense of pride. The main concern on my mind was how my parents, who live in India, would respond. I had no idea whether—or to what extent—our lawsuit would be covered by the media. I had tried to prepare my parents for what was going to happen, but even I was not in a position to predict how things would go, what would be written, and how people would react. Although my parents were initially supportive in the weeks leading up to the filing, they had a very different reaction to the very public revelation of intimate and painful details of my life. Societal image is extremely important to my family, and I felt like they were disappointed in me for making the decision to come forward as a Plaintiff. They asked me to

refrain from responding to interview requests from Indian media outlets, and stopped telling friends and relatives where I was pursuing my Ph.D. to prevent them from encountering material about the lawsuit. My life was, thankfully, not all hardship, because in December 2018 I married my husband—but that was only one month after the lawsuit was filed. Unfortunately, when I think about the year 2018, our wedding is not the first thing that comes to mind. Instead, I think about the lawsuit.

24.     Despite these concerns, I decided to join this lawsuit and serve as a Class Representative because I was made aware that I wasn't the only person who had been mistreated by the three former professors, and I felt strongly about ending the abuse. My primary goal in serving as a Class Representative was to offer something akin to closure to the past targets of abuse at the hands of the three professors and bring justice for them.

25.     I also wanted to contribute to the conversation about the sexual power politics of academia and to use my experience to inform policy surrounding reporting harassment and bias, sexual or otherwise. I have always been deferential to authority and a pacifist by nature, but the extent and the egregiousness of the former professors' abuse was sufficient to break patterns of a lifetime. Sexual assault by itself is hard enough to heal from, and the experience of reporting it further delayed, if not complicated, the process of moving on. I didn't want this experience and my labor to go unnoticed, and I wanted to set a precedent that encouraged institutions of higher education to factor in the integrity and the suffering of victims/survivors and whistleblowers who report sexual harassment and violence. Those who come forward to report instances of sexual harassment and violence often have to put their entire lives on pause, and they deserve empathy rather than suspicion when they choose to report. By coming forward as a Plaintiff, I hoped to lend my voice to those who didn't have the means or the opportunity to demand their rights. I believe

that those who have suffered at the hands of people with power should have the chance to share their truth and fight for their rights like those who benefit from said power are entitled to, especially in institutes of higher education.

### Approval of the Settlement

26. I was not promised any amount of money in connection with my support of this settlement or any prior settlement with Dartmouth. My approval of this settlement is based on my view that, in light of the record and the risks, it is in the best interests of the class. I authorized the proposed settlement of $14 million and programmatic relief with Dartmouth, and I believe that the proposed settlement is fair, adequate, and reasonable.

27. I also believe that the proposed allocation plan is fair, reasonable, and adequate, and does not impermissibly favor some class members over others.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 26, 2020                             /s/ Vassiki Chauhan
                                                Vassiki Chauhan

13