# Exhibit 7

# UNITED STATES DISTRICT COURT
# THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **KRISTINA RAPUANO, VASSIKI CHAUHAN, SASHA BRIETZKE, ANNEMARIE BROWN, ANDREA COURTNEY, MARISSA EVANS, JANE DOE, JANE DOE 2, and JANE DOE 3,**<br><br>*Plaintiffs, on behalf of themselves and all others similarly situated,*<br><br>v.<br><br>**TRUSTEES OF DARTMOUTH COLLEGE,**<br><br>*Defendant.* | **Hon. Landya B. McCafferty, U.S.D.J.**<br><br>Case No. 1:18-cv-01070 (LM)<br><br>**DECLARATION OF ANNEMARIE BROWN** |

I, Annemarie Brown, hereby declare as follows:

1. I make this Declaration in support of Plaintiffs' Motion for Final Approval of the Class Settlement and Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards.

2. I make this Declaration based upon personal knowledge. If called and sworn as a witness, I would testify competently as to the facts in this Declaration.

3. I am a Plaintiff and a Class Representative in this lawsuit.

**The Steps I Have Taken to Protect the Interests of the Class and the Degree to Which the Class Has Benefitted from those Actions**

4. From the beginning when I joined the suit, I understood that as a Class Representative, I had a duty to ensure that the interests of all class members were protected and that I needed to make decisions with those interests in mind. I understood that this meant that I could not put my own interest before the interests of the Class, if ever there were a conflict between our interests. I also understood that I would be required to commit to providing meaningful assistance to our lawyers as the prosecution of this case moved forward.

1

5. I believe I have fulfilled, and I continue to fulfill, my duties to the Class. I have been actively involved in the litigation of this case, as described more fully below, and have been in close contact with the attorneys representing the Class in order to monitor and contribute to this case since I joined.

6. I believe that this settlement brings substantial benefits to the class. The monetary component of the settlement enables class members to receive substantial compensation in a fair and equitable way without having to testify publicly, either in court or at a deposition, about their personal experiences. In fact, not having to testify publicly is a substantial benefit because of the mental and emotional trauma it would resurface for each class member personally, as well as for the bystanders, including my own students and their families who would be unnecessarily adversely affected. Each member has been impacted enough, over a substantial period of time—including via press coverage that was intended to be helpful, but ultimately resurfaced pain for all.

7. I believe that this settlement, and the process that we've undergone to effect it, has advanced the treatment of similarly affected women, both at Dartmouth and beyond. I am grateful to have contributed to awareness, and to have added to the menu of potential remedies available to survivors who are in the intense academic atmosphere in which we suffered. It is my sincere hope that the actions of myself and my co-Plaintiffs, and the national conversation we have helped to advance about the power imbalance in academia, will prevent something like this from happening again.

**The Amount of Time and Effort I Have Expended in this Action**

8. Since I first became involved in this litigation in August 2018, I estimate that I have spent over three hundred (300) hours performing actions that benefitted the Class at large, including participating in mediation and helping to craft a plan for Class-wide relief that I am

confident will effect meaningful change at Dartmouth and provide meaningful redress for members of the Class. A summary of my activities is as follows:

- a) In the months leading up to the filing of the Complaint, I dedicated many hours to assisting with the investigation of the class action. I carried out multiple full initial investigative interviews with Class Counsel and shared my knowledge of Dartmouth's culture and policies and practices. After my initial interview, my attorneys and I had many calls and exchanged many emails regarding my claims and the class claims.

- b) I helped my attorneys prepare the detailed Class Action Complaint. I had numerous phone calls with my attorneys, reviewed drafts of the Complaint, and made edits to it before it was filed. I then reviewed the final work product after the Complaint was filed.

- c) After the filing of the Complaint, I conferred with my attorneys to help them prepare my EEOC charge. I reviewed and edited this document before it was filed.

- d) I helped my attorneys prepare the First Amended Complaint and reviewed the final work product after it was filed.

- e) I spent a significant amount of time gathering and reviewing documents and other potential information about the case and my claims. I looked for documents in hard copy and in my emails, text messages, and other electronic files. I also turned over access to my personal email accounts and my cell phone—which I found extremely invasive—in the name of service to the Class. I also reviewed documents with my attorneys.

f)     I conferred with my attorneys regarding our initial disclosures, including making lists of witnesses and the locations of various documents. I also had conversations with my attorneys about this process.

g)     I also prepared for, attended, and actively participated in three full days of mediation and settlement negotiations. These activities, alone, amounted to more than one hundred (100) hours of my time.

