**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 11-26-2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
KRISTINA RAPUANO, ET AL.        *
                                *   18-cv-1070-LM
          v.                    *   July 9, 2020
                                *   10:04 a.m.
TRUSTEES OF DARTMOUTH COLLEGE   *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SPECIAL HEARING
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

APPEARANCES:

For the Plaintiffs:     Deborah K. Marcuse, Esq.
                        Nicole Wiitala, Esq.
                        David Sanford, Esq.
                        Sanford, Heisler, Sharp, LLP

                        Charles G. Douglas, III, Esq.
                        Douglas, Leonard & Garvey, PC

For the Defendant:      Joan A. Lukey, Esq.
                        Justin J. Wolosz, Esq.
                        Lyndsey M. Kruzer, Esq.
                        Choate, Hall & Steward, LLP

Court Reporter:         Susan M. Bateman, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

```
1                    P R O C E E D I N G S
2              THE CLERK:  This Court is in session and has
3    for consideration a fairness hearing in civil matter
4    18-cv-1070-LM, Kristina Rapuano, et al., versus Trustees
5    of Dartmouth College.
6              THE COURT:  All right.  Welcome everyone that
7    I see on the screen.
8              I know there are others that I don't see on
9    the screen.  I welcome you as well.
10             I entered a public access order in this case,
11   you may have already seen it, and the reason for that is
12   because this is happening via video and this is not
13   normally how we conduct hearings, as you can imagine,
14   but because of the pandemic we are conducting this
15   hearing via video.
16             And in order to do that I need to weigh First
17   Amendment rights.  I need to weigh the right of the
18   public to access this hearing and make sure that this
19   video proceeding is not impinging on that right.
20             I've done the weighing.  I've made the factual
21   findings.  They're contained in my public access order.
22   I won't belabor them here, but I just wanted to let you
23   know that I have found that this video proceeding
24   adequately accounts for the public's right of access.
25             In some ways, frankly, a Zoom hearing like
```

1   this gives the public greater access to a hearing like

2   this because those who may not come to this hearing

3   because of travel, distance, fear, embarrassment,

4   because of -- maybe they have symptoms so they wouldn't

5   necessarily be able to come to an in-court hearing.

6   Maybe they have COVID-19.  Maybe they're under a

7   quarantine.

8           There are all kinds of people who would not

9   attend a hearing in court who will attend a hearing via

10  video.  So in many ways this hearing grants the public

11  greater access during this pandemic to this hearing and

12  this proceeding.

13          I do want to say that my approach to this

14  pandemic and all the hearings that I've held has been to

15  try to make them as accessible for the public as I

16  possibly can.  So I give access to anyone who requests

17  the link to this hearing.  I believe that the court's

18  business is the public's business, and I have been

19  giving the link out to anyone, any member of the public

20  who requests it.  So there could be a large number of

21  people watching.  Some you may know as counsel,

22  litigants.  You may know that there are people watching,

23  but I want you to know that this Zoom link has been

24  given out to any member of the public who requests it,

25  any member of the media who requests it.

1           So let me just also begin this hearing by

2    reminding members of the public who are watching and

3    anybody who is participating in this hearing, we have a

4    local rule, it's 83.8, and it states, and I'll just read

5    a little bit to you, "All persons are prohibited from

6    photographing, recording (audio or video), broadcasting,

7    transmitting, or televising court proceedings."

8           This is a court proceeding so that rule

9    applies.

10          And should there be any violation of it, which

11   I know there will not be, I'm confident there will not

12   be, that would result in sanctions, including, you know,

13   removal of court-issued media credentials or restricted

14   entry to future hearings.

15          I just want to issue that warning.  I don't

16   anticipate that I would need to in any way issue any

17   sanctions for a violation of that local rule.  At least

18   that's my hope.

19          As I said, my approach is to grant wide

20   access, and I have not had one violation of this rule

21   and we've been doing hundreds of video hearings here in

22   New Hampshire.

23          So that being said, let me also tell people on

24   this video proceeding, clients who are here, your

25   lawyers, obviously your lead counsel, are on the screen

1     as well.  Should at any point you need to speak to your

2     lawyers, all you need to do is let me know.  Just say,

3     Judge, may I speak to my lawyer.  I will -- the nice

4     thing about this technology is that Ms. Sackos who you

5     just saw, she's in control.  She's in charge.  She will

6     create a breakout room for you to speak confidentially

7     with your lawyer.  That can happen at any moment at any

8     time.  We all know that's part of this process because

9     in court all you would have to do is nudge your lawyer

10    and you would have an opportunity to speak to them.