    (1)     To prepare for the mediation, I drafted and edited a victim impact statement which dug into and amplified the trauma of my treatment in the lab where I had spent so much of the time that I had considered the pinnacle of my education; participated in extensive phone calls and conference calls with my attorneys leading up to the mediation; reviewed the Mediation Statement; and worked on a programmatic relief proposal with my attorneys and my expert.

    (2)     I travelled from New Hampshire to Boston (on July 23, 2019) and then back again (on July 26, 2019) in order to attend the mediation.

    (3)     The mediation and settlement negotiations, which I participated in, took place on July 24-26, 2019 (three full days). I worked almost nonstop for these three days. The actual mediation sessions and negotiations totaled about thirty (30) hours (10 ½ hours on the first day, 9 ½ hours on the second day, and 10 hours on the third day).

    (4)     During the mediation, I also spent many hours meeting with my attorneys. We met the day before the mediation for several hours. We also met early before each day of negotiations. After each day

        of mediation concluded, I spent several hours meeting with my attorneys and/or my co-Plaintiffs, sometimes late into the night. I also spoke with our expert in preparation for the next day of negotiations.

    (5)    The programmatic relief portion of the settlement was extremely important to me. Before the mediation, I spent many hours discussing programmatic relief with my attorneys, working with an expert, and researching in order to come up with a proposal that was meaningful and beneficial to the Class.

h)    After the mediation sessions, settlement negotiations continued for several weeks. I actively participated in these ongoing discussions with my attorneys and spent a significant amount of time working to finalize the settlement.

i)    I then reviewed the Settlement Agreement and related documents.

j)    I participated in regular conversations with my attorneys throughout the duration of this case, with calls often lasting over an hour and sometimes as often as several times a day. There were also substantial additional communications by way of frequent and regular email correspondence.

k)    I also met with my attorneys in person on five occasions (in addition to the day before the mediation). I travelled to New York to meet with my attorneys on November 13-15, 2018; March 21, 2019; and March 22, 2019.

9.    Finally, one of the most significant services that I believe I contributed to the Class is that I agreed to be interviewed by several major media outlets covering the case. I ordinarily would have declined to speak with a major news outlet about such an intimate topic, but I believed

that it was my duty as a Class Representative to raise awareness about my experiences at Dartmouth and ensure that other members of the class knew about the existence of our class action and could stay informed.

### **Duties to the Class Going Forward**

10.     If the settlement is approved, all Plaintiffs will have an ongoing duty to monitor the programmatic relief with Class Counsel for several years.  The other Plaintiffs and I will work with Dartmouth in proposing nominees for the External Advisory Committee.  We will also meet with the External Advisory Committee to recommend strategies, resources, and/or sources of expertise, and to share any information in any format we believe might be relevant to the C3I initiative.  We will also meet with the Provost to ensure continuing dialogue and feedback on the implementation of these programmatic measures.  I have already dedicated time and effort to these responsibilities, and I anticipate spending many hours on these ongoing duties.

### **Negative Effects, Risks, and Stresses of Participating in This Litigation**

11.     Though I am proud of the work that we have done, participating as a Plaintiff in this action has come with many risks, burdens, and negative effects.

12.     The decision to come forward as a named Plaintiff in a publicly filed case was very difficult. Although I felt strongly that using my own name would signify courage to women who came behind me, I also knew that this visibility could affect my future employability.  I worked very hard for my name to mean something as a credentialed scientist and professor; I did not want my name to become a de facto impediment to my future. However, I ultimately chose to use my real name because I felt a responsibility to my co-plaintiffs, the women who still struggled to contribute their similar stories to our cause, and to my own students. I felt it was my duty to protect the futures of those who were not yet in a position to stand alone to defend theirs, and to stand up

for all young and rising female scientists who could need the example of bravery I and many of my co-plaintiffs would be setting in facing this head-on.

14. Given the close-knit nature of my field, I took substantial risks in my own career by stepping forward in this lawsuit. I knew that women who have stepped forward in the past have been sidelined, and their career goals thwarted by similar actions. The path to academic teaching jobs, and tenure in these fields, is very subjective as well, and I couldn't be sure my history of speaking out by joining this action as a Plaintiff wouldn't negatively affect future decisions—in spite of objective evaluative criteria, such as the consistently high ratings and glowing reviews in student evaluations from each course I taught at Dartmouth.