11    This is not an in-court proceeding.

12           So I want to make sure that you understand

13    that at any point if you would like to speak to your

14    counsel we will move you into a breakout room and let

15    you do that, and I want to assure you that that is not

16    something I am worried about.  That's just part of the

17    process.  And I want to make this as close to an

18    in-court hearing as I can in terms of your comfort

19    level.

20           So if you ask, you will be granted that time.

21    Just understand that.

22           All right.  So if you're not speaking -- and

23    that includes me because I won't be speaking much more

24    beyond the introduction.  I will mute my microphone just

25    to help keep things relatively quiet for the person who

1    is speaking.

2            Now, let me just warn folks.  Right now

3    everything seems to be working.  I can see everybody's

4    screen clearly.  I can see your faces clearly.

5    Hopefully you can as well.

6            Sometimes because of the bandwidth that's

7    being used for video we can start having sticking and

8    people getting stuck and we can have technological

9    issues.  There is a fix for it, and here's the fix.  And

10   if it happens, I just want to warn you ahead of time

11   this is how I'll deal with it, and I know Ms. Sackos is

12   listening as well.  If we start having problems with

13   people getting stuck and having technical issues, what I

14   think we'll do is we will keep on the screen for

15   bandwidth purposes as few videos as we can.  Ms. Sackos

16   will help us with that.

17           So whoever is speaking in the moment should

18   stay on the screen, but then we might have to remove

19   people from the screen just to allow for the bandwidth

20   if we run into that issue.  I'm not seeing that right

21   now, and I hope that carries on through this proceeding,

22   but I just want to let you know that might be one

23   technical glitch.  That's how I'll deal with it.  So you

24   might not see everybody all the time, but you'll see all

25   the faces that you need to see.

1           So we'll keep lead counsel on the screen,

2   we'll keep myself, unfortunately, on the screen, and

3   then we'll keep whoever is the speaker if we run into

4   problems.

5           All right.  If there are any technical issues,

6   let me know.  Just try to signal us.  Sometimes you get

7   stuck.  We don't know that you're stuck.  But let us

8   know if there's something that you missed or some sort

9   of problem.  We'll try to fix it.

10          All right.  So those are the sort of

11  procedural issues I wanted to go over with you.

12          Let me just begin I think this important

13  proceeding by summarizing where we are and then getting

14  right into it.  I know that the plaintiffs are going to

15  make some statements and the provost is also going to

16  speak, and then counsel will perhaps speak at the end.

17  I'll have a few questions.  I've read everything you've

18  submitted.

19          So first, the parties in this case presented a

20  proposed settlement for preliminary approval, and at

21  that stage the Court determines whether it will likely

22  be able to, that's the standard, likely be able to

23  certify the class and approve the settlement under Rule

24  23(e).

25          Now, if yes, the Court then directs service to

1   all class members, and after notice to the class the

2   Court holds a fairness hearing at which class members

3   may appear to support or object to the proposed

4   settlement.  Then the Court decides whether to give

5   final approval to the settlement.

6          Now, in my order dated January 29th I

7   explained the more rigorous standard of review that I

8   was using to review the proposed settlement.  It makes

9   no sense to have a judge approve preliminarily a

10  settlement and then go to the final fairness hearing and

11  have the judge say, yeah, but I have this problem, I

12  have that problem.

13         So ultimately, as I laid out in my January

14  29th order, I actually carefully scrutinized the

15  proposed settlement at that time and gave it preliminary

16  approval.

17         Today is the fairness hearing, and all class

18  members have received notice of this hearing.  I will

19  hear from victims, plaintiffs, and then I believe a

20  statement from the provost at Dartmouth, and then I'll

21  hear I assume from counsel to end this proceeding.  And

22  then, as I said, I'll have a few questions based on my

23  reading of some of the documents just to get some

24  clarity.

25         Now, my understanding at the outset is that no

1    member of the class objects to this settlement, and I

2    just want to confirm that at the start that is still the

3    case.  There is no objection from any member of the

4    class?

5              MS. MARCUSE:  Your Honor, that is correct.

6              This is Deborah Marcuse for the plaintiffs.

7              THE COURT:  Okay.  All right.  Thank you.

8              That having been said and the introduction

9    having been laid out, I know that counsel had spoken and

10   reached an agreement or understanding as to how this

11   proceeding would occur, and I believe there are three

12   members from the class who are going to make statements

13   and you would like to begin that way.  So I don't want

14   to stand in the way of that.

15             Is there anything else that counsel needs to

16   bring to my attention before we begin that process?