14. My productivity at work has suffered throughout the course of the lawsuit. I lost hours and energy to the efforts required of me as a Plaintiff. Moreover, due to my visibility as a public figure in the lawsuit, I took on hours of unseen labor acting as a confidante and advisor to my students who sought the opportunity to speak on these issues.

15. This case was widely covered by major media outlets. The highly publicized nature of this lawsuit made participating as a Plaintiff extremely stressful, taxing, and difficult. A google search of my name yields results describing, in detail, deeply personal accounts of the sexual harassment, assault, and trauma that I experienced.

16. I was also attacked on social media for coming forward. These attacks started with widely shared opinions as one claiming that "victims…should be deeply ashamed of their scorched earth tactics…" There were also more personal attacks, such as "who would believe the ugly ones?" I was specifically targeted on an individual basis and called "nasty," "disgusting," "laughable," "shameful," a "fraud," an "imposter," "the opposite of a victim," and accused of "doing this for the $$$$$" and "spreading [my] legs to 'alleged' predators for years."

7

After the suicide of my colleague and former head of the department was blamed publicly on his involvement in our lawsuit, I was called a "liar," a "murderer," and told that I should "burn in hell."

17. Participating as a Plaintiff in this lawsuit has had a profound impact on me and taken a complete toll on my life. Being a Plaintiff has taken a great deal from my life in a multitude of painful ways: my physical and mental health, my relationships (both close and cordial), my finances, my ability to contribute to society as a professor, and to my students and community as a mentor and friend. During the course of the lawsuit, I was diagnosed with PTSD as I spooled through nightmares, flashbacks, and constant spinning rumination on the events which transpired during my time at Dartmouth. My rheumatoid arthritis flared under stress to the point of physical debilitation; with painful joints, I struggled to use my hands, to sleep at night, and on a vacation taken during the lawsuit, my boyfriend spent days on site pushing me in a wheelchair. Finally, the death of my colleague implicated in the lawsuit and the blame and public vitriol that followed me afterwards—in my home, my community, and in the *New York Times*—had an unspeakably negative impact on my mental and emotional wellbeing.

18. As a result of this litigation and events that transpired as a result of this litigation, I have been compelled to take a prolonged leave of absence for health reasons, with unknown impacts on my future employment. I am hopeful that some of the monetary benefit of the settlement will help me offset the (primarily health-related) monetary impacts I have incurred over the duration of the settlement. The toll that these disabling effects have taken on me damage my future prospects in an abundance of ways, many of which are still yet to come.

19. My participation soured relationships with my colleagues on campus as faculty split into factions either in support of our efforts or hostile towards us. Some colleagues posted "I

8

believe the women" on their whiteboards; some turned and walked the other way when I walked down the hallway. Without a clear idea of where each member of my community stood, I distanced myself from the Department as a whole. I stopped attending brown bag talks, colloquia, and professional development opportunities. Finally, after our colleague committed suicide in October 2019, the divisions were made plain as those who had previously restrained themselves in public accused me and my co-plaintiffs of murder. I was told that members of the faculty circulated emails containing accusations and called the Plaintiffs (including me) liars who were ultimately responsible for the suicide of our colleague. In spite of a few openly supportive individuals who made themselves known, it was no longer possible to embrace any semblance of belonging to my community. I began to isolate entirely from friends, push away my family, and close off to my personal relationship. The damage done over time to these relationships is impossible to fully undo, and the years of distance and loneliness can never be won back.

20.    Despite these concerns, I decided to join this lawsuit and serve as a Class Representative to represent the interests of women that I deeply cared about and believed in that wore the scars of the decades-long cycle of abuse. My primary goal in serving as a Class Representative was to prevent future generations of women from going through the agony, degradation, and professional and personal derailment to which I was subjected by the accused professors.

## Approval of the Settlement

21.    I was not promised any amount of money in connection with my support of this settlement or any prior settlement with Dartmouth. My approval of this settlement is based on my view that, in light of the record and the risks, it is in the best interests of the class. I authorized the

proposed settlement of $14 million and programmatic relief with Dartmouth, and I believe that the proposed settlement is fair, adequate, and reasonable.

22. I also believe that the proposed allocation plan is fair, reasonable, and adequate, and does not impermissibly favor some class members over others.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 25, 2020 /s/ *Annemarie Brown*
Annemarie Brown