17             MS. MARCUSE:  Not from the plaintiffs, your

18   Honor.

19             MS. LUKEY:  And nor from the defendant.

20             Thank you.

21             THE COURT:  All right.  Thank you.

22             All right.  So I believe that Ms. Brietzke, if

23   I'm pronouncing that correctly, is going to be your

24   first speaker and will be reading a statement or making

25   a statement on behalf of all the victims.

1          And so I'll let you, Attorney Marcuse,

2    introduce each of your speakers.

3          MS. MARCUSE:  Thank you, your Honor.

4          And as a preliminary matter, thank you so

5    much, and thank you to all of the court personnel, for

6    the great care that you have shown in putting this

7    together in this complicated and difficult time.  We so,

8    so appreciate it.

9          The first individual to speak will be

10   plaintiff and class representative Sasha Brietzke

11   reading a statement on behalf of all nine plaintiffs in

12   this case.

13         THE COURT:  All right.

14         Ms. Brietzke, please go ahead.

15         MS. BRIETZKE:  Your Honor, thank you.

16         My name is Sasha Brietzke.  I am currently

17   still a graduate student at Dartmouth College, and I am

18   reading this statement on behalf of all nine named

19   plaintiffs:  Kristina Rapuano, Vassiki Chauhan,

20   Annemarie Brown, Andrea Courtney, Marissa Evans, Jane

21   Doe, Jane Doe 2, and Jane Doe 3.

22         We want to begin by thanking the Court and all

23   of those involved for their great effort in this case.

24   We are grateful for this opportunity to gather virtually

25   and be a part of this final fairness hearing.

1          We have come a long way and endured

2   immeasurable pain and risk to get here, but today we are

3   proud of ourselves as plaintiffs and class

4   representatives for banding together to report our

5   harassment in the labs of Bill Kelley, Todd Heatherton,

6   and Paul Whalen in the Psychological and Brain Sciences

7   Department at Dartmouth, and standing up for an entire

8   class of our peers who suffered silently.

9          Pursuing this lawsuit required us to make some

10  of the most personal and sensitive details of our lives

11  public, subject to scrutiny and ridicule by colleagues

12  and strangers.  Having already experienced significant

13  emotional, physical, and career harm at the hands of the

14  three predatory professors, we risked further exposure

15  and trauma by reliving those memories as we went forward

16  with this case.

17          Our ability to work suffered and our once

18  passionate love for science dimmed, but still we stand

19  here today united in power and feel hope for our futures

20  and the women that we stand for.

21          We believe that bringing and resolving this

22  case on behalf of the class has brought the most

23  benefits to the largest number of people possible.

24  Though it is not possible to fully restore what each

25  member of our class has lost, we are hopeful that the

1    resolution we have worked hard and long to obtain will

2    help restore wholeness to the women we represent.  So we

3    are most proud today of our fellow class members who now

4    can stand with us and have this opportunity to help

5    enact change and seek some redress for what they went

6    through at Dartmouth.  We are here for you and in

7    solidarity with all of you today.

8            In academia there is an insidious notion that

9    we can only effectuate change once we have achieved

10   tenure.  We were consistently told to "keep our heads

11   down and do our science" instead of cause a fuss about

12   the conditions created by the three professors in which

13   we were forced to work.  Conditions in which gendered

14   derogatory comments about appearance and scientific

15   ability were made flippantly.  Conditions in which the

16   spectre of sexual violence loomed ominously.  Conditions

17   which forced women out of the institution, and more

18   egregiously, out of science itself.

19           In 2017 we decided that the terms of climbing

20   the career ladder were just too much to bear and that

21   while our science, while an easier path professionally,

22   meant complicity in sheltering sexual predators.  We all

23   came to school to learn and make exciting discoveries,

24   but we temporarily paused to raise our heads, to issue

25   reports, and to fight for ourselves and others.

1        Ultimately, we chose to bring forward this

2    lawsuit because it was the right thing to do.  To stand

3    up for our friends, our co-workers, the unresolved

4    generations who came before us, and generations yet to

5    follow who deserve the honest promise of a Dartmouth

6    education.  We came forward because each of us knows a

7    multitude of women who have encountered the same

8    experience at our institution, as well as within the

9    broader circles of science and academia.  We hope that

10   by effecting this change within the bounds of our campus

11   we have set the tone for change on a broader scale to

12   follow.

13        All nine of us detailed our stories before the

14   public eye exposing our painful memories and the toll

15   that they took on us.

16        The six of us who chose to publicly include

17   our names did so because we felt that we had to be

18   heard, to stand up for yourselves, and to loudly give a

19   voice to those who felt they could not.

20        In this case being a Jane Doe didn't equate to

21   complete anonymity, but the use of pseudonyms was

22   critical for each Jane Doe.  The Jane Doe plaintiffs in

23   our lawsuit were only able to come forward and seek

24   justice through the court system because they were given

25   the opportunity to use a pseudonym.  The ability to file

1   a lawsuit as a Jane Doe is a critically important

2   protection that enables individuals to vindicate their

3   rights in court and fight to end the cycle of abuse and

4   silence.

5           At Dartmouth three bad apples were removed,

6   but they risked spoiling the bunch.  We hope that the

7   meaningful reforms being enacted as part of the

8   settlement will prevent this from happening again.

9   Collective action, as we've shown here, is capable of

10  strongly moving the needle.  The substantial

11  programmatic relief obtained through this settlement

12  will remain in place for the next ten years and will

13  entail over $1.5 million of support for women in our

14  community moving forward.  We cannot continue to live in

15  a society that treats sexual assaults as a mere scandal.

16  We cannot continue to turn a blind eye when we observe

17  violent language and behavior from those in power.

18  There must be zero tolerance in our institutions for

19  sexual harassment and violence.  We are proud of our

20  accomplishments, but in many ways we wish we were not

21  here today.  We deserved the opportunity to learn in a

22  safe environment.  Future women must be treated better

23  by the academy.

24          Speaking up about sexual violence in the

25  workplace is nearly impossible.  It was difficult even

1    though we had a sizable group.  The power differential

2    between advisor and advisee is astronomical as mentors

3    hold the key to our entire future in the field.  Our

4    heart aches for those students who must stand alone in

5    the Title IX office who will be discredited and

6    discouraged from reporting, who will be left to fend for

7    themselves against retaliation.  We came together and

8    through the strength of a community were able to be

9    heard and transform our department.  Let our narratives

10   prompt the public at large to believe women.  Let our

11   records and the public make it easier for future women

12   to be heard.  Next time it should not take nine women or

13   ninety women.  Listen to the first woman, and together

14   let's make sure it does not happen to another.

15              Thank you so much to the Court for the

16   privilege to speak and for your time.

17              THE COURT:  Thank you very much.

18              Attorney Marcuse.

19              MS. MARCUSE:  Thank you very much to all of

20   the nine plaintiffs.

21              The next person to speak will be Kristina

22   Rapuano.

23              MS. RAPUANO:  Thank you.

24              And thank you, your Honor, for the opportunity

25   to speak and address the Court today.

1          All right.  My name is Kristina Rapuano.  I

2    was raised in a blue-collar home.  I graduated from

3    elementary school in a church where I was taught

4    creationism over natural selection.  My father, who

5    attended trade school instead of a traditional high

6    school, insisted on college and so I fumbled my way into

7    a large state school where I had virtually no

8    interaction with professors.  I am the first in my

9    family's history to pursue post-graduate education.

10          When I arrived at Dartmouth, everything felt

11   foreign; the language, the social etiquette, the

12   expectations.  I struggled to fit in and to find my

13   place in this new world.  They say imposter syndrome is

14   normal in graduate school, but I felt to my core that I

15   did not belong in a PhD program, much less at Ivy League

16   institution.  I didn't feel this way because of a lack

17   of confidence in my own abilities but because I quite

18   literally did not belong to this group of ivory tower

19   elites.

20          Many people don't understand how power can be

21   abused until they experience it firsthand, up close.  I

22   desperately wanted to belong.  I wanted a seat at the

23   table, and so I was pulled into a toxic culture that

24   eventually escalated to the point of no return.

25          The power that faculty wield over their

1    graduate students under these conditions is not just

2    harmful but life-threatening.  My experiences at

3    Dartmouth cost me my mental health, my physical

4    well-being, and my sense of connection.  Years later I

5    am still grappling with these consequences.  It's no

6    small feat that I am still standing here before you

7    today, albeit virtually.

8            Although these experiences were horrifying,

9    bringing this lawsuit forward came with its own set of

10   challenges.  It would have been far easier for us to

11   remain silent, but silence perpetuates narratives like

12   my own.  Our stories were dissected and scrutinized by

13   the media, as well as by our peers, our colleagues, and

14   by complete strangers.  To have such personal stories

15   exposed to the world and placed under a lens is not only

16   retraumatizing, it's invasive.  The act of recounting

17   difficult memories, having to constantly remind yourself

18   that what happened was not your fault, worrying about

19   how the public will perceive you, praying this won't

20   affect your position in your department and your

21   relationship with your peers, trying not to let the

22   negative comments and messages on social media get to

23   you, this all wears a person down no matter how strong

24   and resilient they are.  This exposure can change a

25   person's reputation for years to come.  I can say with

1    confidence that I continue to be recognized for my

2    service rather than for my science.

3           My story is not unique.  It's a narrative that

4    pervades academia.  It's part of a pattern that needs to

5    come to an end.  I watched that cycle continue in our

6    own department as I learned of other women being harmed.

7    It was at that point that I chose to come forward with

8    my own story.  I wanted to be known for my science, not

9    for the worst moments of my life, but the science cannot

10   exist without the women behind it persisting in spite of

11   these moments.

12          Not a single one of the ninety women

13   represented today should have had to experience the

14   things that they did at Dartmouth, but I'm proud to say

15   that this cycle ends with us.  I'm proud of what we've

16   accomplished as a class.  I'm proud of each of the women

17   that came forward to reclaim their power and their

18   voices.  Believe me when I say I know how much it takes

19   out of you.  This work is exhausting.  And yes, it

20   absolutely is work.  It shouldn't have been our

21   responsibility to do this work, but I hope that academia

22   will be a safer and more equitable place because of the

23   work that each and every one of us put in.

24          We stand here today on the shoulders of so

25   many women that came before us, women that demanded

1    space in the academy and would not take no for an

2    answer, women that demanded that their voices be heard,

3    women that encouraged us to speak our truth, and allies

4    that centered and amplified those voices.

5              There's still so much work to do and so many

6    more walls to tear down.  Despite the collective trauma

7    and countless hours, months, years worth of emotional

8    labor, I'm hopeful that our case has and will continue

9    to inspire change throughout academia.  We have ignited

10   a flame that will not go out, that cannot be forgotten,

11   and that will continue to grow and gain momentum as we

12   demand the restructuring of a flawed system.

13             Thank you for your time.

14             THE COURT:  Thank you very much.

15             Attorney Marcuse.

16             MS. MARCUSE:  Thank you, your Honor.

17             And thank you, Kristina.

18             The last of the plaintiffs to speak at this

19   time will be Vassiki Chauhan.

20             MS. CHAUHAN:  Your Honor, I'm Vassiki Chauhan,

21   a plaintiff in the lawsuit and a fifth year graduate

22   student at the Department of Psychological and Brain

23   Sciences at Dartmouth.

24             Since the night I was assaulted, I have

25   written many statements both for possessing my own

1  trauma and for communicating the sheer magnitude of

2  impact with others.  The common theme has been about the

3  struggles of reintegrating fragments of space, time, and

4  self that are ripped apart by the voices of denial, of

5  choice, and of consent.  Today, I'm using this

6  opportunity to relate in my own words and my own voice

7  the narrative of a choice I made with complete

8  self-awareness and sense of agency:  The decision to

9  share my truth and demand justice.  Between that fateful

10  night and this momentous morning, I have become a

11  different person.  I had to in order to survive.  I am a

12  single data point amongst numerous survivors of sexual

13  violence, one who has been able to inspire for some

14  semblance of justice in return for the selfless act of

15  repeatedly reliving my own trauma.

16          Growing up in suburban middle class India in

17  an upper caste family, I had the privilege of nurturing

18  the dream of becoming a scientist from an early age.  I

19  was sheltered in a safe and supportive home where my

20  parents made space for my curiosity.  Today home means

21  something different to me.  Today home is a place where

22  one can dissent without the fear of retaliation.

23  Standing up for what I believe is right has been a more

24  important introduction to American culture than the

25  food, the politics, and the Super Bowl Sundays.  I would

1   never have thought that as an international student on a

2   nonimmigrant visa, the civil justice system of the

3   United States of America would give me the same rights

4   as its own citizens.  After an early life of equating

5   strength with the steadfastness in following one's own

6   path in spite of the challenges thrown by life, I got to

7   learn about the importance of demanding reform in the

8   face of abuse.  After years of internalizing the message

9   that sexual violence stems from the deficiencies in a

10  victim's moral integrity, I got to learn about the

11  fundamental, nonnegotiable value of human dignity.  I've

12  been given the ability to not only negotiate for

13  bringing closure to those who have been hurt in the

14  past, but to demand structural change in our own

15  institution.  I decidedly feel at home even in the face

16  of adversity.

17          Our story of dissent is a single page in the

18  history book of the lived experience of oppressed

19  people.  However, we are proposing to settle a sexual

20  harassment lawsuit as a class and are working with

21  Dartmouth to set a precedent for programmatic change.

22  Had someone told me about this outcome, I would have

23  disregarded it as fiction.  This demonstrates the

24  importance of stating the reality of our lived

25  experience and the extent of our collective pain.

1    When we came forward, we did not know that we

2  would be here today.  We sincerely hope that the

3  programmatic relief component of this settlement sets

4  the stage for civil law not to offer not just

5  distributive but transformative justice.  I can't wait

6  to watch the next decade unfold as the provost diversity

7  fund is used to not only support and amplify

8  historically marginalized identities but to bring in

9  leaders and researchers with expertise in studying

10  trauma, systemic inequality, conflict and multiple

11  models of justice.  Maybe someday such researchers will

12  be part of our own Psychological and Brain Sciences

13  Department.

14    I wouldn't be here if it wasn't for those who

15  stand with me.  These women believed me, they supported

16  me through their own struggles, and reminded me that my

17  life has value when I couldn't believe that myself.  We

18  have wept for each other and we have laughed together in

19  the most trying of times.  We all study human brains and

20  behavior, but in the course of making this journey we

21  got to experience the importance of empathy, collective

22  decision-making, and solidarity.  Not only do I believe

23  that every single person here today is going to lead a

24  vibrant life as scientists and advocates, but that they

25  will continue to improve the lives of those around them.

1   We have all received an education in taking action not

2   in the interest of presenting ourselves as saviors or

3   victims but for embracing the pain and amplifying the

4   voices of those who remake their lives in spite of

5   fractured histories.

6           I've wondered many times about which of my

7   memories have not been touched by trauma, and there

8   isn't much.  To go through with the Title IX complaint

9   and the lawsuit, I had to leave all my wounds open

10  because healing demands safety, stability, and

11  perspective.  However, transcending the limits of my

12  personal experience to prevent future harm was its own

13  form of healing.  I have now given up my early dream of

14  becoming a scientist, but I am thankful that I'm amongst

15  others who share my vision and my ethos and will live my

16  dreams for me.

17          The experience is akin to simultaneously

18  living nine lives.  Meanwhile, I will focus my energy on

19  creating a culture of consent and uplifting voices that

20  dare to dissent.

21          Your Honor, thank you for letting me present

22  this statement.  I really hope you will remember my

23  gratitude for making space for an outsider like me, and

24  for enabling those on the margins of society to ask for

25  change that creates a more just and equitable world.

1          Thank you.

2          THE COURT:  Thank you so much.

3          Attorney Marcuse, should we hand this over now

4    to Attorney Lukey, or would you like to make remarks

5    now?  I want to make sure we proceed in a manner that

6    counsel has agreed on.

7          MS. MARCUSE:  I will gladly pass it along to

8    Ms. Lukey after stating simply that we are very proud to

9    represent the nine plaintiffs in this case and the class

10   that is represented here today.

11         And we are very grateful that it has been

12   possible in this case to reach a resolution that permits

13   the parties in this case to enter into a historic

14   partnership going forward to make this institution,

15   Dartmouth, and academia more broadly, a better place.

16   It takes great courage I believe on behalf of all of

17   these parties to engage in such a partnership.

18         The law is at times an imperfect and limited

19   instrument, and we are so grateful that in this instance

20   we have been able to accomplish the settlement that is

21   before you today.

22         Thank you.

23         THE COURT:  Thank you.

24         Attorney Lukey.

25         MS. LUKEY:  Thank you, your Honor.  Thank you

1  for the opportunity for all of us to be here.

2          And on a personal note, thank you to the three

3  brave women who just spoke.  I was very moved by your

4  words, and I admire the courage of all of you as I know

5  does the individual I'm about to introduce who was part

6  of the important partnership that all of you have

7  brought about as part of this settlement.

8          It is my privilege to introduce the Provost of

9  Dartmouth College, Joseph Helble.

10          MR. HELBLE:  Thank you.

11          Thank you, your Honor.

12          I should have recognized the same problem I

13  have in Zoom meetings and in the classroom.  I forget to

14  unmute my microphone when I'm about to start speaking.

15          So first I would like to add my thanks to you,

16  your Honor, and the court for the opportunity to meet

17  with you here today and to speak with you today.

18          And Sasha, Kristina, and Vassiki, I want to

19  thank you for your statements, and I will echo what

20  Attorney Marcuse said just a moment ago.  I view this as

21  an important partnership as we collectively seek to

22  address wrongs that exist in higher education that we

23  are all collectively committed to confronting.

24          So let me say on behalf of the institution

25  that I and we are grateful to the three of you and to

1  all of you for coming forward to bring to light the

2  toxic environment that was created by three former

3  faculty members who will not ever set foot on the

4  Dartmouth campus again.

5          As I've said in the past, and I'll say now, it

6  bears repeating, their conduct flies in the face of our

7  mission as an institution and our core values, and that

8  is why we took unprecedented steps to revoke their

9  tenure.

10         It's been gratifying for me to have the chance

11  to work with you, and collectively all of the plaintiffs

12  in the case, to begin to take steps to shape Dartmouth's

13  reforms and response as part of our campus climate and

14  culture initiatives.

15         As I said, we're deeply invested in

16  identifying and rectifying sexual misconduct and

17  committed to doing everything we can to prevent it in

18  the future.

19         Each of you individually in different ways in

20  your brief opening statements have referred to some of

21  the measures we're taking, measures we've developed in

22  consultation with you as plaintiffs that we're committed

23  to moving forward and acting upon.

24         It's an expansion of the provost faculty

25  diversity fund and a broadening of the scope of that

1    fund to incentivize the hiring of faculty with expertise

2    in gender and racial discrimination and violence.

3            It's the expansion, in addition, of members of

4    our external advisory committee that reviews the

5    progress of C3I, our Campus Client and Culture

6    Initiative, that was developed in response to the

7    behavior that you've collectively brought to light.

8            We have agreed jointly that we'll propose

9    nominees for these positions who have no prior

10   connection to Dartmouth, and that you will have the

11   opportunity to continue to meet as you choose with the

12   external advisory committee to help ensure that we

13   collectively are taking the steps to move Dartmouth

14   forward and hopefully more broadly move higher education

15   forward in addressing unacceptable behavior that your

16   bravery has brought to light.

17           In addition, we've committed to expanding our

18   investment and resources that support women and support

19   all members of the community who experience potential

20   harm, sexual discrimination, and sexual violence through

21   partnering with WISE, a local advocacy organization for

22   survivors of gender-based violence.

23           So let me simply end by saying I know that

24   you, the plaintiffs, and we share a willingness to do

25   the hard work necessary to create a truly nurturing,

1    supportive, and inclusive culture.  I look forward to

2    continuing to work with you as I'm confident that

3    together we can make Dartmouth a leader known for zero

4    tolerance of sexual misconduct.

5            Sasha, I was struck by your words at the very

6    beginning.  This is going to be a paraphrase because I

7    was jotting quickly on a pad, but I believe what you

8    said was effectively, we hope that by effecting change

9    on our own campus we will effect change elsewhere.  I

10   absolutely hope and am encouraged and believe that's the

11   case and look forward to working with you collectively

12   as we bring this process to a close to make that a

13   reality.

14           So thank you, your Honor.

15           Thank you all.

16           THE COURT:  All right.  Thank you all very

17   much.

18           I think at this point what I would like to do

19   is just ask a few questions.

20           I have carefully read the excellent briefing

21   that has been filed, and I have just a few questions.

22   So if you will permit, I just want to make clear -- and

23   this is probably to Attorney Marcuse.

24           There are -- in your brief it says 76 women in

25   the class, but since that filing I think two recent

1    exclusions have occurred.  So that's where we get a

2    total number of 74.

3            Would that be correct?

4            MS. MARCUSE:  That is correct, your Honor.

5            THE COURT:  Okay.  All right.

6            And then I am just not clear on the average

7    class payment and how you get that number.

8            I understand the average supplemental payment

9    will likely be 280,000, but I'm confused as to how you

10   calculate the average class payment exceeding 105,000.

11   I'm sure it's just my own shortcomings.  I'm sure you

12   can explain to me how you come to that number.

13           MS. MARCUSE:  I would actually ask my

14   colleague, Nicole Wiitala, to address that question, if

15   I may.

16           THE COURT:  You certainly may, and we'll make

17   that happen.

18           Is she on the screen right now?

19           MS. MARCUSE:  She's not on the screen, but she

20   is on audio and I believe she is unmuted right now.

21           THE COURT:  Excellent.  Okay.  Good.

22           Go ahead.

23           MS. WIITALA:  Yes, your Honor.  This is Nicole

24   Wiitala.

25           So for the average class payment we took the

1   $14 million settlement and we deducted all -- we made

2   all the anticipated deductions for attorneys' fees,

3   costs, and service awards, and then we took the, at the

4   time it was 76 individuals that were in the class, and

5   basically divided that number by the amount that was

6   left over after making all deductions for costs and

7   attorneys' fees and things like that.

8           MS. MARCUSE:  And I believe, and Nicole can

9   correct me if I am wrong, that one of the anticipated

10  expenses has come in below what we did anticipate, and

11  so that, along with the change in the number of class

12  members to 74 from 76, will raise that number somewhat.

13  I have not done the math, but I believe that the

14  allocation by Judge Walsh -- the expense for that was

15  capped at 85,000, I believe, and so that was the number

16  we were using.  I believe that the actual number was

17  much closer to 30,000.

18          Nicole, is that correct?

19          MS. WIITALA:  Yes.  I believe it was about

20  $32,000.

21          MS. MARCUSE:  So along with the two fewer

22  individuals who chose to proceed as class members down

23  to 74, there will also be approximately 53,000

24  additional dollars going from the expenses category back

25  into the fund for supplemental payments.

1          THE COURT:  Okay.  That's clear to me.  Thank

2    you.

3          And I just want to confirm my understanding

4    that only the 29 members of the class who file a claim

5    form are going to get more than the base amount.

6          Is that correct?

7          MS. WIITALA:  That is correct, your Honor.

8          THE COURT:  The final thing that I would flag

9    is just the clause in your proposed judgment, final

10   judgment, that has me sort of exercising forever

11   jurisdiction over the case.  I think I will narrow that

12   somewhat.  I think it makes sense to have me have some

13   amount of continuing jurisdiction with respect to the

14   administration of the fund, but I may narrow that

15   language somewhat.  So I just wanted to alert you to

16   that.

17         I think those are my questions.  I don't have

18   any questions on the attorneys' fees.  I thought the

19   briefing was really, really excellent.  A judge

20   appreciates that.

21         Would counsel like to say anything further

22   before we close?

23         MS. MARCUSE:  Your Honor, I would just like

24   to, further to your point about the briefing,

25   acknowledge my colleague Nicole Wiitala who is largely

1   responsible for that exceptional briefing and has truly

2   been a full partner in this litigation in a very

3   extraordinary way both with respect to complicated legal

4   arguments and the very complicated human elements of

5   this case.  We are very grateful to have her.

6           THE COURT:  Attorney Lukey, would you like to

7   have any last words?

8           MS. LUKEY:  Your Honor, no.

9           Again, to thank you.

10          Unless my partner, Justin Wolosz, who handled

11  the briefing and works for us has something to say, we

12  are content with the state of the record, and we

13  appreciate this opportunity today for all of us to get

14  together for this hearing.

15          THE COURT:  Attorney Wolosz?

16          MR. WOLOSZ:  No.  Nothing further from me

17  unless your Honor has questions.

18          Thank you very much.

19          THE COURT:  All right.  Then let me say that

20  I'm likely to issue an order along the lines of the

21  proposed approval document and the proposed judgment.

22          Thank you very much to counsel in this case.

23  Your work has been first-rate.  Your legal work and

24  advocacy for your clients has been really impressive.

25          To take a case like this with such highly

1    charged allegations and reduce it to a settlement is

2    commendable.  For all the reasons stated in the

3    excellent briefing that you've filed in support of this

4    proposed settlement, I think that counsel have all

5    performed a public service and I thank you for that.

6              To Dartmouth:  Settling this case in this

7    manner is a credit to the institution.

8              And you are, sir, as well.  So thank you.

9              To the plaintiffs:  You represent courage,

10   persistence, and strength.  My hope is that this

11   litigation while it cannot make you whole, my hope is

12   that it brings you finality and a sense of vindication.

13             Thank you to everybody for your participation

14   in this case.

15             Let me do a last thank you and a call-out to

16   Judge Morrill, our state court judge who mediated this

17   case to this remarkable settlement.  I want to

18   acknowledge him and his talents in that respect.

19             So thank you very much to everybody.  I

20   appreciate everything that you've done in the case from

21   start to finish.

22             We had a little bump in the road at one point

23   where I needed further briefing, you gave me that, and

24   ultimately I was able to become very comfortable with an

25   analysis of this case that was consistent I thought with

1    Rule 23 and case law on class actions.

2            So that having been said, I think at this

3    point the court adjourns.

4            Thank you everyone.

5            MS. LUKEY:  Thank you.

6            MS. MARCUSE:  Thank you, your Honor.

7            (Conclusion of hearing at 10:49 a.m.)

```
 1                   C E R T I F I C A T E

 2

 3

 4        I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate

 6   transcription of the within proceedings, to the best of

 7   my knowledge, skill, ability and belief.

 8

 9

10   Submitted: 8-28-20    /s/   Susan M. Bateman _____
                           SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```